UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS, INC.,

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

## DIAMOND STAFFING SOLUTIONS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY MOTION FOR EXPEDITED DISCOVERY

### Introduction

Founded in May, 2002, Diamond Staffing Solutions, Inc. ("Diamond Staffing Solutions$^{SM}$") is a personnel placement company based in Derry, New Hampshire that focuses exclusively on the jewelry industry, leveraging the thirty years of experience of its President, Suzanne DeVries, in the retail and wholesale jewelry field. Since its establishment, Diamond Staffing Solutions$^{SM}$ has continuously advertised its services by using the service marks Diamond Staffing Solutions$^{SM}$ and Diamond Staffing$^{SM}$ (collectively, the "Marks") in commerce, and promoting its services on the website www.diamondstaffing.com. As a result of Diamond Staffing Solutions'$^{SM}$ extensive promotional efforts and the rapid growth of its national business, the Marks have acquired significant recognition in the professional staffing industry. Indeed, over the past few years Diamond Staffing Solutions$^{SM}$ has repeatedly placed candidates in a number of regional and national fine jewelry retailers and wholesalers, and has repeatedly been profiled in leading jewelry industry publications. See Exhibits appended to Verified Complaint.

By the fall of 2003, Diamond Staffing Solutions[SM] had developed extensive goodwill and had established a secondary meaning for the Marks, to the extent that Plaintiff's services had come to be identified with Diamond Staffing[SM] and Diamond Staffing Solutions[SM] in the minds of consumers of professional staffing services. It was at this time that the defendant, Diamond Staffing, Inc. ("DSI") entered the professional staffing services marketplace. In the fall of 2003, DSI registered the www.diamondstaffinginc.com domain name, and by November of 2003, on information and belief, changed its name from Ultimate Personnel to DSI and began offering staffing services using the Diamond Staffing[SM] mark. Since that point in time, Diamond Staffing Solutions[SM] has become aware of an increasing number of instances of actual confusion in the marketplace based on (among other things) the similarity of the marks and services offered, including one particularly disturbing incident in February 2005 in which a prominent potential client of Diamond Staffing Solutions[SM] contacted DSI looking for prospective candidates.

Diamond Staffing Solutions[SM] now moves this court to enter an order expediting discovery, in anticipation of a motion for preliminary injunction Diamond Staffing Solutions[SM] plans to file. More specifically, Diamond Staffing Solutions[SM] requests that DSI be compelled to respond to Plaintiff's First Requests for Production of Documents and First Set of Interrogatories **within ten (10) days from the date of service, April 29, 2005**, and to produce one or more individuals to testify as to matters known or reasonably available to DSI pursuant to Fed. R. Civ. P. 30(b)(6) **within twenty-one (21) days from this date**.[1] This discovery is narrowly tailored to particular elements of Diamond Staffing Solutions'[SM] trademark infringement claim, in particular the following:

---

[1] The discovery requests and Rule 30(b)(6) Notice of Deposition are appended hereto as Exhibits 1 and 2. The foregoing schedule presumes that DSI will comply fully with the written discovery requests in the suggested timeframe.

- DSI's intent in registering the www.diamondstaffinginc.com domain name and beginning to offer professional staffing services using the Diamond Staffing[SM] mark eighteen (18) months after Diamond Staffing Solutions'[SM] entry into the marketplace;

- Additional instances of actual confusion of which Diamond Staffing Solutions[SM] is currently unaware, particularly instances in which retailers and other potential clients, as well as potential employees, contact and/or contract with DSI rather than Diamond Staffing Solutions[SM]; and

- The channels that DSI advertises and promotes its services through, the avenues through which DSI obtains its clients, and the nature and extent of DSI's clients base.

**Factual Background[2]**

Stated succinctly, the facts germane to this intellectual property dispute are as follows:

- **May 2002** - Diamond Staffing Solutions[SM] first uses Diamond Staffing[SM] in commerce in connection with providing staffing services in the retail and wholesale jewelry industry, and registered www.diamondstaffing.com.

- **May 2002 through fall 2003** - Diamond Staffing Solutions[SM] builds substantial goodwill and name recognition for the Marks in the jewelry industry through news articles, stories and profiles published throughout the U.S., sponsorship and attendance at national trade shows, as well as by virtue of the high quality of its professional staffing services. Plaintiff's services come to be identified with the Diamond Staffing[SM] and Diamond Staffing Solutions[SM] service marks in the minds of consumers of professional staffing services.

- **September, 2003:** DSI registers www.diamondstaffinginc.com domain name.

- **November 2003** - On information and belief, DSI changes its name from Ultimate Personnel to Diamond Staffing, Inc. DSI files for federal registration of the "Diamond Staffing" mark with the United States Patent and Trademark Office ("USPTO") on November 12, 2003, in turn admitting that it first used Diamond Staffing[SM] in commerce on November 8, 2003.

- **November 20, 2003** - Diamond Staffing Solutions[SM] files for federal registration of both "Diamond Staffing" and "Diamond Staffing Solutions" with the USPTO.

---

[2] The facts in this section are supported by the Complaint, which has been verified by Diamond Staffing Solutions'[SM] President, Suzanne DeVries, as well as the Exhibits appended thereto.

- **December 5, 2003** - Diamond Staffing Solutions'[SM] predecessor counsel informs DSI in writing that DSI's use of Diamond Staffing[SM] in connection with its staffing services infringed Plaintiff's rights in the mark. Plaintiff's prior counsel demands that, among other things, DSI cease and desist from using Diamond Staffing in connection with staffing services.

- **December 23, 2003** - DSI, through counsel, responds to Plaintiff's cease and desist letter by refusing to discontinue its use of the mark.

- **December 2003 to filing of this action** - Plaintiff's predecessor and current counsel contacts DSI via email and in writing on multiple occasions in an attempt to resolve the confusion and reach a business resolution. DSI refuses to cease and desist from using the Diamond Staffing[SM] mark or www.diamondstaffinginc.com. DSI rejects any settlement and baselessly threatens to audit Plaintiff's financial information and depose her friends and family, stating that "[i]f your client is determined to gamble her entire business on this lawsuit, serve your papers."[3]

- **September 2004** - Diamond Staffing Solutions[SM] identified as a defendant in a discrimination action filed with the Massachusetts Commission Against Discrimination (MCAD). The complainant in the MCAD action intended to sue DSI but, due to the similarity of names, the complainant mistakenly sued the wrong party. After incurring legal expense, Diamond Staffing Solutions[SM] was able to convince the Complainant to amend its Complaint, dismiss Diamond Staffing Solutions[SM] and bring charges of discrimination against DSI.

- **On or about November 3, 2004** – Following the USPTO's publication of "Diamond Staffing" for opposition on DSI's application, Plaintiff opposed DSI's federal trademark registration by filing a Notice of Opposition with the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board.

- **February 11, 2005:** Kirschner Corporation, a Minnesota-based jewelry manufacturer and wholesaler and a significant potential client of Diamond Staffing Solutions[SM], e-mails DSI mistakenly in an attempt to reach Ms. DeVries. This incident, along with the MCAD incident, solidifies the concern of Diamond Staffing Solutions[SM] that it is losing business to DSI as a result of the confusion in the marketplace. Indeed, since late 2003 numerous potential clients and employees had confused the two entities (as reflected by Exhibits appended to the Verified Complaint).

- **March 14, 2005:** Shortly after being retained by Diamond Staffing Solutions[SM], the undersigned files the Verified Complaint in this Court. After allowing DSI a short window of opportunity to reach an amicable resolution (which Diamond Staffing Solutions[SM] extended upon request of DSI on the express agreement that

---

[3] See April 4, 2005 letter from R. Meltzer to N. Papastavros appended hereto as Exhibit 3.

said extension would not prejudice any motion for preliminary injunction)[4], Diamond Staffing Solutions[SM] served the Complaint.

## Argument

### A.    Expedited Discovery Of The Sort Requested By Diamond Staffing Solutions[SM] Is Routinely Granted In Support Of A Preliminary Injunction Motion.

The Federal Rules of Civil Procedure and the relevant authorities grant the district courts broad powers to permit expedited discovery in circumstances like those here. 28 U.S.C. § 1657(a) provides that "the court shall expedite the consideration of any action…for… preliminary injunctive relief…." In addition, Fed. R. Civ. P. 26(d) specifically authorizes the Court to allow discovery on an expedited basis. See Fed. R. Civ. P. 26(d) 1993 Advisory Committee Note (order providing for expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction").

Expedited discovery is recognized as a necessary means for ensuring timely and just determination of a dispute where the pace of normal pretrial procedures will prejudice a party. In this case, further delay prejudices Diamond Staffing Solutions[SM] as a result of the loss of potential clients, candidates, and goodwill in the marketplace, and favors DSI by permitting it to continue to benefit from the association with Diamond Staffing Solutions.[SM] Courts in this Circuit and elsewhere have routinely granted expedited discovery and held a hearing within a short timeframe in similar sorts of disputes involving intellectual property and intangible assets. See e.g. Knapp Schenck & Co. Ins. Agency, Inc. v. Lancer Mgmt. Co., Inc., Civ. A. No. 02-12118-DPW, 2004 WL 57086, at *3 (D. Mass. Jan. 13, 2004) (Woodlock, J.) (expedited discovery (namely, document requests, interrogatories and Rule 30(b)(6) deposition) allowed in a

---

[4] See Exhibit 4 appended hereto.

case involving the purported unlawful use of confidential proprietary and trade secret information acquired during sale negotiations between the parties) (unreported) (appended hereto as Exhibit 5); Thermo Web Sys., Inc. v. Beebe, Civ. A. No. 00-40170-NMG, 2001 WL 311295, at *1 (D. Mass. Mar. 15, 2001) (Gorton, J.) (expedited discovery allowed in a case involving, among other claims, misappropriation of trade secrets and unfair competition) (unreported) (appended hereto as Exhibit 6); Pod-Ners, LLC v. Northern Feed & Bean of Lucerne, Ltd., 204 F.R.D. 675 (D. Col. 2002); Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 275 (N.D. Cal. 2002) (patent infringement case; good cause standard adopted).  As the U.S. District Court for the Northern District of California noted in Semitool, "[c]urrently, under Rule 26, the bar on discovery extends until the Rule 26(f) conference which often takes place three or four months into the litigation . . . ." 208 F.R.D. at 275.  Accordingly, "good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party. *It should be noted that courts have recognized that good cause is frequently found in cases involving claims of infringement and unfair competition.*" Id. at 276 (emphasis added).

### B.    Diamond Staffing Solutions[SM] Has Established "Good Cause" For Obtaining The Requested Expedited Discovery.

   1.   "Good Cause" Exists Given That Plaintiff Has Already Demonstrated A Likelihood Of Prevailing On The Merits, And Given The Irreparable Harm Plaintiff Continues To Incur.

To determine whether there is a likelihood of confusion in the marketplace between two competing service marks (the "key element in any infringement action"),[5] this Circuit applies an eight factor test:  (1) the similarity of the marks, (2) the similarity of the services, (3) the

---

[5] Calamari Fisheries, Inc. v. Village Catch, Inc., 698 F. Supp. 994, 1009 (D. Mass. 1988).

relationship between the parties' channels of trade, (4) the relationship between the parties' advertising, (5) the classes of prospective purchasers, (6) evidence of actual confusion, (7) DSI's intent in adopting the mark, and (8) the strength of the Marks.  Boustany v. Boston Dental Group, Inc. 42 F. Supp. 2d 100, 108 (D. Mass. 1999); Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981).  Based on the facts pled in the Verified Complaint and the exhibits appended thereto, Diamond Staffing Solutions[SM] submits that it is likely to succeed on the merits of its claim, considering, among other things, that the marks are identical or, at minimum, extremely similar, that the services offered by the parties are very similar (indeed, both parties have sought federal registration of the "Diamond Staffing" mark under the same USPTO class), and that there are already numerous instances of actual confusion (for example, at least 100 misdirected e-mails).[6]

The likelihood of success on the merits is the key issue, because the other decisions will flow from that ruling.  Boustany, 42 F. Supp. 2d at 104 (quoting Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1st Cir. 1989)).  Indeed, when a party establishes a likelihood of success on the merits, irreparable harm is presumed.  Boustany, 42 F.Supp.2d at 111; Virgin Enters., Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003) (citations omitted).  Here, the inherent irreparable injury to Diamond Staffing Solutions[SM] supports expediency in discovery in order to stem further instances of trademark infringement by the DSI and the resultant client and candidate confusion.  This irreparable injury is not rebutted by the passage of time between the time Diamond Staffing Solutions[SM] first learned of DSI's infringing activity and the present;

---

[6] It is noteworthy that the First Circuit recently held that "the type of commercial injury actionable under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is "*not* restricted to the loss of sales to actual and prospective buyers of the product in question.  Confusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the

during that time, Diamond Staffing Solutions[SM] made repeated attempts to resolve the dispute, and filed an Opposition to DSI's attempted registration of the "Diamond Staffing" service mark in the USPTO.  See Verified Complaint, ¶¶ 18 and 19; see also Boustany, 42 F. Supp. 2d at 112 (presumption of irreparable harm not rebutted notwithstanding passage of eight months between time learned of use of mark and initiation of litigation; in interim period of time, plaintiff not "indolent or passive," since he had meetings with staff, sought advice of counsel, and engaged in cease and desist communications); Supercuts, Inc. v. Super Clips, 18 U.S.P.Q.2d 1378 (D. Mass. 1990) (presumption of irreparable harm not rebutted notwithstanding passage of ten months).

