UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS, INC.,

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

## RULE 56(F) AFFIDAVIT OF NICHOLAS G. PAPASTAVROS

I, Nicholas G. Papastavros, do on oath hereby depose and say as follows:

1.    I am a partner in the law firm of Nixon Peabody LLP, and am lead counsel for the plaintiff, Diamond Staffing Solutions, Inc. ("Diamond Staffing Solutions$^{SM}$") in this matter.

2.    Attached hereto as Exhibit 1 is a true and accurate copy of the Transcript from the hearing on Diamond Staffing Solutions$^{SM}$ Motion for Expedited Discovery, dated May 9, 2005.

3.    Attached hereto as Exhibit 2 is a true and accurate copy of a printout of excerpts from the defendant's website, www.diamondstaffinginc.com .

4.    Plaintiff served its Complaint in late April, 2005, and filed its Motion for Expedited Discovery, along with a supporting memorandum, on April 29, 2005.

5.    Defendant then filed its Opposition to Plaintiff's Motion for Expedited Discovery, along with its Motion to Dismiss or, in the alternative, for Summary Judgment, on May 6, 2005. At that time, no discovery had been completed.

6.    In this vein, no discovery has been completed at the current time.

7.    Diamond Staffing Solutions$^{SM}$ believes that it has presented sufficient facts necessary to oppose Diamond Staffing, Inc.'s ("DSI") Motion for Summary Judgment in its

Opposition brief, the May 9, 2005 Affidavit of Suzanne DeVries, the May 20, 2005 Second

Affidavit of Suzanne DeVries, and the Verified Complaint.

8.     However, to the extent the Court disagrees, Diamond Staffing Solutions[SM]

contends that additional facts necessary to support its Opposition brief are solely within the

possession and control of DSI.  These facts include, but are not limited to, the following:

- Facts relating to DSI's intent in registering the domain name
  www.diamondstaffinginc.com;

- Facts relating to DSI's intent in changing its name from Ultimate Personnel to Diamond
  Staffing, Inc.;

- Facts relating to instances of actual confusion between Diamond Staffing Solutions[SM] and
  DSI, including confusion among clients, potential clients or potential employees;

- Facts relating to DSI's channels of advertising, marketing and promotion; and

- Facts relating to the nature and extent of DSI's client base, including whether DSI places
  candidates in positions within the jewelry industry and/or related industries.

9.     The Court has previously acknowledged that "good cause" exists for this

expedited discovery in its ruling in Diamond Staffing Solutions[SM,] Motion for Expedited

Discovery, dated May 9, 2005.

Signed under the pains and penalties of perjury this 20th day of May, 2005.

_____
Nicholas G. Papastavros

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CV NO. 05-40046

------------------------------
DIAMOND STAFFING,                    )
            Plaintiff,               )
                                     )
    vs.                              )
                                     )
DIAMOND STAFFING,                    )
            Defendant.               )
------------------------------

MOTION HEARING

BEFORE:  Saylor, D.J.

                        United States District Court
                        Courtroom No. 2
                        595 Main Street
                        Worcester, MA 01608
                        Monday, May 9, 2005

