IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS INC )
                                        )

       Plaintiff                    )

                                           )

v.                                    )        CIVIL ACTION NO:05-40046-FDS

                                         )

DIAMOND STAFFING, INC            )

                                         )

       Defendant                )

## MOTION FOR PROTECTIVE ORDER AS TO THE DEPOSITION OF ATTORNEY MARY CASEY PURSUANT TO F.R.C.P. 26(c)

Now comes the Defendant, Diamond Staffing, Inc. ("Diamond Staffing") and moves this Honorable Court to quash a subpoena served on Diamond Staffing's counsel, Attorney Mary Casey, or for a protective order prohibiting this deposition at this time, as inconsistent with the Court's prior May 9, 2005 order permitting expedited discovery.

In the alternative, Diamond Staffing requests that substantial restrictions be placed on the deposition, and that the deposition be had at a time of mutual convenience to the parties and their counsel and that this Court grant extensions of existing filing deadlines so as to permit Diamond Staffing to similarly depose the Plaintiff's attorneys. As grounds for this motion, Diamond Staffing states as follows:

1.  The Plaintiff, Diamond Staffing Solutions ("the Plaintiff") filed this suit against Diamond Staffing alleging that Diamond Staffing was somehow infringing on the Plaintiff's mark. Diamond Staffing has registered its trademark in Massachusetts, and has a prior filing for the federal mark with the United States Patent and Trademark Office. The Plaintiff apparently alleges violation of common law rights established prior to those registrations.

1

2. Diamond Staffing responded to the suit by moving to dismiss the Plaintiff's Complaint, which Diamond Staffing views as entirely frivolous. All of the facts indicate that the Plaintiff is a home-based business located on a cul de sac in New Hampshire, and that the Plaintiff inflates and puffs its image for marketing purposes in the fine jewelry business, and that the Plaintiff is suing for bad-faith purposes a very much larger Massachusetts-based temp agency with ten offices in multiple states and more than 1400 weekly workers on its payroll and with yearly sales in excess of $30,000,000.

3. The Plaintiff moved for expedited discovery in this matter, seeking to conduct depositions and acquire documents prior to an intended motion for preliminary injunction. Diamond Staffing opposed the motion for expedited discovery on the grounds that the case is so obviously frivolous that no discovery was necessary for the court to consider and decide the motion to dismiss. Diamond Staffing was also concerned about the harm to its business and its confidential relationships caused by invasive discovery in a clearly frivolous lawsuit.

4. While the Court did grant the request for expedited discovery, the Court also placed severe restrictions on that discovery. For example, the Court precluded the parties from seeking financial documentation and from deposing customers, two categories that demonstrate an intent by this Court to steer the preliminary discovery away from the most invasive and, potentially harmful, categories of disclosure.

5. In doing so, the Court was temporarily barring the parties from seeking highly relevant, fact-specific material, but allowing the parties to gather basic documentation that would supposedly support its motion for preliminary injunction.

6. In effect, it appears from the Order that the Court was bifurcating discovery into two, distinct phases. The first round of discovery, to be completed prior to the filing of the Plaintiff's Motion for Preliminary Injunction and prior to the hearing on Diamond Staffing's Motion to Dismiss, appears to be limited to discovery amongst the party and direct fact witnesses. The second tier of discovery, which delves into customers and financial information, digs deeper into the workings of the two companies, and clearly involves a greater risk of harm to the companies by disclosure. Depositions of attorneys are clearly in the second category of discovery.

7. The Plaintiff has now subpoenaed Attorney Mary Casey to testify at a deposition. Attorney Casey is Diamond Staffing's co-counsel in this case, and is actively involved in all stages of litigation. She is actively involved in researching and drafting briefs, advising Diamond Staffing and otherwise participating in strategic and tactical decisions pertaining to this litigation.

8. Diamond Staffing acknowledges that Attorney Casey has relevant information in this matter pertaining to the due diligence search conducted by Diamond Staffing prior to its use of the mark in 2003, and pertaining to Diamond Staffing's prior registration of the mark ahead of the Plaintiff. In fact, her testimony, which would be helpful to Diamond Staffing, might ultimately be the key testimony if this matter were to proceed to trial.

9. Indeed, this is a lawsuit in which many, many lawyers have relevant personal knowledge. Should this matter survive Diamond Staffing's Motion to Dismiss, Diamond Staffing has every intention of deposing Plaintiff's three attorneys who also have highly relevant information, Attorneys Jim Hood, Don Mofford and Vaughn

3

Tomzarian. As a side note, the Plaintiff failed to identify Mr.Tomzarian and Mr. Hood in its mandatory disclosures.

