IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIAMOND STAFFING SOLUTIONS INC ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | CIVIL ACTION NO:05-40046-FDS |
| ) | |
| DIAMOND STAFFING, INC ) | |
| ) | |
| Defendant ) | |

DEFENDANT, DIAMOND STAFFING, INC.'S OPPOSITION TO THE
PLAINTIFF'S MOTION FOR ENTRY OF SANCTIONS AND/OR TO
COMPEL RESPONSES TO DEPOSITION QUESTIONS, EMERGENCY
CROSS MOTION FOR SANCTIONS AND COSTS AND RENEWED
EMERGENCY CROSS MOTION FOR A PROTECTIVE ORDER

Now comes the Defendant, Diamond Staffing, Inc. ("Diamond Staffing") and opposes the

Plaintiff's Motion for Entry of Sanctions and/or to Compel Responses to Deposition Questions,

and renews its request, on an emergency basis, for a protective order to halt further deposition

questioning of Attorney Mary Casey or, in the alternative, to provide limitations on scope or

location.

As grounds for this opposition, Diamond Staffing states that

1.   This motion is an absolute breach of an express and explicit agreement between

counsel on June 1, 2005 that the Plaintiff would not raise the issue of irrevocable

waiver of attorney/client privilege in the manner in which it is now raising this issue.

On that day, at the deposition of Frank Vaccaro, Plaintiff's counsel stated "My

suggestion…is you allow Mr. Vaccaro to testify and the other witnesses to

testify….I'm not going to contend that such testimony is a waiver of some other

privilege, nor would I contend that you have irrevocably waived your right to assert

privilege over those communications…." Diamond Staffing relied upon this agreement

1

in providing testimony. Plaintiff's counsel is now violating that agreement, and is estopped from doing so.

2.    The Defendant has the absolute and inviolate right to exert the attorney/client privilege as to the issue of direct communications involving legal advice between Diamond Staffing and its attorney, and the argument by the Plaintiff to the contrary is based entirely upon misstatements and fallacies that have arisen due to the procedural history of this case.

As grounds for the cross motion for sanctions and costs, and the renewed request for a protective order, Diamond Staffing states that:

1.    It has complied, in good faith, with all court orders and with all agreements between the parties.

2.    The Plaintiff has repeatedly violated the same orders and agreements, probing into prohibited areas of discovery, and failing to comply with agreements made in good faith.

3.    Diamond Staffing's counsel has already been subjected to four hours of irrelevant, repetitive examination, the record of which clearly demonstrates an intent to harass and annoy.

4.    Diamond Staffing has relied upon promises of Plaintiff's counsel made on June 1, 2005, and has now incurred excessive expense to defend its rights under both the law, the court's order and agreements made in good faith.

5.    It is clear that Plaintiff's counsel cannot be trusted to conduct this discovery without specific limitations imposed by the Court, including limitations of topics, or an order that no further questioning is to be allowed.

As further grounds for this opposition and cross motion, Diamond Staffing states as follows:

1. The Plaintiff filed this lawsuit claiming some form of infringement by Diamond Staffing on the Plaintiff's mark. The Plaintiff is a home-based business in New Hampshire that focuses exclusively in the jewelry business. Diamond Staffing is a Massachusetts-based corporation that provides, almost exclusively, temporary employment for warehouse, call-center, light manufacturing and agricultural workers. Based upon the facts in this case, it appears that any claim of trademark infringement is frivolous at best, and in bad faith, at worst.

2. Based upon the clearly frivolous nature of this lawsuit, Diamond Staffing immediately filed a motion to dismiss under F.R.C.P. 12(b)(6) or, in the alternative, for summary judgment under Rule 56(c). F.R.C.P. 12(b)(6) is specifically included in the rules of civil procedure to give a party an opportunity to have a complaint against it tested by the court before it is required to plead defenses and engage in invasive and harassing discovery. Diamond Staffing availed itself of the protections of F.R.C.P. 12(b)(6) by filing a timely motion to dismiss this lawsuit prior to filing an answer and defenses.

3. Thus, Diamond Staffing has admitted or denied no allegations, and has pled no affirmative defenses of any sort. In fact, the only statement made by Diamond Staffing at this juncture is that the Plaintiff cannot make a case of trademark infringement under its the burden of proof belonging to the Plaintiff.

4. Notwithstanding the pending motion to dismiss, the Plaintiff moved for expedited discovery in this matter. Diamond Staffing opposed the request, asking, instead, that the

Court hear the motion to dismiss under Rule 12(b)(6) prior to permitting the discovery to proceed. Diamond Staffing argued that expedited discovery in the context of a pending motion to dismiss was fraught with tremendous potential for prejudice and harm. Nonetheless, this Court granted the Plaintiff's motion for expedited discovery, although the Court limited certain discovery as to customers. The discovery dispute before the Court is exactly the issue that concerned Diamond Staffing at the time of the expedited discovery motion.

5. F.R.C.P. 26(b)(1) provides the limits of discovery. It states that "parties may obtain discovery regarding any matter, *not privileged*, that is relevant to the claim *or defense* of any party…" Again, Diamond Staffing reiterates that at this point in the lawsuit, a motion to dismiss having been filed based upon the Plaintiff's inability to make a prima facie claim of trademark infringement, *it has pled no defenses*.

6. Expedited discovery has continued to demonstrate the baseless nature of Plaintiff's claim. It is now evident that not only do the two companies not share common business or geographical locale, but also that they do not overlap in terms of customers and they do not operate in similar marketing channels. Indeed, it is now evident that the Plaintiff cannot even demonstrate the usage of a mark subject to infringement. The entire allegation of willful infringement is apparently based upon clip-art found on Diamond Staffing's web page, even though the same clip art is found on the web pages of dozens of other companies sharing the "diamond" name. This was evident from the deposition of the Plaintiff's president, (page 165-173). When the deponent was asked the basis for her contention in the Complaint that "as my business began to blossom in the summer and fall of 2003, on information and belief, […the Defendant]…took note of Plaintiff's

4

success, and on information and belief determined to capitalize on Plaintiff's reputation and success by changing its name from Ultimate Personnel to Diamond Staffing, Inc," she was only able to identify similar clip art that is shared by a large number of companies, many of which predated the use of the clip art by the Plaintiff and none of which have been accused by the Plaintiff of infringement.[1] See, Exhibit A.

7. Expedited discovery has only enhanced the likelihood that this lawsuit will be dismissed on Diamond Staffing's motion under Rule 12(b)(6).

8. On June 1, 2005, Plaintiff took the deposition of the persons most knowledgeable at Diamond Staffing. Diamond Staffing designated its president, Frank Vaccaro, as a witness most knowledgeable. As is shown on page 75, Diamond Staffing's counsel specifically raised the issue that it was not going to waive the attorney/client privilege, that it was prepared to instruct the witness not to answer and that the Defendant was explicitly not raising an "advice of counsel" defense. In order to allow discovery to proceed, counsel conducted a colloquy on the record. On page 76, to resolve the issue, Plaintiff's counsel stated "My suggestion…is you allow Mr. Vaccaro to testify and the other witnesses to testify….I'm not going to contend that such testimony is a waiver of some other privilege, nor would I contend that you have irrevocably waived your right to assert privilege over those communications…." Diamond Staffing's counsel stated on page 77 that "I will note for the record that I'm objecting to this line of questioning and reserving my rights to move to strike and remove it from the transcript." The deposition

---

[1] Also of interest-the Plaintiff has yet to show any kind of enviable success or notable reputation that the Defendant (or anyone for that matter) would find beneficial to capitalize upon. The records of the Secretary of the Commonwealth demonstrate that the Defendant did not change its name from Ultimate Personnel to Diamond Staffing, Inc. Indeed, many, if not all of the allegations in the Complaint, are either demonstrably false on their face or simply ludicrous.

then proceeded under that agreement. Copies of these pages from this deposition transcript are attached hereto as Exhibit B.

