UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS, INC.

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

**PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT
OF ITS EMERGENCY MOTION FOR SANCTIONS**

At the eleventh hour, defendant Diamond Staffing, Inc. ("DSI") has completely reversed course, claiming (in direct contradiction to sworn testimony, statements, and pleadings) that it is not asserting the "advice of counsel" defense to plaintiff's trademark infringement claim.  DSI's use of the privilege as a "sword and a shield" and attempts to play "fast and loose" should be rejected, and DSI should be sanctioned as requested by plaintiff Diamond Staffing Solutions'[SM] Motion.[1]  Contrary to DSI's contention, no express or implicit agreement from the Vaccaro deposition or elsewhere exists to save its misdoing.[2]

---

[1]  As set forth in greater detail below, DSI does not challenge the applicability of Fed. R. Civ P. 37 in this context, lending further support to Diamond Staffing Solutions'[SM] Motion.

[2]  Indeed, DSI's counsel himself stated *a mere three pages* after the purported "agreement" between counsel at Mr. Vaccaro's deposition that "now we're into potential litigation issues.  At that point those communications are I think strictly privileged.  *That's not the same as intent in selecting the name.*"  Deposition of Frank Vaccaro, dated June 1, 2005, at 79 (attached hereto as Exhibit 1).

**DISCUSSION**

I.    **DSI'S CLAIM THAT IT IS NOT ASSERTING THE ADVICE-OF-COUNSEL DEFENSE FOR THE FIRST TIME, FOLLOWING THE CLOSE OF EXPEDITED DISCOVERY, RINGS HOLLOW, AND IT SHOULD BE SANCTIONED FOR ITS CONDUCT.**

One of the lynchpins of DSI's defense to Diamond Staffing Solutions'[SM] claim of trademark infringement over the past several months has been its reliance on the advice of its counsel, Mary Casey, in picking the name "Diamond Staffing Inc." for its company in the fall of 2003. The circumstances surrounding the adoption of the name were clearly one of the subjects of expedited discovery contemplated by this Court. Transcript of May 9, 2005 hearing at 34-35 (attached to June 24, 2005 Memorandum In Support of Emergency Motion for Sanctions ("Memo") as Exhibit 2). Indeed, DSI cited its reliance on Ms. Casey's advice in numerous sworn statements and pleadings, starting with its *own Motion To Dismiss.* See DSI's Memorandum in Support of Motion to Dismiss at 11 ("[a]s to Diamond's intent in adopting its mark, the Affidavit of Mary Casey makes clear that the name was selected because it was available and subject to trademark protection.")[3]

---

[3]    DSI has also relied on advice of counsel in the following instances:

-- In Frank Vaccaro's affidavit, Vaccaro unambiguously stated that he relied upon Casey's advice when adopting the mark: "Before selecting our name we proposed several names to our attorney who checked the names on various databases to determine whether the names were available and free for our use. She approved our usage of Diamond Staffing following her due diligence investigation." Affidavit of Francis Vaccaro in Support of the Defendant's Motion to Dismiss for Failure to State a Claim, at ¶ 5;

-- Defendant filed the Affidavit of Mary C. Casey, Esq. in Support of the Motion to Dismiss, delineating her purported steps taken to research the use of the mark in order to deny liability for trademark infringement. Affidavit of Mary C. Casey, Esq. in Support of the Defendant's Motion to Dismiss for Failure to State a Claim, at ¶¶ 3,4.

-- In Response to Interrogatory Number 2, Defendant stated: "Francis Vaccaro in conjunction with Attorney Mary Casey conducted exhaustive due diligence as to name selection." Responses to First Set of Interrogatories, at p. 2.

*(Footnote continued on next page)*

Even more tellingly, this Court stated in its June 9, 2005 hearing that "you've raised an advice of counsel defense that whatever privilege might otherwise attach is---is gone and she is to testify about these trademark issues. It's as simple as that." Transcript of June 9, 2005 Hearing at 4-5, 12 (Memo Exh. 1). DSI *never contradicted* the Court's statement during the hearing, instead trying to *limit* the waiver of the attorney-client privilege by identifying Attorney Casey's role in "research and drafting of briefs" in the instant litigation, and advice Ms. Casey rendered to Mr. Vaccaro's "other companies and businesses" which should not be part of the expedited discovery. The Court stated in response that "with regard to other things that she does… the presumption at least is that it's out of bounds." Id. at 11 (Memo Ex. 1)

Diamond Staffing Solutions[SM] is respecting this boundary in seeking relief from the Court, and having closely reviewed the Court's prior order is *not* seeking sanctions or to compel testimony with respect to Ms. Casey's role in the litigation or her advice to other entities with which Mr. Vaccaro was associated. See Memo at 2 FN 2. Diamond Staffing Solutions[SM] is instead seeking the imposition of sanctions for Ms. Casey's explicit failure to answer a panoply of questions *directly related* to the expedited discovery explicitly permitted by the Court. See Memo at 4-5 (enumerating unanswered questions regarding the adoption of 'Diamond Staffing, Inc." as the name for the company, including the advice given to Mr. Vaccaro regarding the availability of Diamond Staffing, Inc. as a name for a company.) Contrary to DSI's contentions, then, plaintiff is not overreaching here. Indeed, in levying its baseless accusations, DSI wholly disregards the numerous irrelevant areas of questioning which its own counsel pursued at Suzanne DeVries' deposition, including questions about her daughter's name; her boyfriend's

---

*(Footnote continued from previous page)*
-- During the Deposition of Frank Vaccaro, Vaccaro repeatedly stated that he relied upon Casey's advice regarding the mark's background research and adoption. Vaccaro Dep. at 66-67, 68, 71, 72, 73-75, 77-78 (Ex. 1).

name; her educational background; her prior work history; her ex-husband's position in the Air

Force; the authorized number of shares of stock in Diamond Staffing Solutions$^{SM}$; the

background of her employees; and her payroll process, among others.  Deposition of Suzanne

DeVries, dated June 14, 2005, at 8-26, 29-32, 60-67 (attached hereto as Exhibit 2).  Many of the

background questions posed to Ms. Casey (see DSI Opposition at 12-13) of which DSI

complains were in the same vein as those *previously asked Ms. DeVries*; sauce for the goose is

undoubtedly sauce for the gander.  Moreover, questions regarding the policies and practices Ms.