Moreover, particularly telling instances of confusion have transpired in recent months which heightened Diamond Staffing Solutions'[SM] awareness of and concern about the infringement problem, including the February 11, 2005 instance of actual confusion concerning prominent jewelry wholesaler Kirschner Corp. and being named in the MCAD Complaint last fall.  This also militates in favor of a finding that the presumption of irreparable harm is not rebuttable on these facts.  See Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F.Supp. 994 (D. Mass. 1988) (finding of irreparable harm notwithstanding passage of twenty-one (21) months since first use of mark, considering recent change in circumstances).[7]

---

trademark owner."  The Beacon Mutual Insurance Company v. OneBeacon Insurance Group, 376 F.3d 810 (1st Cir. 2004).

[7] The Second Circuit has noted that "[t]he cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right *had concluded that there was no infringement, but later brought an action because of the strength of the commercial competition. . . . In these cases, it appeared indisputable that the trademark or copyright owners were well aware of their rights and had concluded that they were not violated.*"  Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 39 (2d Cir. 1995) (citations omitted).  Certainly Diamond Staffing Solutions[SM] has at no point in time concluded that its rights were not violated, given its persistent course of conduct in identifying infringement, seeking a resolution, and opposing DSI's actions in the USPTO.

2.    <u>Expedited Discovery Comports With The Administration Of Justice.</u>

The Rules of Civil Procedure "shall be construed and administered to secure the just, speedy and inexpensive determination of every action." Fed. R. Civ. P. 1. Here, as in the <u>Semitool</u> case, the relevance of the requested discovery is not at issue, since it specifically targets the elements of trademark infringement. Moreover, Diamond Staffing Solutions[SM] is taking a very focused approach to the expedited discovery, seeking chiefly information about (1) defendant's intent in changing its name to DSI and commencing offering services under the "Diamond Staffing" mark, (2) instances of actual confusion in the marketplace of which Diamond Staffing Solutions[SM] is unaware (for example, situations where potential clients and candidates mistakenly contacted DSI instead of Diamond Staffing Solutions[SM], and as a result never ended up using Diamond Staffing Solutions[SM]), and (3) DSI's customer base and means of advertising and promoting its services. Diamond Staffing Solutions'[SM] focused approach to discovery supports issuance of the relief it now requests. <u>See</u> <u>Ellsworth Assocs., Inc. v. U.S.</u>, 917 F.Supp. 841, 844 (D. D.C. 1996) (allowing expedited discovery that is "narrowly tailored.") The discovery requests target key components of the trademark infringement claim, and if additional evidence is unearthed it can only benefit the Court in resolving the dispute before it efficiently. <u>See, e.g.</u> <u>Boustany,</u> 42 F.Supp.2d at 110 ("[a]ctual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion.")

Expedited discovery will pose little hardship for DSI. The schedule proposed by Plaintiff is both reasonable and appropriate. This schedule calls for document production and interrogatory responses within ten (10) days of service, and a Fed. R. Civ. P. 30 (b)(6) deposition within twenty-one (21) days of service (presuming full compliance with the written discovery requests, and a fulsome production of documents). DSI has been on notice of the issues in this

case since December, 2003, and since that time, there have been numerous communications between counsel.  Since receiving Plaintiff's opposition to its filing for federal trademark registration more than five months ago, DSI has had the opportunity to explore the issues internally at length and to prepare its documents and defenses.  Indeed, DSI has already set forth its position, to a large extent, in its Reply to Diamond Staffing Solutions$^{SM}$ Opposition to DSI's attempted registration of the Diamond Staffing mark.  <u>See</u> Exhibit 7 attached hereto.

### Conclusion

Based on the foregoing, Diamond Staffing Solutions$^{SM}$ respectfully requests this Court to compel DSI to respond to the attached interrogatories and document requests within ten (10) days from service, and produce one or more witnesses for deposition testimony pursuant to Fed. R. Civ P. 30(b)(6) within twenty-one (21) days from service, presuming DSI's full compliance with the written discovery requests in a timely fashion.

DIAMOND STAFFING SOLUTIONS, INC.

By its attorneys,

  /s/ Gina M. McCreadie
Nicholas G. Papastavros (BBO#635742)
Michael L. Cornell (BBO # 651405)
Gina M. McCreadie (BBO # 661107)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000 (telephone)
(617) 345-1300 (facsimile)

Date:  April 29, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS, INC.,

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

**PLAINTIFF DIAMOND STAFFING SOLUTIONS, INC.'S FIRST SET
OF INTERROGATORIES TO DEFENDANT DIAMOND STAFFING, INC.**

Pursuant to Local Rule 26 and Rules 26 and 33 of the Federal Rules of Civil Procedure

and in accordance with *Plaintiff Diamond Staffing Solutions, Inc.'s Emergency Motion for*

*Expedited Discovery*, Plaintiff Diamond Staffing Solutions, Inc. hereby requests that Defendant

Diamond Staffing, Inc. ("DSI") answer the following interrogatories, under oath, within ten (10)

days of the date of service hereof.

### DEFINITIONS AND INSTRUCTIONS

1.      The definitions and instructions contained in the Federal Rules of Civil Procedure

are incorporated herein by reference, as if set forth fully herein.

2.      The term "document" shall have the same definition as that contained in Fed. R.

Civ. P. 34(a), including without limitation electronic mail, and shall include originals and copies

(including all non-identical copies and photocopies).

3.      The term "communication" means any transmittal of information (in the form of

facts, ideas, inquiries or otherwise) including any written or oral exchange or contact between

two or more persons, including meetings, conversations, and correspondence, written or oral, in

person, by telephone, by wire, by letter, by electronic mail, direct or indirect, through any intermediaries, or by any other means. "Communication" also includes any document concerning any communication, including any agenda, minutes, notes, and other records or recordings of the communication.

4.    To "identify" (with respect to a document) is to state for each such document:

(a)    The type of document;

(b)    The general subject matter of the document;

(c)    The date of the document, if any; and

(d)    The author(s), addressee(s), and recipient(s) of the document.

5.    To "identify" (with respect to a communication) shall mean to state for each such communication:

(a)    The date of the communication;

(b)    All persons (including last known residential and business address) who participated in the communication or were present;

(c)    Where the communication took place;

(d)    What each party said during the communication; and

(e)    Provide all material terms of the communication or document.

6.    The term "concerns" or "concerning" shall mean referring to, describing, evidencing, or constituting.

7.    When an interrogatory calls upon a party to "state the basis" of or for a particular claim, assertion, allegation, or contention, the party shall:

(a)    Identify each and every document (and, where pertinent, the section, article or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b)  Identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(c)  State separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and

(d)  State separately any other fact which forms the basis of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory.

8.  The term "person" shall mean and refer to any natural person or any business, legal or governmental entity or association.

9.  To "identify" (with respect to a person) is to state the person's full name, current and last known residential and business addresses, current occupation, and relationship to the plaintiff and/or defendant.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

10.  "And" as well as "or" shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the interrogatory all responses which might otherwise be construed to be outside its scope.

11.  Unless otherwise established by the context, the plural shall be construed to include the singular and the singular the plural.

12.  The term "Complaint" shall mean the Complaint filed in this action.

13.  "Lawsuit" shall mean the litigation, the style and number of which is found in the caption to this request.

14.  The term "Plaintiff" shall mean Diamond Staffing Solutions, Inc. and its officers, directors, employees, agents, affiliates and/or representatives.

15.     The term "Defendant," "You," or "Your" shall mean Diamond Staffing, Inc. and their officers, directors, employee, attorneys, agents, affiliates, predecessors (including Ultimate Personnel successors) and/or representatives.

16.     The term "Diamond Staffing$^{SM}$" shall mean the service mark used by Plaintiff as described in the Complaint and as shown in Exhibit A of the Complaint and the mark used by Defendant which is the subject of this Lawsuit.

17.     Please itemize and identify each interrogatory answer or any portion of an answer which is withheld on the basis of a claim of work-product, trial preparation, attorney-client privilege or any other privilege or confidentiality, including the following information:

(a)     the type of privilege asserted;

(b)     the basis for asserting the privilege;

(c)     the date of the information, if applicable; and

(d)     without revealing the privileged material, a description of the information withheld sufficient to bring the matter before the Court to obtain a ruling on Your claim of privilege.

18.     If any of the interrogatories contained herein is claimed to be objectionable:

(a)     Identify the portion of the interrogatory that is claimed to be objectionable;

(b)     State the nature and basis of the objection in sufficient fashion to permit the court to rule on the validity of the objection, and

(c)     Provide an answer any portion of the interrogatory that is not claimed to be objectionable.

19.     Unless otherwise indicated, the time frame for all responses is from May 2002 to the present.

20.     To the extent not contrary to the instructions and definitions contained herein, Plaintiff also specifically incorporates all definitions listed in Local Rule 26.5(C) for the United States District Court for the District of Massachusetts.

## INTERROGATORIES

**INTERROGATORY NO. 1**

Please identify all persons who have knowledge of the facts and circumstances relevant to the case, including all persons with knowledge of the factual allegations and legal claims set forth in the Complaint.  For each such person, please provide a summary of the knowledge possessed.

**INTERROGATORY NO. 2**

Please state the basis for (i) Your determination to offer services under the terms "Diamond Staffing" and/or "Diamond Staffing, Inc." and/or (ii) Your determination to change Your name from Ultimate Personnel to Diamond Staffing, Inc.

**INTERROGATORY NO. 3**

Please state whether Defendant undertook any investigation and/or search for any use of a mark before You started offering services under the terms "Diamond Staffing" and/or "Diamond Staffing, Inc."  If Your response is in the affirmative, please identify the person(s) involved in conducting the search(es), when the search was conducted, and provide a summary of such search(es).

**INTERROGATORY NO. 4**

Please identify all persons that You are aware of who use or have used the Diamond Staffing$^{SM}$ mark, or whose name or mark is comprised of or incorporates the words "diamond" and any variation of the word "staff," including "staffing," regardless of the goods/services offered under those names.

**INTERROGATORY NO. 5**

Please describe with specificity the circumstances under which You became aware of Plaintiff's use of the Diamond Staffing$^{SM}$ mark. Your answer should include:

    (a)    The date on which You became aware of the Plaintiff's use of the Diamond Staffing$^{SM}$ mark; and

    (b)    An identification of all persons with knowledge concerning the facts and circumstances under which You became aware the Plaintiff's use of the Diamond Staffing$^{SM}$ mark.

**INTERROGATORY NO. 6**

Please state whether Defendant ever received from any person any misdirected electronic mail, regular or express mail, telephone calls, orders, complaints, or other communication(s) which was intended for Plaintiff. If so, please identify when such communication was received, from whom it was received/to whom it was directed, whether/when Defendant responded, whether/when Defendant notified Plaintiff, and identify all individuals who have knowledge of the facts and circumstances relevant to such communication(s).

**INTERROGATORY NO. 7**

Please identify any person known to Defendant who has become confused in any way

with respect to DSI, Diamond Staffing Solutions, Inc. and/or the entities offering services under

the Diamond Staffing$^{SM}$ term or mark, and please summarize any and all such instances of

confusion and identify all persons with knowledge of the facts and circumstances of said

instance(s) of confusion.

**INTERROGATORY NO. 8**

Please identify each publication or forum in which Defendant has advertised any of its

services (periodical, newspapers, internet, mailer, etc.) from September 2003 to the present.

**INTERROGATORY NO. 9**

Please identify each of Your customers and/or clients from September 2003 to the

present, and summarize the nature of their business.  The foregoing should not be construed to

include an identification of candidates placed in employment opportunities with customers

and/or clients.

**INTERROGATORY NO. 10**

Please state whether Defendant has ever temporarily and/or permanently placed any

person in employment in the jewelry industry.  If Your answer to this Interrogatory is in the

affirmative, please:

(a)     Identify all such placements, including the date, customer and/or client and

position filled; and

(b)     Identify all persons with knowledge of the facts and circumstances of such

placement(s).

**INTERROGATORY NO. 11**

Please identify every individual, company and/or other entity to whom You

communicated between May 2002 and the present, in an effort to prevent him/her/it from using

and/or registering a mark consisting of or incorporating the terms "diamond" and any variation

of the word "staff," including "staffing," and for each person or entity identified, please identify

every communication made.