            *   *   *   *   *   *   *   *   *   *

**TARALLO & TARALLO**
PROFESSIONAL COURT REPORTERS

P.O. BOX 85
AUBURN, MASSACHUSETTS 01501
TEL: (508) 832-0048          FAX: (508) 832-0209

```
 1    APPEARANCES:

 2            NIXON PEABODY LLP
                BY:  Nicholas G. Papastavros, Esq.
 3            100 Summer Street
                Boston, Massachusetts 02110-2131
 4                        On behalf of the Plaintiff.

 5

 6            Robert N. Meltzer, Esq.
                P.O. Box 1459
 7            Framingham, Massachusetts 01701
                - and -
 8            Mary Casey, Esq.
                Harbor Law Group
 9            48 Maple Avenue
                Shrewsbury, Massachusetts 01545
10                        On behalf of the Defendant.

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1    (The Court enters the room at 4:24 p.m.)

2

3              P R O C E E D I N G S

4              THE CLERK:  Court is now open.  You may

5    be seated.  Case No. 05-40046.  Diamond Staffing

6    Solutions V Diamond Staffing.

7              Counsel please note your appearance for

8    the record.

9              MR. PAPASTAVROS:  Good afternoon, Your

10   Honor.  Nick Papastavros from the firm of Nixon

11   Peabody.  I'm here on behalf of the plaintiff,

12   Diamond Staffing Solutions, Incorporated.

13             THE COURT:  Good afternoon.

14             MR. MELTZER:  Good afternoon, Your

15   Honor.  Rob Meltzer for the defendant, Diamond

16   Staffing, Inc.

17             THE COURT:  Good afternoon.

18             MS. CASEY:  Mary Casey, representing

19   the defendant, from Harbor Law Group.

20             THE COURT:  Good afternoon.  All right.

21   I think we actually have three motions pending in

22   this case.  The easy one is plaintiff's motion for

23   leave to file a reply brief, which I'm going to

24   grant.

1        The defendants have filed a motion to

2   dismiss for summary judgment or in the alternative

3   to compel plaintiffs to post a bond.  That motion

4   was filed on May 5.  To the extent it's a motion to

5   dismiss, it's not -- or a motion for summary

6   judgment, it's not yet ripe.

7        And to the extent it's a motion to

8   compel posting of a bond, I'm going to deny it in

9   its present form.  If, at the appropriate time, I

10   grant a preliminary injunction to the plaintiffs or

11   any other ruling party, Rule 65 will require them

12   to post a bond, and I will so order at the time.

13        So really we're here on the emergency

14   motion for expedited discovery which was filed

15   April 29.  And Mr. -- I hope I don't mispronounce

16   it -- Mr. Papastavros.

17        MR. PAPASTAVROS:  That's correct, Your

18   Honor.

19        THE COURT:  I'll hear from you first.

20        MR. PAPASTAVROS:  Thank you, Your

21   Honor.

22        The plaintiff, Diamond Staffing

23   Solutions, whose materials look like this, Your

24   Honor, this is their material that they send out to

1    each and every of their clients, are a Derry, New

2    Hampshire corporation incorporated in the State of

3    Delaware.

4              They commenced doing business in May of

5    2002 and they -- their business is essentially in

6    the area of professional staffing services,

7    primarily in the jewelry industry.  Their first --

8    Diamond Staffing Solutions first two customers were

9    two national jewelry chains, Helzberg Diamonds and

10   Whitehall Jewelers.  Helzberg has 260 stores,

11   Whitehall 380 stores, both according to their

12   websites.  So that looks like the approximate, Your

13   Honor.

14             The point is that Diamond Staffing

15   Solutions, Incorporated, was immediately doing

16   business on a nationwide level from the get-go, May

17   of 2002.  And over the last few years, they have

18   meticulously built their reputation in the area of

19   staffing services.

20             They are now a preeminent staffing

21   service in the jewelry industry with customers,

22   including Helzberg, others, Sterling Jewelers which

23   has a chain of Kay jewelry stores, over a thousand

24   nation-wide, Borsheim's Jewelry, a company that

1  Warren Buffett has invested in, and Borsheim has

2  the largest store nationwide in Omaha, Nebraska.

3  They've also contracted with Tiffany's and have

4  developed a significant reputation in this industry

5  over the last new years.

6        In fact, they've done such a good job

7  that their reputation has extended beyond the

8  industry, and they have recently been retained by

9  Swarovski Crystal to do some work in giftware.  So

10  they're starting to broaden out their scope.  So

11  although admittedly their focus will continue to be

12  in the jewelry industry.

13        One of the things that Diamond Staffing

14  Solutions has tried to do since May of 2002 is

15  meticulously protect their brand which is very

16  important to them.  They have refused a significant

17  number of opportunities with companies in the

18  industry that have less than sterling reputations.

19  Essentially, their goal is to do business with

20  companies that are on the up and up.  And in the

21  jewelry industry, that could be a little bit of a

22  concern from time to time.

23        The plaintiff believes that Diamond

24  Staffing and Diamond Staffing's entry into the

marketplace and their activities over the last

couple of years significantly jeopardize what

Diamond Staffing Solutions, Incorporated is doing.

There is a -- Diamond Staffing, as our

papers indicate, Diamond Staffing, Inc. or DSI, as

I will refer to them, came onto the marketplace in

or about November of 2003.  That's 18 months after

the plaintiff commenced doing business.  Since that

point in time, there has been a considerable amount

of confusion in the marketplace between the two

companies.

As the affidavit of my client, Suzanne

DeVries, who is here today, indicates, on at least

four separate occasions, including one occasion

identified in the defendant's papers, entities have

-- I should say actual and potential clients or

candidates have gone to DSI looking for my client,

Diamond Staffing Solutions, Incorporated.  That

includes clients -- one client out of Minnesota,

another client apparently in Chicago which we were

actually unaware of until receiving defendant's

papers on Friday.  Certain of these clients appear

to have made their way to Diamond Staffing

Solutions, Incorporated.  Ultimately others -- for

1    example, the Chicago company, we're not sure of.

2    This is the first we ever heard of it.

3              We believe that this confusion, indeed,

4    could be and is causing Diamond Staffing Solutions

5    harm in the marketplace and certainly harming its

6    reputation.  The confusion can be exemplified by

7    Diamond Staffing, Inc.'s website.

8              As this picture indicates, which I'm

9    sure is what you can see, is probably a diamond on

10    the front of their website.  Diamond Staffing, Inc.

11    markets itself as a staffing company that is a cut

12    above the rest with a diamond on the first page of

13    the website.  Diamond Staffing, Inc. says they

14    don't do business in jewelry, but you can't tell

15    that from the first page of the website, nor can

16    you tell it otherwise.  It seems as if certainly if

17    they're not doing business in the jewelry

18    industry -- and that's certainly one of the things

19    that we want to seek discovery on -- that they

20    would not turn away business if it came their way.

21    They do staffing services in different areas.

22              Now, Diamond Staffing Solutions,

23    Incorporated, the plaintiff, has also received a

24    number of misdirected e-mails that were intended

1  for Diamond Staffing, Inc.  And, you know, we think

2  that there is a considerable amount of actual

3  confusion in the marketplace that the defendant is

4  simply ignoring in their favor.

5          Now, Your Honor, there is a number of

6  other -- a number of the other Pignons factors or

7  Polaroid factors under trademark law also militate

8  in favor of the plaintiff here.  The marks are very

9  similar.  The services, while not identical, are

10  very similar for purposes of trademark law.  They

11  are both staffing services companies.  They may not

12  do identical things, but there still exists a

13  confusion in the marketplace.  And the standard,

14  Your Honor, really is that a recent First Circuit

15  talks about the -- as I'll identify it here in one

16  second.  The Beacon Mutual case from 2004.  The

17  cite is 376 F.3d 8.  The key is does the confusion

18  present a significant risk to the sales, goodwill

19  or reputation of the service mark holder, and we

20  believe that there is significant confusion

21  especially to the goodwill and the reputation of my

22  client.

23          Now, Your Honor, we also think that

24  there are a couple of other factors, the Pignons or

1  Polaroid factors under trademark law militate in

2  favor of my client here.  As I said, the services

3  are very similar.  Marketing channels are actually

4  going to be very similar.  Both parties market on

5  Monster.com.

6         We believe ultimately that the intent

7  factor will militate in favor of my client.  One of

8  the key questions here is what was the intent of

9  DSI when they came onto the marketplace in November

10 of 2003.  And it's our contention that DSI is

11 simply attempting to trade off of Diamond Staffing

12 Solutions name.  We believe that DSI knew about

13 Diamond Staffing Solutions website.  In fact, they

14 probably would have registered the domain name

15 Diamond Staffing.com had it been available, but it