10. Diamond Staffing objects to the deposition of Attorney Casey at this time as being inconsistent with the Court's discovery order which excludes certain relevant discovery that is not directly focused on the key elements of Plaintiff's claim. Diamond Staffing has viewed the Court's order as a pragmatic order permitting the Plaintiff to find fact-specific evidence to support the pending motions, not to engage in repetitive and invasive discovery that does not advance the cause of providing the court with information relevant to intended motions.

11. Diamond Staffing has acted in reliance on this interpretation. As the attached pages from the deposition of Diamond Staffing's president, Frank Vaccaro, demonstrates, Diamond Staffing's counsel permitted Mr. Vaccaro to testify as to conversations with Attorney Casey in order to permit the Plaintiff to discover how Diamond Staffing selected its name, and how it investigated prior use of the mark.

12. The testimony provided by Mr. Vaccaro is directly contrary to the Plaintiff's allegation that Diamond Staffing had some kind of nefarious purpose in adopting the Diamond Staffing mark. Indeed, in its own discovery, the Plaintiff has yet to produce a shred of evidence to support the claim that Diamond Staffing intentionally adopted the Plaintiff's mark for financial purposes or that Diamond Staffing even knew of the Plaintiff's existence.

13. In fact, the six hundred or so pages of documents produced by the Plaintiff thus far in the case have yet to show any basis whatsoever for this lawsuit. Consequently, the

4

Plaintiff's attempt to depose Attorney Casey appears to be nothing more than a desperate fishing expedition design to harass Diamond Staffing.

14. The deposition of Attorney Casey would be merely cumulative of prior testimony. While her testimony may be relevant at a later date to verify documents and prior testimony of Mr. Vaccaro, it is not necessary at this time or for the purpose of this Court's order. Indeed, the Plaintiff should be spending less time on seeking to harass Diamond Staffing's counsel and should be spending more time complying with its own discovery obligations.

15. Diamond Staffing's position on this issue is not inconsistent with the position taken by the Plaintiff in another discovery dispute in this case. Diamond Staffing has commenced the deposition of one Ken Peterson, a business consultant to the Plaintiff. Mr. Peterson admitted that he had little or no knowledge of trade-mark law, and apparently had no direct knowledge of the facts in this case other than what he was told by Ms. DeVries, the Plaintiff's president. At this deposition, Plaintiff's counsel objected to testimony of conversations between Peterson and Plaintiff's *prior* counsel and instructed the third-party witness not to answer the questions. The basis for this instruction, apparently, was that Peterson was the Plaintiff's agent, and therefore the conversations were somehow privileged. Diamond Staffing's counsel has yet to find any case law to support this contention, which will be briefed at a later time if this matter proceeds.

16. Notwithstanding, if the Plaintiff objects to the production of relevant testimony from a third-party business consultant who appears not to have been acting in any form of protected capacity in communication with prior counsel, the same Plaintiff can hardly

5

claim the right to seek testimony from Attorney Casey, who is actively involved in this litigation.

17. Diamond Staffing is not requesting that this Court permanently quash the subpoena to Attorney Casey. Diamond Staffing is requesting that this Court find that the subpoena falls within a category of invasive discovery barred by the temporary expedited discovery order, such that Attorney Casey's deposition be postponed until after this Court has considered the motion to dismiss and has had an opportunity, if necessary, to address limitations and ground rules on all attorney discovery.

18. In the alternative, if the Court views attorney discovery as appropriate at this juncture, allowances should be made for Diamond Staffing to depose the Plaintiff's three attorneys, all of whom possess relevant factual information as well.

19. Finally, Diamond Staffing requests that this deposition, if allowed to go forward, be limited to very narrow topics of inquiry. Further, the deposition should go forward at a time of mutual convenience. Diamond Staffing wishes this Court to know that Ms.Devries' personal schedule has severely impeded and hampered this Court's discovery order deadlines. Ms. Devries removed herself to Nevada for a trade show for a week during this very short discovery period. Ms.DeVries' deposition was scheduled to go forward on June 9, 2005. Plaintiff's counsel requested that this deposition be postponed until June 14, 2005 due to the marriage of the deponent's daughter on June 11, 2005. Diamond Staffing's counsel has agreed, notwithstanding that this change has wreaked havoc on counsel's schedule.