9. The Plaintiff next served a deposition subpoena on Diamond Staffing's attorney, Mary Casey, who is clearly in the category of "other witnesses" referenced in the June 1, 2005 deposition. Diamond Staffing immediately sought a protective order against this subpoena, again noting that a motion to dismiss had been filed under Rule 12(b)(6), and that Diamond Staffing was concerned about the taking of this deposition prior to the hearing on the motion to dismiss. Diamond Staffing stated in its Motion for a Protective Order that Attorney Casey would have relevant information should this case proceed, and that her testimony would be relevant and helpful. However, nothing in that motion claimed the "advice of counsel" defense, nor did it waive any privileges. Indeed, no questions had yet been put to counsel at a deposition. Diamond Staffing has been unable to locate any case law that supports the contention that the likelihood of raising an "advice of counsel" defenses waives attorney/client privilege before the defense has been asserted in a responsive pleading or while a motion under Rule 12(b)(6) is pending.

10. Case law supports Diamond Staffing's position that the "advice of counsel defense" may not be used as a sword against it until Diamond Staffing raises the defense of its own accord. This issue was discussed in some detail in Nitinol Medical Technologies, Inc. v. AGA Medical Corporation, 135 F. Supp. 2d 212,214-15 (D.Mass. 2000). In Nitinol, the Court noted that "[t]he current convention in patent litigation strategy is as follows: the patent owner opens with a claim for willful infringement; the alleged infringer answers by denying willful infringement and asserts good faith reliance on advice of counsel as an affirmative defense; then the owner serves contention interrogatories and document

requests seeking the factual basis for that good faith reliance...relating to counsel's opinion...."

11. The <u>Nitinol</u> case then states, quite clearly, that the decision as to whether a party intends to raise such a defense must be a *conscious* and willing decision *by the party*. The Court noted that "it is beyond question that the 'deliberate injection of the advice of counsel defense into a case waives the attorney-client privilege'..." <u>Nitinol</u>, 135 F.Supp.2d. at 217, citing <u>Mushroom Assoc. v. Monterey Mushrooms, Inc.</u>, 1992WL 442892 at 3.

12. This issue was also raised in <u>In re Raytheon Securities Litigation</u>, 218 F.R.D. 354,356 (D.Mass. 2003), in which, in the procedural synopsis, the Court noted that "...he...[the judge]... rejected Lead Plaintiff's argument that the right to withhold documents on the privilege grounds was waived by defendant's intent to rely on an advice of counsel defense, finding that defendant did not intend to rely on such a defense..."

13. For this same point, See, also, <u>In re Keeper of the Records XYZ Corporation v. United States of America</u>, 348 F. 3rd.16,24 (1st Cir. 2003)("When an attorney participates in an extrajudicial meeting or negotiation, his participation alone does not justify implying a broad subject matter waiver of the attorney-client privilege. There is a qualitative difference between offering testimony at trial or asserting an advice of counsel defense in litigation, on the one hand, and engaging in negotiations with business associates, on the other hand. In the former setting, the likelihood of prejudice looms: once a litigant chooses to put privileged communications at issue, only the revelation of all related exchanges will allow the truth-seeking process to function unimpeded. In the latter scenario, however, such concerns are absent. The party has introduced its lawyer into the negotiations, but that act, in and of itself, does nothing to cause prejudice to the

opposition or to subvert the truth-seeking process. Furthermore, a rule that would allow broad subject matter waivers to be implied from such communications would provide perverse incentives: parties would leave attorneys out of commercial negotiations for fear that their inclusion would later force wholesale disclosure of confidential information. This would strike at the heart of the attorney-client relationship--and would do so despite the absence of any eclipsing reason for the implication of a waiver. Where a party has not thrust a partial disclosure into ongoing litigation, fairness concerns neither require nor permit massive breaching of the attorney-client privilege.")

14. In short, a reliance on "advice of counsel" is not to be presumed or gleaned by interpretation. The reliance on counsel is pled as an affirmative defense, or is specified by name, with the clear intent of waiving attorney-client privilege in order to invoke the defense.

15. Here, Diamond Staffing has pled no such affirmative defense. Rather, Diamond Staffing has argued that no actual infringement has occurred; this is not an instance where Diamond Staffing is acknowledging infringement, but denying that infringement is willful. In addition, Diamond Staffing's intent as to this point can be clearly inferred from the motion to dismiss. The basis of the motion to dismiss is that the Plaintiff cannot meet its burden of proof as to essential elements. Good faith reliance on counsel is not even discussed in the papers. Diamond Staffing has not made a deliberate and knowing assertion of the defense, and has not waived the attorney-client privilege.

16. Also, when the issue was raised at the June 1, 2005 deposition, Diamond Staffing made it abundantly clear that it was not engaging in waiver of attorney/client privilege, a position agreed to by Plaintiff's counsel.

17. The Court should note that *the Plaintiff*, not Diamond Staffing, raised the "advice of counsel" defense in its opposition to the motion for protective order (in violation of the June 1, 2005 agreement), and that the phrase does not appear in Diamond Staffing's motion for protective order, nor would it be have been logical for Diamond Staffing to even discuss defenses that had not been raised.

18. In its opposition to Diamond Staffing's motion for a protective order, the Plaintiff ignores the fact that the essential element of "advice of counsel" is an assertion of "reliance on the advice of counsel." Nitinol, 135 F.Supp.2d. at 214. The "advice of counsel" goes to the specific state of mind of the party in adopting a mark, and goes beyond the mere recitation of factual circumstance. The five examples of alleged assertion of "advice of counsel" do not go to this issue, and torture the language of the pleadings in an attempt to find such an assertion of such a defense. The statements of Mary Casey that the name was not previously trademarked does not reference reliance by Diamond Staffing, nor does the Affidavit of Frank Vaccaro state any assertion of reliance on counsel's advice for selecting the name. The interrogatories state that due diligence was conducted, but does not reference ultimate reliance on advice of counsel. On page 75 of the deposition of Frank Vaccaro, Diamond Staffing's counsel specifically reasserted the attorney/client privilege and made it abundantly clear to Plaintiff's counsel that "advice of counsel" was not being tendered as a defense at that time.

19. In fact, Diamond Staffing's counsel specifically stated that "I'm more concerned about a relation of dialogue …which at some point spills over from transactional side of this to potentially actual legal advice." Plaintiff's counsel replied that "I'm not going to contend that such testimony is a waiver of some other privilege, nor would I contend that you

have irrevocably waived your right to assert privilege over those communications." On page 77, Diamond Staffing's counsel again asserted the privilege, stating that "my objection is on particular legal advice…"  The notion that Diamond Staffing intended to deliberately interject an "advice of counsel" defense is flatly contradicted by the record, as is the suggestion that the privilege was waived based upon testimony by any witness.

20. The Court permitted the Plaintiff to proceed with Attorney Casey's deposition. As the Plaintiff notes in its current motion, the Court stated "you've raised an advice of counsel defense that whatever privilege might otherwise attach is gone and she is to testify about these trademark issues…" Diamond Staffing again notes that it has not raised the "advice of counsel" defense, or any defense other than the filing a motion to dismiss for failure of the Plaintiff to state a viable cause of action.

21. With all due respect to this Court, the decision to raise that defense at the appropriate time for raising that defense, belongs to Diamond Staffing. Diamond Staffing is not proceeding through discovery voluntarily; Diamond Staffing has been ordered to comply with discovery under order prior to a hearing on its legally appropriate motion to dismiss. Diamond Staffing has been unable to identify any case law in which compelled discovery prior to a hearing on a motion to dismiss creates a sort of "constructive defense" as both the Plaintiff and this Court seem to be suggesting.