Casey followed in her intellectual property law practice (see DSI Opposition at 13) are squarely

within the scope of the expedited discovery order, as Diamond Staffing Solutions$^{SM}$ is certainly

entitled to find out whether Ms. Casey followed her usual practices and procedures in clearing

"Diamond Staffing" as a name for the defendant.  Finally, DSI's concern about plaintiff counsel

"marking the transcript" with the unanswered questions (see DSI Opposition at 14)  rings

hollow, considering that counsel knew full well that the instant motion would be necessary

during the course of the deposition and wanted to facilitate the Motion's preparation.[4]

     Finally, the caselaw cited by DSI -- and the discourse between counsel during the

testimony of Frank Vaccaro, which DSI relies on so heavily -- *strongly support* plaintiff's

position.  As stated in In re: Keeper of the Records of XYZ Corporation v. United States of

America, 348 F.3d 16, 24 (1st Cir. 2003), where advice of counsel is asserted, as in the instant

case (as opposed to negotiations with business associates), "the likelihood of prejudice looms:

once a litigant chooses to put privileged communications at issue, *only the revelation of all*

*related exchanges will allow the truth-seeking process to function unimpeded.*"  See DSI's

---

[4]    The statement by DSI counsel that "the four hour time allotment" for Ms. Casey's deposition "was
preordained  by the Court" (see DSI Memo at 15) is likewise wholly baseless.  During the June 9,
*(Footnote continued on next page)*

Opposition to Motion to Entry of Sanctions at 7 ("DSI's Opposition").  DSI has repeatedly put

privileged communications at issue, including at the Deposition of Frank Vaccaro (see FN 2

supra) and fundamental fairness demands "the revelation of all related exchanges."  Moreover,

no "express and explicit agreement" was entered into in this deposition; indeed, DSI deliberately

distorts the discourse between counsel at the Vaccaro deposition to suit its own ends.  DSI's

counsel stated in the same series of communications with Diamond Staffing Solutions'[SM]

counsel that:

> In this context, understanding your right to know about intent, *I have no problem
> with him testifying as to understandings he developed as a result of
> communications* [with Mary Casey]."  (Vaccaro Dep. at 75) (emphasis added)
> (Ex. 1).

> A mere three pages later, DSI's counsel stated that:

> You see the point?  At some point, somebody mentioned – somebody for the
> plaintiff starts mentioning the word "lawyer," and now we're into potential
> litigation issues.  At that point those communications are I think strictly
> privileged.  *That's not the same as intent in selecting the name*. (Vaccaro Dep. at
> 79) (emphasis added) (Ex. 1).

Moreover, in response, Diamond Staffing Solutions'[SM] counsel stated that "it's

impossible to draw the line.  My suggestion, Rob, is that you allow Mr. Vaccaro *and the other

witnesses*[5] to testify…I'm not going to contend that such testimony is a waiver of *some other*

privilege."  Vaccaro Dep. at 76 (emphasis added).  Mr. Vaccaro was thereafter allowed to testify

generally as to communications with Ms. Casey.  Id. at 77.  By "some other privilege,"

plaintiff's counsel was specifically contemplating advice in conjunction with the instant

---

*(Footnote continued from previous page)*
> 2005, hearing, the Court stated explicitly that "the presumption is that it's going to be a seven-hour
> deposition."  Transcript of June 9, 2005 Hearing at 18 (Memo Exh. 1).

[5]     DSI concedes that Ms. Casey falls within the category of "other witnesses."  See DSI's Opposition at 6.

- 6 -

litigation, which was commenced months after the selection of "Diamond Staffing, Inc." as the name for the defendant.

In short, it has always been clear that attorney-client communications regarding selection of the name "Diamond Staffing, Inc." was fair game, but that advice pertaining to this litigation was not. This is the boundary which Diamond Staffing Solutions[SM] is respecting, that the Court sought to draw, but that DSI now seeks to evade. Diamond Staffing Solutions[SM] requests that this fast and loose conduct not be condoned and DSI be sanctioned appropriately.

## II.     DSI MAKES NO ATTEMPT TO REFUTE THE APPLICABILITY OF RULE 37 SANCTIONS IN THE INSTANT SET OF CIRCUMSTANCES.

DSI takes the position that having now made the decision *not* to rely on advice of counsel, despite its prior statements to the contrary, it is entitled to shield discovery by applying the attorney-client privilege.   In the event this position is rejected as (among other things) an unfair change of course, however, DSI essentially concedes that the imposition of the sanctions requested by Diamond Staffing Solutions[SM] is authorized, making no attempt to distinguish any of the caselaw Diamond Staffing Solutions[SM] cited.  Citing venerable caselaw, Diamond Staffing Solutions[SM] pointed out that (i) courts have been willing to enter preclusion orders, such as that now sought by the plaintiff, regardless of whether that conduct constitutes flagrant or repeated violations of court orders and (ii) that the remedy sought by Diamond Staffing Solutions[SM] (a finding that DSI acted in bad faith in choosing the name "Diamond Staffing, Inc." for the new company in the fall of 2003) is narrowly tailored to punish the sanctionable behavior (a refusal to allow Ms. Casey to testify regarding the advice rendered to DSI regarding the selection of the name) and is accordingly justified.  In summary, then, because DSI should not be entitled to "change its legal position 180 degrees," the sanctions requested by plaintiff are entirely justified.

**CONCLUSION**

Attorneys Casey and Meltzer attended the June 9, 2005 hearing before this court, were responsible for filing every pleading in this case and have had numerous opportunities to state that they were not relying on the advice of counsel defense. Having asserted advice of counsel as a sword in its Rule 12(b)(6) Motion, in affidavits, and in discovery responses, it was only when compelled to offer its attorney's testimony after the June 9, 2005 hearing that DSI asserted the shield of attorney-client privilege. Under such circumstances, the sanctions (or, alternatively, the alternative relief) suggested in plaintiff's Emergency Motion are wholly appropriate.

Respectfully submitted,

DIAMOND STAFFING SOLUTIONS, INC.

By its attorneys,


/s/ Nicholas G. Papastavros_____

Nicholas G. Papastavros, BBO #635742
Michael L. Cornell, BBO #651405
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
(617) 345-1000

Dated: July 5, 2005

# EXHIBIT 1

Diamond Staffing Solutions
vs.
Diamond Staffing

# Deposition of Francis G. Vaccaro

Volume I

June 1, 2005
pp 1-135

Jones Reporting
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 66

1    A. Yes, it is.
2    Q. And you reviewed the responses to
3 interrogatories before you signed this document?
4    A. Yes, I did.
5    Q. And the responses were true at the time you
6 made them to the best of your knowledge?
7    A. Yes, they were. And are.
8    Q. If I could turn your attention to page 2 of
9 this document.
10    A. Page 2? Okay.
11    Q. More specifically, the response to
12 interrogatory number 2.
13    A. Yes, sir.
14    Q. Do you see the third -- I guess it's
15 technically the fourth sentence -- excuse me -- of
16 that response, the sentence that starts with your
17 name?
18    A. Francis Vaccaro, yes.
19    Q. Yes, sir. Could you read that sentence into
20 the record?
21    A. Certainly. "Francis Vaccaro in conjunction
22 with Attorney Mary Casey conducted exhaustive due
23 diligence as to name selection."
24    Q. And that refers to the name selection of

Page 67

1 Diamond Staffing, Inc., as the name for your new
2 business in September of 2003?
3    A. Yes, it does.
4    Q. What due diligence was conducted?
5    A. We gave Attorney Casey several names for the
6 startup of our company, and she came back with the
7 fact that no one had trademarked or had the right to
8 that name anywhere. And we adopted it.
9    Q. You just testified that we gave Attorney
10 Casey several names for the startup of our company?
11    A. I did. I apologize.
12    Q. So no one else at your company?
13    A. No. I did.
14    Q. What names did you give Attorney Casey?
15    A. Gosh, I don't recall.
16    MR. MELTZER: I'm going to allow him to
17 answer the question based on our discussion before
18 without any waiver of attorney/client privilege
19 based on the discussion.
20    MR. PAPASTAVROS: Well, I don't think
21 that the giving of names from Mr. Vaccaro to Miss
22 Casey has anything to do with the rendering of --
23    MR. MELTZER: That's not why I'm not
24 instructing him not to answer. We're not waiving