**DIAMOND STAFFING SOLUTIONS, INC.**

By its attorneys,

    /s/ Nicholas G. Papastavros
Nicholas G. Papastavros (BBO#635742)
Michael L. Cornell (BBO # 651405)
Gina M. McCreadie (BBO # 661107)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000 (telephone)
(617) 345-1300 (facsimile)

Date:  April 29, 2005

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail(by hand) on _and fax on April 29, 2005_
_Gina McCreadie_

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS, INC.,

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

## PLAINTIFF DIAMOND STAFFING SOLUTIONS, INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT DIAMOND STAFFING, INC.

Pursuant to Local Rule 26 and Rules 26 and 34 of the Federal Rules of Civil Procedure and in accordance with *Plaintiff Diamond Staffing Solutions, Inc.'s Emergency Motion for Expedited Discovery*, Plaintiff Diamond Staffing Solutions, Inc. (Diamond Staffing Solutions[SM]) hereby requests that Defendant Diamond Staffing, Inc. ("DSI") produce documents at the law offices of NIXON PEABODY LLP, attorneys for the Plaintiff, located at 100 Summer Street, Boston, Massachusetts 02110, for the purposes of inspecting and copying the documents identified and defined below within ten (10) days of the date of service hereof.

### DEFINITIONS AND INSTRUCTIONS

1. The definitions and instructions contained in the Federal Rules of Civil Procedure are incorporated herein by reference, as if set forth fully herein.

2. The term "document" shall have the same definition as that contained in Fed. R. Civ. P. 34(a), including without limitation electronic mail, and shall include originals and copies (including all non-identical copies and photocopies).

3.     The term "communication" means any transmittal of information (in the form of facts, ideas, inquiries or otherwise) including any written or oral exchange or contact between two or more persons, including meetings, conversations, and correspondence, written or oral, in person, by telephone, by wire, by letter, direct or indirect, through any intermediaries, or by any other means.  "Communication" also includes any document concerning any communication, including any agenda, minutes, notes, and other records or recordings of the communication.

4.     The term "concerns" or "concerning" shall mean referring to, describing, evidencing, or constituting.

5.     "And" as well as "or" shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the request all responses which might otherwise be construed to be outside its scope.

6.     Unless otherwise established by the context, the plural shall be construed to include the singular and the singular the plural.

7.     The term "Complaint" shall mean the Complaint filed in this action.

8.     "Lawsuit" shall mean the litigation, the style and number of which is found in the caption to this request.

9.     The term "Plaintiff" shall mean Diamond Staffing Solutions, Inc. and its officers, directors, employees, agents, affiliates, and/or representatives.

10.     The term "Defendant," "You," or "Your" shall mean Diamond Staffing, Inc. and its officers, directors, employees, agents, attorneys, affiliates, predecessors, successors (including Ultimate Personnel), and/or representatives.

11.    The term "Diamond Staffing<sup>SM</sup>" shall mean the service mark used by Plaintiff as described in the Complaint and shown in Exhibit A of the Complaint and the mark used by Defendant which is the subject of this Lawsuit.

12.    With respect to each such document, oral statement, or communication inquired about in any request that you claim to be privileged or to constitute work product:

      (a)    Identify the document, oral statement, or communication to the fullest extent possible;

      (b)    Include the date, maker, recipient, all cc's, and type of document (e.g., letter, memoranda); and

      (c)    State the specific basis of the claim of privilege or work product for each document.

13.    If any of the Requests contained herein is claimed to be objectionable, then

      (a)    Identify the portion of the request that is claimed to be objectionable;

      (b)    State the nature and basis of the objection in sufficient fashion to permit the court to rule on the validity of the objection, and

      (c)    Provide an answer shall be given to any portion of such request that is not claimed to be objectionable.

14.    Unless otherwise indicated, the time frame for all requests is from May 2002 to the present.

15.    To the extent not contrary to the instructions and definitions contained herein, Plaintiff also specifically incorporates all definitions listed in Local Rule 26.5(C) for the United States District Court for the District of Massachusetts.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1**

All documents concerning (i) the registration of the domain name www.diamondstaffinginc.com and all other domain names incorporating the term "diamond" and any variation of the word "staff," including "staffing" and (ii) the creation or incorporation of Diamond Staffing, Inc ("DSI"). The foregoing includes, but is not limited to, all documents that concern the changing of names from Ultimate Personnel to DSI.

**REQUEST NO. 2**

All documents concerning how, why, and when You chose the name Diamond Staffing, Inc., and/or determined to offer services under the term "Diamond Staffing" or "Diamond Staffing, Inc."

**REQUEST NO. 3**

All documents concerning any investigation and/or searches You undertook for use of a mark before You started to offer services under the term "Diamond Staffing."

**REQUEST NO. 4**

All documents concerning whether Your offering of services under the term "Diamond Staffing" infringed on or conflicted with Diamond Staffing Solutions' trademark rights.

**REQUEST NO. 5**

All documents concerning any request or inquiry You received either from customers, clients and/or candidates (i) about any and all temporary or permanent employment in the jewelry industry, or (ii) intended for Diamond Staffing Solutions, Inc. and/or Suzanne DeVries.

**REQUEST NO. 6**

All documents concerning any customer, client and/or candidate confusion of any type between DSI and Diamond Staffing Solutions, Inc., including confusion of any type regarding the parties' domain names/web site addresses.

**REQUEST NO. 7**

All documents sufficient to identify the names and business of Your customers and/or clients from September 2003 to the present.

**REQUEST NO. 8**

All documents concerning the advertisement of any of Your services from September 2003 to the present, including (i) the type of publication or forum in which the advertisement was placed (periodical, newspaper, internet, mailer, etc.) and (ii) samples of said advertisements sufficient to determine the style and type of the advertisement.

**REQUEST NO. 9**

All documents concerning every individual, company and/or other entity to whom You have written or otherwise communicated between 2000 and the present, in an effort to prevent him/her/it from using and/or registering a mark consisting of or incorporating the terms "diamond" and any variation of the word "staff," including staffing.

**REQUEST NO. 10**

All documents filed with any state or federal trademark office regarding a mark consisting of or incorporating the terms "diamond" and any variation of the word "staff," including "staffing."

**REQUEST NO. 11**

All documents concerning the policies and procedures by which DSI obtains candidate

information, including resumes, and places candidates with clients.

**DIAMOND STAFFING SOLUTIONS, INC.**

By its attorneys,

   /s/ Nicholas G. Papastavros
Nicholas G. Papastavros (BBO#635742)
Michael L. Cornell (BBO # 651405)
Gina M. McCreadie (BBO # 661107)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000 (telephone)
(617) 345-1300 (facsimile)

Date: April 29, 2005

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail(by hand) or _and fax on April 29, 2005_
_Gina McCreadie_

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS, INC.,

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

## NOTICE OF RULE 30(B)(6) DEPOSITION OF DEFENDANT

Please take notice that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure,

Plaintiff Diamond Staffing Solutions, Inc. will take the deposition of Defendant Diamond

Staffing, Inc. on **Wednesday, May 18, 2005, at 9:00 a.m.** at the offices of NIXON PEABODY

LLP, 100 Summer Street, Boston, Massachusetts, 02110. The deposition will be taken before a

notary public or before some other officer authorized by law to administer oaths. The deposition

will continue from day to day until completed. You are invited to attend and cross-examine.

Fed. R. Civ. P. 30(b)(6) requires the deponent, Diamond Staffing, Inc., to designate one

or more of its officers, directors, managing agents, or other person who consents to testify on its

behalf, and may set forth, for each person so designated, the matters on which he or she will

testify. The person(s) so designated should be the persons(s) most knowledgeable of the matters

listed in Schedule A and must testify as to matters known or reasonably available to the

organization.

**DIAMOND STAFFING SOLUTIONS, INC.**

By its attorneys,

  /s/ Nicholas G. Papastavros
Nicholas G. Papastavros (BBO#635742)
Michael L. Cornell (BBO # 651405)
Gina M. McCreadie (BBO # 661107)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000 (telephone)
(617) 345-1300 (facsimile)

Date:  April 29, 2005

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail(by hand) on and fax on April 29, 2005
Gina McCreadie

**SCHEDULE A**

**SUBJECT MATTER FOR EXAMINATION PURSUANT TO FED. R. CIV. P. 30(b)(6)
NOTICE OF DEPOSITION TO DIAMOND STAFFING, INC.**

1.    The definitions and instructions contained in the Federal Rules of Civil Procedure are incorporated herein by reference, as if set forth fully herein.

2.    The term "document" shall have the same definition as that contained in Fed. R. Civ. P. 34(a), including without limitation electronic mail, and shall include originals and copies (including all non-identical copies and photocopies).

3.    The term "communication" means any transmittal of information (in the form of facts, ideas, inquiries or otherwise) including any written or oral exchange or contact between two or more persons, including meetings, conversations, and correspondence, written or oral, in person, by telephone, by wire, by letter, direct or indirect, through any intermediaries, or by any other means.  "Communication" also includes any document concerning any communication, including any agenda, minutes, notes, and other records or recordings of the communication.

4.    The term "concerns" or "concerning" shall mean referring to, describing, evidencing, or constituting.

5.    "And" as well as "or" shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the request all responses which might otherwise be construed to be outside its scope.

6.    Unless otherwise established by the context, the plural shall be construed to include the singular and the singular the plural.

7.    The term "Complaint" shall mean the Verified Complaint filed in this action.

8.    "Lawsuit" shall mean the litigation, the style and number of which is found in the caption to this request.

BOS1487766.1

9.    The term "Plaintiff" shall mean Diamond Staffing Solutions, Inc. and its officers, directors, employees, agents, affiliates, and/or representatives.

10.    The term "Defendant," "You," or "Your" shall mean Diamond Staffing, Inc. and its officers, directors, employees, attorneys, agents, affiliates, predecessors, successors (including Ultimate Personnel), and/or representatives.

11.    The term "Diamond Staffing$^{SM}$" shall mean the service mark used by Plaintiff as described in the Complaint and shown in Exhibit A of the Complaint and the mark used by Defendant which is the subject of this Lawsuit.

12.    To the extent not contrary to the instructions and definitions contained herein, Plaintiff also specifically incorporates all definitions listed in Local Rule 26.5(C) for the United States District Court for the District of Massachusetts.

## SUBJECT MATTER

1.    Information regarding (i) Defendant's determination to offer services under the terms Diamond Staffing and/or Diamond Staffing, Inc. and/or (ii) Defendant's determination to change its name from Ultimate Personnel to Diamond Staffing, Inc., including but not limited to, information on how, why, and when Defendant registered the domain name www.diamondstaffinginc.com and/or chose the name Diamond Staffing, Inc.

2.    Information on any investigation and/or search Defendant performed for use of any mark before it started offering services under the terms "Diamond Staffing" and/or "Diamond Staffing, Inc."

3.      Information concerning any persons Defendant is aware of who use or have used the Diamond Staffing$^{SM}$ mark, or whose name or mark is comprised of or incorporates the words "diamond" and any variation of the word "staff" including "staffing," regardless of the goods/services offered under those names.

4.      Information on Plaintiff's use of the Diamond Staffing$^{SM}$ mark, including without limitation, when Defendant became aware of Plaintiff's use of the Diamond Staffing$^{SM}$ mark.

5.      Information on any customer, client, and/or candidate or other confusion of any type between DSI and Diamond Staffing Solutions, Inc., including without limitation (i) misdirected communication sent to Defendant which were intended for Plaintiff and (ii) confusion of any type regarding the parties domain names/web site addresses.

6.      Information on Defendant's advertising in any type of publication (periodical, newspaper, internet, mailer, etc.) or forum from September 2003 to the present.

7.      Information on Defendant's customers and/or clients and their businesses from September 2003 to the present, including without limitation, any customers and/or clients temporarily or permanently placed in the jewelry industry, and whether Defendant received requests from customers, clients and/or candidates regarding temporary or permanent employment in the jewelry industry.

8.      Information on any individual, business, and/or other entity to whom Defendant communicated between May 2002 and the present, in an effort to prevent him/her/it from using and/or registering a mark consisting of or incorporating the terms "diamond" and any variation of the word "staff," including "staffing."

9.      Information regarding filings with state or federal trademark offices regarding a mark consisting of or incorporating the terms "diamond" and any variation of the word "staff," including "staffing."

10.      Information regarding policies and procedures by which DSI obtains candidate information including resumes, and places candidates with clients.