16 wasn't available so they registered Diamond

17 Staffing, Inc.com.  But they certainly were aware

18 of what we were doing in the marketplace in

19 November of 2003 when they started.

20        So, Your Honor, what I'm seeking here

21 today is some discovery to, you know -- on an

22 expedited basis -- to try to bolster these

23 contentions that I provided a sampling of.

24        THE COURT:  Well, one thing that's not

clear to me is what the urgency is now.  I take it

this issue has been at least on Diamond Staffing

Solutions radar screen since November of '03.

Right?  So it's a year-and-a-half.  You have

cross-applications.  Are those still pending at the

patent and trademark office?

MR. PAPASTAVROS:  Your Honor, Diamond

Staffing Solutions, Inc. has opposed the attempted

registration of DSI and subsequently moved to stay

that proceeding in light of the current proceeding

before Your Honor.  We also have a pending

application that's going through the trademark

office.  I believe that that was recently approved

for publication.

THE COURT:  All right.  But talk to me

about the timing of it.

MR. PAPASTAVROS:  Certainly.  Your

Honor.  And I understand that that would be an

issue from Your Honor's perspective.

There is significant events that have

happened recently.  No. 1, in the fall of 2004, my

client was named as a defendant in an MCAD

proceeding and was served papers.  Papers were

served on them, when, in fact, the papers were

1    intended for DSI and not my client.  Obviously,

2    that type of a proceeding, which my client is

3    attempting to build its reputation in the industry,

4    is very concerning to my client.  And that raised

5    the ante.

6            And, secondly, there was an incident in

7    February of this year in which a significant

8    client, Kirschner Corporation, in Minnesota, I

9    believe it's February 25, contacted DSI to, you

10   know, looking for Miss DeVries, in fact, and

11   looking for Diamond Staffing Solutions,

12   Incorporated.

13           Ultimately, we were able to get in

14   touch with Kirschner Corporation.  However, it is

15   our understanding that there was some communication

16   during contact between DSI and Kirschner to the

17   effect that Diamond Staffing Solutions,

18   Incorporated, was an affiliate of DSI.  We are

19   still -- you know, we'd like to discover some

20   information relating to that, Your Honor.  That's

21   our understanding at this time.

22           But those two issues significantly

23   raised the ante for my client.  And there is case

24   law that we have referred to, Your Honor, in our

1    motion papers, understanding the delay here, that

2    says that even in situations like this where a

3    defendant puts it there is a seven-month delay,

4    even in circumstances like this you can be entitled

5    to expedited relief.

6              THE COURT:  All right.

7              MR. PAPASTAVROS:  A couple other things

8    with respect to that delay, Your Honor, we

9    submitted at the time.  My predecessor counsel is

10   not an experienced litigator, actually, so that

11   comes into play here, Your Honor.

12             And the other thing is that my

13   client -- I don't think DSI can claim they're

14   prejudiced here because my client has all the way

15   along been clearly trying to protect its rights

16   here.  I mean, it has opposed DSI's registration in

17   the trademark office.  It has sent a number of

18   cease and desist correspondence.  And the Boustany

19   case from the District of Massachusetts talks about

20   how when the plaintiff is attempting to be vigilant

21   in protecting its rights that some sort of delay in

22   seeking injunctive relief shouldn't be held against

23   it to any great extent.

24             THE COURT:  Okay.  Anything further?

1          MR. PAPASTAVROS:  No.  I'll turn it

2      over to my brother here and ask for a time to rebut

3      if possible.

4          THE COURT:  Yes.

5          MR. MELTZER:  Thank you, Your Honor.

6      Again, Rob Meltzer for the defendant, Diamond

7      Staffing, Inc.

8          Diamond Staffing, Inc. is a

9      Worcester-based temp agency.  As our documents

10     demonstrate, this year's sales are approximately

11     $35 million, provides a weekly payroll of 1,400 to

12     1,600 employees, is a temp agency, does not provide

13     full-time placement.  It is in no way in the

14     jewelry industry.  It is distinctly contrasted from

15     Diamond Staffing Solutions, Inc. which identifies

16     itself in its own papers as exclusively in the

17     jewelry industry.

18         Our position on this expedited

19     discovery, Your Honor, is that this plaintiff lacks

20     standing to bring a lawsuit in the first place.

21     There is no likelihood of success on the

22     preliminary injunction.  There is no possibility of

23     success on an ultimate trial.  This has been

24     harassment of my client.

1           There is also several misleading things

2   that I want to clarify.  First of all, Diamond

3   Staffing, Inc. is a Massachusetts corporation in

4   good standing.  No. 2, it holds the state mark.  It

5   has the exclusive right to use the state mark.

6   And, in fact, in the paperwork submitted by the

7   plaintiff, they routinely use the state mark which

8   implies some kind of superior right.  No. 3,

9   Diamond Staffing, Inc. does have a pending federal

10  trademark application and, in fact, the plaintiff

11  has not been accepted for publication and, in fact,

12  the plaintiff did not seek for federal trademark

13  protection and, in fact, it has no right to

14  interfere with any use of Diamond Staffing, Inc.

15  trademark in Massachusetts.

16          The issue that's been raised is whether

17  or not there was some common law right prior use,

18  prior to the granting of the state trademark rights

19  of Diamond Staffing, Inc.  The law on this is black

20  letter.  In order to have any kind of common law

21  rights, it has to be in a geographic area

22  specifically targeted, and it has to be in the

23  exact channel of commerce.

24          In our papers, we've cited the Boustany

case, Boston Dental, Boston Dental Group, Inc.,

both dentists in exactly the same business,

targeting the same customers in the same geographic

area.  We reference the Baystate Savings, Baystate

Financial case, another Worcester case where it was

held that even though they have pretty much the

same name and were pretty much across the common

from each other, no Lanham Act because they're not

in the identical general business.  One is a

savings bank.  One, although a financial services

company, is a commercial bank and, therefore, no

competition for the same customers.

All of the cases that have been cited

by the plaintiff have exactly the same fact

pattern.  For example, they cite Champion Golf Club

V Champion Golf Club, Inc.  The court noted,

"Houston and Nicholasville (phonetic) provided

nearly identical services."  Plaintiff cited a case

called Thrifty Rent-a-car V Thrift Cars, Inc.

Again, the court noted that this became an issue

when the two companies with the same name in the

same geographic proximity were involved in exactly

the same business.  Northern Light Technology V

Northern Lights.  Similar situation.  The court

1    noted that both companies were providing exactly

2    the same services apparently and exactly the same

3    location.   The quote from the court is in the

4    present case, the plaintiff and defendant services

5    are likely to be related in the minds of the public

6    as both offer web page services and navigate the

7    worldwide web.   It is very different when the web

8    user accessed Northern Lights.com and found a site

9    advertising oil drilling.

10             Well, this is the case where the

11   customer accessing a site would find the figurative

12   of oil drilling.   This is a case where you have one

13   company, a Massachusetts company, state mark,

14   federal trademark protection application, providing

15   a temp service, a very large company with an awful

16   lot of money invested in its advertising in the

17   state.

18             On the other hand, you have a

19   home-based business out of New Hampshire who cannot

20   identify a single advertising or otherwise infusion

21   into the Massachusetts market before the state mark

22   was issued.   And in fact, the plaintiff in their

23   own papers admits where their case is going to

24   fail.

1          On Page 8 of the reply brief which I

2    received today -- I'll give you their quote.  They

3    state, second paragraph down, "While the services

4    offered by the parties here may not be identical."

5    That's the fifth line down, second paragraph.

6    Excuse me.  Fourth line down.

7          There is absolutely no case law that I

8    have found anywhere that states that an

9    out-of-state company in a different line of

10   business with different customers, different

11   marketing base, different advertising, can come

12   into a state and challenge the use of a name by a

13   company who is incorporated in that state or state

14   rights and pending federal rights and tell them

15   they can't use that name.

16          I also point out, Your Honor, that the

17   horseshoe of confusion, again, going back to

18   Boustany or Baystate or anything else, confusion

19   does not have to be as simple as the name.  The

20   customers are not the same.  There cannot be

21   confusion.  As we put in our papers, there is not a

22   possibility that my client, Diamond Staffing, Inc.,

23   could service their customer or the other way

24   around.  It's simply not in the same industry.