20. Diamond Staffing's counsel have extensive commitments during the week of June 13 caused by rescheduling prior appointments to accommodate Ms.Devries' schedule,

and cannot attend a deposition on June 15, 2005. Thus, if this Court does agree to allow this deposition to proceed, the deposition should be scheduled at a time of mutual convenience to all parties, and should be respectful of the continuing patience that Diamond Staffing has demonstrated to the Plaintiff's personal needs.

For the foregoing reasons, Diamond Staffing respectfully requests that the deposition subpoena of Attorney Casey be quashed at this time, to take place at a later time and date pursuant to a separate order governing attorney depositions, or that this Court provide limitations on such testimony, require scheduling to a mutually convenient time and that equal access to counsel for depositions be granted.

> Respectfully Submitted,
> **Diamond Staffing, Inc.**
> By its attorneys,
>
> Robert N. Meltzer, BBO #564745
> P.O. Box 1459
> Framingham, MA 01701
> Phone: (508) 872-7116

Dated: June 8, 2005

Certificate of Service

I Certify that I have Served a copy of the above
on Plaintiff Counsel.

6-8-05

CERTIFICATE OF COMPLIANCE WITH L.R.37.1

Pursuant to Local Rule 37.1, the parties have met and conferred by telephone to discuss the discovery dispute subject to the attached motion, and the parties have been unable to resolve the dispute without the aid of the Court.

Respectfully Submitted,
**Diamond Staffing, Inc.**
By its attorney,

Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Dated: June 8, 2005

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____

DIAMOND STAFFING SOLUTIONS, INC.

V.

DIAMOND STAFFING, INC.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  05-40046-FDS

TO:  Mary Casey, Esq.
     The Harbor Law Group
     48 Maple Avenue, Shrewsbury, MA 01545

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION  The Harbor Law Group  48 Maple Avenue, Shrewsbury, MA 01545 | DATE AND TIME  6/15/2005 9:00 am |
| --- | --- |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
| --- | --- |
|  |  |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| *[signature]* | 6/7/2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael L. Cornell (BBO # 651405), Attorney for Plaintiff, Nixon Peabody LLP
100 Summer Street, Boston, MA 02110, (617)345-1043

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

CONFIDENTIAL
Francis G. Vaccaro

66

1    A.  Yes, it is.

2    Q.  And you reviewed the responses to

3    interrogatories before you signed this document?

4    A.  Yes, I did.

5    Q.  And the responses were true at the time you

6    made them to the best of your knowledge?

7    A.  Yes, they were.  And are.

8    Q.  If I could turn your attention to page 2 of

9    this document.

10   A.  Page 2?  Okay.

11   Q.  More specifically, the response to

12   interrogatory number 2.

13   A.  Yes, sir.

14   Q.  Do you see the third -- I guess it's

15   technically the fourth sentence -- excuse me -- of

16   that response, the sentence that starts with your

17   name?

18   A.  Francis Vaccaro, yes.

19   Q.  Yes, sir.  Could you read that sentence into

20   the record?

21   A.  Certainly.  "Francis Vaccaro in conjunction

22   with Attorney Mary Casey conducted exhaustive due

23   diligence as to name selection."

24   Q.  And that refers to the name selection of

67

1    Diamond Staffing, Inc., as the name for your new

2    business in September of 2003?

3        A.  Yes, it does.

4        Q.  What due diligence was conducted?

5        A.  We gave Attorney Casey several names for the

6    startup of our company, and she came back with the

7    fact that no one had trademarked or had the right to

8    that name anywhere.  And we adopted it.

9        Q.  You just testified that we gave Attorney

10   Casey several names for the startup of our company?

11       A.  I did.  I apologize.

12       Q.  So no one else at your company?

13       A.  No.  I did.

14       Q.  What names did you give Attorney Casey?

15       A.  Gosh, I don't recall.

16           MR. MELTZER:  I'm going to allow him to

17   answer the question based on our discussion before

18   without any waiver of attorney/client privilege

19   based on the discussion.

20           MR. PAPASTAVROS:  Well, I don't think

21   that the giving of names from Mr. Vaccaro to Miss

22   Casey has anything to do with the rendering of --

23           MR. MELTZER:  That's not why I'm not

24   instructing him not to answer.  We're not waiving

CONFIDENTIAL
Francis G. Vaccaro

68

1  any attorney/client communications privileges here

2  by allowing him to answer that question.

3          MR. PAPASTAVROS:  Well, I don't think

4  there's any applied.