22. The Plaintiff's current motion under Rule 37 is thus based upon the curious circumstance in which the Plaintiff is not only attempting to litigate its infringement claim, but it is also trying to plead the defenses which have not been raised, and is trying to argue waiver of rights that have not been waived. Indeed, the Plaintiff is relying entirely upon inflammatory and prejudicial misstatements of both the procedural record of this case,

and the law of trademark infringement. For example, contrary to the Plaintiff's assertions, Diamond Staffing has been unable to locate a single case in which the mere fact that one party has heard of the name of a similar company constitutes infringement under the Lanham Act.[2] In fact, as was noted in the motion to dismiss, companies may exist, side-by-side, with nearly identical names, without being deemed to be infringing. See, also, Q Division Records, LLC v. Q Records and QVC, Inc., 2000 U.S. Dist. LEXIS 1773)

23. At the June 9 hearing on the Motion for Protective Order, at which both attorneys were present, the Court was quite specific as to what areas of questioning it would regard as out of the bounds of the discovery process. The Court stated "I expect counsel to act in good faith. If you have a good-faith basis to impose privilege or proper work-product protection, you may do so." (Hearing on Defendant's Motion for Protective Order, p. 11 at 14-18). The Court gave a number of guidelines in the June 9 Motion regarding the proper scope of discovery, one of which was: *".. to the extent that she (Attorney Mary C. Casey) is involved in the litigation of this case that...is privileged, because that doesn't relate to the trademark issue..."* (p. 10 at 20-23)

24. Plaintiff's counsel, while certainly completely understanding the directives of the Court, commenced the deposition by taking the position that Ms. Casey could not interpose objections otherwise he would disqualify her. (Deposition of Mary Casey, p. 5 at 17 to p.7 at 11) Plaintiff's counsel then proceeded to conduct a wholesale investigation into Attorney Casey's activities in relation to the litigation at hand. Questions included whether she did a personal review of documents, specifics on which members of the Defendant's staff she worked with, what documents were located, etc. (Deposition of

---

[2] In the deposition of Suzanne DeVries, the Plaintiff's president, she testified (page 37) that prior to choosing the name Diamond Staffing Solutions, she was aware of a company called Diamond Dental Staffing, but this did not concern her because it had "nothing to do specific to the jewelry industry."

Mary Casey, p.8 at 20 through p. 10 at 22). All of these questions were in violation of the Court's directive, as they served as direct inquiry as to litigation work, not trademark work.

25. The Court also issued a directive barring inquiry *" With regard to other things she does for other clients... "* (p. 11 at 6-7) Plaintiff's counsel, again, did not adhere to this directive and asked numerous questions regarding when and how Attorney Casey met Mr. Vaccaro, the nature of the legal services Attorney Casey provided to Mr. Vaccaro as far back as 1999 and also in 2001, one year prior to Ms. DeVries starting her business and two years prior to the existence of Diamond Staffing, Inc. Despite the objections of defendant's attorney, Plaintiff's counsel continued to disregard the orders of the Court by repeatedly returning to the same question, insisting on asking for confidential information about matters and clients that are not relevant to the trademark issue at hand, threatening the witness (for the second of many times during the deposition) that he would "call the judge" to compel an answer. (See Deposition of Mary Casey, pages 68-79). Defendant's attorney indicated that he welcomed the opportunity to reach the Court for clarification, but Plaintiff's counsel chose not to make the call (see Deposition of Mary Casey p. 78 at 11-18).

26. A third area that the Court specifically identified as out of bounds of the scope of the discovery was relating to: *" ...other things for this client not relating to trademark, the presumption at least is that it's out of bounds because it's irrelevant and privileged. "* (p. 11 at 7-11) Plaintiff's counsel, in total breach of the directives given by the Court as to the intent and scope of the discovery, delved into Ms. Casey's personal history from 1971 to the present day, which appeared to be a back-door way of inquiring into how work was

performed for this client, and other clients, not related to trademarks. He started with questions about when and where she attended high school, proceeded to ask about every educational institution she ever attended, every job and position she ever held, and why she moved her personal residence in 1979 and 1980. (Deposition of Mary Casey pages 20-31) These questions were of a personal nature, irrelevant to the trademark issue in question and certainly well outside the scope of the discovery.

27. In addition, other questions concerning Attorney Casey's legal practice, whether her practice was successful, how many hours she worked and how many hours she billed, were considered by Plaintiff's counsel to be fertile hunting grounds (page 38 at 16-24 and page 39 at 1-15). Despite this, Ms. Casey was gracious, professional and completely cooperative, answering every question without voicing any complaint. This line of questioning was not only completely inappropriate; it also wasted substantial time allotted by the court for the deposition, which time could have been used with more efficacy.

28. Bad faith was demonstrated by Plaintiff's counsel by his demeanor during the questioning. It was clear that he was more interested in trying to trick Attorney Casey into giving "wrong" answers or somehow to discredit herself than in actually finding out legitimate and relevant information. At one point in the deposition, Plaintiff's counsel asked Attorney Casey what kinds of searches she would typically conduct for a trademark client. Attorney Casey responded to the question. Plaintiff's counsel insisted she had not answered and, asked the question repeatedly a total of four times. Despite Ms. Casey's answer after each time he asked the question, and her indication (after the third time that the question was asked) that she didn't understand exactly what Plaintiff's

13

counsel was looking for, Plaintiff's counsel concluded by saying "let the record reflect
that the witness is not answering that question," and threatened to "call the judge at
noontime" to compel an "appropriate response."    Counsel for the Defendant stated that
Plaintiff's counsel should also inform the Court that the question was answered four
times. (See Deposition of Mary Casey, pages 50-53). Plaintiff's counsel again elected
not call the Court, apparently wishing only to use this threat as a tactic to try to intimidate
and harass the deponent.

29. Plaintiff's counsel maintains that Attorney Casey refused to answer questions. Attorney
Casey's deposition lasted four hours, generating 118 pages of transcript. Had Plaintiff's
counsel carefully reviewed the transcript of the deposition, he would clearly see that the
majority of questions that he is asking the Court to compel an answer to were, in fact,
answered. For example, the question relating to the goods and services that the new
company (Diamond Staffing, Inc.) would be offering was answered on p. 90 at 14-15.
The questions which the deponent did *not* answer had to do with conversations she had
with her client, which fall into the attorney-client communications privilege protection.
However, she was forthcoming and very cooperative in answering other questions of fact
that got to the sum and substance of the matter. Attorney Casey was trying to act in good
faith in attempting to be as cooperative as possible in providing the relevant information
being requested without breaching her ethical obligation to protect her client's
confidentiality, which her client, through its attorney, was obviously directing her to
maintain.

30. Furthermore, Plaintiff's counsel is disingenuous when, in a footnote on page 3 of
Plaintiff's Memorandum in Support of Emergency Motion for Sanctions, he states that

14

the deposition of Ms. Casey must continue "...since she was only available from approximately 9:00 AM through 1:00 p.m. on June 17, 2005." He knows very well that the four-hour time allotment was predetermined by the Court and agreed to by all parties. Attorney Casey rearranged her schedule in order to make herself available for the deposition. All parties were aware that it was always the intent of the parties that Attorney Casey's deposition would continue on a future date. By making untrue statements in a legal document, Plaintiff's counsel, again, appears to be trying to portray Attorney Casey as being uncooperative and unresponsive in the eyes of the court.

31. Finally, and most importantly, as evidence of Plaintiff's bad faith, the Court should note that on June 21st the attorneys for both parties filed a Joint Motion to Extend Deadlines. In that Motion, it clearly states that "...discovery disputes came to light during the deposition of Mary Casey... for which the parties will need the Court's assistance in resolving." (p. 2, item 4). That was the proper way to handle this situation. For the Plaintiff's attorney to subsequently proceed, three days later, to file a Motion for Sanctions containing such exaggerated and virulent claims against a fellow member of the Bar is unprofessional and duplicitous.

32. The Defendant requests that the Court carefully scrutinize the facts of this case. The Defendant is confident that the facts will show that Attorney Casey did not breach the intent and scope of the June 9 court order regarding the discovery process, but that she did, in fact, act in a professional, cooperative and responsive manner while, at the same time, trying to fulfill her obligation to protect her client's interest in those instances where she felt it was warranted or where she was asked to do so. Had she answered those questions to which Defendant's attorney objected, she not only would have been guilty of

15

unethical behavior by breaching her client's confidentiality rights, she would also have made herself liable to charges of malpractice.

33. Plaintiff's motions for sanctions against her and to compel responses is unwarranted, constitutes egregious misconduct on the part of the attorney for the Plaintiff and is nothing less than an attempt to harass and intimidate her into breaching her responsibilities regarding attorney-client confidentiality and to besmirch her reputation. The attorney for the Plaintiff has elevated this dispute to a point where it has become acrimonious completely beyond the merits of the case.  Personal sanctions in this matter are completely uncalled for and draconian in nature and, it is respectfully submitted, should be disregarded by the Court.

34. The Defendant respectfully submits that the number of motions, actions and other legal documents being submitted in this case are such that they are unnecessarily and frivolously taking up the Court's time in an attempt to create a distraction from the fact that the Plaintiff does not have a viable case.