Page 68

1 any attorney/client communications privileges here
2 by allowing him to answer that question.
3    MR. PAPASTAVROS: Well, I don't think
4 there's any applied.
5    Q. But be that as it may, Mr. Vaccaro, you can
6 answer the question.
7    MR. MELTZER: If I thought they applied,
8 I'd instruct him not to answer.
9    Q. Mr. Vaccaro, you can go ahead and answer.
10    A. I believe that hopefully and I know she will
11 have a list of those names that I provided. They
12 were Preferred Staffing maybe -- I can't remember.
13 There were probably 10, 12, 15 names that we -- we?
14 -- I submitted them, but I talked to the core people
15 about possible names, and I submitted them to
16 Attorney Casey. So there were a bunch of names.
17 And this was the one that came out.
18    Q. Was Diamond Staffing, Inc., one of the
19 names?
20    A. Diamond Staffing, Inc., was one of the
21 names, yes, sir.
22    Q. And did you come up with that name?
23    A. No, I did not.
24    Q. Who did?

Page 69

1    A. One of the women in my group, Susan Boffoly.
2    Q. How do you spell her last name?
3    A. B O F F O L Y.
4    Q. She was not one of the staffers that started
5 with you at DSI?
6    A. No, she is.
7    Q. Did Miss Boffoly came up with the other
8 names as well?
9    A. I don't recall. We all came up with
10 different names in the group. Then I listed them
11 all. And I gave them to Miss -- Attorney Casey.
12    Q. And these were the individuals who you were
13 considering commencing a new business with; is that
14 correct?
15    A. That is, yes.
16    Q. Did you have a meeting with these
17 individuals to come up with these different
18 potential names for the business?
19    A. I didn't have a formal meeting. I kind of
20 asked them to submit names that I thought might be
21 cool to be honest with you, and they gave me a dozen
22 of them. And -- they gave me more than a dozen.
23 There were probably a hundred. I don't have that
24 list. But I narrowed it down to 10 or 12 that I

18 (Pages 66 to 69)

**Page 70**

1   liked. And I sent them off for verification.
2     Q. Did you receive the e-mails from your
3   employees -- strike that.
4         Did you receive --
5     A. No.
6     Q. -- the names of the -- let's try it one
7   more time.
8     A. Sure.
9     Q. Did you receive the prospective names for
10   your new company from these individuals over the
11   e-mail?
12     A. No, sir.
13     Q. How did you receive them?
14     A. Telephone, in person. Various ways. Quite
15   honestly, Sue who's probably one of the more
16   creative ones involved in coming up with the names
17   -- she liked doing that. So -- I just thought it
18   was a good name. And there were -- I said to her I
19   thought there were 10 or 12 good names, and we
20   submitted them all. This is the one that came back
21   okay.
22     Q. Did you write them all down and furnish the
23   list to Miss Casey?
24     A. Yes, I did.

**Page 71**

1     Q. Did you write them out --
2     A. I wrote them out in my handwriting. I
3   handed it to her. She took them and -- I know she
4   checked them.
5     MR. PAPASTAVROS: Off the record.
6     (Off the record.)
7     MR. PAPASTAVROS: That list would be
8   responsive to document requests. Obviously, I'm not
9   contending it still exists, but we'd request that a
10   search be undertaken for that document to the extent
11   it exists.
12     MR. MELTZER: We're not holding back any
13   documents. We provided the entire file -- all of
14   the search documents in its entirety. In fact, I
15   have the original. So if it's not something that's
16   already been produced, then I -- my understanding
17   would be it doesn't exist anymore.
18     Q. Did you have a preferred name on that list
19   at the time you compiled those names, Mr. Vaccaro?
20     A. Honestly, no. Looking to start a company.
21   That's what I do. I start businesses and build on
22   them. The girls liked this name, Sue being the key
23   one. And -- so I was fine with it.
24     I kind of thought it was, like I said, a

**Page 72**

1   cool name because diamond represents a pretty nice
2   object, and it's about doing business. And that's
3   what happened. I don't even remember the other
4   names right now, but I know that -- I'm sure Mary
5   has some of them. But I think Preferred was one. I
6   don't remember the others.
7     Q. When you furnished the list to Miss Casey,
8   did you give her any instructions?
9     A. Yes. I instructed her to please check these
10   through the patent and trademark and the state to
11   see if we could open our company. And prior to that
12   -- the day before I instructed Mark Donabedian to
13   register for the diamondstaffinginc.com, .net, .org
14   trademark because I wanted to make sure we had that
15   first before we could even proceed getting a
16   trademark or anything else because -- otherwise you
17   can't run a business without an e-mail system.
18     Q. Let me make something clear though,
19   Mr. Vaccaro, at that point in time you didn't know
20   what company name you were going to select, correct?
21     A. We had -- I'll tell you exactly what
22   happened. We had narrowed it down to Diamond
23   Staffing dah-dah-dah-dah. I instructed Mark to run
24   clearance on Diamond Staffing, Inc., because that's

**Page 73**

1   the one everybody wanted. If the trademark came
2   back or there was any problems, then we didn't have
3   it. I think it's a matter of $50 or something. It
4   was ridiculously cheap.
5     Q. Let me make sure I get the chronology
6   correct.
7     A. Yes.
8     Q. You compiled a list of 10 or 15 names from
9   your employees that you presented to Miss Casey. Do
10   I have that correct?
11     A. Yes, you do.
12     Q. What happened next?
13     A. She came back with a list of companies that
14   were okay, and then Mark registered Diamond
15   Staffing, Inc.
16     Q. How many companies did she come back with?
17     A. I think two or three, to be honest with you.
18   I don't recall them. I'm not going to lie to you.
19   I'm under oath anyway. But I think two or three.
20   This is the one the gang wanted, and that was it. I
21   said, okay, then, Mark, go register it.
22     Q. When Miss Casey came back with two or three,
23   you canvased your employees again --
24     A. Yes, I did.