11.      Information regarding the factual allegations and legal claims set forth in the Verified Complaint.

**RUBENSTEIN**

**ATTORNEY AT LAW**

P.O. Box 1459

FRAMINGHAM, MASSACHUSETTS 01701

(508) 872-7116

fax (508) 872-8284

robmeltzer@aol.com

April 4, 2005

Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
Attn: Nicholas G. Papastavros, Esq.
BY FAX 617-345-1300

Re: <u>Diamond Staffing Solutions, Inc. v. Diamond Staffing</u>

Dear Nick:

Attorney Mary Casey has forwarded the Complaint in the above-captioned matter to my office for analysis.

I must say that I've rarely seen a lawsuit that is quite so factually insupportable and quite so legally deficient. I have no doubt that it will not survive a motion to dismiss under F.R.C.P. 26.

Even so, I'm sure that you've discussed the ramifications of this suit with your client in the unlikely event that the court allows the suit to proceed. I'm confident that you have informed your client that she is handing me the right to audit her company's books and finances, to thoroughly review her business and marketing plan, and to depose her friends, family, customers and competitors, all permissible under F.R.C.P. 26. I also trust that she understands that my client will pursue her both individually and corporately for attorney's fees and costs after my client prevails at trial.

If your client is determined to gamble her entire business on this lawsuit, serve your papers.

Very truly yours,

Robert N. Meltzer

Cc:    Mary Casey, Esq.
       client

**Papastavros, Nicholas**

**From:**      Mary Casey [casey@harborlaw.com]
**Sent:**      Thursday, March 24, 2005 12:41 PM
**To:**        Papastavros, Nicholas
**Subject:**   RE: Diamond Staffing Solutions/Diamond Staffing, Inc.

Nick,

I have referred the matter to litigation counsel and we will be responding
to your letter by April 5th.  Thanks/Mary

-----Original Message-----
From: Papastavros, Nicholas [mailto:NPAPASTAVROS@nixonpeabody.com]
Sent: Wednesday, March 23, 2005 11:29 AM
To: casey@harborlaw.com
Subject: Diamond Staffing Solutions/Diamond Staffing, Inc.

Mary:

   Pursuant to our conversation a few minutes ago, this will confirm my
agreement to extend the time for Diamond Staffing, Inc. to respond to
the terms set forth in my March 16, 2005 letter up to and including
Tuesday, April 5, 2005.  As we discussed, this agreement is expressly
conditioned on Diamond Staffing, Inc.'s agreement that any time lapse
between the time of filing of the Complaint and the time of Diamond
Staffing Inc.'s response shall not be used in any way against Diamond
Staffing Solutions, Inc., including against any subsequent request by
plaintiff for injunctive relief.

   Please contact me immediately if the foregoing does not comport with
your understanding.  Thank you.

Nick

Nicholas G. Papastavros
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110
(617) 345-1329 (t)
(866) 947-1827 (f)
npapastavros@nixonpeabody.com

Westlaw.

Not Reported in F.Supp.2d

Page 1

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
KNAPP SCHENCK & COMPANY INSURANCE
AGENCY, INC., Plaintiff,
v.
LANCER MANAGEMENT COMPANY, INC. and
Lancer Insurance Company, Defendants.
**No. Civ.A. 02-12118-DPW.**

Jan. 13, 2004.

Lawrence P Murray, Burns & Levinson, Boston,
MA, for Plaintiff.

Jamie N. Hage, Nicholas G. Papastavros, Nixon
Peabody, LLP, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

**\*1** Plaintiff Knapp Schenck & Company Insurance
Agency, Inc. ("Knapp Schenck") brings this action
against Lancer Management Company, Inc. and
Lancer Insurance Company (collectively "Lancer"),
alleging unlawful use of confidential, proprietary,
and trade secret information acquired during sale
negotiations between the parties. With discovery
now completed, Lancer seeks summary judgment
and, additionally, moves for sanctions and attorney
fees pursuant to Rule 11 of the Federal Rules of
Civil Procedure and 28 U.S.C. § 1927. For the
reasons set forth below, I grant in part and deny in
part Lancer's motion for summary judgment and
deny its motion for sanctions.

*I. BACKGROUND*

Knapp Schenck, a Massachusetts corporation with
its principal place of business in Massachusetts,
manages the Splash Fuel Oil Dealers Program
("Splash program"), which provides insurance
service packages for oil heat dealers. Lancer
Insurance is a New York-based company which
provides commercial and private automobile
insurance coverage in the passenger transportation
industry and in the last year has entered into the oil
heat dealer insurance market with the launch of its
Oilheat Dealers Insurance Network ("ODIN").

In around late March or early April, 2002,
representatives of Knapp Schenck and Lancer
Management began discussions concerning a
potential acquisition of the Splash program by
Lancer. On April 5, 2002, James Tyrrell, the Splash
program manager, and Knapp Schenck Treasurer
Hilbert Van Schenck met with Lancer Vice
President Art Catapang to discuss the acquisition. In
that meeting, Tyrrell and Van Schenck explained
various aspects of the Splash program to Catapang
and provided him with documentation about the
program, [FN1] including an actuarial report
compiled by the Aon Corporation.

> FN1. What documentation Van Schenck
> and Tyrrell actually gave to Catapang
> seems to be in dispute. In his deposition,
> Catapang stated that he was given
> "program information" and "underwriting
> information" in addition to the Aon report,
> which he described as "premium
> information." Van Schenck stated in his
> deposition that they gave Catapang
> "historical loss data" and the Aon report.
> In his deposition, Tyrrell stated that they
> gave Catapang "some general information
> on the program, specifically brochures, the
> applications and a general overview of the
> program" along with the Aon report. For
> purposes of the instant motions I will take
> as undisputed only that Van Schenck and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

Tyrrell gave the Aon report to Catapang.

In the week or so following the April 5, 2002 meeting, Tyrrell and Catapang met several times to discuss the Splash program and during that time an "acquisition due diligence team" from Lancer discussed marketing and business strategies with Knapp Schenck senior executives and was granted access to Knapp Schenck's underwriting files, personnel files, and claims files.

On April 23, 2002, Van Schenck executed a "Letter of Intent" ("LOI") sent to him by John Petrilli, general counsel for Lancer. Under the terms of the LOI, upon execution it constituted an agreement in principle for the acquisition of the Splash program by Lancer, but it was not a binding agreement with respect to the acquisition. The LOI was to be effective until either (1) the parties terminated it in writing or (2) May 15, 2002, if no definitive agreement for the acquisition was reached by then. The LOI further stated that "[u]pon such termination, the agreements contained in this Agreement in Principle become void and of no further force or effect, except for the provisions of this Paragraph 5 and Paragraphs 7, 8 and 9 hereof, which shall remain in full force and effect."

Paragraph 7, under the heading "Publication and Confidentiality," stated in relevant part:
**\*2** Each of the parties hereto shall hold confidential this Agreement in Principle, the contents and terms hereof, including any attachments hereto, the fact that discussions concerning the matters herein are taking place and other facts with respect to such discussions, including the status thereof. In addition, each of the parties shall hold confidential all financial or other information supplied by the other in the course of the evaluation, negotiation, or performance of due diligence in respect of this Agreement in Principle or the transactions contemplated herein, provided that such confidentiality obligation shall apply only to non-public information which is designated in writing to be confidential by the disclosing party, and which was not available to the other party on a non-confidential basis from a third party.

Paragraph 9, [FN2] under the heading "Miscellaneous," contained provision (c) titled "No Waiver," which stated:

> FN2. Paragraph 8 concerned fees and expenses and is not relevant to the present dispute.

The parties to this Agreement in Principle acknowledge and agree that no failure or delay in exercising any right, power, or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other further exercise thereof or the exercise of any right, power or privilege hereunder.

For reasons which are in dispute, [FN3] negotiations between the parties did not give rise to any agreements subsequent to the LOI for the contemplated acquisition. On May 17, 2002, Knapp Schenck sent a letter to Lancer in which it requested that Lancer "return any and all proprietary and other related information and documents that [Lancer] acquired while it had access to the books and records of [Knapp Schenck]." In the letter, Knapp Schenck referred to "Proprietary Information," which it described as "documents and related items including but not limited to information relating to brokers, accessing systems and producers relating to the Splash and Septicover Programs."

> FN3. Knapp Schenck asserts in its Complaint that as the May 15, 2002 expiration date for the LOI approached, "Lancer Management had so changed its offer to acquire the Splash program that such offer was no longer commercially viable or desirable for the Plaintiff and the term for the letter of intent expired on its own accord." Lancer, on the other hand, contends that the parties failed to reach an agreement because Knapp Schenck lost interest in the deal. In filing a counterclaim against Knapp Schenck, Lancer alleged that "Knapp Schenck did not abide by its agreements and representations, and entered into substantive negotiations with third parties during the pendency of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 3

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

Agreement" and that "Knapp Schenck came to the conclusion that it was not interested in consummating the transaction with Lancer" as a result of those negotiations.

In response, Lancer's general counsel faxed a letter back to Knapp Schenck on the same day stating that it was his understanding that "employee files (other than a contract and a few leases) were not copied or removed from Knapp Schenck, nor was any policyholder lists." He further asked Knapp Schenck to advise him "what information Lancer Management employees currently hold that is proprietary that was not retained by Knapp Schenck at its offices," and he stated he would check with his employees to see if they had such information.

Sometime around August 2002, Lancer Insurance added to its website an icon indicating the availability of services for oil heat dealers. On around October 1, 2002, Lancer added a link on its website to ODIN, which offers insurance coverage for oil heat dealers.

On October 23, 2002, Knapp Schenck filed a Verified Complaint in the Suffolk Superior Court, alleging that Lancer unlawfully used confidential and proprietary trade secret information obtained during the parties' negotiations and Lancer's due diligence review of information pertaining to the Splash program. Specifically, Knapp Schenck contended that Lancer illegally used protected information which

*3 included, but was not limited to: underwriting information and guidelines, including renewal and new business guidelines, the referral process, unacceptable exposures and target rate increases; account lists; broker lists; payroll and expense records; account files, including applications, policies, effective dates, premiums, rate structures, rate sheets, pricing information, sales claims, loss history, correspondence with brokers and premium and loss ratio information; target market information; and underwriting philosophy.

Knapp Schenck alleged seven separate counts: knowing and willfully theft and use of protected

information in violation of Mass. Gen. Laws ch. 93A §§ 2, 11 (Count I); theft of trade secret information by fraud and deception in violation of Mass. Gen. Laws ch. 93 § 42A (Count II); fraudulent misrepresentation (Count III); common law misappropriation of protected information (Count IV); breach of the confidentiality agreement (Count V); conversion (Count VI); and tortious interference with economic advantage (Count VII). Knapp Schenck sought both injunctive relief, in the form of preliminary and permanent injunctions against Lancer, and monetary damages for the harm caused by Lancer's conduct.

On October 30, 2002, Lancer removed the action to this Court, and on December 13, 2002, following discussions with the parties, I consolidated the request for a preliminary injunction with resolution of the case on the merits--either through summary judgment or through trial--and ordered limited discovery in an expedited fashion.

In moving for summary judgment, [FN4] Lancer argues that Knapp Schenck has failed to produce any evidence that Lancer has used information it obtained in negotiations with Knapp Schenck. Moreover, Lancer contends that, even assuming Lancer used information it received from Knapp Schenck, summary judgment is appropriate because Knapp Schenck failed to provide evidence that any of the information was confidential under the LOI or otherwise and thus has not shown that such use would have been improper. [FN5]

> FN4. With its answer, Lancer brought five counterclaims against Knapp Schenck. Because neither party has addressed the counterclaims, I deal here only with Knapp Schenck's claims.

> FN5. Lancer also offers arguments for summary judgment tailored to Counts III and VII. Knapp Schenck, however, apparently does not oppose summary judgment as to those counts. In a letter to Lancer counsel dated June 19, 2003, counsel for Knapp Schenck stated:
> You have no doubt received my opposition

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

Page 4

to your motion for summary judgment at this point. This pleading was filed and served prior to my receipt of your June 17 letter. In that pleading I did not respond in opposition to your request that Count III (Misrepresentation) and Count VII (Tortious Interference with Economic Relations). I have decided not to pursue these particular claims for reasons I do not need to discuss with you.
Accordingly, I grant summary judgment as to Counts III and VII.

Lancer additionally asks this Court to impose sanctions on Knapp Schenck and award Lancer attorney fees because Knapp Schenck failed to conduct an adequate investigation prior to bringing this action and failed to withdraw its Complaint after discovery revealed that it had no basis for its claims.

*II. DISCUSSION*
A. Motion for Summary Judgment

1. *Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it has the "potential to affect the outcome of the suit under applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000), and a "genuine" issue is one that "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997).

**\*4** In considering a motion for summary judgment, courts must view the issues in a light most favorable to the nonmoving party, indulging all reasonable inferences in that party's favor. *Barreto-Rivera v. Medina-Vargas,* 168 F.3d 42, 45 (1st Cir.1999). However, to oppose the motion successfully, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set

forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841-42 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994).