```
 1              If they are not in the same industry,

 2   they cannot bring this action.  Under the Lanham

 3   Act, a preliminary injunction cannot issue and, in

 4   fact, this case should be dismissed.

 5              THE COURT:  Are you saying that the

 6   businesses literally have to be identical

 7   regardless of likelihood of confusion?

 8              I mean, can I start a company called

 9   Ford Busses and say, well, no, there is no

10   likelihood of confusion.  Ford makes cars and

11   trucks and I'm making busses.

12              MR. MELTZER:  Ford is federal

13   trademark, Your Honor.  The --

14              THE COURT:  Let's make it a common law.

15   Let's put the registration out for a moment.  Let's

16   talk about common law.

17              MR. MELTZER:  Probably the best example

18   would be the Baystate case, Your Honor.  I think

19   that Baystate, which is a 2004 case, probably

20   demonstrates how much the federal courts have

21   narrowed this issue.

22              The Baystate case is incredibly

23   important in this context because anybody looking

24   at Baystate Savings Bank in Worcester and Baystate
```

1    Financial are looking at two Baystate entities

2    pretty much across the common from each other.

3    They both involve money, both in financial

4    services.

5              What the court said is because their

6    customers are different, one is involved in

7    commercial banking, one is not, and notwithstanding

8    the fact they have the same name and they appear to

9    be both in banking, what you have to look at is it

10   has to be identical, or the term is "nearly

11   identical" is the phrase that's been used

12   routinely.

13             THE COURT:  Isn't the strength of the

14   mark a factor as well?  Baystate is a geographic

15   descriptor that's on the weak side of the

16   continuum, is it not, as opposed to Kodak or

17   Polaroid or names of that nature?

18             MR. MELTZER:  Right.  Your Honor, as I

19   pointed out in our brief, the reason that doesn't

20   even become an issue here is the first prong is

21   there has to be a right to own a mark.  Before you

22   even get to weak versus strong, the question is do

23   they have the legal right to claim ownership.

24             And when you look at these issues, what

1  they've essentially admitted to in their affidavit

2  is that Diamond Staffing Solutions, Inc. was not

3  advertising in Massachusetts to the general public.

4  They claim that simply because they have customers

5  who are national, this somehow or other gives them

6  national coverage.

7         One that I can point to in our favor is

8  that in Massachusetts, there are 312 corporations

9  alone that use the name Diamond.  That's just

10  corporations across the country, routinely across

11  the Internet.

12         THE COURT:  Well, I saw that argument.

13  We're getting a little ahead of ourselves here

14  because we're talking about the merits.  But my

15  reaction to that was that the mark is not Diamond.

16  The mark is Diamond Staffing that's in dispute.

17  Just as in Baystate.  It wasn't bay or state.  It

18  was Baystate.  I think we need to take the two

19  words together.

20         MR. MELTZER:  That's our argument.  We

21  own Diamond Staffing in Massachusetts.  That's the

22  point.  It's registered to my client.  There is no

23  question about that.  No amount of discovery in

24  this case is going to change the fact that Diamond

1    Staffing belongs in Massachusetts to my client.

2              THE COURT:  But whether that's true or

3    not -- and let's just accept for the moment it's

4    true -- isn't the mark that's in dispute the words

5    "Diamond Staffing" as opposed to "Diamond"?

6              MR. MELTZER:  No, Your Honor.  What's

7    in dispute, and the only thing that's in dispute,

8    is during that time frame between the time of the

9    commencement of business in 2002, 2003, before the

10   state mark was granted to my client, is whether or

11   not there was use in this market, prior use, by

12   Diamond Staffing Solutions, Inc.  That's what

13   they're going to have to prove.

14             THE COURT:  Of what mark?  What is the

15   mark that's in dispute in this case?

16             MR. MELTZER:  They would have to prove

17   that they were using the Diamond Staffing mark in

18   Massachusetts.  And, in fact, in the affidavit

19   that's been produced by Miss DeVries, what they

20   admit to is, in fact, there was no general public

21   marketing.  What they do, according to their own

22   affidavits, is they go to specialized jewelry

23   industry magazines.  They network through the

24   industry.

1          So to make the argument simply because

2    they have customers in Massachusetts -- you have to

3    come in and say this is my neighborhood.  This is

4    where I'm establishing my business.  This is my

5    name.  This is what I'm putting into it.  You can't

6    simply say well, we have customers that stretch

7    across the country.  Therefore, regardless of state

8    trademark law and federal registration, which they

9    didn't apply for, that they can now come into

10   Massachusetts and say you can't use this name.

11   It's simply -- there is no case law to that point.

12         Our whole motion to dismiss is based

13   upon the fact that they cannot produce any kind of

14   documentation whatsoever.  The case is entirely

15   frivolous.

16         THE COURT:  If they went into business

17   in the temporary agency business in New Hampshire

18   covering all businesses, not just jewelry, are you

19   saying that would not infringe on your mark because

20   your mark is limited solely to Massachusetts?

21         MR. MELTZER:  Your Honor, at this

22   juncture, Your Honor, that would not be the case,

23   and reason is this:  Since the inception of this

24   company, my client is advertising the temporary

agency in the Boston Globe which does identify in
blanket Southern New Hampshire.  If, in fact, they
were to commence any kind of temporary agency in
Southern New Hampshire, then, in fact, based upon
the fact that it's targeting and marketing to the
general public, in fact, we would be seeking to
enjoin infringement of those common law rights in
Southern New Hampshire.

          The reason that hasn't been done, Your
Honor, is they are not in the same business.  In
fact, if they insist that they are in the same
business, then, in fact, we do have rights that
we're going to have to enforce.

          But as we stand here today, Your Honor,
if you look at their own documentation, they don't
claim to be a temp agency.  They say specifically
in their own advertising, it says, Focusing
exclusively on the jewelry industry.  The
affidavits are my client is not in the jewelry
industry.  Consequently, there is no claim under
the Lanham Act.

          One thing that I would also like to
discuss with you, Your Honor, on the issue of why
there has to be expedited discovery.  It's been a

1    year-and-a-half, almost two years since apparently

2    the plaintiff found out about this.  Clearly, I

3    find it somewhat repugnant to suggest that perhaps

4    the problem was prior counsel didn't understand how

5    to do this or couldn't do it or wasn't a litigator.

6          Frankly, the law makes it very, very

7    clear that a party has to protect their own rights.

8    They did not seek a trademark.  They did not

9    apparently seek a trademark until much later.  And

10   they did not decide a year-and-a-half ago that

11   there was any rush.

12          Now they come in and say,

13   notwithstanding the fact that there is some serious

14   questions about any success on the merits, no

15   success on the merits, they're going to order --

16   you know, they want you to order my client to start

17   turning over business records for a huge company

18   that's operating legally under Massachusetts law.

19   It makes no sense.

20          THE COURT:  What prejudice has resulted

21   to DSI from the delay in filing the lawsuit?

22          MR. MELTZER:  Prejudice to whom, Your

23   Honor?

24          THE COURT:  To DSI, the defendant.

1          MR. MELTZER:  To my clients?

2          THE COURT:  Yes.

3          MR. MELTZER:  My clients are operating

4   a company unrelated to this.  At this juncture,

5   they've been proceeding to operate legally well

6   within their rights.  There has been no prejudice

7   to anybody.

8          In fact, I find it kind of astonishing

9   that there has been a suggestion that four