5      Q.  But be that as it may, Mr. Vaccaro, you can

6  answer the question.

7          MR. MELTZER:  If I thought they applied,

8  I'd instruct him not to answer.

9      Q.  Mr. Vaccaro, you can go ahead and answer.

10     A.  I believe that hopefully and I know she will

11 have a list of those names that I provided.   They

12 were Preferred Staffing maybe -- I can't remember.

13 There were probably 10, 12, 15 names that we -- we?

14 -- I submitted them, but I talked to the core people

15 about possible names, and I submitted them to

16 Attorney Casey.  So there were a bunch of names.

17 And this was the one that came out.

18     Q.  Was Diamond Staffing, Inc., one of the

19 names?

20     A.  Diamond Staffing, Inc., was one of the

21 names, yes, sir.

22     Q.  And did you come up with that name?

23     A.  No, I did not.

24     Q.  Who did?

CONFIDENTIAL
Francis G. Vaccaro

69

1    A.   One of the women in my group, Susan Boffoly.

2    Q.   How do you spell her last name?

3    A.   B O F F O L Y.

4    Q.   She was not one of the staffers that started

5  with you at DSI?

6    A.   No, she is.

7    Q.   Did Miss Boffoly came up with the other

8  names as well?

9    A.   I don't recall.  We all came up with

10  different names in the group.  Then I listed them

11  all.  And I gave them to Miss -- Attorney Casey.

12    Q.   And these were the individuals who you were

13  considering commencing a new business with; is that

14  correct?

15    A.   That is, yes.

16    Q.   Did you have a meeting with these

17  individuals to come up with these different

18  potential names for the business?

19    A.   I didn't have a formal meeting.  I kind of

20  asked them to submit names that I thought might be

21  cool to be honest with you, and they gave me a dozen

22  of them.  And -- they gave me more than a dozen.

23  There were probably a hundred.  I don't have that

24  list.  But I narrowed it down to 10 or 12 that I

CONFIDENTIAL
Francis G. Vaccaro

70

1    liked.  And I sent them off for verification.

2        Q.   Did you receive the e-mails from your

3    employees -- strike that.

4                Did you receive --

5        A.   No.

6        Q.    -- the names of the -- let's try it one

7    more time.

8        A.   Sure.

9        Q.   Did you receive the prospective names for

10   your new company from these individuals over the

11   e-mail?

12       A.   No, sir.

13       Q.   How did you receive them?

14       A.   Telephone, in person.  Various ways.  Quite

15   honestly, Sue who's probably one of the more

16   creative ones involved in coming up with the names

17   -- she liked doing that.  So -- I just thought it

18   was a good name.  And there were -- I said to her I

19   thought there were 10 or 12 good names, and we

20   submitted them all.  This is the one that came back

21   okay.

22       Q.   Did you write them all down and furnish the

23   list to Miss Casey?

24       A.   Yes, I did.

CONFIDENTIAL
Francis G. Vaccaro

71

1    Q.  Did you write them out --

2    A.  I wrote them out in my handwriting.  I

3  handed it to her.  She took them and -- I know she

4  checked them.

5         MR. PAPASTAVROS:  Off the record.

6         (Off the record.)

7         MR. PAPASTAVROS:  That list would be

8  responsive to document requests.  Obviously, I'm not

9  contending it still exists, but we'd request that a

10  search be undertaken for that document to the extent

11  it exists.

12         MR. MELTZER:  We're not holding back any

13  documents.  We provided the entire file -- all of

14  the search documents in its entirety.  In fact, I

15  have the original.  So if it's not something that's

16  already been produced, then I -- my understanding

17  would be it doesn't exist anymore.

18    Q.  Did you have a preferred name on that list

19  at the time you compiled those names, Mr. Vaccaro?

20    A.  Honestly, no.  Looking to start a company.

21  That's what I do.  I start businesses and build on

22  them.  The girls liked this name, Sue being the key

23  one.  And -- so I was fine with it.

24         I kind of thought it was, like I said, a

CONFIDENTIAL
Francis G. Vaccaro

72

1    cool name because diamond represents a pretty nice

2    object, and it's about doing business.  And that's

3    what happened.  I don't even remember the other

4    names right now, but I know that -- I'm sure Mary

5    has some of them.  But I think Preferred was one.  I

6    don't remember the others.

7        Q.  When you furnished the list to Miss Casey,

8    did you give her any instructions?