35. During the deposition of Attorney Mary Casey, the Plaintiff's attorney has demonstrated bad faith and a flagrant disregard of the Court's directives which constituted conduct unbecoming a member of the Bar and should be sanctionable. The Court should also note that the conduct is a specific breach of the June 1, 2005 agreement between counsel as to the issue of attorney/client privilege. Defendant's counsel notes that the local rules specifically require counsel to meet and confer to address discovery disputes between themselves without court intervention. If Plaintiff's counsel cannot be trusted to live within the agreements reached by the parties, then the local rule is rendered meaningless.

36. This court has granted tremendous leeway to the Plaintiff to conduct expansive and invasive discovery, and Diamond Staffing has complied with the Court's orders. Notwithstanding that it does not appear that the Plaintiff's claim will survive the motion to dismiss, Diamond Staffing has provided its most sensitive customer lists and business information to the Plaintiff. Attorney Casey answered all questions fully, and repeatedly at her deposition. She did so notwithstanding the complete lack of relevance of the questions.

37. However, this Court must recognize limits on discovery when equity so requires. The Plaintiff should not be allowed to define Diamond Staffing's defenses, especially when Plaintiff's defense of choice raises the vital issue of waiver of privilege. Diamond Staffing is fully aware of the contours of the "advice of counsel" defense and its impact on discovery. At this juncture, Diamond Staffing has not raised this defense, and would likely not even considering doing so at this juncture.

38. Thus, the extreme sanctions that the Plaintiff is seeking are without any basis whatsoever. The questions asked, which go to the heart of advice given by counsel, are not relevant to any defenses because no defenses have been tendered. Rule 26 specifically recognizes the limitation of privilege. Privilege has not been waived, and has been asserted appropriately at the deposition of Attorney Casey.

39. In addition, the suggestion that raising the privilege defense as to the per se advice between attorney and client constitutes prima facie evidence of bad faith of Diamond Staffing is so extreme and so unsupportable as a matter of law that it defies credibility. Rule 26 grants a party a right to invoke this privilege, and Diamond Staffing has merely exercised its right.

40. The suggestion that Diamond Staffing is somehow obstructing discovery is brazenly outrageous. Diamond Staffing has produced documents and witnesses as requested. On the other hand, the Plaintiff has utterly failed thus far to produce a shred of evidence to support the wild accusations made in its Complaint. In addition, because of family commitments and trade shows, the Plaintiff's president has removed herself from availability for oral testimony for expansive periods of time. The Court should note that the Plaintiff sought the expedited discovery, yet has failed to produce documents and testimony to support the claim.

41. In addition, as the transcript demonstrates, the Plaintiff has moved far afield from relevant topics in the deposition. Questions pertaining to unrelated business entities and unrelated clients have no relevance to this lawsuit. The record also demonstrates badgering and harassment of the witness in a manner that show extreme disregard for a member of the bar, and a counsel in this litigation. This is not a malpractice lawsuit, or a claim for breach of contract between parties in privity. Attempts to suggest impropriety and efforts to condemn practice policies of a member of a bar are grossly inappropriate in the procedural context of this lawsuit.

42. Consequently, Diamond Staffing again respectfully requests that the Plaintiff's motion be denied in toto. Diamond Staffing respectfully requests a protective order to preclude any further harassing and invasive exploration of topics not yet in issue. Finally, Diamond Staffing requests that this Court order the Plaintiff to pay attorney's fees and costs of this opposition. In the alternative, the Court should require that any further questioning to continue in the Court's presence so that objections may be addressed as questions are raised.

18

Respectfully Submitted,
**Diamond Staffing, Inc.**
By its attorneys,

Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Mary C. Casey, BBO #636250
Harbor Law Group
48 Maple Avenue
Shrewsbury, MA 01545
Phone: (508) 842-9244

Dated: June 30, 2005

19

## CERTIFICATE OF SERVICE

I, Robert N. Meltzer, do hereby certify that on this day I served a copy of the foregoing by first class mail, postage prepaid, and fax, to:

Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
Attn: Nicholas G. Papastavros, Esq.

_____
Robert N. Meltzer

June 30, 2005

20

# EXHIBIT A

Page 165

1    MR. PAPASTAVROS: And I would also
2  object so far as she has stated, in 2004 and 2005
3  she doesn't know.
4        MR. MELTZER: She said four, perhaps,
5  more than 2003, plus or minus.
6        MR. PAPASTAVROS: "Plus" is what she
7  said. It mischaracterizes is her testimony.
8        MR. MELTZER: I'm saying if we add six
9  to the 20 --
10   **Q.** Could we believe it's more than 20?
11        MR. PAPASTAVROS: The question has
12  nothing to do with the documents. My objection is
13  registered.
14   **Q.** You understand the question?
15   **A.** I do.
16   **Q.** Okay, the answer to that question?
17   **A.** More than 14.
18   **Q.** Going back down to the next paragraph it
19  says, "As plaintiff begins to blossom." Do you see
20  that?
21   **A.** Yes. As my business begins to blossom "in
22  the summer and fall of 2003, on information and
23  belief, took note of Plaintiff's success, and on
24  information and belief determined to capitalize on
        FLYNN REPORTING ASSOCIATES

Page 166

1  Plaintiff's reputation and success by changing its
2  name from Ultimate Personnel to Diamond Staffing,
3  Inc."
4   **Q.** Could you tell me what your basis for that
5  statement is?
6   **A.** Putting a diamond on the front of their
7  website.
8   **Q.** What else?
9   **A.** Having "a cut above the rest," which I
10  believe was on their first website.
11   **Q.** What else?
12   **A.** Those are the two things that come mostly to
13  mind.
14   **Q.** Having a diamond on the front of their web
15  page and having "a cut above the rest" on their web
16  page; is that your testimony?
17   **A.** That's my testimony.
18        MR. PAPASTAVROS: And you're talking
19  about the basis for the entire statement, "As the
20  business began to blossom in the summer and fall of
21  2003," right?
22        MR. MELTZER: Correct.
23   **Q.** Do you recall testifying earlier about the
24  web page or Diamond Dental Staffing?
        FLYNN REPORTING ASSOCIATES

Page 167

1   **A.** Yes.
2   **Q.** Is that what you saw?
3   **A.** No.
4   **Q.** What did you see when you checked the
5  Diamond Dental Staffing web page?
6   **A.** I don't know exactly, but this is not what I
7  saw.
8   **Q.** You didn't see something that said, "a cut
9  above the rest" with a diamond on it?
10        MR. PAPASTAVROS: Objection,
11  mischaracterizes on the web page.
12        THE WITNESS: No.
13        MR. MELTZER: Mark what we have been
14  referring to.
15        (Marked, Exhibit 30, Diamond Dental
16  Staffing, Ltd. web page.)
17   **Q.** Have you ever talked to anybody at Diamond
18  Dental Staffing, Ltd.?
19   **A.** No.
20   **Q.** Do you have reason to believe that they have
21  changed their web page since you reviewed it in
22  2002?
23        MR. PAPASTAVROS: Objection. Are you
24  saying this is the entirety of their web page or one
        FLYNN REPORTING ASSOCIATES

Page 168

1  page?
2        MR. MELTZER: I am providing the front
3  page.
4        MR. PAPASTAVROS: So your question is,
5  do you believe they changed their front page?
6        MR. MELTZER: That's right.
7        THE WITNESS: I don't know the answer to
8  that.
9   **Q.** Do you have any reason to believe they are
10  capitalizing on your success?
11   **A.** No.
12   **Q.** I ask you if you ever saw that web page?
13   **A.** No.
14   **Q.** You never reviewed that web page, "Diamond
15  Lourves, a cut above the rest"?
16   **A.** Have I ever reviewed it?
17   **Q.** Have you ever seen that web page?
18   **A.** No.
19   **Q.** Have you ever talked to anybody at this
20  company?
21   **A.** No.
22   **Q.** Do you think they are capitalizing on your
23  success by using "A cut above the rest"?
24        MR. PAPASTAVROS: Objection. Lacks
        FLYNN REPORTING ASSOCIATES

Page 169

1  foundation.

2      **Q.** I ask you when it says, "A cut above the

3  rest" and the word "diamond," do you have any reason

4  to believe they are capitalizing on your success?

5      **A.** No, because they don't have a diamond on it.

6          MR. MELTZER: Let's mark that as the

7  next one.

8          (Off the record.).