Page 74

1    Q. -- and the determination was made to go with
2  Diamond Staffing, Inc.?
3    A. Yes, I did. Well, actually, prior to
4  submitting them we had a ranking of what was voted
5  on, and that was the one that they wanted. And as
6  far as I was concerned, if they wanted it, and I'm
7  starting a company with people and they like the
8  name, as long as it was legal, I'm ready to go.
9    Q. Other than compiling the names and giving
10  them to Miss Casey, did you do any other due
11  diligence in the process of selecting the name
12  Diamond Staffing, Inc.?
13    A. I did not. I did not.
14    Q. Are you personally aware of the -- of what
15  Miss Casey did after you gave her the list of names?
16    A. Am I personally aware of what she did?
17    Q. Yes.
18    A. Yes.
19    Q. What is your understanding in that regard?
20    A. That she checked it through with the Federal
21  Trademark Commission and that at that time no one
22  had entered anything like that with the federal
23  trademark; that the state of Massachusetts had no
24  one but one company that had gone out of business

Page 75

1  that was an asbestos company that gives Diamond
2  Staffing and that they had lost their right to that
3  trademark in Massachusetts and that we could have
4  it.
5    And that's what happened.
6    Q. Anything else?
7    A. Just conversation with my attorney. And
8  that's it.
9    Q. What was the nature of that conversation?
10    MR. MELTZER: I'm going to object on
11  that one. Instruct him not to answer about specific
12  communications with counsel.
13    THE WITNESS: Okay.
14    MR. PAPASTAVROS: Off the record.
15    (Off the record.)
16    MR. MELTZER: Nick, let me explain my
17  concern, and maybe we can figure out a way to allay
18  this. There are three kinds of communications I
19  suppose, you know, obviously that take place between
20  counsel and a client.
21    In this context understanding your right
22  to know about intent, I have no problem with him
23  testifying to understandings he developed as a
24  result of communications. I'm more concerned about

Page 76

1  a relation of dialogue I said/she said, I said/she
2  said which at some point spills over from
3  transactional side of this to potentially actual
4  legal advice, and that's where my concern is.
5    So obviously --
6    MR. PAPASTAVROS: My suggestion on that
7  front -- it's impossible to draw the line. My
8  suggestion, Rob, is you allow Mr. Vaccaro to testify
9  and the other witnesses to testify. I would -- you
10  would -- I'm not going to contend that such
11  testimony is a waiver of some other privilege, nor
12  would I contend that you have irrevocably waived
13  your right to assert privilege over those
14  communications.
15    There's simply no way of determining
16  whether or not those privileges -- those
17  communications are directly germane until we elicit
18  them.
19    MR. MELTZER: Let's do it this way then:
20  Let me interpose a blanket objection on
21  attorney/client privilege. What I'd like you to do
22  is ask the question, let me think about it before he
23  answers.
24    MR. PAPASTAVROS: That's fine.

Page 77

1    MR. MELTZER: And let me caution my
2  client that when you answer these questions my
3  objection is on particular legal advice -- that's
4  where that -- as opposed to going to the nuts and
5  bolts of what transpired, and at that point I may
6  object and instruct you not to answer.
7    THE WITNESS: All right. I'll shut up.
8    MR. MELTZER: I will note for the record
9  that I'm objecting to this line of questioning and
10  reserving my rights to move to strike and remove it
11  from the transcript. Okay.
12    THE WITNESS: Okay.
13    MR. PAPASTAVROS: I don't even remember
14  if there was a question pending.
15    (Reporter read back.)
16    MR. MELTZER: You can answer that.
17    A. I'm sorry, I wasn't paying attention. I
18  apologize. I thought you were talking to -- I
19  thought you were going to ask me the question.
20    Q. The original question was what other due
21  diligence had you conducted other than furnishing
22  this list to Miss Casey.
23    A. Right.
24    Q. I believe you testified that you had some

20 (Pages 74 to 77)

CONFIDENTIAL
Francis G. Vaccaro

Page 78

1  conversations with her --
2    A. Yes.
3    Q. -- the followup question to which was what
4  were the nature of those conversations?
5    A. Sure.
6      MR. MELTZER: Go ahead and answer it.
7    A. Okay. Basically Mary was an advisor, and
8  there were some names on that list that she felt I
9  shouldn't even go near, even though we could have a
10  shot at having those names. And because of that
11  relationship, I just struck those names from the
12  list.
13      That was to me further extent of her
14  doing the due diligence I needed to successfully
15  acquire the name.
16    Q. Did you have a conversation with respect to
17  Diamond Staffing, Inc.?
18    A. Yes, we did.
19    Q. What was the nature of that conversation?
20    A. She felt there was no one, nothing at all
21  that would enable us from having that name.
22    Q. Did she express any reservations whatsoever
23  regarding you going with that name?
24    A. No. None to my knowledge.

Page 79

1    Q. Have any reservations been expressed
2  following that point in time?
3      MR. MELTZER: Hold on a second.
4      THE WITNESS: Sorry.
5      MR. MELTZER: Nick, now we're going from
6  -- what time frame? You're now moving from intent
7  in selecting the name to subsequent legal advice
8  after the name was selected? That's getting closer
9  to the line that I've been concerned about.
10      (Pause.)
11      MR. MELTZER: You want to do a narrower
12  time frame?
13      MR. PAPASTAVROS: I'll try to rephrase.
14      MR. MELTZER: You see the point? At
15  some point somebody mentioned -- somebody for the
16  plaintiff starts mentioning the word "lawyer," and
17  now we're into potential litigation issues. At that
18  point those communications are I think strictly
19  privileged. That's not the same as intent in
20  selecting the name.
21      The only caveat is obviously any
22  comments made by the attorney to the plaintiff's
23  attorney which he has knowledge certainly is not
24  subject to that same objection.

Page 80

1    Q. When was the first time that you became
2  aware of the plaintiff Diamond Staffing Solutions,
3  Incorporated?
4    A. About a month after I opened. Somewhere, as
5  I stated prior, an e-mail came that she was going to
6  consult her attorneys about the name, and I
7  forwarded that to Attorney Casey.
8    Q. Was this approximately a month after you
9  selected Diamond Staffing Incorporated as a name?
10    A. No. We selected Diamond Staffing
11  Incorporated back in September. So it was roughly
12  two months.
13    Q. And when was the domain name
14  diamondstaffinginc.com registered?
15    A. I don't recall. But I think we have some
16  documentation that would say it was done. Mark
17  Donabedian would probably be able to answer that. I
18  believe it was in September also. In fact, it was.
19  I just don't know what date.
20    Q. Have you ever gone onto the website
21  diamondstaffinginc.com?
22    A. The only time I went on --
23  diamondstaffing.com?
24    Q. Correct.

Page 81

1    A. Diamond Staffing, Inc., is me. Yeah, if
2  she's Diamond Staffing -- if your -- I don't know.
3  I've seen her jewelry website. If that's her
4  website.
5    Q. We'll stipulate the plaintiff -- that
6  Diamond Staffing Solution, Inc.'s website is at
7  diamondstaffing.com.
8    A. I did -- I did. I did.
9    Q. And when was the first time?
10    A. November 2003.
11    Q. After you learned of --
12    A. After I had gotten that e-mail, that's when
13  I checked it out.
14    Q. Do you know if anyone else associated with
15  Diamond Staffing, Inc., accessed the plaintiff's
16  website prior to that point in time?
17    A. No one did. We didn't know she was in our
18  radar. We didn't know she existed.
19    Q. Did you ever give -- strike that.
20      Did you ever give Mr. Donabedian
21  instructions regarding the registration of a domain
22  name for your company?
23    A. Yeah, I told him to register
24  diamondstaffinginc.com.

21 (Pages 78 to 81)

# EXHIBIT 2

Volume 1
Pages 1 - 231
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


C.A. No. 05-40046-FDS

DIAMOND STAFFING SOLUTIONS, INC.,
    Plaintiff,
      vs.
DIAMOND STAFFING, INC.,
    Defendant.