2. *Improper Use*

At the core of each of Knapp Schenck's claims is the allegation that in establishing ODIN Lancer improperly used the information it obtained from Knapp Schenck about the Splash program. *See Burten v. Milton Bradley Co.,* 763 F.2d 461, 462-63 (1st Cir.1985) ("The essence of the wrong [in a misappropriation claim] is generally 'the breach of the duty not to disclose or to use without permission confidential information acquired from another.' ') (quoting *Jet Spray Cooler, Inc. v. Crampton,* 377 Mass., 159, 165, 385 N.E.2d 1349 (1979)). At the time it filed its Complaint, Knapp Schenck based its claims on the inference that Lancer used the information it obtained from Knapp Schenck during the parties' negotiations concerning the Splash program. That inference arose out of Knapp Schenck's contentions that (1) Lancer launched ODIN only months after negotiations between the parties ended, despite purportedly telling Knapp Schenck that it had no experience in the field, (2) the statements of protection for policies covered under the ODIN and Splash programs are almost identical, (3) the customer services offered by ODIN are substantially similar to those offered by Splash, and (4) the targeted geographic markets for the two programs are identical. In sum, Knapp Schenck stated in its Complaint:

Plaintiff believes that Defendants have, and will continue to use, all of the information that [Defendants] stole from the Plaintiff in their competing insurance program, ODIN, to Plaintiff's great detriment. With no prior expertise or experience in servicing the insurance needs of the niche market for oil heat dealers, the Defendants have within a matter of months after stealing Plaintiff's proprietary information, developed and implemented a program in direct competition with the Plaintiff's Splash® program in the very same states.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

Lancer contends that summary judgment is warranted as to all counts because the inference that Lancer used any of the information it obtained from Knapp Schenck is not supported by any evidence and therefore rests on "sheer speculation." Lancer argues that the evidence clearly demonstrates that Lancer had the experience and capability, even prior to its discussions with Knapp Schenck, to enter the oil heat provider insurance market and thus the inference that Lancer must have relied on Knapp Schenck information in launching ODIN is unfounded. Lancer further argues that because the evidence shows--and because Knapp Schenck does not dispute--that Lancer based its rates for the ODIN program on publicly-available rates from the Insurance Service Organization ("ISO"), adjusted by loss cost multipliers ("LCMs") determined from Lancer's own information, [FN6] there is no force for the inference that Lancer used Knapp Schenck's information in starting ODIN.

> FN6. Lancer contends that it took LCMs from its Nobel propane program and applied them to the ISO rates across the board in setting rates for the ODIN program.

**\*5** While Lancer may be correct that Knapp Schenck has failed to provide evidence of a smoking gun which directly demonstrates that Lancer used Knapp Schenck information, [FN7] its argument falls short of establishing sufficient grounds for summary judgment because Knapp Schenck has nevertheless provided enough evidence to put the use issue in dispute.

> FN7. To further underscore this point, Lancer notes (1) the lack of evidence that any Knapp Schenck officials have firsthand knowledge of use by Lancer of Knapp Schenck information, and (2) deposition testimony by Lancer officials that they never used the Aon report or any other information obtained from Knapp Schenck.

Even assuming that Lancer was both intending to and capable of entering the oil heat insurance

market without relying on any information it received from Knapp Schenck, [FN8] that fact, along with the undisputed fact that Lancer ultimately based its rates for the ODIN program on the publicly-available ISO rates does not inexorably lead to the conclusion that it never used Knapp Schenck's information. In his deposition testimony, Knapp Schenck Treasurer Hilbert Van Schenck stated that the Aon report and loss data Knapp Schenck gave to Lancer would be useful even to a company that set its rates according to the ISO rates. Van Schenck based this contention in part on the fact that the ISO rates do not provide information relevant for determining coverage for pollution, [FN9] which constitutes an important portion of the coverage provided by the Splash and ODIN programs. Thus, as an initial matter, Knapp Schenck has put in dispute the issue whether Lancer directly used Knapp Schenck information at least in determining rates of coverage for pollution.

> FN8. James Tyrrell, the Splash program manager, testified in his deposition that Lancer had neither the background nor the experience to enter the oil heat insurance business. Thus, whether Lancer could have started ODIN without using information it obtained from Knapp Schenck during discussions about the Splash program is in dispute. Hilbert Van Schenck testified in deposition that it took Knapp Schenck five years to write the line of business for the Splash program, that Lancer is the only competitor to have entered the business in the last three years, and that he knew of no business that became fully operational in less than five years without the aid of data such as that provided by Knapp Schenck to Lancer.

> FN9. Van Schenck stated that the standard coverage captured by the ISO rates contains an absolute exclusion for pollution whereas the Splash program offers a buy-back option for coverage of some activities. In addition, Van Schenck stated that data from propane dealer coverage programs would also not be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

Page 6

useful in determining coverage for pollution because the propane programs generally exclude such coverage as well.

Moreover, even if Lancer did not use the Knapp Schenck information to set its pollution coverage rates, a triable issue remains as to the use issue. According to Van Schenck's testimony, information provided by the Aon report and by the additional loss data provided to Lancer by Knapp Schenck [FN10] would be helpful in assessing the adequacy of the LMCs Lancer used to adjust the ISO rates. This contention is further supported in the Summary Report of Simon Everett, whose expert testimony Knapp Schenck intends to present at trial. According to the report, Everett will testify that

> FN10. While it is undisputed that the Aon report was given to Lancer during the April 5, 2002 meeting, it is not entirely clear when the relevant loss data was exchanged. Van Schenck testified that he gave "historical loss data" to Catapang in the April 5 meeting and in an email from Catapang to Dave Delaney on April 8, 2002, Catapang states that during that meeting, Van Schenck provided him with, among other things, "Loss Engineering Info" and "Claims Response Info." However, on April 15, Van Schenck sent Catapang an email to which he purportedly attached a "loss ratio report."

[t]he AON report and the additional loss claims data provided by Knapp Schenck to Lancer represents loss (the "Data"), claims and pricing data that is valuable to any entity in the marketplace seeking to write, underwrite, acquire or start up a fuel oil dealer insurance product or program. The type of data contained in the AON report is held by very few persons in the insurance market. Using the same data, several established reinsurance and insurance companies were able to make an informed business decision as to whether or not to write the fuel oil dealers line of business.... The data is material to making an informed business decision whether or not to enter into this line of insurance.

An insurance company who received the Data would save significant time in starting up a fuel oil dealers line of insurance which offered similar coverage. The Data represents overall data relating to a specific program that is extremely useful in putting the program together and pricing the program. The Data is much more useful in this respect than piecemeal loss cost runs which could be provided by agents in the marketplace. The Data is sufficient to make an informed underwriting decision, including setting the price wherein one could expect a reasonable return on investment. The Data would provide the foundation for entering into the fuel oil dealer program insurance.

**\*6** In short, Knapp Schenck argues that even if Lancer did not use Knapp Schenck information directly to set its rates, the Aon report and loss claims data were nevertheless valuable to Lancer insofar as they gave Lancer a competitive advantage in quickly entering the market by helping it assess the adequacy and profitability of the ISO-based rates.

Lancer points to deposition testimony by Lancer officials that the information contained in the Aon report and the loss claims data was essentially useless, [FN11] and it insists that it went ahead with launching the ODIN program without the aid of Knapp Schenck information--or for that matter, any historical loss claims data similar to that provided by Knapp Schenck. Lancer argues that one need not infer that it used Knapp Schenck information to evaluate the ISO rates, stating that

> FN11. Catapang testified in his deposition that the information was "of no value." In his deposition, Van Schenck disputed the testimony read from Catapang's deposition that the loss information was not "currently valued."

Lancer may have exercised poor business judgment in relying on ISO loss costs and importing a cost multiplier from Lancer's Nobel propane product to get the ODIN product up and running in an expedited fashion, but that is what

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

Page 7

Lancer actually did, and that is not a legal violation.

Lancer's arguments do little more than underscore that it is disputed both whether, as an initial matter, the Aon report and additional loss claims data supplied by Knapp Schenck were useful to Lancer and, perhaps more importantly, whether Lancer in fact used that information to evaluate the ISO-based rates or instead simply "exercised poor business judgment" in not using it (or information like it). While Knapp Schenck has not mounted any direct evidence that Lancer used the information in this way, the circumstantial evidence it has gathered regarding Lancer's lack of any of its own loss data, the unlikelihood that a company would launch a program like ODIN without credible loss claims data, and the similarities between the Splash and ODIN programs, at a minimum, presents a triable issue as to whether Lancer used the Aon report and loss claims data in evaluating its rates for entry into the industry. [FN12] Additionally, as noted above, the issue of whether Lancer used Knapp Schenck information directly to determine rates for pollution coverage is also in dispute. Thus, I find that summary judgment in favor of Lancer as to the use issue--at least with respect to the Aon report and loss claims data--is not warranted. Given that demonstrating use--or at least usefulness--is a critical element of Knapp Schenck's claims and since Knapp Schenck has put into dispute the use issue only with regard to the Aon report and the loss claims data, I consider the remaining issues for summary judgment only with regard to those two sets of information.

> FN12. This finding is limited to the Aon report and loss claims data. Knapp Schenck has not provided any evidence that Lancer used any of the other information that it claims was confidential, proprietary, or trade secret information to evaluate the ODIN rates or otherwise.

### 3. *Misappropriation of Trade Secrets*

In addition to showing that the defendant used its information, to establish a claim of

misappropriation of trade secrets under Massachusetts law, [FN13] a plaintiff must show that the information was "in fact and in law [ ] confidential," *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840, 282 N.E.2d 921 (1972), and that plaintiff took reasonable steps to preserve the secrecy of the information, *USM Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 393 N.E.2d 895 (1979). [FN14]

> FN13. In its Complaint, Knapp Schenck alleges Lancer's unlawful use of "proprietary, confidential, and trade secret information." As the First Circuit has noted in dicta, it is unclear whether and how the Massachusetts courts differentiate among confidential information, proprietary information, and trade secret information. *Foster-Miller, Inc. v. Babcock & Wilcox Canada,* 210 F.3d 1, 8 (1st Cir.2000). For present purposes, I will conflate the three terms and use the standards set forth for misappropriation of trade secrets. If there is a difference between that standard and the standard for the misappropriation of confidential and proprietary information, it is that the latter applies to information that does not quite reach the level of trade secrets either because it was not reasonably protected or because it is merely business information. *See USM Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 104, 393 N.E.2d 895 (1979). Given that I find that there is a triable issue as to whether the Aon report and the loss claims data information constitute trade secret information, there is no need to test the evidence against this lower threshold standard for the purposes of the present motions.

> FN14. Obviously, a plaintiff must as a threshold matter show that the information constitutes a trade secret. Under Massachusetts law, a trade secret may consist of "any formula, pattern, device or compilation of information which is used in one's business, and which gives him

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

Page 8

opportunity to obtain an advantage over competitors who do not know or use it." *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 736, 260 N.E.2d 723 (1970). Lancer has not contested that the Aon report and loss claims data fit within this definition, so I need not address that issue here.

*\*7* Lancer argues that even assuming there is a genuine issue of material fact with regard to the use issue, summary judgment in its favor is still warranted because Knapp Schenck failed to designate any information as confidential under the terms of the LOI and Knapp Schenck failed to take reasonable measures to protect the allegedly confidential information. [FN15]

> FN15. Lancer also contends that the information was not confidential because it was publicly-available. Lancer points to deposition testimony by Knapp Schenck officials conceding that certain information Knapp Schenck claimed was confidential was in fact publicly-available. However, Knapp Schenck has maintained that the Aon report and the loss claims data were not publicly-available, so at least as to that information there is at a minimum a question of confidentiality.

a. *Confidentiality*

Knapp Schenck argues that much of the information it gave to Lancer was to be treated as confidential pursuant to the LOI. However, under the terms of the LOI, information had to be deemed confidential in writing, and Knapp Schenck has not produced any evidence that it made such a designation for the Aon report or the loss claims data. Nevertheless, even assuming the Aon report and loss claims data were not protected under the terms of the LOI, there is still a genuine issue of material fact as to whether they were confidential for the purposes of the misappropriation claims. In his deposition testimony, Van Schenck stated that during the April 5, 2002 meeting he

gave to Mr. Catapang a copy of historical loss

data and the AON pricing report, and asked him and told him that the information was strictly confidential and [Knapp Schenck] didn't expect it to be distributed to anyone except to his reinsurers, if it was required in order to get a reinsurance placement, but outside of that to keep it confidential.

This testimony, while slightly different in the details, is corroborated by Tyrrell, who stated in his deposition that

Van Schenck had the AON report with him and said, "You understand, Mr. Catapang"--I don't know if he said "Mr. Catapang," but my recollection is he said, "You understand this is confidential and we don't give it to anybody."

And Mr. Catapang said, "Of course. Of course we do."

While Catapang disputes that such an exchange ever took place, whether it did or not is a question for a jury, not an issue appropriately determined on summary judgment.