10  independent issues of confusion in three years

11  somehow warrants the court to step in and act.

12  Clearly, there is not a single issue of my client,

13  you know, adopting any business that belongs to

14  them or vice versa.

15          There is no prejudice happening to

16  anybody.  The prejudice right now is my clients are

17  being dragged through a case that is frivolous.

18          THE COURT:  Anything further?

19          MR. MELTZER:  That's it.  Thank you,

20  Your Honor.

21          THE COURT:  Mr. Papastavros.

22          MR. PAPASTAVROS:  Thank you, Your

23  Honor.

24          I have to say, Your Honor, my reply

brief basically addresses 90 percent of what Mr.

Meltzer just said.  I really urge Your Honor to

read it because there are a number of

misrepresentations of trademark law that were just

uttered by my brother, some of which I find hard to

believe.

But, Your Honor, starting with the idea

of common law rights, on Page 3 of my reply brief,

the leading treatise McCarthy said it is not

registration but only use of a designation of mark

that creates rights and priority over others.

And my brother insists on saying that

we are not in the State of Massachusetts.  The

affidavit of my client is directly to the contrary.

We were placing customers in Massachusetts between

May of 2002 and November of 2003 when DSI came onto

the marketplace.  So, Your Honor, frankly, I don't

know what he is referring to.  I mean, I really

have difficulty understanding how DSI can come

forward and say that we were not operating in

Massachusetts during that time.  There is direct

sworn-to statements before Your Honor that says

much to the contrary.

The other -- and with respect to this

idea that our publications don't blanket Massachusetts, we have had a national client base since our inception, including Whitehall Jewelers and Helzberg Diamonds, both which have stores in Massachusetts, and were placing customers in Massachusetts during that time.

The publications that we refer to in Miss DeVries' affidavit, five nationally distributed jewelry publications including JCK, Modern Jewelers, National Jewelers, Professional Jewelers, they are all disseminated in Massachusetts.

So our advertising is out there in Massachusetts during the interim period of time. We have acquired common law rights over the mark before any registration is ever filed. There is black letter law that common law use supersedes any type of a registration if it's done earlier in time, and that's what the basis of our entire case is. That's why the case is not at all frivolous, as my brother persists in saying.

The next thing I would point to, Your Honor, is this idea that the services need to be identical. McCarthy has a 15-page list of examples

1    in which trademark uses of noncompetitive goods are

2    held to have been -- goods and services are held to

3    have been confusing and similar.  These services in

4    no way need to be identical.  It's just black

5    letter law.

6            And, in fact, we would submit, Your

7    Honor, we have in the papers -- I'm not claiming

8    that the services are exactly identical, but we're

9    talking about two professional staffing service

10   agencies in which there is clear overlap and there

11   is clear evidence of confusion in the marketplace.

12   That is all the Lanham Act requires.

13           The next point I would want to

14   emphasize, Your Honor, is my brother's intention

15   that it's not possible that the two clients could

16   service each other's business.  As I pointed out,

17   Your Honor, we already have some indication that

18   there is interest on their part in servicing our

19   clients.

20           I mean, DSI services a whole range of

21   bases.  There's no reason why -- I'm not clear on

22   whether they are in the jewelry industry currently.

23   That's one of the things that we hope to take

24   discovery on.  But certainly if they are expanding

1    their business, that could be an area in which they

2    are targeting.  So as we see it, Your Honor, we

3    believe that we're certainly entitled to discovery

4    along those lines.

5            With respect to this -- there's some

6    reference to jurisdiction, Your Honor.  I'm frankly

7    uncertain as to what my brother is referring to

8    here.  There's not a question of jurisdiction here.

9    In fact, we are, of course, bringing suit in

10   defendant's own backyard to avoid that.

11           And finally, Your Honor, I think with

12   respect to this idea of actual confusion, I think

13   it's important to emphasize that under the Lanham

14   Act, you don't even need to show actual confusion

15   to be entitled to an injunction.  All you need to

16   do is show that there is a likelihood of confusion.

17   We have shown more than that.

18           We have shown numerous instances of

19   actual confusion that are reflected in Miss

20   DeVries' affidavit.  We are aware of four instances

21   in which entities contacted DSI looking for Diamond

22   Staffing Solutions, Incorporated.  We have received

23   a number of inquiries for the defendant.  There is

24   clear confusion in the marketplace between the two

staffing agencies, Your Honor. All of that is set out in the reply brief as well as the affidavit of Miss DeVries.

THE COURT: All right. Here is what I'm going to do. If this case proceeded in the normal course, I'd set it down for a scheduling conference, and I could order stage discovery on as vast a timetable as I thought was appropriate.

What I'm going to do is order a form of expedited discovery, although not as expedited as the plaintiff has asked for. Basically, I'm going to set aside the next six weeks or so in which to conduct some limited discovery pointing toward a preliminary injunction motion and hearing at some point in mid-June. I'll go through this more specifically.

First, I'm going to grant the motion, in part, for expedited discovery. I find good cause for ordering expedited discovery, at least to the extent it's expedited in the sense that it's occurring before the scheduling conference.

I am not prejudging the merits of the preliminary injunction motion in any way, shape or form, either as to likelihood of success or

1    immediate irreparable harm.  I express no opinion

2    on either topic.

3           The issue here is whether plaintiffs

4    have shown good cause to conduct some expedited

5    discovery, and I find that there is good cause.

6    They are above that threshold which is considerably

7    lower than the merits threshold.  The marks are

8    certainly substantially similar, Diamond Staffing

9    Solutions, Inc. and Diamond Staffing, Inc.

10           There is obviously a dispute about

11    geographic coverage and the similarity of services

12    and the channels of trade in which those services

13    are advertised and sold, but there is at least a

14    substantial possibility that there is either an

15    overlap or enough of an overlap that there would

16    cause confusion for consumers of the services.

17           In terms of the timetable, my

18    understanding is that the plaintiff filed

19    interrogatories and document requests and the

20    30(b)(6) deposition notice with their pleadings on

21    April 29.  They asked the defendant respond to the

22    interrogatories and document request by May 9,

23    which is today, and then the deposition occur

24    within a week or so thereafter.

 1            What I'm going to do is to give the

 2    defendants three weeks until -- it's a little short

 3    of three weeks -- but until May 27 to respond to

 4    the interrogatories and document request.

 5            Mr. Meltzer, do you wish to serve

 6    interrogatories or document requests yourself

 7    during this period?

 8            MR. MELTZER:  I would, Your Honor.

 9            THE COURT:  All right.  And in a

10    moment, I'll get to the scope of these materials.

11            But what I'm going to do, then, is to

12    order that those be served on the plaintiff by the

13    close of business on Monday, May 16; that is,

14    interrogatories and document requests consistent

15    with the limitations that I impose, and that

16    plaintiffs will respond by May 27.  It gives them

17    two weeks.  That's what it means to be expedited

18    sometimes.

19            Depositions shall be completed by

20    Friday, June 10.  Mr. Meltzer, are you going to do

21    a 30(b)(6) notice as well?

22            MR. MELTZER:  Yes, I will.

23            THE COURT:  Why don't you get out there