9        A.  Yes.  I instructed her to please check these

10   through the patent and trademark and the state to

11   see if we could open our company.  And prior to that

12   -- the day before I instructed Mark Donabedian to

13   register for the diamondstaffinginc.com, .net, .org

14   trademark because I wanted to make sure we had that

15   first before we could even proceed getting a

16   trademark or anything else because -- otherwise you

17   can't run a business without an e-mail system.

18       Q.  Let me make something clear though,

19   Mr. Vaccaro, at that point in time you didn't know

20   what company name you were going to select, correct?

21       A.  We had -- I'll tell you exactly what

22   happened.  We had narrowed it down to Diamond

23   Staffing dah-dah-dah-dah.  I instructed Mark to run

24   clearance on Diamond Staffing, Inc., because that's

CONFIDENTIAL
Francis G. Vaccaro

73

1    the one everybody wanted.  If the trademark came

2    back or there was any problems, then we didn't have

3    it.  I think it's a matter of $50 or something.  It

4    was ridiculously cheap.

5        Q.  Let me make sure I get the chronology

6    correct.

7        A.  Yes.

8        Q.  You compiled a list of 10 or 15 names from

9    your employees that you presented to Miss Casey.  Do

10   I have that correct?

11       A.  Yes, you do.

12       Q.  What happened next?

13       A.  She came back with a list of companies that

14   were okay, and then Mark registered Diamond

15   Staffing, Inc.

16       Q.  How many companies did she come back with?

17       A.  I think two or three, to be honest with you.

18   I don't recall them.  I'm not going to lie to you.

19   I'm under oath anyway.  But I think two or three.

20   This is the one the gang wanted, and that was it.  I

21   said, okay, then, Mark, go register it.

22       Q.  When Miss Casey came back with two or three,

23   you canvased your employees again --

24       A.  Yes, I did.

74

1     Q.  -- and the determination was made to go with

2  Diamond Staffing, Inc.?

3     A.  Yes, I did.  Well, actually, prior to

4  submitting them we had a ranking of what was voted

5  on, and that was the one that they wanted.  And as

6  far as I was concerned, if they wanted it, and I'm

7  starting a company with people and they like the

8  name, as long as it was legal, I'm ready to go.

9     Q.  Other than compiling the names and giving

10  them to Miss Casey, did you do any other due

11  diligence in the process of selecting the name

12  Diamond Staffing, Inc.?

13     A.  I did not.  I did not.

14     Q.  Are you personally aware of the -- of what

15  Miss Casey did after you gave her the list of names?

16     A.  Am I personally aware of what she did?

17     Q.  Yes.

18     A.  Yes.

19     Q.  What is your understanding in that regard?

20     A.  That she checked it through with the Federal

21  Trademark Commission and that at that time no one

22  had entered anything like that with the federal

23  trademark; that the state of Massachusetts had no

24  one but one company that had gone out of business

CONFIDENTIAL
Francis G. Vaccaro

75

1    that was an asbestos company that gives Diamond

2    Staffing and that they had lost their right to that

3    trademark in Massachusetts and that we could have

4    it.

5              And that's what happened.

6         Q.   Anything else?

7         A.   Just conversation with my attorney.  And

8    that's it.

9         Q.   What was the nature of that conversation?

10             MR. MELTZER:  I'm going to object on

11   that one.  Instruct him not to answer about specific

12   communications with counsel.

13             THE WITNESS:  Okay.

14             MR. PAPASTAVROS:  Off the record.

15             (Off the record.)

16             MR. MELTZER:  Nick, let me explain my

17   concern, and maybe we can figure out a way to allay

18   this.  There are three kinds of communications I

19   suppose, you know, obviously that take place between

20   counsel and a client.

21             In this context understanding your right

22   to know about intent, I have no problem with him

23   testifying to understandings he developed as a

24   result of communications.  I'm more concerned about

CONFIDENTIAL
Francis G. Vaccaro

76

1    a relation of dialogue I said/she said, I said/she

2    said which at some point spills over from

3    transactional side of this to potentially actual

4    legal advice, and that's where my concern is.

5                So obviously --

6                MR. PAPASTAVROS:  My suggestion on that

7    front -- it's impossible to draw the line.  My

8    suggestion, Rob, is you allow Mr. Vaccaro to testify

9    and the other witnesses to testify.  I would -- you

10   would -- I'm not going to contend that such

11   testimony is a waiver of some other privilege, nor

12   would I contend that you have irrevocably waived

13   your right to assert privilege over those

14   communications.

15               There's simply no way of determining

16   whether or not those privileges -- those

17   communications are directly germane until we elicit

18   them.