9          (Marked, Exhibit 31, Diamond Lourves web

10  page.)

11      **Q.** This is Diamond Mini Storage. Have you ever

12  seen that one?

13      **A.** No.

14      **Q.** Have you talked to a company called Diamond

15  Mini Storage?

16      **A.** No.

17      **Q.** Have you ever communicated with them about

18  the "cut above" here?

19      **A.** No.

20      **Q.** Do you have any reason to believe whether

21  this is company capitalizing on your success?

22          MR. PAPASTAVROS: I am going to object

23  with respect to companies she never saw before,

24  looked at the website, never had any encounters

FLYNN REPORTING ASSOCIATES

---

Page 170

1  with. As she sits here today she doesn't know the

2  company and has no reason to believe one way or the

3  other.

4          MR. MELTZER: Okay, your objection is

5  noted.

6          Let's mark this as the next one.

7          (Marked, Exhibit 32, Diamond Mini

8  Storage web page.)

9      **Q.** As you sit here today, have you ever heard

10  of a company called Black Diamond Realty with a

11  diamond on it and "A cut above the rest"?

12      **A.** No.

13      **Q.** Never spoke to that company?

14      **A.** No.

15          MR. MELTZER: Let's mark this as the

16  next one.

17          (Marked, Exhibit 33, Black Diamond

18  Realty web page.)

19      **Q.** Have you ever heard of Diamond Realty and

20  Management with a diamond on it and "A cut above the

21  rest"?

22      **A.** No.

23      **Q.** Have you ever spoken to that company?

24      **A.** No.

FLYNN REPORTING ASSOCIATES

---

Page 171

1          MR. MELTZER: Mark it.

2          (Marked, Exhibit 34, Diamond Realty and

3  Management website.)

4      **Q.** Have you ever heard of a company called

5  Diamond Window Tint, "Simply a cut above the rest"?

6      **A.** No.

7      **Q.** No?

8          Never spoke to this company?

9      **A.** No.

10      **Q.** Is that a "no"?

11      **A.** No.

12          MR. MELTZER: Mark that.

13          (Marked, Exhibit 35, DWT Enterprises,

14  Inc.)

15      **Q.** How about "Diamond Limousine, a cut above

16  the rest"?

17      **A.** No.

18      **Q.** Ever talk to them?

19      **A.** No.

20      **Q.** Never spoke to them at all?

21      **A.** No.

22          MR. MELTZER: Mark that one.

23          (Marked, Exhibit 36, Diamond Limousine

24  web page.)

FLYNN REPORTING ASSOCIATES

---

Page 172

1      **Q.** How about Diamond Motors of Dallas, Texas

2  with "Diamond, a cut above the rest"; ever speak to

3  that company?

4      **A.** No.

5          (Marked, Exhibit 37, Dallas Diamond

6  Movers.)

7      **Q.** Let's go across the pond to England, Diamond

8  Holidays, a cut above the rest"; have you ever

9  talked to that company?

10      **A.** No.

11          MR. MELTZER: Marks that one.

12          (Marked, Exhibit 38, Diamond Holidays

13  web page.)

14          MR. MELTZER: Thank you.

15      **Q.** Probably should be merciful. It doesn't

16  say, "A cut above the rest" on this. Have you ever

17  spoken to anybody at Diamond Medical Staffers?

18      **A.** No.

19      **Q.** Did you ever hear of this company?

20      **A.** I have heard of them, but I have not.

21      **Q.** When?

22      **A.** I have heard of them, because when you bring

23  up Diamond Staffing, they come up in diamond medical

24  staffing.

FLYNN REPORTING ASSOCIATES

Page 173

1    Q. When did you first hear of them?
2    A. I don't know.
3         MR. MELTZER: Mark that.
4         (Marked, Exhibit 39, Diamond Medical
5    Staffing, Inc. web page.)
6    Q. In Number 28, the document response provided
7    a Diamond Staffing Solutions document request.
8         MR. PAPASTAVROS: I'm going to ask you
9    to wait after you ask the question, so we could show
10   it to the witness.
11   Q. I ask you to take a look at Request Number
12   31.
13   A. (Witness complies.)
14   Q. I'm going to hand you the documents that
15   were provided by your counsel in response.
16        MR. PAPASTAVROS: I object. We're not
17   interested in going through this exercise unless you
18   want to suspend the deposition.
19        MR. MELTZER: Well, I guess the question
20   I'm going to ask, there's no question there, I am
21   going to ask, is there a document in there
22   specifically responsive to this request?
23        MR. PAPASTAVROS: Unless you want to
24   suspend for more than an hour for her to go through

Page 174

1    every last document therein, Rob, that question is
2    unanswerable and you know that. If you want to ask
3    a different question, go ahead.
4         MR. MELTZER: Are you instructing her
5    not to answer?
6         MR. PAPASTAVROS: No. I'm saying if you
7    want take a break and go through the documents and
8    have her produce a response, do you want her to do
9    that; that is one of your seven hours?
10        MR. MELTZER: I'm not limited by that.
11        MR. PAPASTAVROS: Sure you are. That is
12   what Judge Saylor said.
13   Q. Who assembled the response?
14        MR. PAPASTAVROS: Objection.
15   Q. Did somebody at Diamond Staffing, Inc.
16   prepare these documents for production?
17   A. Yes.
18   Q. And who did that?
19   A. Myself and Lucy.
20   Q. How did you go about doing that with Lucy?
21        MR. PAPASTAVROS: Are you talking about
22   with the Bates numbers, Rob, or without? Because I
23   will stipulate that my office put the Bates numbers
24   on there, like every law office. But if your

Page 175

1    question goes to the responses to your document
2    request, that's a different question.
3         MR. MELTZER: I'm talking about the
4    package of documents that were provided. Who
5    provided this package of documents, who prepared it?
6         MR. PAPASTAVROS: The answer to that
7    question is I gave you the documents at Mr.
8    Vaccaro's deposition, as you well know.
9    Q. My question is, who prepared this stack of
10   documents? Who copied them; let's start with that?
11   A. Who prepared them was myself, Lucy and Nick,
12   and his office.
13   Q. In preparing this response, as we sit here
14   today, can you recall a document that is responsive
15   specifically to Request Number 31?
16   A. No.
17        MR. PAPASTAVROS: I'm going to object
18   insofar as she is she has already said she has not
19   seen Exhibit 28 before. Why don't you read back the
20   question.
21        And you could answer it if you
22   understand.
23        MR. MELTZER: I'll withdraw the
24   question.

Page 176

1    Q. Turning to the top of Page 2 of the Verified
2    Complaint.
3         MR. PAPASTAVROS: Is this a good time
4    for a break, Rob?
5         MR. MELTZER: Yes, go ahead.
6         MR. PAPASTAVROS: Thanks.
7    Q. I just noticed on Page 1 the words starting
8    with "this," that one word. See where that word is?
9    Could you read that sentence starting with "this"
10   for the record, please?
11   A. "This name change is causing substantial
12   confusion in the marketplace, given the identical
13   diamond staffing services offered by the companies
14   and overlapping customer base."
15   Q. I'll show you a document that was marked as
16   Exhibit Number 3, which is a confidential customer
17   list of Diamond Staffing, Inc. from the deposition
18   of Mr. Vaccaro, and just take a moment to look at
19   it. And the question I'm going to ask you is
20   whether there is a single customer on that Diamond
21   Staffing list, which is also a customer of Diamond
22   Staffing Solutions, Inc. from the deposition of
23   Frank Vac?
24   A. Okay.



# Diamond Dental Staffing, Ltd.

13306 117th Ave NE
Kirkland, WA 98034
Phone: 425.821.0337
Fax: 425.823.2278
Email:
rgordon@diamond-dentstaff.com
*Toll Free!* 1.866.683.0337

- Employee Services
- Employer Services
- Interview Request
- Who We Are
- Contact Us
- Permanent Jobs
- Temporary Jobs
- News/Newsletter

Home

Welcome to...

## Diamond Dental Staffing, Ltd.

Diamond Dental Staffing, Ltd. provides permanent and temporary employment services exclusively for the dental community of Western Washington. We pride ourselves on going the extra mile to make your experience with us pleasant and your relationship with us long term.



Whether you have staffing needs in your practice or you are looking for a permanent or temporary position, Diamond Dental Staffing, Ltd. brings the two of you together. The search for the right staff member or the right position for you is streamlined, using today's technology for the job of tomorrow.