\*   \*   \*   \*   \*   \*   \*

C O N F I D E N T I A L

      DEPOSITION of MARY SUZANNE DeVRIES, called
as a witness by counsel for the Defendant, pursuant
to the applicable provisions of the Massachusetts
Rules of Civil Procedure, before Patricia A. Bucko,
Registered Professional Reporter and Notary Public
in and for the Commonwealth of Massachusetts, taken
at the Offices of Robert N. Meltzer, 1661 Worcester
Road, Framingham, Massachusetts, on Tuesday, June
14, 2005, commencing at 9:35 a.m.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
FLYNN REPORTING ASSOCIATES
Professional Court Reporters

One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 \* (617) 536-2727
FAX: (508) 752-4611
TOLL FREE: (888) 244-8858
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
FLYNN REPORTING ASSOCIATES

CONDENSED
TRANSCRIPT

Page 6

1  States District Court. I am going to be asking you
2  questions about that case today.
3       Just so we are clear about what I'm
4  asking, I will be referring to Diamond Staffing
5  Solutions today as DSS.
6    A.  Okay.
7    Q.  Have you ever been deposed before?
8    A.  No.
9    Q.  As I said, I will be asking you questions
10  about this case today. If you don't understand my
11  questions, let me know and I am more than happy to
12  rephrase them so that you understand. The questions
13  have to be answered verbally. The reporter can't
14  take down shakes of the head, nods, things of that
15  nature.
16       If you need a break at any time, just
17  let me know and I'll be more than happy to let you
18  do that, consult with counsel. I think that's all
19  we have got for today.
20       Would you please state your occupation.
21    A.  Owner of Diamond Staffing Solutions, Inc.,
22  president.
23    Q.  And where is that company located?
24    A.  East Derry, New Hampshire.

Page 7

1    Q.  And what is the address?
2    A.  Five Remington Court.
3    Q.  And what is your home address?
4    A.  Five Remington Court.
5    Q.  Can you describe the neighborhood where that
6  address is?
7       MR. PAPASTAVROS:  Objection.
8    Q.  When he objects you could still answer the
9  question, he is just objecting for the record. We
10  have reserved our objections until the time of
11  trial.
12       MR. PAPASTAVROS:  You can answer.
13    A.  Describe the neighborhood?
14    Q.  Right.
15    A.  Be more specific, please.
16    Q.  Is it a residential neighborhood?
17    A.  Yes, it is.
18    Q.  Are there any commercial properties nearby?
19    A.  No.
20    Q.  How long is the street?
21    A.  I don't know the answer to that one.
22    Q.  Okay. How far back from the street is your
23  house?
24    A.  A hundred feet.

Page 8

1    Q.  Is it visible from the street?
2    A.  Yes, it is.
3    Q.  Do you have a separate entrance at the house
4  for company?
5    A.  No.
6    Q.  Does the corporation rent office space from
7  the owner of the property?
8    A.  No.
9    Q.  And who owns that property?
10    A.  Myself and my ex-husband.
11    Q.  And who lives there with you?
12       MR. PAPASTAVROS:  Objection.
13    Q.  Again, you can answer the question.
14    A.  Myself, my daughter, and my boyfriend.
15    Q.  What is your daughter's name?
16    A.  Kristina with a K.
17    Q.  I'm sorry, whose boyfriend?
18    A.  Terry Mathis.
19    Q.  I'm sorry, whose boyfriend is that?
20    A.  My boyfriend.
21    Q.  What is his last name?
22    A.  Mathis, M-a-t-h-i-s.
23    Q.  And what is the name of your ex-husband?
24    A.  Curtis A. DeVries.

Page 9

1    Q.  And where is he located, now?
2    A.  In Derry, New Hampshire.
3    Q.  Do you have a street address for where he is
4  currently located?
5    A.  Yes. Let me think of it. My understanding
6  is it's 101 Fairway Drive.
7    Q.  Fairway Drive?
8    A.  Yes.
9    Q.  Is Mr. Mathis employed by your company?
10    A.  No.
11    Q.  How about your daughter?
12    A.  No.
13    Q.  How long have you been employed by DSS?
14    A.  Three and a half years.
15    Q.  Since it was incorporated?
16    A.  Yes. Well, before -- before that.
17    Q.  What do you mean by that?
18    A.  I mean, we -- in April we started, the end
19  of April we started the business; we incorporated in
20  May.
21    Q.  April of what year?
22    A.  April of 2002.
23    Q.  You were in business a month prior to
24  incorporation?

3 (Pages 6 to 9)

457b22de-680d-44b6-a5b9-4fe807957191

Page 10

1   A. Yes.
2   Q. And where did you work prior to April 2002?
3   A. Management Recruiters.
4   Q. And what is Management Recruiters?
5   A. It is a recruiting firm.
6   Q. Located where?
7   A. Bedford, New Hampshire.
8   Q. What was your position there?
9   A. Recruiter.
10  Q. When did you start at that company?
11  A. January of '01.
12  Q. What kind of positions does Management
13  Recruiters recruit for?
14  A. All kinds of positions.
15  Q. And what industries?
16  A. All, all different industries.
17  Q. Does it recruit for the jewelry industry?
18  A. Not specifically, no.
19  Q. While you were at Management Recruiters, did
20  you recruit for any positions in the jewelry
21  industry?
22  A. Yes.
23  Q. For what kind of positions?
24  A. Management. Some management positions.

Page 11

1   Q. Did you actually place anybody?
2   A. Yes.
3   Q. For what client?
4   A. Whitehall.
5   Q. How many?
6   A. One.
7   Q. Any others?
8   A. No.
9   Q. Did you have an ownership interest in
10  Management Recruiters?
11  A. No.
12  Q. Who owned the company?
13  A. Jack. I can't think of Jack's last name. I
14  forget Jack's last name.
15  Q. The address where it is located?
16  A. Bedford, New Hampshire, and I don't know the
17  exact address.
18  Q. When's the last time you spoke to Jack?
19  A. I don't know; a few years ago.
20  Q. Why did you leave Management Recruiters?
21  A. To pursue my own interests.
22  Q. Prior to January of '01, where did you work?
23  A. Service Merchandise.
24  Q. What location?

Page 12

1   A. Manchester.
2   Q. In a store?
3   A. Yes.
4   Q. What was your position at Service
5   Merchandise?
6   A. Diamond consultant.
7   Q. What did you do as a diamond consultant?
8   A. Sold jewelry.
9   Q. Is that a retail position?
10  A. Yes.
11  Q. Deal directly with customers?
12  A. Yes.
13  Q. Did you deal with any wholesalers?
14  A. No.
15  Q. Did you manage any individuals?
16  A. No.
17  Q. When did you begin at Service Merchandise?
18  A. 1989.
19  Q. What was your position when you started
20  there in 1989?
21  A. Diamond consultant.
22  Q. Were you in that position until you left?
23  A. No, I left them in 1992.
24  Q. Where did you go in 1992?