Even were I to assume that Knapp Schenck has not provided sufficient evidence to create a factual dispute about whether there was an oral agreement, a jury could find that the undisputed facts surrounding the exchange of information support an implied finding of confidentiality. A confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered. *Burten v. Milton Bradley Co.,* 763 F.2d 461, 463 (1st Cir.1985). Thus, "[w]here the facts demonstrate that a disclosure was made in order to promote a specific relationship, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret, the parties will be bound to receive the information in confidence." *Id.; see also Sentinel Prods. Corp. v. Mobil Chem. Co.,* No. civ. A. 98-11782-PBS, 2001 WL 92272, *12 (D.Mass. Jan.17, 2001) (a finding of an implied confidential relationship could be sustained where plaintiff loaned a machine to defendant for a limited trial period during sale discussions). Here, given that the Aon report and loss claims data were exposed to Lancer for the explicit purpose of evaluating the Splash program in contemplation of acquiring it, I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 9

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

find that a jury could reasonably find that an implied confidential relationship arose between Knapp Schenck and Lancer.

b. *Reasonable Precautions*

**\*8** Under Massachusetts law, information cannot be confidential if the possessor of the information does not take reasonable security precautions to protect it. *USM Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 393 N.E.2d 895 (1979); *see also Burten,* 763 F.2d at 463 ("An implied confidential relationship can be defeated [ ] if the disclosing party voluntarily conveys a trade secret to another without limitation upon its use."). In evaluating whether a party has take reasonable precautions to protect confidential information, relevant factors to be considered include (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed ... to (any) employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered "readily ascertainable" by the third parties through patent applications or unrestricted product marketing. *Id.* at 98.

Lancer offers a number of different arguments each designed to show that the information it received from Knapp Schenck was not confidential because Knapp Schenck did not take appropriate measures to protect the information both within and outside Knapp Schenck. Most of these arguments, however, are contentions about the general practices of Knapp Schenck, [FN16] and even setting aside the fact that most are disputed by Knapp Schenck, [FN17] they are not particularly helpful in determining whether Knapp Schenck adequately protected the information at issue here--namely, the Aon report and the loss claims data. For example, Lancer's contention that Knapp Schenck did not have any employee nondisclosure agreements for the first seven years the Splash program was in

operation is not relevant if, as Knapp Schenck contends, only a handful of Knapp Schenck executives had access to the Aon report and the loss claims data. [FN18] Moreover, even assuming that Lancer's contentions do apply to the Aon report and the loss claims data, a jury, applying the factors listed above, could reasonably find that Knapp Schenck's actions were adequate given the circumstances.

> FN16. Lancer contends, for example, that Knapp Schenck did not use employee nondisclosure or nonpiracy agreement during the early years of the Splash program, that Knapp Schenck's agreements with its brokers did not contain confidentiality provisions, and that the insurance carriers which issue coverage for the Splash program share ownership rights in the loss history data.

> FN17. For example, Knapp Schenck points to Van Schenck's deposition in which he testifies that Knapp Schenck has confidentiality agreements with its brokers and insurance carriers.

> FN18. Van Schenck testified that only he and four others in the company.

Lancer specifically contends that Knapp Schenck waived confidentiality as to the Aon report by disclosing it to First American Insurance Company (now Arch Insurance). Lancer points to an affidavit by Vice President, Secretary, and Counsel to Arch Insurance, Joseph Labell, in which Labell states that "at no time did Arch Insurance either have a written agreement or any specific discussion with Knapp Schenck to treat as confidential, or as trade secret, information it received from Knapp Schenck or from any agent working on behalf of Knapp Schenck." Labell, however, in a separate affidavit on behalf of Knapp Schenck states that **\*9** As a matter of practice, policy and custom in the insurance industry, it was understood by Arch Insurance, at the time known as First American Insurance Company, that the information and data, including the AON report and loss claims

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

data, exchanged with Knapp Schenck during the period of investigation and evaluation for the proposed business relationship was to be used solely for that purpose and that such information would not be disclosed to third parties unless it was necessary to effectuate that purpose.

Thus, Labell's testimony that there was no written agreement of confidentiality is immaterial if there was an implied understanding of a confidential relationship. The determination of whether in fact there was such a relationship and the general issue of whether Knapp Schenck's actions constituted reasonable precautions in light of the exchanges between Knapp Schenck are questions best left for a jury. Thus, I find that there is a genuine dispute as to the issue of the reasonableness of the precautions taken by Knapp Schenck in protecting the Aon report and loss claims data.

### 4. Breach of LOI Agreement

Under the plain terms of the LOI, information exchanged by Knapp Schenck and Lancer was deemed confidential, "provided that such confidentiality obligation shall apply only to non-public information which is designated in writing to be confidential by the disclosing party." The only written evidence Knapp Schenck points to in support of its contention that it designated information given to Lancer as confidential is the May 17, 2002 letter in which Knapp Schenck requested the return of its proprietary information. In that letter Knapp Schenck designated as proprietary "documents and related items including but not limited to information relating to brokers, accessing systems and producers relating to the Splash and Septicover Programs." Even assuming this was a timely designation, which arguably it was not, Knapp Schenck has not sufficiently shown that the Aon report and the loss claims data fit within this designation. And given that Knapp Schenck has not presented any evidence that Lancer improperly used or disclosed information other than the Aon report and loss claims data, Knapp Schenck has not provided any evidence of a breach of the agreement with respect to the categories of information designated in the May 17 letter.

### 5. Limitation on LOI

Having found that there has been no breach of the LOI demonstrated, I must also address the question whether the LOI, which provides that the confidentiality obligation applies only to materials designated as such in writing and is arguably an integrated document, displaces any implied or oral duty of confidentiality. Even assuming that the LOI is to be treated as a integrated document, I find that the LOI is not inconsistent with and does not supplant confidentiality obligations predating its effective date.

The LOI covers information exchanged "in the course of the evaluation, negotiation, or performance of due diligence in respect of this Agreement in Principle or the transactions contemplated herein." The evaluation, negotiation, or performance of due diligence for the sale of Splash did not actually begin until after the April 5th meeting, during which Schenck gave the Aon report and (at least some of) the historical loss data to Lancer. In other words, I view the April 5 meeting as a preliminary meeting for the parties to decide, as an initial matter, whether to enter into negotiations regarding the sale of Splash. The purposes of the LOI went into effect sometime after the meeting, when Catapang indicated that the figures "looked good" and that Lancer would like to do a further evaluation. Indeed, only after the April 5 meeting did the "due diligence team" from Lancer go to Knapp Schenck to review files and speak with executives, and thus, the April 5 meeting was not part of the due diligence process contemplated by the LOI. Whether the meeting was part of the "evaluation [or] negotiation in respect of this Agreement in Principle or the transactions contemplated herein" depends on the point at which those evaluations or negotiations began. I find that they did not begin until some initial decision to move ahead with the sale was made by Lancer--that, in other words, the "evaluation" and "negotiation" contemplated in the LOI were the evaluation and negotiations connected with the due diligence process. The oral agreement and attendant implied duty of confidentiality are collateral obligations pertaining to the pre-negotiation period.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

### 6. *Disposition*

**\*10** Accordingly, Lancer's motion for summary judgment will be granted on the merits as to Count V, the breach of contract claim; Lancer's motion is denied as to Counts I, II, IV and VI.

### B. Sanctions

Lancer moves for sanctions against Knapp Schenck on the grounds that Knapp Schenck failed to investigate adequately the basis for its claims before bringing suit and additionally failed to inform Lancer in a timely manner that it was dropping two of its counts. Lancer contends that Knapp Schenck's actions warrant sanctions under both Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927.

### 1. *Rule 11*

Lancer argues that Knapp Schenck violated subsections (b)(2) and (b)(3) of Rule 11. Those sections provide:
> (b) Representations to the Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--
> ...
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed.R.Civ.P. 11.

As an initial matter, given that I have found summary judgment is not warranted except as to Counts III, V, and VII, Rule 11 on its face is not applicable to the surviving counts. Specifically, as

to Count V, the claim of breach of confidentiality, I find that sanctions are not appropriate. It is undisputed that the parties entered into the LOI which contained a confidentiality provision. While I have determined that the provision does not apply to the information about which the use issue is in dispute, I do not find that Knapp Schenck was unreasonable in its contention that a breach claim was supported in law and by the facts of the case.

Additionally, at the time Knapp Schenck filed its Complaint, it could have reasonably believed that Counts III and VII were warranted. It certainly had a basis in law for the claims and given the circumstances surrounding the failed negotiations with Lancer regarding the Splash program and the subsequent launch of ODIN, I find that Knapp Schenck had a colorable belief that discovery might reveal a basis in fact for the claims. The mere fact that Knapp Schenck has not opposed Lancer's Motion for Summary Judgment as to Counts III and VII does not change this conclusion. Knapp Schenck may have decided not to pursue the claims for variety of legitimate reasons. Moreover, even were I willing to assume that Knapp Schenck abandoned the claims because discovery revealed no factual basis for the claims, Rule 11 concerns what Knapp Schenck knew at the time it filed the Complaint. *See Cruz v. Savage,* 896 F.2d 626, 631 (1st Cir.1990) ( "Courts should avoid using the wisdom of hindsight and instead evaluate an attorney's conduct based upon what was reasonable at the time the attorney acted."). Finally, given the expedited time frame for discovery and the fact that Lancer's motion for summary judgment followed closely on the heels of discovery completion, I do not find that Knapp Schenck delayed too long after a reasonable time for investigation and discovery in abandoning Counts III and VII.

**\*11** The purpose of Rule 11 is to "deter dilatory and abusive tactics in litigation and to streamline the ligation process by lessening frivolous claims or defenses." There is no evidence here that the rule applies to the actions of Knapp Schenck.

### 2. *28 U.S.C. § 1927*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

Lancer additionally argues that Knapp Schenck failed to give Lancer notice of its intention to abandon its claims in violation of 28 U.S.C. § 1927. Section 1927 provides:

Any attorney or person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

According to Lancer, in a meet-and-confer discussion as well as in a follow-up letter, Lancer encouraged Knapp Schenck to dismiss its claims but Knapp Schenck refused. Lancer further states that only after it filed its Motion for Summary Judgment did Knapp Schenck send Lancer a letter stating that it would not pursue Counts III and VII. Thus, Lancer contends that Knapp Schenck unreasonably and vexatiously multiplied proceedings by forcing Lancer to brief claims that it intended to abandon.

Lancer assumes that Knapp Schenck all along intended to abandon the claims and unnecessarily waited until Lancer had completed its summary judgment motion before doing so. That assumption, however, is disputed by Knapp Schenck and in any event is not supported by the chronology of the filings. According to Knapp Schenck, the Rule 7.1 meet-and-confer discussion occurred on May 29, 2003, the day before Lancer filed its Motion for Summary Judgment. Lancer sent the follow-up letter to Knapp Schenck on June 17, 2003, the same day that Knapp Schenck filed its Motion in Opposition to Summary Judgment, and Knapp Schenck responded two days later with a letter stating that it was not pursuing Counts V and VII.

Given that Lancer filed for summary judgment the day following the May 29 meet-and-confer discussion, it is reasonable to assume, as Knapp Schenck suggests, that the work done on the Lancer brief with regard to Counts V and VII was done or substantially done. Moreover, there is no evidence that Knapp Schenck intended before that date not to

pursue the claims. Knapp Schenck may have decided to abandon the claims after reading Lancer's Motion for Summary Judgment. In that case, the notice it gave to Lancer in the June 19 letter, two days after filing its opposition motion, was indeed timely. In *Pathe Computer Control Systems Corp. v. Kinmont Industries, Inc.,* 955 F.2d 94, 99 (1st Cir.1992), the First Circuit held that plaintiff's abandonment was "reasonably prompt" where defendant filed for summary judgment one day after responding to interrogatories and plaintiff abandoned the claim in its opposition motion. Here, while Lancer's Motion for Summary Judgment came two months after the close of discovery, I find that Knapp Schenck was entitled to at least some time to assess the evidence following discovery, as well as to evaluate Lancer's summary judgment motion, and thus the notice it gave was not unreasonably untimely.

**\*12** In *Hales v. Prudential Insurance Company of America,* No. Civ. 00- 2299 DWF/RLE, 2002 WL 31242213 (D.Minn. Oct.3, 2002), cited by Lancer, the court held that § 1927 sanctions were appropriate where plaintiff abandoned six claims after defendants moved for summary judgment. In that case, however, plaintiff brought six claims against defendants that it had abandoned in a previous case and plaintiffs indicated to defendants prior to defendants' motion for summary judgment that they intended to drop the claims. Here, Knapp Schenck made no indication that it intended to drop the claims before Lancer's Motion for Summary Judgment. Lancer's reliance on *Burger-Moss v. Steinman,* 127 F.R.D. 452, 453 (S.D.N.Y.1989), is similarly misplaced. In that case, three years after the case had been filed, after defendants moved for summary judgment, and on the day plaintiffs' counsel signed the joint pretrial order as the basis for proceeding to trial, plaintiffs conceded their inability to prove their case. Here, Knapp Schenck gave notice to Lancer two days after filing its opposition at the tail end of an expedited discovery process. I therefore find that sanctions under § 1927 are not appropriate in this case.