24    as well.  File it by May 16.  I'm going to -- yes,

1    Mr. Papastavros.

2            MR. PAPASTAVROS:  I apologize, Your

3    Honor.  One thing I wanted to address with respect

4    to the deposition notices.  Additionally, issues

5    have been raised by the affidavits my brother has

6    filed, and I'd like the opportunity to either amend

7    my 30(b)(6) notice or possibly there's one

8    particular person that I would like the opportunity

9    to depose based on the affidavit submitted.

10           THE COURT:  Here is what I was going to

11   order:  That both sides can do 30(b)(6)

12   depositions.  Mr. Papastavros, I'll allow you to

13   amend your notice, again, consistent with the

14   limitations that I'm about to impose.

15           MR. PAPASTAVROS:  Yes, Your Honor.

16           THE COURT:  And both parties, if they

17   so choose, can do two additional depositions of the

18   other side without further leave of court.  I'm not

19   suggesting that you take those two; but if they

20   prove appropriate, the parties can do it.  And I'm

21   going to ask that at least one week notice be given

22   prior to deposing anyone from the other side.

23           Let me turn, then, to the limitations.

24   The plaintiffs have suggested in their materials

1    that the discovery be targeted, and I essentially

2    agree with that with a few additional comments.

3    The first category would be the circumstances

4    surrounding the registration of the domain name.

5    The second is the circumstances surrounding the

6    name change of the defendant to Diamond Staffing,

7    Inc.  The third category is instances of actual

8    confusion among clients, potential clients or

9    potential employees.  The fourth is channels of

10   advertising, marketing and promotion.  The fifth is

11   characterized by the plaintiff as the nature and

12   extent of the DSI client base.  What I'm willing to

13   permit here is evidence or discovery as to the

14   nature of the clients that each other serves.  In

15   particular, to give plaintiff a chance to ask

16   whether there has been any feelers to either

17   jewelry stores or department stores, what have you.

18          I do want to emphasize that discovery

19   into things such as business plans and marketing

20   plans and so forth should be narrowly limited to

21   the issues at hand here; that is, the trademark

22   infringement.  I'm not giving either side complete

23   license to look into the business records of one

24   another's business at this stage, but it ought to

1    be targeted to the issues of the use of the mark,

2    the intent to use the mark, the markets in which

3    the mark is being used or is potentially going to

4    be used and so forth.

5            And there will be no discovery at this

6    stage as to damages or financial records and so

7    forth.  I don't see any need for that at this

8    stage.  It's hard for me to say that in the

9    abstract.  That's the general thrust of what I want

10   the discovery to be limited to.

11           The parties will have an opportunity to

12   conduct merits discovery afterward to the extent it

13   hasn't been done already.  And the only other

14   wrinkle in all of this is my assumption is that

15   you're going to be deposing each other's employees.

16           If for some reason a party seeks to

17   depose a third party, my strong preference is that

18   such a person only can be deposed once; and I

19   would, therefore, ask the parties, if possible, to

20   work out an agreement that said person be deposed

21   only once on all topics.  In other words, I don't

22   want someone being harassed with two depositions

23   because we have staged discovery.  If each other's

24   employees are deposed twice, that doesn't trouble

1    me.

2              MR. MELTZER:  If I may address that,

3    Your Honor.

4              My understanding is, unlike my client

5    who's got 1,400 to 1,600 employees, my

6    understanding is that the company is a single

7    employee-wide.  My concern is that all of our

8    discovery has to be with the person most

9    knowledgeable or the company's one employee.  Our

10   discovery is going to have to get more broader than

11   to the customer as to their potential market.  And

12   to be barred from doing that, it's a little

13   difficult for my client.

14             THE COURT:  Well, at this stage, again,

15   we're talking about a PI.  Do you really need to

16   depose each other's customers?  I mean, we're

17   talking about instances of actual confusion or the

18   likelihood of future confusion.

19             MR. MELTZER:  Well, can I make a

20   suggestion.  I think maybe the way to rectify that

21   is if the discovery at this stage is limited to the

22   overlap of that area -- we don't believe it

23   exists -- but clearly if the discovery is aimed at

24   our involvement in the jewelry industry and their

1    discovery is limited to their involvement outside

2    of the jewelry industry, I think that would

3    probably make a more targeted purpose of what

4    you're trying to do here today.

5         THE COURT:  Well, again, it's hard to

6    say in the abstract.  Let me try to make up an

7    example that would be better.  Come to find out,

8    you're placing people at Filene's and Filene's has

9    a jewelry department and they've placed someone at

10   Filene's.  You say, well, it doesn't really overlap

11   because we put a shoe salesman in and it doesn't

12   have anything to do with the jewelry department at

13   Filene's.  He says, well, I see Filene's on the

14   list.  They're one of our big customers.

15        Somehow, that issue has to be resolved.

16   My preference at this stage is that if you're going

17   to have to depose someone at Filene's, and I hope

18   you wouldn't, that that person only be deposed once

19   on that narrow issue.

20        MR. PAPASTAVROS:  I agree, Your Honor.

21        MR. MELTZER:  The problem with that,

22   Your Honor, is that there's really -- there's two

23   issues on the issue of customers.  One is the issue

24   of the industry versus not industry, but the two

1    ways these are different is temp versus permanent.

2    So I think if we ignore that, I think that makes it

3    more confusing than less confusing.

4            THE COURT:  Well, again, I'm not --

5    you're going to be permitted to submit affidavits

6    in connection with the PI, in other words, to make

7    your case.  You're going to be permitted to

8    cross-examine or to take the deposition of their

9    people, and your witnesses will have an opportunity

10   at their deposition to make a point.  If the

11   president of your company says we don't do

12   permanent placement, we only do temporary, we've

13   never talked to a jewelry person, you know, your

14   client has the right to say that.  I'm not sure how

15   it's going to effect this discovery.

16           What relief do you want from me now

17   during this stage discovery?

18           MR. MELTZER:  I think the concern that

19   I'm having, Your Honor, is that if I send out a

20   30(b)(6) and it's a one-person wide company, by the

21   time I get back the interrogatory answers I want to

22   make sure I have adequate time, the customer is

23   identified, it becomes that key witness in this

24   case, that I have the ability when I receive back

1    the interrogatory with the document request to file

2    a third-party deposition notice and have that

3    person there without having to be forced to take a

4    preliminary injunction to say I only get one shot

5    at this person. My hands are tied. Whereas, the

6    number of people -- if we have to produce 12 or 15

7    people, that's the people most knowledgeable that

8    are my clients, it puts us at a serious

9    disadvantage.

10    THE COURT: Well, it's hard for me to

11    answer that in the abstract. When I said

12    third-party witnesses, I was thinking of, you know,

13    the people that give out domain names and things of

14    that sort. I wasn't thinking of customers. I'm a

15    little bit sensitive to you deposing each other's

16    customers for obvious reasons.

17    I'm going to, I think, leave it where

18    it is. I'm going to leave it to you all to file a

19    motion for protective order, a motion to compel.

20    And if you convince me that I can't do justice

21    without a particular deposition, I'll allow the

22    deposition to go forward, and we'll put out a

23    timetable if we have to.

24    But I'll tell you that I'm going to be