19               MR. MELTZER:  Let's do it this way then:

20   Let me interpose a blanket objection on

21   attorney/client privilege.  What I'd like you to do

22   is ask the question, let me think about it before he

23   answers.

24               MR. PAPASTAVROS:  That's fine.

CONFIDENTIAL
Francis G. Vaccaro

77

1          MR. MELTZER:  And let me caution my

2    client that when you answer these questions my

3    objection is on particular legal advice -- that's

4    where that -- as opposed to going to the nuts and

5    bolts of what transpired, and at that point I may

6    object and instruct you not to answer.

7          THE WITNESS:  All right.  I'll shut up.

8          MR. MELTZER:  I will note for the record

9    that I'm objecting to this line of questioning and

10   reserving my rights to move to strike and remove it

11   from the transcript.  Okay.

12          THE WITNESS:  Okay.

13          MR. PAPASTAVROS:  I don't even remember

14   if there was a question pending.

15          (Reporter read back.)

16          MR. MELTZER:  You can answer that.

17     A.   I'm sorry, I wasn't paying attention.  I

18   apologize.  I thought you were talking to -- I

19   thought you were going to ask me the question.

20     Q.   The original question was what other due

21   diligence had you conducted other than furnishing

22   this list to Miss Casey.

23     A.   Right.

24     Q.   I believe you testified that you had some

CONFIDENTIAL
Francis G. Vaccaro

78

1    conversations with her --

2        A.   Yes.

3        Q.   -- the followup question to which was what

4    were the nature of those conversations?

5        A.   Sure.

6              MR. MELTZER:  Go ahead and answer it.

7        A.   Okay.  Basically Mary was an advisor, and

8    there were some names on that list that she felt I

9    shouldn't even go near, even though we could have a

10   shot at having those names.  And because of that

11   relationship, I just struck those names from the

12   list.

13             That was to me further extent of her

14   doing the due diligence I needed to successfully

15   acquire the name.

16       Q.   Did you have a conversation with respect to

17   Diamond Staffing, Inc.?

18       A.   Yes, we did.

19       Q.   What was the nature of that conversation?

20       A.   She felt there was no one, nothing at all

21   that would enable us from having that name.

22       Q.   Did she express any reservations whatsoever

23   regarding you going with that name?

24       A.   No.  None to my knowledge.

CONFIDENTIAL
Francis G. Vaccaro

79

1      Q.   Have any reservations been expressed

2   following that point in time?

3                MR. MELTZER:   Hold on a second.

4                THE WITNESS:   Sorry.

5                MR. MELTZER:   Nick, now we're going from

6   -- what time frame?  You're now moving from intent

7   in selecting the name to subsequent legal advice

8   after the name was selected?  That's getting closer

9   to the line that I've been concerned about.

10               (Pause.)

11               MR. MELTZER:   You want to do a narrower

12  time frame?

13               MR. PAPASTAVROS:   I'll try to rephrase.

14               MR. MELTZER:   You see the point?  At

15  some point somebody mentioned -- somebody for the

16  plaintiff starts mentioning the word "lawyer," and

17  now we're into potential litigation issues.  At that

18  point those communications are I think strictly

19  privileged.  That's not the same as intent in

20  selecting the name.

21               The only caveat is obviously any

22  comments made by the attorney to the plaintiff's

23  attorney which he has knowledge certainly is not

24  subject to that same objection.

CONFIDENTIAL
Francis G. Vaccaro

80

1    Q.  When was the first time that you became

2  aware of the plaintiff Diamond Staffing Solutions,

3  Incorporated?

4    A.  About a month after I opened.  Somewhere, as

5  I stated prior, an e-mail came that she was going to

6  consult her attorneys about the name, and I

7  forwarded that to Attorney Casey.

8    Q.  Was this approximately a month after you

9  selected Diamond Staffing Incorporated as a name?

10    A.  No.  We selected Diamond Staffing

11  Incorporated back in September.  So it was roughly

12  two months.

13    Q.  And when was the domain name

14  diamondstaffinginc.com registered?

15    A.  I don't recall.  But I think we have some

16  documentation that would say it was done.  Mark

17  Donabedian would probably be able to answer that.  I

18  believe it was in September also.  In fact, it was.

19  I just don't know what date.

20    Q.  Have you ever gone onto the website

21  diamondstaffinginc.com?

22    A.  The only time I went on --

23  diamondstaffing.com?

24    Q.  Correct.