We look forward to working with you at Diamond Dental Staffing, Ltd.

Copyright© 2002 Diamond Dental Staffing, Ltd.
Read Our Privacy Policy
12660 Visitors!

Designed & Developed by



EXHIBIT
30 (mp)
PAB 6-14-05

PENGAD 800-631-6989

 **infolink**.com.au          australian: architecture - building - construction - design

Home  |  Companies  |  Product News  |  Industry News  |  Careers  |  Tenders  |  Advertise Online

Search Site





[GO]

Directory

▫ Click here to view
  entire Directory
▫ Building Services

  Commercial &
▫ Professional
  Services
▫ Construction &
  Building
▫ Heating, Cooling &
  Insulation
▫ Interior Finishes

  Kitchens,
▫ Bathrooms and
  Laundries
▫ Landscape &
  Outdoor
▫ Lighting & Electrical

▫ Windows, Doors &
  Glazing

**News**

# Diamond Louvres – a cut above the rest

This month, Lidco launches a valuable new product – the Diamond Louvre™ System. While Diamond Louvres™ are not only functional and endlessly versatile, Lidco has ensured that they also look as attractive as any true diamond should, adding value to their setting.

Suitable for both domestic and commercial applications, Diamond Louvres™ are available in a range of sizes, colours, finishes and control options for complete flexibility. Accessories such as stacking kits, remote control, torsion bars and fixed glass extension can be used to further customise the Diamond Louvres™. An integrated security system, finished to blend seamlessly with the Diamond Louvre™ System, is also available.

Diamond Multi Framing, a perimeter frame system developed to complement Diamond Louvres™, is a long awaited answer to the problem of combining adjustable glass louvres with conventional residential and commercial framing systems. With insect and security screens as an integral part of the design, Diamond Multi Framing allows installation of louvres like any conventional windows.

The quality and performance of Lidco Diamond Louvres™ is assured with testing to Australian Standards AS2047 and AS1288 by an independent NATA certified testing laboratory.

Diamond Louvres™ can be subtle or spectacular – whatever your needs, they are a priceless addition to your property. To find out more about Lidco, click here.

*12 June 2001*

Ads by Google

**RoGAL Ventilation**
Gravity Roof Ventilators Air Inlet Louvres

**Air Duct - Do It Yourself**
Wide Selection and Expert Advice Low Prices and Free Delivery!



## More news for Lidco

Changes at Lidco – 455AN *(5-Apr-2005)*

Bifold insect screen – Lidco – 759AN *(5-Apr-2005)*

Old name, new company: Lidco *(4-Mar-2005)*

Insect screen *(19-Oct-2004)*

Screening out six-legged pests *(18-Oct-2004)*

More ...


EXHIBIT
31 (mo)
PAB 6-14-05

C

Con

Email

**More Prod**

Perform;
Syster



Diamond L



Bi-Fold S





EXHIBIT
32 (md)
PAB 1-14-05
PENGAD 800-631-6989

# Diamond Mini Storage





**CONVENIENTLY LOCATED ONLY 1/2 MILE WEST OF HWY 27**

**STATE O THE ART SECURITY**

## A CUT ABOVE THE REST

 **DIAMOND'S FRIENDLY MANAGERS LIVE ON SITE FOR ADDED SECURITY, SERVICE & CLEANLINESS**

 **CONTINUOUS CAMERA MONITORING**

 **CLIMATE CONTROLLED UNITS AVAILABLE**

 **CONVENIENT 24 HR 7 DAY KEYPAD ENTRY**

 **MONTH TO MONTH LEASES**

 **BOXES & PACKING SUPPLIES AVAILABLE**



**6400 HWY 544 EAST (LUCERNE PARK RD.) WINTER HAVEN 33881**

**OFFICE HRS M-FRI 10-6  SAT 10-4**

# 863-421-5772

**FAX: 421-8274**



Click the ad to view it in full size

Welcome to Black Diamond Realty!    Page 1 of 3

## Thank You for visiting the **Black Diamond Realty** Web Site!



*Black Diamond Realty*

*"Truly a Rare Find!"*

## Residential Homes, Cottages, Waterfront Properties and Recreational Lan
Serving
*Marinette County and Northern Oconto County, Wisconsin*

| | |
|---|---|
| **Black Diamond Realty, llc.**<br>**"Truly A Rare Find!"**<br>**TERRY & BRENDA MARTIN**<br>Brokers/Owners<br>W11344 Cty Road X Crivitz, WI 54114 | **Office**  715-757-9238<br>**Fax**  715-757-9268<br>**E-mail:**  realtypros@blackdiamondrealty.com |



**#2159**          **$68,000.**

### *Walking Distance to 2 Public Landings on High Falls Flowage!*
Meticulous 1988 Artcraft
Manufactured Home 14' x 60'
Tastefully Decorated Two Bedrs & Bath
Most Furnishings Remain.
Built in Hutch, Ample Cupboards,
Ceiling Fan, Vaulted Ceiling.
Range & Refrigerator.
Washer/Dryer Hook-ups. Pitched Roof,
Storage Unit, Screen Porch, Front
Entrance Decking. Drilled Well,
Conventional Septic System
Taxes 2004 $620.66




**#2095**          **$85,000.**

### **Hunters Haven!**
Beautiful wooded lots between
Landings #1 & #5 of High Falls Flowage.
Your Camp is a 12' x 60' mobile home
w/ 2 bedrooms, bath, free standing
wood burning stove.
Pitched roof, Aluminium siding & Attached
garage. 24' x 28' detached garage.
Dog Kennels are available for those
*Special Coon or Bear Dogs!*
Drilled Well 186', Conventional Septic
System,
Concrete driveway, Groomed Yard of .80
acres
This Land is located in Close Proximity to
Public Hunting Lands, Snowmobile Trails,



EXHIBIT
33(mo)
PAS 6-14-05

Fantastic Swimming & Fishing Water
2004 taxes on 3 parcels $603.02



**#2131          $86,000.**

### High Falls Road

*It's Hard to Locate a Larger Parcel in the*
*Twin Bridge Area.... Don't Miss Out!!*
9.5 acres of Rolling Land...This Private,
Secluded,
Wooded Parcel is a Perfect Hide-a-way!
Whether you Prefer Hunting Land
or Future Building Site.... This is Awesome!
Located on the End of Bonasa Drive.
1.5 miles to Landing #3 of High Falls
Flowage
for a Swimming Beach & Boat Launch.



**#2155    $58,000. Talking House**

### *A Stones Throw...*
### *to the Public Boat Landing*
### *of Crooked Lake!*
This Quaint, Vinyl Sided Framed Cabin
One Bath & Bedroom
is just a "Doll House"
for Your Starter Get-a-way!
Detached Garage with
additional Storage Unit. 3 lots of .38 ac.
2004 taxes $630.18



**#2149          $38,000.**

### Located On Caldron Falls Road

Three (3+/-) Wooded,
Vacant, Buildable Land.
Perk Probable, Electric, Phone Road Side.
Some Deed Restrictions May Apply.