Page 13

1   A. To Seiko Time.
2   Q. What Time?
3   A. Seiko Time.
4   Q. What is Seiko Time?
5   A. Seiko watches.
6   Q. Located where?
7   A. Mauwauk, New Jersey, Mahwah, New Jersey.
8   Q. What was your position there?
9   A. Sales merchandiser.
10  Q. Is that in a store?
11  A. No.
12  Q. What does a sales merchandiser do?
13  A. On-the-road sales.
14  Q. To whom?
15  A. It was a territory sales position.
16  Q. What was your territory?
17  A. Southern New Hampshire and western
18  Massachusetts.
19  Q. What kind of customers would you call on.
20  A. Independent retailers and large national
21  accounts.
22  Q. What kind of large national accounts?
23  A. Service Merchandise.
24  Q. What kind of retailers?

4 (Pages 10 to 13)

457b22de-680d-44b6-a5b9-4fe807957191

1      A. J.C. Penney. Small independent retailers,
2  independent jewelry retailers.
3      Q. And how long were you at that company?
4      A. Almost two years.
5      Q. You said you returned to Service
6  Merchandise?
7      A. In the interim I went to work for a company
8  called Oris.
9      Q. How do you spell that?
10     A. O-r-i-s.
11     Q. What is Oris?
12     A. It's a high-end Swiss watch line.
13     Q. What did you do for Oris?
14     A. Road sales.
15     Q. And the territory?
16     A. Yes.
17     Q. What was the territory?
18     A. Fifteen-state territory.
19     Q. What kind of customers?
20     A. High-end independent retailers, jewelry
21  retailers.
22     Q. How long were you with Oris?
23     A. Six months.
24     Q. And you eventually left Oris?

1      A. Yes.
2      Q. Why?
3      A. The territory was too large and my children
4  were little at the time.
5      Q. Where did you go after leaving Oris?
6      A. I took nine months off.
7      Q. And what did you do?
8      A. Went back to Service Merchandise.
9      Q. Doings what job?
10     A. Diamond consultant.
11     Q. Again, that is in the retail?
12     A. Part-time, yes.
13     Q. You say "part-time"; how many hours are we
14  talking about per week?
15     A. Twenty hours per week.
16     Q. Do you recall what year it was you returned
17  to Service Merchandise?
18     A. 1995.
19     Q. Between 1995 and 2001, were you at Service
20  Merchandise the whole time?
21     A. Yes.
22     Q. Working part-time?
23     A. Yes.
24     Q. In retail?

1      A. Except for Christmas.
2      Q. What happened at Christmas?
3      A. Increased my hours as the business
4  increased.
5      Q. You say you started at Service Merchandise
6  in 1989, I believe?
7      A. Yes.
8      Q. Where were you prior to 1989?
9      A. With Belden Jewelers.
10     Q. And what is Belden Jewelers?
11     A. Belden Jewelers is a mall jewelry store.
12     Q. And which store were you working at?
13     A. At the Arsenal Mall store.
14     Q. Where is that?
15     A. Yes. That is in Watertown, Mass.
16     Q. What were your responsibilities at that
17  store?
18     A. Sales.
19     Q. Retail?
20     A. Yes.
21     Q. Dealing with customers that came into the
22  store?
23     A. Yes.
24     Q. Did you have any management

1  responsibilities?
2      A. No.
3      Q. Deal with any wholesalers?
4      A. No.
5      Q. What year did you start at Belden Jewelers?
6      A. I don't know.
7      Q. Do you know approximately?
8      A. 1980. Probably '80 -- Kristina was born in
9  '86. Probably like in '86. Well, now, wait a
10  minute, it wasn't, it was -- I don't know.
11  Stephanie was born in '89, '84 -- so around that
12  area.
13         MR. PAPASTAVROS: I just want to
14  register an objection. Do you, Miss DeVries, do you
15  understand what he means when he says "wholesalers"
16         THE WITNESS: Yes, I do.
17     Q. What year was that, you think you began at
18  Belden?
19     A. '85. Because Stephanie was -- it was about
20  '85.
21     Q. Is this full-time employment at Belden
22  Jewelers?
23     A. No.
24     Q. How many hours per week?

457b22de-680d-44b6-a5b9-4fe807957191

Page 18

1  A. 20 to 25.
2  Q. Prior to Belden Jewelers, where did you
3  work?
4  A. Can I have a break for a second, please?
5  Q. Sure.
6  MR. MELTZER: Off the record.
7  (Off the record.)
8  MR. PAPASTAVROS: Can you read back the
9  question?
10  (Read back.)
11  THE WITNESS: I owned an exercise
12  business.
13  Q. What was the name of your business?
14  A. Two Your Health, T-w-o.
15  Q. And where was that company located?
16  A. Belmont, Mass. I actually had a partner in
17  that as well.
18  Q. Who was the partner?
19  A. Sandra Cavanaugh.
20  Q. What was the business?
21  A. It was an exercise business that
22  incorporated on-premise exercise at corporations.
23  Q. What was your position at that company?
24  A. Owner. Co-owner.

Page 19

1  Q. What year did you start that company?
2  A. 1981 or so.
3  Q. Did that run all the way to 1985, when you
4  joined Belden Jewelers?
5  A. Yes.
6  Q. And did you cease with Two Your Health?
7  A. We just actually dissolved the partnership
8  because we both had children at the same time. Very
9  amenable.
10  Q. You were living in Massachusetts, at the
11  time?
12  A. Yes.
13  Q. Where were you living?
14  A. Belmont, Mass.
15  Q. When did you move to Derry, New Hampshire?
16  A. In 1995. March of 1995.
17  Q. And prior to Two Your Health?
18  MR. PAPASTAVROS: Just to stipulate for
19  the record, I believe that one of her jobs was in
20  New Jersey at that time, Rob, too.
21  Q. Did you get back to New Jersey, are we going
22  back?
23  MR. PAPASTAVROS: It is Seiko, right.
24  THE WITNESS: Yes.

Page 20

1  Q. Were you actually living in New Jersey at
2  the time?
3  A. No.
4  Q. Where were you living at the time?
5  A. Belmont.
6  Q. I just want to clarify that. I assume
7  because your territory was in, as you stated, prior
8  job, prior to western Massachusetts, in southern New
9  Hampshire, so you were still living in this area?
10  A. Yes.
11  Q. You didn't actually move physically to New
12  Jersey?
13  A. No.
14  Q. How about prior to 1981, where did you work?
15  A. European Health Spa.
16  Q. Where?
17  A. In Great Falls, Montana.
18  Q. Were you living in Montana?
19  A. Yes.
20  Q. In Great Falls?
21  A. Yes.
22  Q. What was your position there?
23  A. Manager.
24  Q. What were your responsibilities at that

Page 21

1  European Health Spa?
2  A. Managing the club.
3  Q. And what year did you start there?
4  A. I don't know. I don't remember.
5  Q. Do you know approximately?
6  A. No.
7  Q. Do you know how long you were there?
8  A. A few years. I don't remember.
9  Q. And why did you leave that job?
10  A. I left that job to come to Massachusetts.
11  Q. And why was that?
12  A. Because my husband was transferred here with
13  GE.
14  Q. From GE?
15  A. Uh-huh.
16  Q. Is that a "yes"?
17  A. Yes.
18  Q. Where did you work prior to European Health
19  Spa?
20  A. Argenzio Brother Jewelers.
21  Q. How do you spell that?
22  A. A-r-g-e-n-z-i-o.
23  Q. Where is that located?
24  A. To be noted. Incidentally, when I was