*III. CONCLUSION*

For the reasons set forth more fully above, Lancer's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 13

2004 WL 57086 (D.Mass.)

**(Cite as: 2004 WL 57086 (D.Mass.))**

motion for summary judgment is GRANTED IN
PART (as to Counts III, V and VII) and DENIED
IN PART (as to Counts I, II, IV and VI) and
Lancer's motion for sanctions is DENIED.

2004 WL 57086 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 1:02CV12118  (Docket)
                    (Oct. 30, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

2001 WL 311295 (D.Mass.)

**(Cite as: 2001 WL 311295 (D.Mass.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.
THERMO WEB SYSTEMS, INC., Plaintiff,
v.
Daniel BEEBE and Spanish Fort Supply, Inc.,
Defendants.
**No. Civ.A. 00-40170-NMG.**

March 15, 2001.

MEMORANDUM & ORDER

GORTON, J.

**\*1** On October 6, 2000, plaintiff Thermo Web Systems, Inc. ("Thermo Web") filed a Verified Complaint against defendants Daniel Beebe ("Beebe") and Spanish Fort Supply, Inc. ("SFS") alleging, *inter alia,* misappropriation of trade secrets, breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with advantageous business relations and unfair competition in violation of M.G.L. c. 93A, § 11. [FN1]

> FN1. Plaintiff named a third defendant, Kevin MacDonald ("MacDonald"), in the Complaint but it settled its claims against him prior to trial.

On December 20, 2000, this Court entered a preliminary injunction enjoining the defendants from engaging in certain competition with the plaintiff (Docket No. 40). Expedited discovery was ordered and an early trial date set to minimize the effects of the injunction.

On February 14, 2001, after a four-day trial, the jury returned a verdict finding
  1) Beebe and SFS not liable on the claim of misappropriation of trade secrets,
  2) Beebe liable for damages in the amount of $1 on the claim of breach of contract,
  3) Beebe liable for damages in the amount of $75,000 on the claim of breach of implied covenant of good faith and fair dealing, and
  4) Beebe and SFS liable for damages in the amount of $175,000 on the claim of tortious interference with advantageous business relations.

Prior to the trial, this Court informed the parties that it would not submit the claims under Chapters 93A and 93 to the jury but would determine for itself whether liability had been proven under Massachusetts statutory law. As then directed, the parties have submitted proposed findings of fact and conclusions of law with respect to those claims. The plaintiff's request for a hearing is denied because the Court is well aware of the claims which have been extensively briefed. The following findings of fact and conclusions of law with respect to the Chapter 93A and 93 claims are hereby entered:

*I. Findings of Fact*

1. Plaintiff, Thermo Web, is a Massachusetts corporation in the business of designing, manufacturing, supplying and servicing products used in the paper-making industry. Those products include Lexan blades and sheets, coater blades and doctor blades. Thermo Web's customers are primarily paper mills located throughout the United States.

2. The individual defendant, Beebe, is a former employee of Thermo Web. He was employed as its sole sales representative in the southeastern United States, including areas in Louisiana, Alabama, Georgia and Florida. His responsibilities were (a) to cultivate good will between Thermo Web and its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

2001 WL 311295 (D.Mass.)

**(Cite as: 2001 WL 311295 (D.Mass.))**

customers and (b) to determine the needs and the evolving market demand for paper mill supplies in his area.

3. When Thermo Web hired Beebe in 1996, he signed a "Company Information and Invention Agreement" which stated that during his employment by Thermo Web and thereafter, he would not disclose any company trade secrets or proprietary information to others or use the same for his own benefit. The agreement also provided that at the time of his termination from Thermo Web, for whatever reason, he would return to the company all of its papers and records in his possession.

**\*2** 4. The corporate defendant, SFS, is an Alabama corporation also in the business of manufacturing, supplying and servicing products used in the paper-making industry. SFS was formed by Beebe while he worked for Thermo Web, but without its knowledge, in or about October, 1999.

5. Beebe incorporated SFS to sell products such as Lexan blades and sheets only after he reasonably believed that Thermo Web had rejected his suggestion for it to sell those products.

6. While Beebe was employed by Thermo Web, and after he had incorporated SFS, his company supplied Thermo Web with Lexan products through Robert Dement, the manager of Thermo Web's plant in Atlanta, Georgia. Neither Dement nor Beebe divulged to Thermo Web Beebe's interest in SFS.

7. Dement communicated with Beebe (in Alabama) by telephone from his office in Atlanta. The Thermo Web purchase orders to SFS for Lexan products were initiated in Georgia and the products were shipped to Thermo Web's Atlanta facility.

8. SFS sent Dement two checks totaling approximately $2,000 as "commissions" for the sales of Lexan products to Thermo Web. These payments originated in Alabama and were sent to Dement in Georgia.

9. SFS has made no sales of its products to any customers located in Massachusetts.

*II. Conclusions of Law*

A. M.G.L. c. 93A, § 11

Chapter 93A, § 2(a) of the Massachusetts General Laws prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce". Any person engaged in trade or commerce who suffers a loss of money or property as a result of another's use of an unfair method of competition or an unfair or deceptive act may seek damages and such equitable relief as the court deems appropriate. M.G.L. c. 93A, § 11. A court may also award double or treble damages if it finds that the defendant's conduct was willful and knowing and shall award reasonable attorneys' fees and costs if it finds any violation of Chapter 93A. *Id.*

Massachusetts courts determine whether a practice is unfair or deceptive by looking for conduct which is (1) within the penumbra of some common-law, statutory, or other established concept of unfairness and (2) immoral, unethical, oppressive or unscrupulous. *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 504 (Mass.App.Ct.1979) (quotation marks and citations omitted).
> Whether a given practice runs afoul of these touchstones must be determined from the circumstances of each case.... The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

*Id.* Finally, the actions constituting the unfair method or deceptive act must have occurred "primarily and substantially" within Massachusetts. *Id.*

After consideration of all of the defendants' conduct, this Court concludes that the actions of the defendants do not, as a matter of law, amount to a violation of Chapter 93A. Based upon all of the evidence introduced at trial, the Court is not convinced that the defendants' actions were sufficiently unfair or deceptive to attain the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3

2001 WL 311295 (D.Mass.)

**(Cite as: 2001 WL 311295 (D.Mass.))**

requisite "level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." [FN2]

> FN2. Contrary to the defendants' assertion, the Court has considered all of their conduct in connection with the Chapter 93A claim (not just their alleged misappropriation of trade secrets) because allegations of misconduct were clearly incorporated into that claim by reference.

**\*3** This Court further concludes that even if Beebe's actions were otherwise violative of Chapter 93A, it is uncertain that those actions occurred "primarily and substantially" within the Commonwealth of Massachusetts. The evidence produced at trial indicates that the following relevant conduct occurred entirely or primarily outside of Massachusetts:
 (1) SFS's interactions with vendors and customers, including sales to Thermo Web,
 (2) Beebe's conversations with Dement regarding the viability of starting a business that sold Lexan products, and
 (3) SFS's payments of commissions to Dement for the sale of such products to Thermo Web.
Although the impact of the defendants' conduct was felt in Massachusetts and Beebe's failure to speak up at meetings with Thermo Web's management regarding its corporate opportunity in Lexan products occurred in Massachusetts, those facts do not satisfy the prerequisite that the alleged unfair or deceptive acts occur "primarily and substantially" within Massachusetts.

Finally, as this Court previously informed the parties, the Chapter 93A claim against Beebe failed, as a matter of law, because Massachusetts courts have held that employment agreements and disputes arising therefrom between an employee and his employer do not constitute either "trade" or "commerce" as those terms are used in the Massachusetts Consumer Protection Act. *Informix, Inc. v. Rennell,* 41 Mass.App.Ct. 161, 163 (1996), *rev. den'd* 423 Mass. 1110 (1996). Persuasive evidence was produced at trial that Beebe was, for all practical purposes, SFS. He admitted as much

when he testified that the only employee of SFS during the relevant time period was his wife and that she generally handled bookkeeping matters. Because a Chapter 93A claim cannot lie against Beebe and because he was virtually the alter ego of SFS, the 93A claim against both defendants fails for that reason as well.

B. M.G.L. c. 93, § 42

Section 42 of Chapter 93 of the Massachusetts General Laws prohibits the unlawful conversion of a trade secret and provides, at the Court's discretion, for the award of damages up to double the amount found to have been converted. M.G.L. c. 93, § 42. The following section allows "any aggrieved party" to obtain "appropriate injunctive relief" in order to prevent the aggrieving party from using or disposing of a trade secret, regardless of its value. M.G.L. c. 93, § 42A.

At the conclusion of trial, the jury found the defendants not liable for misappropriation of trade secrets. This Court is content with that finding. The facts do not support a reversal of the verdict on trade secrets because the evidence did not establish that Thermo Web's customer information, pricing, "detailed notching and punch pressing technology" or carbon fiber blade material were trade secrets. Thermo Web's requests for injunctive relief, under § 42A or otherwise, will, therefore, be denied.

It is noted in conclusion that Beebe clearly owes a continuing common law duty to his former employer not to disclose to anyone Thermo Web's confidential information, nor to violate the nondisclosure provision contained in his employment agreement. At this stage of the proceedings, he is well aware of his duty, and the requested injunction would be superfluous and is, therefore, unwarranted.

ORDER

**\*4** For the foregoing reasons, it is ordered that judgment enter in favor of the defendants on the plaintiff's claims of violations of M .G.L. c. 93A, §§ 2 and 11 and c. 93, §§ 42 and 42A.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

2001 WL 311295 (D.Mass.)

**(Cite as: 2001 WL 311295 (D.Mass.))**

So ordered.

2001 WL 311295 (D.Mass.)

   **Motions, Pleadings and Filings (Back to top)**

• 4:00CV40170  (Docket)
                        (Oct. 06, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 

2·9·05

### THE HARBOR LAW GROUP

48 Maple Avenue • Shrewsbury, MA 01545 • Phone (508) 842-9244 • Fax (508) 842-9311 • www.harborlaw.com

DIAM-COYTUS

February 7, 2005

Commissioner for Trademarks
U.S. Patent and Trademark Office
P.O. Box 1451
Alexandria, VA 22313-1451

      Re:    Trademark Registration Serial No. 78326647 – DIAMOND STAFFING
               Opposition 91162785

Dear Madam:

Enclosed is Applicant's revised ANSWER to the above-referenced Opposition to our client's trademark registration. Included are all pertinent exhibits. A copy has also been mailed to the Opposer's attorney, Donald F. Mofford, Esq. At Daly, Crowley & Mofford, LLP.

If you have any questions or need further information, please contact our office.

Yours truly,

Mary C. Casey
Managing Attorney

Enclosures

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Diamond Staffing Solutions, Inc.

    v.

Diamond Staffing, Inc.

Opposition #91162785

## ANSWER

Comissioner for Trademarks
2900 Crystal Drive
Arlington, VA 22202-3513

Madam:

Diamond Staffing, Inc. (Applicant) is a corporation organized and existing under the laws

of the Commonwealth of Massachusetts, having its principal place of business at 46 West

Boylston Drive, Worcester, Massachusetts 01609, and hereby submits its **Answer** to the

above-referenced Opposition #91162785 as submitted by Diamond Staffing Solutions,

Inc. (Opposer) to Applicant's  trademark application, Serial # 78326647.

In answer to Opposer's grounds of Opposition, we allege as follows:

Answer to Opposition                                                  Page 1 of 6

### 1. Opposer's use of mark.

Applicant does not have sufficient information to either admit or deny this statement, except that Applicant maintains that Opposer's use of the mark has been limited exclusively to recruitment for positions in the jewelry industry.

### 2. Opposer's intentions for future use of the mark.

Applicant cannot admit or deny this claim as it cannot know what Opposer's intentions are relative to its future use of the mark. However, Applicant maintains that Opposer's prior and current use, as indicated on its web site and in its Mission Statement, has been limited exclusively to the jewelry industry (see Exhibit "A"), which fact was confirmed by the Opposer during telephone conversations between the Applicant and the Opposer.

### 3. Opposer's valuable reputation.

Applicant does not have sufficient information to admit or deny Opposer's claims regarding the quality of its services, except to note that whatever reputation it has garnered has been limited to the jewelry industry, and not in the broader professional staffing services area.

### 4. Goodwill.

Applicant does not have sufficient information to know whether or not Opposer has developed goodwill.