1    at least initially suspicious of taking the

2    deposition of one another's customers without some

3    indication that you really need it just because the

4    concern is obvious, that you're going to be

5    interfering with one another's business.  I'd

6    rather not go there unless we have to.

7             Mr. Papastavros.

8             MR. PAPASTAVROS:  I concur with that,

9    Your Honor.

10            The additional point I wanted to make

11   is that along those lines of the customers for -- I

12   obviously received my brother's opposition papers

13   on Friday and expedited a reply brief for today.

14   There's some customer-related information,

15   including some stuff that I referred to in our oral

16   argument, that we would like treated confidential.

17            Would Your Honor appreciate a

18   stipulation to be worked out among counsel or is it

19   Your Honor's practice to actually sign off on

20   protective orders going forward?

21            THE COURT:  We can do it either way.

22   If you want to do a joint motion for a protective

23   order, that's fine.  I hope you can work it out one

24   way or another, either stipulated or I can make it

1   as an order of the court.  It might be simpler to

2   do it as a stipulation given the timetable here.

3         The last piece of this that I want to

4   do is to Mr. Meltzer, do you expect to move for a

5   preliminary injunction or are you --

6         MR. MELTZER:  Your Honor, if it turns

7   out that, in fact, they are now moving into

8   temporary placement in our area, then I will

9   certainly be seeking preliminary injunction.  But,

10  again, I was surprised to hear that they are

11  branching out.  It seems to be contrary to make a

12  filing.  I'm not going to know that probably for a

13  few weeks.

14        THE COURT:  What I want to do, then, is

15  to set it down for a preliminary injunction hearing

16  the week of June 27.

17        I was going to set it down for a

18  preliminary injunction hearing on the afternoon of

19  Friday, July first, which is the Friday before the

20  holiday weekend.  Is that going to work, Mr.

21  Meltzer?

22        MR. MELTZER:  That would be fine.  I'm

23  actually going out to my firm's Salt Lake City

24  office the week after, but that's fine.

1          THE COURT:  Mr. Papastavros, does July

2     first in the afternoon work for you?

3          MR. PAPASTAVROS:  I had plans, Your

4     Honor, to be away at that time.

5          THE COURT:  What about earlier that

6     week?

7          MR. PAPASTAVROS:  We'll be leaving

8     early for the fourth weekend to travel.  Earlier

9     that week would be fine.

10          THE COURT:  What I'm going to do, then,

11     is how about 4:00 in the afternoon on June 29 and

12     be prepared to work a little later in the evening.

13     Does that work?

14          MR. MELTZER:  What's the date on that?

15     I'm sorry.

16          THE COURT:  June 29 at 4:00.

17          MR. MELTZER:  That will be fine.

18          THE COURT:  Mr. Papastavros.

19          MR. PAPASTAVROS:  Yes, Your Honor.

20     That will be fine.

21          THE COURT:  That will be the hearing.

22     And so I will ask that parties file their motions

23     by June 17, Friday, and any oppositions by Friday,

24     June 24.  I'm going to be out the week of June 20,

1    but I will be back and we'll have a chance to read

2    them when I get back.

3                While I have you here, why don't we set

4    the same date; that is, June 29, for the scheduling

5    conference.  I think it probably makes some sense

6    to -- well, let me take that back.  The schedule

7    may be up in the air because of the summer.  I

8    think I may have you do a telephone scheduling

9    conference to avoid a trip into here.  Let's see

10   how all of the dust settles on this.

11               Mr. Papastavros, you will file an

12   opposition to the motion to dismiss or for summary

13   judgment in the ordinary course, I take it.

14               MR. PAPASTAVROS:  Yes, Your Honor.  I

15   mean, I guess one question -- I was just thinking

16   about that, actually, in the back of my mind -- is

17   part of our opposition would likely involve

18   56(f)-type motion, and I just wondered with the

19   discovery being scheduled whether that's something

20   that will probably be deferred until the later

21   time.

22               THE COURT:  Well, they filed a number

23   of affidavits with the motion.  It would certainly

24   be a non-atypical response for you to file a Rule

1    56(f)-type of response.  And I'll just wait and see

2    what you do.  I'll leave it at that.

3           MR. PAPASTAVROS:  Thank you, Your

4    Honor.

5           THE COURT:  But my expectation here, I

6    guess, is that unless the case is dismissed under

7    Rule 12(b)(6), we'll have a preliminary injunction

8    hearing.  I will either grant or deny the

9    preliminary injunction, but either way we'll have a

10    case that will go forward with additional discovery

11    and summary judgment briefings as the case may be.

12           Is there anything further?  In

13    particular, is there any request for clarification

14    in terms of the limitations at this stage of the

15    discovery?  I was working off what the plaintiff

16    had suggested, and I think what plaintiffs have

17    requested is appropriate but it needs to be

18    narrowly targeted; that is, I don't want wholesale

19    fishing into business plans and strategies and

20    things that don't relate to the specifics of this

21    case.  And I understand that is not often, you

22    know, an easy line to draw, and I'm going to leave

23    it to you all to work out as best you can any

24    disputes that will come up.

1          MR. MELTZER:  The only concern I have

2    on that, Your Honor, is you said leaving damages

3    off at this point.  I would like to be able to ask

4    about irreparable harm which clearly is an element

5    of the preliminary injunction.  Now, that is going

6    to get into, I think, the question you asked, why

7    now, why is it necessary.  So I need to be able to

8    ask about that in my discovery, but it does get to

9    damages.

10         THE COURT:  Well, I think you're

11   entitled to ask about irreparable harm-type

12   questions, particularly the cause of the delay.

13   I'm not going to state in the abstract how far you

14   can get into monetary damages.

15         What I would not expect is that the

16   parties will be required to produce financial

17   statements and other things like that relating to

18   monetary damages.  I mean, again, I need a

19   framework around this before I can answer the

20   question.

21         I think you're right.  You're entitled

22   to ask irreparable harm-type questions; what were

23   the reasons for the delay and what harm have you

24   suffered and are you going to suffer if the

1    injunction doesn't have issue.  And I would hope

2    you would not need to get into the financial-type

3    information and leave it at that.  That's the best

4    I can do for you right now.

5              Mr. Papastavros.

6              MR. PAPASTAVROS:  Thank you, Your

7    Honor.  I think that is sufficient.

8              MR. MELTZER:  If I can just make one

9    point, Your Honor.  Clearly, they are trying to

10   limit out the geographical scope prior to the state

11   filing of the Mass. trademark.  Is your order

12   essentially encompassing any discovery, even after

13   the filing of the state mark, or are you suggesting

14   that it is limited to them demonstrating what

15   they're laying claim to prior to the state mark?

16   We have still have the right to rely on 110(b).  My

17   understanding as the papers were filed today is

18   that they are claiming that somehow or other their

19   conduct prior to filing the state mark gave them

20   the right to the state as a whole.

21             THE COURT:  Well, my understanding is

22   that they have a common law trademark claim that

23   they used the mark first in the relevant market.

24   You say they may have used the mark first, but it

1    is not the relevant market.  We have different

2    customers, different geographies, different

3    everything else.  It's not the same.

4               I would expect the discovery on those

5    issues, who used the mark first and in what

6    geography and for what purpose and soliciting what

7    customers and doing what advertising.  That's what

8    I would expect this discovery to be about.