*Near Thunder Mt., Veterans Park Falls,*
*High Falls Flowage & Thompson State Park.*

*Taxes to be Determined....New Parcel Split*



**#2158          $79,900. Motivated**

### Located On Neveln Lane
### in Twin Bridge
Your Diamond in the Rough!
**This is a Gem You'd Be Proud to Own!**
This property is Flourishing from Within
of a Quality Framed Home!
Three Bedrooms, One Full Bath, Appliances,
Full Wall Free Standing Fireplace,
**Finished, Full Basement,**
Detached 3 + Garage and Workshop.
**.46 acre parcel**
2004 taxes $1,188.33



**#2156       $83,500.** Talking House

### Modern Day.... Chalet!
Situated on a Corner, Double Lot of 1.5 ac.
A Quiet Area in the Heart of Twin Bridge
just off Deer Lake Rd.
Charming A-Frame, Post & Beam
Construction,
Loft & Master Room, Lg. Picture Windows,
Snack Bar, Appliances & Some Furnishings
Remain. Wood Burning Fireplace on
Stone Hearth. Front Decking for an
Appealing Approach..
Interior Ceiling of Knotty Pine, Track Lights.
**New Vinyl Exterior , New Roof &
Carpeting!**
This Could Be for Your Family.
2004 taxes $848.19



**#2160        $108,000.**

### Lot 31 on Nature's Trail
### (Under Construction)
**2 miles from High Falls Flowage!**
Brand New Comfortable Living Area.
Three Bedroom, Two Bath (Whirlpool Tub)
1400 sq. ft. of a Quality Manufactured Home.
Plush Carpeting, 6 panel interior doors,
Finished Interior Drywall.
Up Grade Appliances including
Side-by-Side Refrigerator, Dishwasher, Range
Split Floor Plan, Patio Doors to Rear Deck
**Overlooking a Beautiful Pine Plantation.**
**On 2.48 acres**
Perimeter Blocking, Drilled Well,
Conventional Septic System
2004 taxes New Assessment

## Don't Forget....Stop in Our Office to Register for Our Monthly Drawing....
## Great Give-a-Ways!

### Check out more listings

Page 1 . . . Page 2 . . . Page 3 . . . Page 4 . . . Page 5 . . . *Back to Home Page*

## Black Diamond Realty, llc.

## A Cut Above The Rest!

**Whether Buying or Selling
Please Allow Our Family ..
to Give Your Family..
the Service You Deserve!**

**We are available ..7 days a week
Including Weekends and Holidays
To Serve Your Real Estate Needs!**

**TERRY & BRENDA MARTIN**
Brokers/Owners
W11344 County Road X
Crivitz, WI 54114
**Office..... 715-757-9238**
**Fax ....... 715-757-9268**
E-mail:realtypros@blackdiamondrealty.com







**A cut above the rest!**



- *Home*
- *About Us*
- *Listings*
- *Rentals*
- *Sellers*
- *Buyers*
- *Renters*
- *Contact Us*

## Diamond Realty & Management,

**Diamond Realty & Management, Inc.** is backed by more than 13 years experience in real estate services and we take great pride in serving our clients with courtesy, professionalism and efficiency.

Although **Diamond Realty & Management, Inc.** has the expertise and network capabilities to assist you throughout the state of Florida and beyond, we focus on **Brevard County and the Space Coast**, servicing the cities of:

- Cocoa
- Melbourne
- Port St. John
- Rockledge
- **The beach communities from Cape Canaveral to Satellite B**

**Check out our new Listings!**
**click here!**




EXHIBIT
34 (MD)
PAB 6-14-05
PENGAD 800-631-6989

We look forward to helping you -- whether you're <u>buying</u>, <u>selling</u>, or re **Diamond Realty & Management, Inc.** is a cut above the rest!


**NEW!** Search for a home!

**Search all of Brevard County online for the perfect f** **for you!** Then call us at Diamond Realty & Management, Inc. for y personal appointment to view the property of your choice

### Mortgage Calculator

House Price: $ 200000
Down Payment: $ 0
APR: 7.5 %
Term: 30 yrs

Calculate

Mortgage Principle: $
Total Payments: $
Monthly Payment: $

**Diamond Realty & Management, Inc.**
Fiske Professional Building
1802 S. Fiske Blvd. Suite 105
Rockledge, Florida 32955
**Phone: 321-638-2298**





## "Simply a Cut Above the Rest"



**Window Tint**

### Window Tinting

Our goal is to offer the best in customer service & product reliability. In addition to a lifetime warranty, we offer an optional No Fault warranty.

Why you need to use our service for window tinting:

We are Fayetteville's exclusive installers of DIAMOND window tint in Fayetteville.

Our films are NC DOT compliant.

We are the only installer/dealer to offer a lifetime "No Fault" warranty. ( What do this mean? You scratch it, We fix it for free! A great amenity for the Dealer Trade & Rental Agency)



We can tint SUVs, station wagons, or van rear half's.

Fast turn-around time and same day service on everything we do.

Professional results every time.

Come visit our showroom and see how our diamond films can put a sparkle on your bottom line!

### Diamond automotive window films are:

### Marquise

When you want the very best, the unparalleled two-layer sputtered metal Marquise films are a "sparkling" choice. They offer the greatest durability and performance of any Diamond automotive window film. This neutral shade will enhance the appearance of any vehicle. Marquise films provide lower reflectivity and higher heat rejection than any of than other all-metal films.

### Brilliant

Brilliant films are the best conventionally- designed film. They are created with a combination of metallized polyester bonded together with a dyed polyester film that possesses special weathering properties. This greenish-blue tint is an excellent choice for light & muted colored vehicles. Prices for Brilliant & Radiant films are the same & are listed below.

### Radiant

Radiant films are uniquely designed. They are the best films to match SUV/Van factory tinted rear windows. The exclusive metallized polyester dye process that resist color change makes this window film a hit for a more conventional look.

### Vehicle Films



**Window films** are thin sheets of polyester that are applied to the surface of glass windows and doors on homes, commercial and public buildings, motor vehicles, and boats. All window films have a powerful adhesive on one side that permits secure bonding to the glass. All high quality films also have a clear, scratch resistant coating on the other side that help prevent the exposed surface of the film from being accidentally marred.

### Commercial

  

### Residential

Fade protection from the sun and keep temperature and glare under control. With out **window tinting** over time, the rays of the sun fade whatever is in their path. But professionally installed window film blocks out 99% of the damaging ultraviolet rays that ordinary windows allow in. That means that draperies, wood furniture, upholstery and carpeting will last longer.

  

### Frosted Films

These films are designed to obscure a pane of glass, preventing anyone from seeing through it. The effect is very similar to sandblasted glass, and is achieved at a fraction of the cost, and, in the case of an installed window, much more cleanly. Frosted films are very commonly used in bathrooms, to block visibility into offices or storage rooms, and in other areas where, for one reason or another, privacy is desired.



HOME / MOTORING / TINTING / PAINTING / CONTACT / FAQ



# Diamond Limousine





Click the ad to view it in full size

## Diamond Limousine

- ### 1624 Poole Blvd Yuba City 673-7749

Classifications:

- **Limousine Service**

Keywords:

``A CUT ABOVE THE REST" LEAVE THE DRIVING TO US! LEAVE THE DRIVING TO US! /
About Our New 20 Passenger SUV Limo Weddings . Proms . Graduations Anniversaries . Bir
Parties 25 PASSENGER BUS AVAILABLE FOR CHARTER SPORTING EVENTS . CONCEF
SHUTTLE TO THE SACRAMENTO VALLEY AMPHITHEATER & NAPA VALLEY WINE TOU
CUT ABOVE THE REST" 1624 Poole Blvd.,Yuba City 673-7749



This ad appeared in the <u>Colusa, CA</u> Yellow Pages & White Pages directory which serves the
communities:

- <u>Willows, CA Yellow Pages & White Pages (Glenn County)</u>
- <u>Williams, CA Yellow Pages & White Pages (Colusa County)</u>
- <u>Stonyford, CA Yellow Pages & White Pages (Colusa County)</u>
- <u>Princeton, CA Yellow Pages & White Pages (Colusa County)</u>
- <u>Maxwell, CA Yellow Pages & White Pages (Colusa County)</u>
- <u>Knights Landing, CA Yellow Pages & White Pages (Yolo County)</u>
- <u>Grimes, CA Yellow Pages & White Pages (Colusa County)</u>
- <u>Colusa, CA Yellow Pages & White Pages (Colusa County)</u>
- <u>Arbuckle, CA Yellow Pages & White Pages (Colusa County)</u>

The Colusa, CA Yellow Pages & White Pages directory covers the following zip codes:

95645, 95912, 95932, 95950, 95955, 95970, 95979, 95987, 95988

1624 Poole Blvd, Yuba City, CA 95991

Home | Search | Customer Care | We're Hiring | About Us | Advertise With Us | Sitemap

**TransWestern® Publishing** Click here for trademark notice information.
We are committed to your privacy and freedom from annoying pop-up ads. Terms of Use.
® 2005 TransWestern® Publishing, all rights reserved.





**972-529-5336**

Mention ApartmentStores.com



EXHIBIT
37 (mo)
PAG 6-14-05

# DALLAS MOVERS
# DIAMOND MOVERS
### Get a <u>MOVING ESTIMATE</u> for your
### Dallas Texas move
### from Diamond Movers.

We are a full service moving company with exceptional customer service and satisfaction with hourly rates available. Licensed and insured for your protection.