6 (Pages 18 to 21)

457b22de-680d-44b6-a5b9-4fe807957191

Page 22

1  working for European Health Spa in Colorado I worked
2  with Argenzio Brother as well.
3     Q. Let me clarify that.
4        Where, exactly, was the European Health
5  Spa that you were in?
6     A. First in Colorado.
7     Q. First in Colorado, okay. Where in Colorado?
8     A. In Northglenn, Colorado.
9     Q. And then in Montana?
10    A. And then in Montana.
11    Q. And what is Argenzio Brothers?
12    A. Argenzio Brother doesn't exist anymore, but
13 they were the largest family-owned -- not the
14 largest, the oldest family-owned business, jewelry
15 business, in Colorado, at the time.
16    Q. Did you work there concurrently with working
17 at European Health Spa?
18    A. Yes, I did.
19    Q. When did you start working at that company,
20 Argenzio Brothers?
21    A. Back in 19 -- I don't know. When I was a
22 14-year old kid I started working for them, so you
23 do the math.
24    Q. When you were 14?

Page 23

1     A. Uh-huh.
2     Q. What year were you born?
3     A. 1956.
4     Q. So you started working there in
5  approximately 1970?
6     A. Yes.
7     Q. And what did you do for them in 1970?
8     A. Wrapped gifts.
9     Q. How long did you do that?
10    A. I stayed with them until I left Colorado,
11 but I went into different capacities, sales.
12    Q. What else other than sales?
13    A. Sales.
14    Q. How many hours a week did you work there
15 starting in 1970?
16    A. Between, depending on the season, between
17 ten and 25.
18    Q. A week?
19    A. Uh-huh.
20    Q. Does that --
21    A. After school. After school.
22    Q. At some point did that increase?
23    A. Yes.
24    Q. And how many hours maximum?

Page 24

1     A. Depending on the season, 40 to 45 hours.
2     Q. All right. You said at one point you worked
3  more hours at other jobs at Christmas, so would that
4  be the time you would work the 40 to 45 hours per
5  week?
6     A. No, because after I graduated I worked for
7  them full-time, and I also worked for them full-time
8  through some school, because I, I got out at noon.
9     Q. And what period of time were you working
10 concurrently with them and also European Health Spa?
11    A. 19 -- I don't remember the year I started
12 with European. Whenever I started with them until I
13 left Colorado. I was working with them and European
14 Health Spa.
15    Q. During your time that you were there, were
16 you at all involved in supervising other people?
17 Talking about Argenzio Brothers.
18    A. No.
19    Q. Did you deal with wholesalers?
20    A. No.
21    Q. Do you know who owned Argenzio Brothers?
22    A. The Argenzio family.
23    Q. Any relation to them?
24    A. No.

Page 25

1     Q. Okay. You said that you were in school.
2  Tell me where you went to high school?
3     A. Northglenn High School.
4     Q. What year did you graduate?
5     A. 1974.
6     Q. Did you go on to college after that?
7     A. I went to a junior college only for a
8  semester.
9     Q. Which junior college was that?
10    A. Community, Denver Community College.
11    Q. And you left there after one semester?
12    A. Yes.
13    Q. Did you have any further education after
14 that?
15    A. No.
16    Q. Did you ever take any kind of short-term
17 courses or certifications?
18       MR. PAPASTAVROS: Objection.
19       Answer if you understand that.
20    Q. Do you understand the question?
21    A. I do, I understand the question.
22    Q. Okay, answer the question.
23    A. I've taken courses that various companies
24 have offered along the way.

1   Q. Such as?
2   A. Sales courses, enhancing courses for, you
3 know, whenever they had, different types of
4 programs.
5   Q. What companies have offered that?
6   A. Service Merchandise offered that.
7   Q. When you left Management Recruiters, did you
8 have a non-compete agreement with them?
9   A. Yes, I did.
10   Q. What were the terms of the non-compete
11 agreement?
12   A. I don't remember.
13   Q. Has Management Recruiters ever alleged that
14 you violated a non-compete agreement?
15   A. Absolutely not.
16   Q. What is the purpose of, what is the nature
17 of the business of the DSS?
18      MR. PAPASTAVROS: Time frame?
19      MR. MELTZER: 2002.
20      (Mr. Vaccaro enters the deposition.)
21   A. Diamond Staffing Solutions?
22   Q. Yes.
23   A. What is their nature?
24   Q. Yes. What did it do in 2002?

1   A. We were recruiting specifically for the
2 jewelry business in 2002.
3   Q. You say recruiting for the jewelry business;
4 what do you mean by that?
5   A. We recruit specifically for the jewelry
6 industry.
7   Q. When you say "industry," do you mean retail,
8 wholesalers, manufacturers, all of the above?
9   A. Yes, yes.
10   Q. Was it your purpose in 2002, to specifically
11 represent the companies that were doing the hiring?
12      MR. PAPASTAVROS: Objection.
13   Q. Do you understand the question?
14   A. No.
15   Q. Okay.
16      When you say recruiting for this, were
17 your customers the actual wholesalers, retailers and
18 manufacturers looking to add employees?
19   A. Yes.
20   Q. You would represent individuals looking for
21 jobs in the industry specifically?
22      MR. PAPASTAVROS: Objection.
23   Q. Do you understand the question?
24      MR. PAPASTAVROS: What do you mean by

1 "represent," Rob?
2   Q. Specifically if someone came to you and
3 said, "I want a job in the jewelry industry and here
4 is my resume," would you find a position that way,
5 if it was not targeted to a specific customer?
6   A. No.
7   Q. Who incorporated DSS?
8   A. We did, my husband, my ex-husband and I.
9   Q. And where was it incorporated?
10   A. In Delaware.
11   Q. Could you tell me why it was incorporated in
12 Delaware?
13   A. Because of tax purposes.
14   Q. What are the tax purposes of incorporating
15 in Delaware, if you know?
16      MR. PAPASTAVROS: Objection. It calls
17 for a legal conclusion.
18   Q. If you understand why there are advantages
19 for tax purposes of incorporating in Delaware.
20      Do you know what the purposes were?
21   A. The tax bracket is less in Delaware.
22   Q. Why was that important?
23   A. I was starting a business.
24   Q. Who told you about this tax benefit in

1 Delaware?
2      MR. PAPASTAVROS: I object, and that
3 assumes facts that are not in evidence. And also --
4      MR. MELTZER: Strike the question. We
5 will redo it.
6   Q. Did somebody tell you there were tax
7 benefits to incorporating in Delaware?
8   A. I don't remember.
9   Q. Who filled out the actual incorporation
10 papers?
11      MR. PAPASTAVROS: Objection.
12   Q. Did somebody fill out the incorporation
13 papers?
14   A. Yes.
15   Q. Who did that?
16   A. Myself and my ex-husband.
17   Q. Do you recall where you got the paperwork to
18 fill out?
19   A. On the Internet.
20   Q. Did you prepare bylaws?
21   A. Yes.
22   Q. Who prepared those specifically?
23   A. Myself and my ex-husband.
24   Q. What was the occupation of your ex-husband?