**5. Common Law Rights.**

Applicant denies that the marks DIAMOND STAFFING SOLUTIONS and

DIAMOND STAFFING have become identified with the Opposer in the minds of

consumers, except, perhaps, for those in the jewelry industry. Applicant maintains

that Opposer's use of the mark has not been sufficiently long to develop any common

law rights or, that any common law rights it may have developed are limited to the

use of DIAMOND STAFFING SOLUTIONS in the jewelry industry, and not in the

broader general professional placement arena.

**6. Applicant's filing.**

Applicant admits that it filed Application Serial No. 78326647 for trademark

registration on November 12, 2003, after searching the PATENT AND

TRADEMARK OFFICE database and finding no other registration or application for

the mark DIAMOND STAFFING.

**7. Priority.**

Applicant denies that priority of use for the name DIAMOND STAFFING is not an

issue. Priority is established by the filing date and Applicant's filing date is prior to

Opposer's filing (see Exhibit "C" and Exhibits "D" and "E").

**8. Similarity of Mark.**

Applicant denies that the marks are identical, but allows that there is similarity

between the marks. Applicant's mark is DIAMOND STAFFING, versus Opposer's

**name** which is DIAMOND STAFFING SOLUTIONS. Moreover, Applicant maintains that Opposer has contributed to making the marks seem identical when it misuses its own name by referring to itself as DIAMOND STAFFING instead of DIAMOND STAFFFING SOLUTIONS.

## 9. Similarity of services.

Applicant accepts the statement indicating how the services are advertised only insofar as both Applicant and Opposer use the Internet to advertise their services. However, Applicant strongly denies that that the parties' services are directed at similar customers. Nowhere on Applicant's web site, or in any of its literature and promotional material, does it solicit or even mention the jewelry industry. Unlike the Opposer, whose very Mission Statement clearly states that it "focuses exclusively on the jewelry industry." (See Exhibit "A"). Thus, while Opposer is clearly in a niche market, i.e. jewelry, Applicant's services are directed at a much broader, varied market, e.g., administrative, customer service, light industrial, sales, and technical, as indicated by its web site. (See Exhibit "B")

## 10. Likelihood of confusion.

Applicant denies that its use of the mark interferes with Opposer's use of its DIAMOND STAFFING SOLUTIONS, INC. mark because the customer base served by the parties is very different. Customers seeking placement services are sophisticated enough to differentiate between Applicant's and Opposer's service offerings. At worst, any customers that inadvertently contact the wrong company will

quickly realize it or can easily be re-directed. Moreover, Applicant has repeatedly

made suggestions to Opposer on steps it can take to avoid the misdirection of emails,

but Opposer, to Applicant's knowledge, has chosen not to implement said steps.


**11. Injurious effect on Opposer.**

Applicant denies that its reputation would reflect negatively on Opposer. Applicant

has been in the employment industry for over 6 years and has built a solid reputation

for excellence, integrity and honesty. It has built and expanded its business over the

years and has developed a loyal customer base and an excellent standing in the

industry.


**12. Likelihood of confusion.**

Applicant denies that the nature of the services is such as to cause actual confusion, or

to result in any loss of business or diminished reputation for the Opposer, and refers

back to statements made in section 10 above.


**13. Exclusive right to use the Mark.**

Opposer argues that registration of the Applicant's mark would give it de facto

exclusive right of use. Federal registration of trademarks was specifically designed to

allow individuals and companies to check on the availability of specific trademarks

and, if a mark was not previously registered, to allow such individual or company to

register such mark and to use it exclusively. Applicant admits that, as the first

registrant, it would obtain exclusive use to the mark DIAMOND STAFFING for

general professional staffing services. Applicant has filed for registration of the mark DIAMOND STAFFING, not DIAMOND STAFFING SOLUTIONS. When Applicant searched the PATENT AND TRADEMARK OFFICE database for the mark DIAMOND STAFFING, it found none, and proceeded to file its application. Applicant followed the federal rules and guidelines relating to trademark research, use and registration.

WHEREFORE, Applicant requests that Application Serial No. 7832664 be allowed and that federal registration of the mark DIAMOND STAFFING be issued for the services specified therein and that this opposition be rejected in favor of the Applicant.

Respectfully submitted,

By: _____
Mary C. Casey
Managing Attorney

ATTORNEY FOR DIAMOND STAFFING, INC.

Harbor Law Group
48 Maple Avenue
Shrewsbury, MA  01545
(508) 842-9244  Telephone
(508) 842-9311  Facsimile
Dated: February 7, 2005



# ABOUT DIAMOND STAFFING



ABOUT US

NEWS

SERVICES

JOB OPPORTUNITIES

OUR MARKET

LOSS PREVENTION

CONTACT US

HOME

Call Today 603-437-2629
Toll Free 877-396-6377
email suzanne@diamondstaffing.com

**Diamond Staffing Solutions**[SM] is a national placement service that focuses exclusively on the jewelry industry and is dedicated to bringing you the best talent in the industry. We strive to develop long term relationships based on integrity, honesty, and chemistry.

Suzanne DeVries, President of Diamond Staffing Solutions[SM], has over 30 years in the retail and wholesale jewelry field. Her business has been built on working with only the crème de la crème - both clients and candidates. Her knowledge, experience and personalized service appeal to the market's most prestigious leaders.

## Our Mission Statement

To continue as the leading national placement service that focuses exclusively on the jewelry industry.

To stay on the cutting edge of the industry's b

To use our personalized service to confidently candidates in positions which maximize their t and to give employers an immediate asset to business.

To establish long-term relationships based integrity, honesty, and chemistry.

To ensure the highest quality of service for our by understanding personalities and company c through site visits, background checks, and personality profiles



"Suzanne has taken a great deal of time to learn about the culture of our organization and understands the skill set that a candidate needs to be successful here. Suzanne represents our company very professionally. She thoroughly pre-screens all candidates before presenting them, and as a result consistently provides quality candidates. Suzanne's response time and work ethic has been unmatched by other firms that we have worked with. It is a pleasure to work with Suzanne and I would recommend the services of Diamond Staffing Solutions[SM] for your recruiting needs."

- Large Retail Jeweler

Copyright © 2004 Diamond Staffing Solutions, Inc.
Diamond Staffing Inc.[SM] & Diamond Staffing Solutions Inc.[SM]
are trademarks of Diamond Staffing Solutions, Inc.

Exhibit "A"





# OUR MARKET

ABOUT US

NEWS

SERVICES

JOB OPPORTUNITIES

OUR MARKET

LOSS PREVENTION

CONTACT US

HOME

As most of you know, the retail jewelry market changes all the time. With any business, keeping abreast of the latest trends, techniques, procedures, and laws is necessary for making good business decisions as it is with our assesments and choices in placements. The knowledge of these things allows us to better select the right candidate and place that candidate in the right position to maximize their talents. Diamond Staffing Solutions, Inc.SM prides itself on being on the cutting edge in the jewelry profession's placement industry and that means working hard, personal service, and knowing the business.

Copyright © 2004 Diamond Staffing Solutions, Inc.
Diamond Staffing Inc.SM & Diamond Staffing Solutions Inc.SM
are trademarks of Diamond Staffing Solutions, Inc.

Call Today 603-437-2629
Toll Free 877-396-6377
email suzanne@diamondstaffing.com

# Diam♥nd Staffing, Inc.

*...A Cut Above the Rest!*



Our Mission          Job Search          Opportunities          Locations

Are you in search of an agency that is a cut above the rest?

If your answer is yes!!!, then talk to us at Diamond Staffing.  Our team approach and creative strategies can be implemented into your company needs and help assure that you exceed your recruitment goals, whatever those may be.

If you want the ultimate in Health Care staffing, visit our health care division at Horizons Healthcare.

**Diamond Staffing, Inc.**
146 West Boylston Drive Worcester, MA
508-459-5005
508-459-5014 (fax)
*resume@diamondstaffinginc.com*

Exhibit "B"



Diamond
Staffing, Inc.

| Diamond Personnel | Diamond Opportunities | Career Seekers | Job Search | Locations |

## Opportunities

Contact Us

Diamond Staffing, Inc. offers a wide array of services such as direct hire, temp, temp to perm and contract. Businesses can depend on us to provide talent for short or long term assignments. Looking to gain experience? Temporary employment can provide a chance to learn new skills and offers flexibility.

## Services Provided:

Administrative Assistants
Customer Service Specialists
Data Entry
Engineering
Executive Assistants
Finance & Accounting

Information Technology
Legal Secretaries
Light Industrial Staffing
Sales
Telesales

Copyright © 2003
Diamond Staffing,
Inc. Worcester MA



UNITED STATES PATENT AND TRADEMARK OFFICE

Home     Index     Search     System Alerts     eBusiness Center     News & Notices     Contact Us

## Trademark Electronic Search System(Tess)

*TESS was last updated on Wed Dec 15 04:34:43 EST 2004*

PTO HOME | TRADEMARK | TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSER DICT | BOTTOM | HELP | PREV LIST

CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [        ]  OR  Jump  to record: [        ]   **Record 3 out of 3**

Check Status  *(TARR contains current status, correspondence address and attorney of record for this mark. Use the "Back" button of the Internet Browser to return to TESS)*

# Diamond Staffing

*Applicant's filing*

| | |
|---|---|
| **Word Mark** | **DIAMOND STAFFING** |
| **Goods and Services** | IC 035. US 100 101 102. G & S: Employment hiring, recruiting, placement and staffing services. FIRST USE: 20031108. FIRST USE IN COMMERCE: 20031108 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 78326647 |
| **Filing Date** | November 12, 2003 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 5, 2004 |
| **Owner** | (APPLICANT) Diamond Staffing, Inc. CORPORATION MASSACHUSETTS 146 West Boylston Drive Worcester MASSACHUSETTS 01609 |

*Exhibit "C"*

| | |
|---|---|
| **Attorney of Record** | Mary C. Casey |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "staffing" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| PTO HOME | TRADEMARK | TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | TOP | HELP | PREV LIST |
| CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

HOME | INDEX | SEARCH | SYSTEM ALERTS | BUSINESS CENTER | NEWS&NOTICES | CONTACT US | PRIVACY STATEMENT

UNITED STATES PATENT AND TRADEMARK OFFICE

Home    Index    Search    System Alerts    eBusiness Center    News & Notices    Contact Us

## Trademark Electronic Search System(Tess)

*TESS was last updated on Wed Dec 15 04:34:43 EST 2004*

| PTO HOME | TRADEMARK | TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | BOTTOM | HELP | PREV LIST |
| CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout    Please logout when you are done to release system resources allocated for you.

Start    List At: [      ]    OR    Jump    to record: [      ]    **Record 1 out of 3**

Check Status    *(TARR contains current status, correspondence address and attorney of record for this mark. Use the "Back" button of the Internet Browser to return to TESS)*

# Diamond Staffing

*Opposer's filing*

| | |
|---|---|
| **Word Mark** | **DIAMOND STAFFING** |
| **Goods and Services** | IC 035. US 100 101 102. G & S: professional staffing services. FIRST USE: 20020506. FIRST USE IN COMMERCE: 20020506 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 78331011 |
| **Filing Date** | November 20, 2003 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Owner** | (APPLICANT) Diamond Staffing Solutions, Inc CORPORATION DELAWARE 5 Remington Court Derry NEW HAMPSHIRE 03038 |
| **Attorney of Record** | Donald F. Mofford |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "STAFFING" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

*Exhibit "D"*





UNITED STATES PATENT AND TRADEMARK OFFICE

Home    Index    Search    System Alerts    eBusiness Center    News & Notices    Contact Us

## Trademark Electronic Search System(Tess)

*TESS was last updated on Wed Dec 15 04:34:43 EST 2004*

| PTO HOME | TRADEMARK | TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | BOTTOM | HELP | PREV LIST |
| CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [        ]    OR   Jump   to record: [        ]    **Record 2 out of 3**

Check Status | *(TARR contains current status, correspondence address and attorney of record for this mark. Use the "Back" button of the Internet Browser to return to TESS)*

# Diamond Staffing Solutions

*Opposer's filing*

| | |
|---|---|
| **Word Mark** | **DIAMOND STAFFING** SOLUTIONS |
| **Goods and Services** | IC 035. US 100 101 102. G & S: Professional staffing services. FIRST USE: 20020506. FIRST USE IN COMMERCE: 20020506 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 78330998 |
| **Filing Date** | November 20, 2003 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Owner** | (APPLICANT) Diamond Staffing Solutions, Inc. CORPORATION DELAWARE 5 Remington Court Derry NEW HAMPSHIRE 03038 |
| **Attorney of Record** | Donald F. Mofford |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "STAFFING SOLUTIONS" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

Exhibit "E"



HOME | INDEX | SEARCH | SYSTEM ALERTS | BUSINESS CENTER | NEWS&NOTICES |
CONTACT US | PRIVACY STATEMENT