9               MR. MELTZER:  That answers the

10   question, Your Honor.  Thank you.

11              THE COURT:  All right.  Anything

12   further?  And I'm sorry I can't be -- I'm concerned

13   that if I lay down the rules any more specific than

14   I have laid them, it's not going to work.  This

15   case is going to be a little different than what it

16   is and maybe a lot different.  I'm trying to at

17   least give the thrust of my intentions here in

18   terms of what this discovery ought to be about.  It

19   ought to be pointing toward a preliminary

20   injunction.  And we'll have time for other merits

21   and discovery later.

22              MR. PAPASTAVROS:  One question, Your

23   Honor, is that given this -- and I appreciate Your

24   Honor has to fashion a reasonable remedy.  To the

extent there is disagreement about the scope of discovery, rather than try to simplify the process, has Your Honor entertained letters to the court to try to gain some clarification on what you would deem permissible or would you prefer that in the form of a formal motion?

THE COURT:  Ordinarily, I prefer motions, but this may be happening at speed and this might be happening in the middle of a deposition.  Contact Mr. Castles if you have a discovery dispute.  I may refer it to Magistrate Judge Swartwood, depending on his availability and mine.  I don't want to get hung up on formality.

On the other hand, the problem when you write letters, sometimes it's not clear what the record is or why I'm taking what step I am and what the record looks like on appeal.  You can dictate the same thing, slap a motion label on it and file it with the court.

MR. PAPASTAVROS:  Thank you, Your Honor.

THE COURT:  But feel free to do things telephonically.  You can do them relatively informally in the sense that you have a problem and

1    would like it resolved.  Mr. Castles will bring the

2    problem to my attention and we'll try to get it

3    resolved.

4                    MR. PAPASTAVROS:  Thank, Your Honor.

5                    THE COURT:  Anything further?

6                    MR. MELTZER:  That's it.  Thank you,

7    Your Honor.

8                    MR. PAPASTAVROS:  No, Your Honor.

9    Thank you.

10                   THE COURT:  All right.  We'll stand in

11   recess.

12                   (Whereupon, the hearing concluded at

13   5:22 p.m.)

14

15

16

17

18

19

20

21

22

23

24

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.


I, Donna M. DiCarlo, Registered Professional Reporter, do hereby certify that the foregoing Pages 1 - 51 to be a true, complete and accurate transcript of hearing RE: Diamond Staffing V Diamond Staffing, CV 05-40046, held at the time and place hereinbefore set forth, to the best of my knowledge, skill and ability.


_____
Registered Professional Reporter

# Diamond Staffing, Inc.

*...A Cut Above the Rest!*



**Our Mission**          **Job Search**          **Opportunities**          **Locations**

Are you in search of an agency that is a cut above the rest?

If your answer is yes!!!, then talk to us at Diamond Staffing.  Our team approach and creative strategies can be implemented into your company needs and help assure that you exceed your recruitment goals, whatever those may be.

If you want the ultimate in Health Care staffing, visit our health care division at Horizons Healthcare.

**Diamond Staffing, Inc.**
146 West Boylston Drive Worcester, MA
508-459-5005
508-459-5014 (fax)
*resume@diamondstaffinginc.com*



Diamond
Staffing, Inc.

## Who is Diamond Staffing, Inc.?

Contact Us

The associates at Diamond Staffing, Inc., collectively have 150 years of experience in handling human resource issues and employment obstacles. We recognize the challenge of today to recruit and maintain skilled employees and are dedicated to making a difference by being a full service provider and partner.

Our mission is to provide quality staffing solutions by establishing loyal relationships with our applicants and clients. We focus on building careers, not just finding a job. Our consultants take pride and time to understand the applicants' needs and strive to effectively match the skills to the opportunity.

Copyright © 2003
Diamond Staffing, Inc..

Worcester, MA

All candidates go through our three tier process. This consists of a phone screening, a face to face interview with one of our expert consultants and our computerized testing program that can be personalized for your company needs. We work closely with businesses to understand their needs and offer cost effective solutions.

Diamond Staffing, Inc. is an Employee Owned company with offices in Massachusetts and New Jersey.



Diamond
Staffing, Inc.

| Diamond Personnel | Diamond Opportunities | Career Seekers | Job Search | Locations |

## Opportunities

Contact Us

Diamond Staffing, Inc. offers a wide array of services such as direct hire, temp, temp to perm and contract. Businesses can depend on us to provide talent for short or long term assignments. Looking to gain experience? Temporary employment can provide a chance to learn new skills and offers flexibility.

## Services Provided:

Copyright © 2003
Diamond Staffing,
Inc. Worcester MA

Administrative Assistants          Information Technology
Customer Service Specialists       Legal Secretaries
Data Entry                         Light Industrial Staffing
Engineering                        Sales
Executive Assistants               Telesales
Finance & Accounting



Diamond
Staffing, Inc.

| Diamond Personnel | Diamond Opportunities | Career Seekers | Job Search | Locations |

**Apply Online!**

## Career Seekers

Contact Us

Let us help you find your next job!  Our commitment is to you, the people.  We offer Weekly Pay, Temporary to Permanent Positions, flexibility and more!  Interested to start your career plan?  Contact your local Diamond Staffing, Inc. office today!

The right opportunity is not always a quick find but our goal is to work with you and the companies to find the best fit.  We have the expertise, experience and commitment to connect people with the right career choice.

You can fill out an on-line application, or start your job search NOW!

Copyright © 2003
Diamond Staffing,
Inc..

Worcester, MA

 We can't find  "http://www.diamondstaffinginc.com/JobFind.asp"  [ Try Again ]

**Error -  Page Not Found**  About this Error

| http://www.diamondstaffinginc.com/JobFind.asp | [ Search ]

---

**Suggested links for** http://www.diamondstaffinginc.com/JobFind.asp

| Personal Finance | Mortgages | Real Estate Investing |
| Financial Planning | Tax Preparation | Stocks |
| Car Loans | Student Loans | Bankruptcy |
| Credit Cards | Cheap Flights | Discount Travel |
| Hotels | Entertainment | Digital Cameras |
| Hair Replacement | Vitamins | Health Care |
| Medical Insurance | Dating | |

---

**10 Related Web Searches Found**

| google search | yahoo | google |
| yahoo search | cookies | hypertext transfer protocol |
| hyper text transfer protocol | 1.1 | apache |
| apache web server | | |

 **We can't find** "http://www.diamondstaffinginc.com/JobFind.asp"    [ Try Again ]

**Error - Page Not Found** About this Error

| http://www.diamondstaffinginc.com/JobFind.asp | [ Search ] |

**Suggested links for** http://www.diamondstaffinginc.com/JobFind.asp

| | | |
|---|---|---|
| Personal Finance | Mortgages | Real Estate Investing |
| Financial Planning | Tax Preparation | Stocks |
| Car Loans | Student Loans | Bankruptcy |
| Credit Cards | Cheap Flights | Discount Travel |
| Hotels | Entertainment | Digital Cameras |
| Hair Replacement | Vitamins | Health Care |
| Medical Insurance | Dating | |

**10 Related Web Searches Found**

| | | |
|---|---|---|
| google search | yahoo | google |
| yahoo search | cookies | hypertext transfer protocol |
| hyper text transfer protocol | 1.1 | apache |
| apache web server | | |



| Diamond Personnel | Diamond Opportunities | Career Seekers | Job Search | Locations |

Diamond
Staffing, Inc.

## Locations

Contact Us

Diamond Staffing  has offices in key locations to maximize our connections with fast growing industries.  Our offices are conveniently located in Massachusetts and New Jersey:

- 146 West Boylston Drive
  Worcester, MA 01608
  Phone: 508-459-5005
  Fax: 508-459-5014
  map

Copyright © 2003
Diamond Staffing,
Inc. Worcester, MA

- 230 Main Street
  Milford, MA 01757
  Phone: 508-381-6500
  Fax: 508-381-6086
  map

- 1 High Street
  Clinton, MA 01510
  Phone: 978-365-4672
  Fax: 978-365-7953
  map

- 102 Washington Street
  Somerville, MA  02143
  Phone: 617-627-9727 or 617-423-3100
  Fax: 617-629-7610
  map

- 16 Winfield Scott Place
  Elizabeth, NJ 07201
  Phone: 908-353-3399
  Fax: 908-353-4499
  map