We specialize in moving your household goods in a safe and efficient manner.
No Job Too Small.
Contact us for your FREE QUOTE!
Diamond Movers, Inc. provides the highest quality service at a reasonable price.
Here are just a few reasons why we are "A cut above the rest".

a.. We only send experienced, professional movers to do our moves.

b.. Reputation means everything to us!

c.. We understand that your satisfaction equals return business and referrals.

d.. We know you have many choices when it comes to movers, that is why we offer unbeatable service for each and every customer.

- Exceptional Service
- Over 20 years experience
- Licensed and Insured for your protection
- Specializing in Homes, Apartments and Office Moves
- 20% Discount
- Local and Statewide
- Packing
- Exact move price over the phone
- Hourly rates available
- Load and unload rental trucks

### Get a <u>MOVING ESTIMATE</u>.

## DIAMOND HOLIDAYS - A CUT ABOVE THE REST!

Please return your completed booking form to;
**DIAMOND HOLIDAYS, Overstone House, Kettering Road, Market Harborough, Leicester, LE16 8AW**
or telephone 01858 467200 to reserve your place.

| 1 | Name of Holiday | Departure Date | Return Date | Code | Booking Reference |
|---|---|---|---|---|---|
| | York St Nicholas Fayre | Saturday 27 November 2004 | Sunday 28 November 2004 | 7873 | |

| 2 | Mr/Mrs Miss/Ms | Initial | Surname | Age |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**3** Please give the address of first named person to whom all correspondence will be sent.

Address: _____
_____
_____
_____
Postcode: _____
Telephone (Day): _____
Next of kin (emergency): _____

**4** Departure Points

GLASGOW ☐
Royal Concert Hall-opposite Buchanan St Station

**8** 

| Holiday Costs Per Person | Cost | Number | Total |
|---|---|---|---|
| Deposit | £25 | | £ |
| Holiday Insurance | £8.95 | | £ |
| Full Payment | £69.95 | | £ |
| Single Room Supplements | £12 | | £ |

Excursions

ALL EXCURSIONS ARE
INCLUDED IN THE
HOLIDAY COST!

**5** Special Requests

We will of course do our best to comply with your special request, but regret that no guarantees can be given. We **must be advised of any disability / medical condition so we can ensure the holiday is suitable.**

**6**

| Accommodation Type | Supplement per person | Number of rooms |
|---|---|---|
| Single room | £12 | |
| Twin/Double room | | |
| Multi bedded room | | |

**7** Insurance

We strongly recommend insurance on all our holidays. Holiday insurance is compulsory on overseas holidays and details of alternative cover must be given below otherwise we will automatically insure you.

Insurance company: _____
Policy number: _____
24 hour telephone number: _____

Where did you see this holiday advertised? (please tick)
The Herald ☐ Evening Times ☐ Other: _____
Do you have your newspaper delivered? Yes ☐ No ☐
If so, on which days: _____
Have you travelled with the paper before? Yes ☐ No ☐
If so, to which destination(s): _____
Newsquest (The Herald & Evening Times) Ltd & Newquest (Sunday Herald) & Diamond Holidays may share your information with organisations who are our business partners. We, or they may contact you with future offers reflecting your preference. Please tick if you do not want to be contacted by us ☐ or by third parties ☐

**TOTAL ENCLOSED**

£ :

TYPE OF CARD _____

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Expiry Date _____
Issue Number (Switch only) _____

Payment of balance by Credit Card will incur an administration fee of 2%. There is no fee for deposits paid by Credit Card. There is no fee for payments by Debit Card. Cheques/Postal Orders should be made payable to DIAMOND HOLIDAYS.

**I have read, understand and accept for myself and the above named persons the booking conditions enclosed with this brochure. I am over 18 years of age.( Please tick as applicable.)**

☐ I enclose the deposit(s) and any insurance premium(s) and will pay the balance 4 weeks prior to departure.

☐ I enclose full payment (includes bookings made within 4 weeks).

Signature: _____ Date: / /

Please note smoking is **NOT** permitted on our coaches.

EXHIBIT
38 (MD)
PAB 6-14-05
PENGAD 800-631-6989

## THANK YOU FOR YOUR BOOKING. WE LOOK FORWARD TO WELCOMING YOU!
This holiday is operated by Diamond Holidays, a trading name of Diamond Shortbreak Holidays Ltd. ABTA No. W0552.

# DIAMOND MEDICAL STAFFING



**Pictured: Dave Shelly. Missing from photo: Christine Sullivan, Amanda Shelley**

Seeking assistance with caring for your loved one is a most difficult decision. We at Diamond Medical Home Care want you to know that we understand your apprehension and we will work with you and your loved one to develop the plan of care that best meets your needs.

Diamond Medical Home Care, Inc., offers a variety of home care services. Services are available to you from one to 24 hours per day. Diamond Medical Home Care offers home care services such as companionship, safety monitoring, medication management, at home adult day care, and post-op recovery assistance.

To have information mailed to you or to schedule a consultation call (717) 335-3444. Diamond Medical Home Care, Inc. is located at 1235 North Reading Road, Stevens, PA.



Return To THE SHOPPING NEWS Home Page

Back To Local Business Page



EXHIBIT

39 (mo)

PA 8 6-14-05

# EXHIBIT B

CONFIDENTIAL
Francis G. Vaccaro

75

1  that was an asbestos company that gives Diamond

2  Staffing and that they had lost their right to that

3  trademark in Massachusetts and that we could have

4  it.

5           And that's what happened.

6      Q.   Anything else?

7      A.   Just conversation with my attorney.  And

8  that's it.

9      Q.   What was the nature of that conversation?

10          MR. MELTZER:  I'm going to object on

11  that one.  Instruct him not to answer about specific

12  communications with counsel.

13          THE WITNESS:  Okay.

14          MR. PAPASTAVROS:  Off the record.

15          (Off the record.)

16          MR. MELTZER:  Nick, let me explain my

17  concern, and maybe we can figure out a way to allay

18  this.  There are three kinds of communications I

19  suppose, you know, obviously that take place between

20  counsel and a client.

21          In this context understanding your right

22  to know about intent, I have no problem with him

23  testifying to understandings he developed as a

24  result of communications.  I'm more concerned about

CONFIDENTIAL
Francis G. Vaccaro

76

1    a relation of dialogue I said/she said, I said/she

2    said which at some point spills over from

3    transactional side of this to potentially actual

4    legal advice, and that's where my concern is.

5                So obviously --

6                MR. PAPASTAVROS:  My suggestion on that

7    front -- it's impossible to draw the line.  My

8    suggestion, Rob, is you allow Mr. Vaccaro to testify

9    and the other witnesses to testify.  I would -- you

10   would -- I'm not going to contend that such

11   testimony is a waiver of some other privilege, nor

12   would I contend that you have irrevocably waived

13   your right to assert privilege over those

14   communications.

15               There's simply no way of determining

16   whether or not those privileges -- those

17   communications are directly germane until we elicit

18   them.

19               MR. MELTZER:  Let's do it this way then:

20   Let me interpose a blanket objection on

21   attorney/client privilege.  What I'd like you to do

22   is ask the question, let me think about it before he

23   answers.

24               MR. PAPASTAVROS:  That's fine.

CONFIDENTIAL
Francis G. Vaccaro

77

1              MR. MELTZER:  And let me caution my

2    client that when you answer these questions my

3    objection is on particular legal advice -- that's

4    where that -- as opposed to going to the nuts and

5    bolts of what transpired, and at that point I may

6    object and instruct you not to answer.

7              THE WITNESS:  All right.  I'll shut up.

8              MR. MELTZER:  I will note for the record

9    that I'm objecting to this line of questioning and

10   reserving my rights to move to strike and remove it

11   from the transcript.  Okay.

12             THE WITNESS:  Okay.

13             MR. PAPASTAVROS:  I don't even remember

14   if there was a question pending.

15             (Reporter read back.)

16             MR. MELTZER:  You can answer that.

17      A.  I'm sorry, I wasn't paying attention.  I

18   apologize.  I thought you were talking to -- I

19   thought you were going to ask me the question.

20      Q.  The original question was what other due

21   diligence had you conducted other than furnishing

22   this list to Miss Casey.

23      A.  Right.

24      Q.  I believe you testified that you had some