457b22de-680d-44b6-a5b9-4fe807957191

Page 30

1   A. At the time --
2       MR. PAPASTAVROS: Objection.
3   Q. At the time, 2002.
4       MR. PAPASTAVROS: Objection, time frame.
5       MR. MELTZER: 2002.
6   A. At the time he was in the U.S. Air Force.
7   Q. What was his position in the U.S. Air Force?
8   A. He was a lieutenant colonel.
9   Q. Was he an attorney?
10  A. No.
11  Q. Was he ever an attorney?
12  A. No.
13  Q. How did you go about drafting the bylaws for
14  the corporation?
15      MR. PAPASTAVROS: Objection.
16  Q. Did you understand the question?
17  A. Yes.
18  Q. How did you go about drafting the bylaws of
19  the corporation?
20  A. We got together and decided what the bylaws
21  should be.
22  Q. Did you have any kind of sample?
23  A. Not with me.
24  Q. How about at the time? In 2002, did you

Page 31

1   have a sample of bylaws?
2   A. Not with me.
3   Q. Okay. So how did you go about knowing what
4   you needed to have in bylaws?
5       MR. PAPASTAVROS: And I would caution
6   the witness, to the extent any of this reflecting
7   communications with a counsel, I would instruct you
8   not to answer that question. If it does not, you
9   should feel free to go ahead and answer.
10  Q. Did you have an attorney to assist you in
11  this?
12  A. No.
13  Q. So how did you go about knowing what you
14  needed to have in bylaws?
15  A. We developed a line of bylaws according to
16  what we thought were good for the company.
17  Q. Had you seen bylaws before?
18  A. My husband had seen bylaws before.
19  Q. Where, if you know?
20  A. I do not know.
21  Q. How many shares of stock were authorized?
22      MR. PAPASTAVROS: Objection.
23  Q. If you know.
24  A. I don't know.

Page 32

1   Q. Do you know how many were issued?
2       MR. PAPASTAVROS: Why don't we try to
3   stick to some of the relevant issues.
4       MR. MELTZER: This is relevant and I
5   have every right to ask these questions. We did
6   reserve --
7       MR. PAPASTAVROS: I'm not instructing
8   her not to answer, but I'm just saying it's not
9   relevant.
10      MR. MELTZER: I think it is relevant. I
11  think we will probably move quickly if we don't have
12  the objection, I understand your objection, but I do
13  think they are relevant.
14  Q. How many were issued in 2002?
15  A. I don't know.
16  Q. How much stock did you receive in 2002?
17  A. I don't know.
18      MR. PAPASTAVROS: Objection. You can
19  answer if you know.
20  Q. Do you know?
21  A. No.
22  Q. Who owns the stock today?
23      MR. PAPASTAVROS: Objection.
24  Q. Who owns the stock today?

Page 33

1   A. I do.
2   Q. A hundred percent?
3   A. With my husband, ex-husband.
4   Q. What percentage do you have?
5   A. I don't know the exact number to that.
6   Q. Do you submit files on a yearly basis to the
7   Delaware Secretary of State?
8   A. No.
9   Q. Are you supposed to?
10  A. No.
11  Q. Did you register the corporation in 2002 to
12  do business in the State of New Hampshire?
13  A. No. You know what, yes I did, I'm sorry.
14  Yes, I did.
15  Q. When did you do that?
16  A. Around that same time. I think it was June
17  of 2002.
18  Q. Do you file corporate taxes in the State of
19  Delaware?
20  A. No.
21  Q. Do you file corporate taxes in New
22  Hampshire?
23  A. Yes.
24  Q. Is it a foreign corporation?

9 (Pages 30 to 33)

457b22de-680d-44b6-a5b9-4fe807957191

Page 66

1  A. No.
2      MR. PAPASTAVROS: Want to take five
3  minutes?
4      (Off the record.)
5  Q. We were talking before the break, we were
6  talking about --
7      MR. PAPASTAVROS: Actually, did you want
8  to --
9      THE WITNESS: Samantha Cummings.
10  Q. I was actually going to ask you if you
11  recalled their names.
12  A. Emily Murphy and Jacqueline Janks, J-a-n-k-s
13  I think.
14      MR. PAPASTAVROS: Josephs?
15      THE WITNESS: Yes, Josephs. I should
16  know that; she is my daughter's friend. And
17  Samantha has recently left us and is working on an
18  on-call basis.
19  Q. Anything else?
20  A. No.
21  Q. Do you have a payroll service that pays your
22  employees?
23  A. Yes.
24  Q. And who is that payroll service?

Page 67

1  A. Pay Days out of New Hampshire.
2  Q. And when did you start using Pay Days?
3  A. Back in late October '03.
4  Q. Does Pay Days take care of checks to Paul
5  Shaver and Ted McCarty?
6  A. Yes.
7  Q. Are they on salary?
8  A. No.
9  Q. How are they compensated?
10  A. On commission.
11  Q. Straight commission?
12  A. Yes.
13  Q. Are they full-time working for you?
14  A. Yes.
15  Q. Where in southern California is Ted McCarty?
16  A. Carmel.
17  Q. Carmel in central, but that's okay.
18      You identified five magazines in the
19  jewelry industry that you have had some involvement
20  with.
21  A. Yes.
22  Q. Are you familiar with any of the magazines
23  that relate directly to the personnel staffing
24  industry?

Page 68

1  A. Yes.
2  Q. Can you name any of the usual magazines that
3  you have seen in the personnel staffing industry?
4  A. There is something, I don't know the acronym
5  that they use, but it's Staffing something, I don't
6  know. I get that magazine, and I don't recall the
7  name of it.
8  Q. Have you ever advertised in it?
9  A. No.
10  Q. Have you ever had an article in it?
11  A. No.
12  Q. Have you ever been quoted in it?
13  A. No.
14  Q. Do you know where that magazine is located?
15  A. No.
16  Q. Do you subscribe to that magazine?
17  A. Yes.
18  Q. Any other magazines other than that one that
19  you could think of?
20  A. No.
21  Q. Have you ever advertised in a personnel
22  staffing magazine?
23  A. No.
24  Q. Have you ever been quoted in a personnel

Page 69

1  staffing magazine?
2  A. No.
3  Q. Have you ever submitted an article in a
4  personnel staffing magazine?
5  A. No.
6  Q. At some point did you create a web page or
7  have a web page created for DSS?
8  A. Diamond Staffing Solutions, yes.
9  Q. When did you first have a web page?
10  A. May 6th, 2002.
11  Q. And who created the web page?
12  A. Jim, and I don't remember Jim's last name.
13      MR. MELTZER: Excuse me.
14      (Off the record.)
15  Q. You said Jim what; do you know his last
16  name?
17  A. I can't think of it right now. I'll think
18  of it in a little bit.
19  Q. Do you know the name of his company?
20  A. He was an independent.
21  Q. He prepared your web page?
22  A. Yes.
23  Q. Could you describe that web page?
24  A. It had a diamond on the front that twirled,

18 (Pages 66 to 69)

457b22de-680d-44b6-a5b9-4fe807957191