UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS, INC.,

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

**DIAMOND STAFFING SOLUTIONS, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

In the two months since Plaintiff Diamond Staffing Solutions[SM], Inc. ("Diamond Staffing

Solutions[SM]") filed its Motion for Expedited Discovery, several additional incidents of telling

actual confusion[1] between its name and services and the name and services of the Defendant,

Diamond Staffing, Inc. ("DSI") have transpired.  For example:

- on June 22, 2005, Diamond Staffing Solutions[SM] received a detailed oral complaint from a Massachusetts Department of Transitional Assistance ("DTA") employee regarding interaction with a rude and indignant DSI staffer who had refused to fill out a verification form.  The DTA employee mistakenly called Diamond Staffing Solutions[SM] after becoming confused following an internet search[2]; and

- On June 9, 2005,  Diamond Staffing Solutions[SM] received a feedback form filled out on its website, www.diamondstaffing.com, from a confused candidate who indicated that she had been "trying to contact [DSI's] Rhode Island office," that "no one had contacted" her and that "she would like to get some feedback instead of calling all the time."[3]

These incidents – along with the numerous additional instances of actual confusion

between 2003 and 2005 –  concretely illustrate the continuing damage to Diamond Staffing

---

[1]    Actual confusion is "*the most persuasive possible evidence* that there is a likelihood of confusion." Copy Cop, Inc. v. Task Printing, Inc., 908 F.Supp. 37, 45 (D. Mass. 1995) (citations omitted) (emphasis added).

[2]    See Affidavit of Lucy Darling, dated July 8, 2005, ¶ 3-10 ("Darling Aff.").

Solutions'[SM] business and goodwill, and the loss of control over its reputation, as a result of DSI's infringement. The incidents (along with the other factors germane to the test for trademark infringement) militate strongly in favor of entry of the preliminary injunctive relief proposed by Plaintiff.

The expedited discovery conducted by the parties further supports the instant motion. First, discovery makes it clear that Diamond Staffing Solutions[SM] has priority of use of the "Diamond Staffing" service mark in all relevant jurisdictions as a result of its 2002-2003 business activities (including but not limited to personnel placements) before DSI was formed and commenced operations. Second, the candidates applying for positions advertised by the parties are not highly sophisticated, and the parties advertise in the same internet channels and will continue to do so, particularly considering DSI's professed intent to conduct additional marketing and post positions on www.monster.com as part of the growth of its professional placement division. Finally, the deposition of Mary Casey, DSI's attorney, demonstrates that DSI adopted the name for its new company with full knowledge of Diamond Staffing Solutions[SM] and its operations, and it should accordingly be inferred that DSI acted in bad faith.

Diamond Staffing Solutions[SM] accordingly requests this Court to enjoin DSI, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from:

- Offering staffing services under the name "Diamond Staffing" or "Diamond Staffing, Inc.", with or without the [SM] symbol;

- Offering staffing services under such a name as to falsely relate or connect, or tend to relate or connect, such name to Diamond Staffing Solutions, Inc. or Diamond Staffing[SM] ; and

- Engaging in any other activity calculated to cause purchasers of services to believe that the staffing services offered by Diamond Staffing, Inc. are actually those of Diamond

---

[3]     See Third Affidavit of Suzanne DeVries, dated July 8, 2005, ¶ 14, Ex. 4 ("DeVries Aff.").

Staffing Solutions, Inc.

Plaintiff also requests that the Order:

- Direct DSI to file with the Court and serve upon Diamond Staffing Solutions, Inc. within thirty days from the service on the Defendant of such injunction a report in writing under oath setting forth in detail the manner and form in which the Defendant has complied with the injunction; and

- Direct DSI to retrieve and surrender for destruction all labels, signs, prints, packages, wrappers, receptacles, and advertisements in its possession bearing the infringing mark.

### Factual Background[4]

Founded in May, 2002, Diamond Staffing Solutions, Inc. is a personnel placement company based in Derry, New Hampshire that focuses on the jewelry and giftware industries, leveraging the thirty years of experience of its President, Suzanne DeVries. Since its establishment, Diamond Staffing Solutions[SM] has continuously advertised its services by using the service marks Diamond Staffing Solutions[SM] and Diamond Staffing[SM] (collectively, the "Marks") in commerce, and promoting its services on the website www.diamondstaffing.com. As a result of Diamond Staffing Solutions'[SM] extensive promotional efforts and the rapid growth of its national business, the Marks have acquired significant recognition in the professional staffing industry. Indeed, over the past few years Diamond Staffing Solutions[SM] has repeatedly placed candidates in a number of regional and national fine jewelry retailers and wholesalers, and has repeatedly been profiled in leading publications. DeVries Aff., ¶ 3-7.

Diamond Staffing Solutions[SM] meticulously built its brand and reputation in the professional staffing arena across the country in the eighteen months between the time it commenced operations in May 2002 and the time when DSI was established in late October or early November 2003. During this period of time, Diamond Staffing Solutions[SM] advertised in

---

[4] Unless supported by a specific citation, the facts in this section are supported by the Complaint, which has been verified by Diamond Staffing Solutions'[SM] President, Suzanne DeVries, as well as the Exhibits appended thereto.

prominent national publications such as Jewelers Circular Keystone ("JCK"), National Jewelers, Modern Jeweler, In-Store Magazine, Professional Jeweler, and Coutour, as well as the Manchester Union-Leader. DeVries Aff. ¶ 6. In 2002, Diamond Staffing Solutions[SM] conducted a significant regional search, and placed a candidate at Whitehall Jewelers Braintree, Massachusetts store, netting $4,000.00 in revenue. DeVries Aff., ¶ 5. Diamond Staffing Solutions[SM] also advertised extensively for candidates to place with its clients on www.monster.com, by placing upwards of *forty listings* on Monster prior to DSI's commencement of operations, including a handful of listings for placements in Boston, Boston/South, and Western/Springfield. Affidavit of Kathleen Gilroy, dated July 8, 2005, at ¶ 9 ("Gilroy Aff."). Certain of Diamond Staffing Solutions'[SM] other postings during this time also sought candidates for positions in Massachusetts. Gilroy Aff., ¶ 11. All told, since commencing operations in 2002, Diamond Staffing Solutions[SM] has placed over 100 postings and invested approximately $17,000.00 in postings on Monster. Gilroy Aff., ¶ 9.

Discovery has demonstrated that following its commencement of operations DSI has likewise advertised on Monster. Gilroy Aff., ¶ 8. DSI purchased access to Monster's resume database on March 17, 2004 for $7,650.00, and renewed this annual contract on March 9, 2005 for $ 8,010.00. Gilroy Aff., ¶ 6. Moreover, DSI has expressed a clear intention to expand its professional placement business and its advertisements on Monster.com. (See Deposition of Annie Moore, dated June 1, 2005 at p. 38 ("Moore Dep."), attached as Exhibit 1 to the Affidavit of Michael Cornell, dated July 8, 2005 ("Cornell Aff."), as follows:

> "Q. Do you have any intentions of placing ads on either Monster or career builder for professional placement going forward?
>
> A. I think down the road, yes, Monster. Yep.
>
> ---------
>
> Q. But it's your intention to go down that road sometime in the future?

A. Yes.

Q. Why do you say that?

A. Monster has a very wide hit range.

Q. Very wide distribution?

A. Yes.

Q. As opposed to say local newspapers?

A. Hm Hm.

Q. So you can solicit a greater range of candidates by placing ads on Monster?  Is that fair to say?

A. Yes."

Annie Moore, DSI's Director of Professional Placement, has searched resumes on Monster *daily*, looking for prospective candidates for the last year.  Id. at 39-40 (Cornell Aff., Ex. 1).

By the fall of 2003, Diamond Staffing Solutions[SM] had developed extensive goodwill and had established a secondary meaning for the Marks on a nationwide basis, to the extent that Plaintiff's services had come to be identified with the Marks in the minds of consumers of professional staffing services.  Affidavit of Amy Wenslow ("Wenslow Aff."), dated July 7, 2005, at ¶ 4-9 ("Wenslow Aff."); Affidavit of Mitchell Horowitz, dated July 1, 2005, at ¶ 6-11 ("Horowitz Aff.")  It was at this time that DSI entered the professional staffing services marketplace.  Prior to selecting the name "Diamond Staffing, Inc.," DSI's President, Frank Vaccaro, submitted a list of prospective names to counsel, Mary Casey.  Deposition of Mary Casey (hereinafter "Casey Dep."), dated June 17, 2005, at 81-82 (Cornell Aff., Ex. 2).  After checking the U.S. Patent and Trademark Office ("USPTO") records and running an internet search on "Diamond Staffing" through an internet search engine, Ms. Casey apparently advised Mr. Vaccaro that it was legally permissible for him to select "Diamond Staffing, Inc." as the name of the company.  Id. at 90-102; Deposition of Frank Vaccaro (hereinafter, "Vaccaro Dep."),

dated June 1, 2005, at 67,78 (Cornell Aff., Ex. 3).[5]  During Ms. Casey's internet search in the
summer of 2003, she came across a reference to Diamond Staffing Solutions[SM] which contained a
description of the professional staffing services the company offered in the jewelry industry.
Casey Dep. at pp 94-96 (Cornell Aff., Ex. 2).  Notwithstanding her learning of Plaintiff's
existence and website, Ms. Casey conducted *no additional due diligence* and apparently
authorized Mr. Vaccaro to go forward notwithstanding the prospect of confusion.  Id.  By the fall
of 2003, DSI had registered the www.diamondstaffinginc.com domain name, and DSI
commenced doing business as "Diamond Staffing, Inc." on November 8, 2003.  U.S. Patent and
Trademark Office (USPTO) Trademark Applications and Registrations Retrieval (TARR) File
Hisotry for U.S. Application Serial # 78326647 (hereinafter "USPTO Application") (Cornell Aff.
Ex. 4).

At or about that time, Diamond Staffing Solutions[SM] began receiving a plethora of
misdirected emails from DSI employees.  Deposition of Suzanne DeVries (hereinafter, "DeVries
Dep."), dated June 14, 2005 at p. 137 (Cornell Aff., Ex. 5).  Shortly thereafter, the business
manager of Diamond Staffing Solutions,[SM] Ken Peterson, spoke to DSI's counsel, Mary Casey,
about Diamond Staffing Solutions'[SM] objections to DSI's name and website.  Id. at 139-141
(Cornell Aff., Ex. 5).  On December 5, 2003, Diamond Staffing Solutions'[SM] predecessor counsel
informed DSI in writing of the infringement, and demanded that DSI cease and desist from using
Diamond Staffing Solutions[SM] in conjunction with staffing services.  Letter from Donald
Moffard, Esq. to Diamond Staffing, Inc., dated December 5, 2003 (Cornell Aff., Ex. 6).  DSI
refused.  Letter from Mary Casey, Esq. to Donald Moffard, Esq., dated December 23, 2003
(Cornell Aff., Ex. 7).  Thereafter, on March 19, 2004, predecessor counsel reiterated his concerns

---

[5]      DSI has refused to permit Ms. Casey to answer many questions relating to communications with Mr.
Vaccaro regarding, inter alia, adoption of the corporate name in 2003.  This has necessitated the filing of Plaintiff's
Emergency Motion for Sanctions and/or to Compel Deposition Testimony, dated June 24, 2005, which remains
pending.

and set forth new evidence of numerous misdirected emails and other communications intended for DSI, but instead received by the Plaintiff. Letter from Donald Moffard, Esq. to Mary Casey, Esq. dated March 19, 2004 (Cornell Aff., Ex. 8).

As it turned out, the misdirected emails were a harbinger of additional confusion to come. Diamond Staffing Solutions[SM] has experienced numerous instances of actual confusion since late 2003, which evidences the actual and potential damage to reputation and goodwill which DSI's infringement is causing. Most egregious and telling among these instances, was the recent incident in February, 2005 in which a prominent potential customer of Diamond Staffing Solutions,[SM] Kirschner Corporation of Minnesota, contacted DSI looking for prospective candidates. Affidavit of Mark Olsen, dated July 1, 2005, at ¶ 2-3, 7-9 ("Olsen Aff."). Rather than forwarding on the clearly misdirected email or responding by email, Annie Moore of DSI contacted Mr. Olsen, indicated that she was familiar with the company referring Mr. Olsen (Carla Corporation in Rhode Island, a *customer of Diamond Staffing Solutions[SM]*), and stated that she could help Mr. Olsen *find a sales representative to meet Kirschner Corporation's needs*. Olsen Aff., ¶ 9 at 2 (emphasis added). Other instances of actual confusion between the two companies include the following:

- The erroneous naming of Diamond Staffing Solutions[SM] as a Defendant in a Massachusetts Commission Against Discrimination ("MCAD") action in September, 2004 (DeVries Aff., ¶ 15; Vaccaro Dep. at 120-21 (Cornell Aff., Ex. 3);

- Several candidates (including one who had *previously visited a DSI office)* visited Diamond Staffing Solutions'[SM] website, and filled out feedback forms intended for DSI, on May 5, 2004, October 21, 2004 and June 9, 2005 (DeVries Aff., ¶ 14);

- Another prospective client of Diamond Staffing Solutions[SM], John Joseph of Joseph Jewelers in Iowa, followed a link from a Google search to DSI's website looking for Diamond Staffing Solutions[SM] and spent approximately 3-5 minutes closely examining several different pages of DSI's website before ultimately concluding that he had the wrong company. Affidavit of John Joseph (hereinafter, "Joseph Aff."), dated July 1, 2005, at ¶ 9;

- Since the fall of 2003, Diamond Staffing Solutions'[SM] employees have received numerous e-mails from candidates which were intended for DSI but were instead misdirected to our attention, as well as misdirected communications from DSI internal employees, and misdirected communications involving DSI bank statements and documents with social security numbers of DSI employees. DeVries Aff., ¶ 13.

- A June 2, 2005 oral complaint from Michelle Zdunczyk of the Massachusetts Department of Transitional Assistance relayed to Diamond Staffing Solutions[SM,] but intended for DSI, regarding a "rude and indignant" DSI employee who refused to fill out an employment verification form in Spanish. Darling Aff., ¶ 4-10.

Through discovery, Diamond Staffing Solutions[SM] has also learned that DSI currently conducts business in Massachusetts, New Jersey, Connecticut, Rhode Island, New York, and Pennsylvania, and that DSI's use of Diamond Staffing[SM] in each of these states post-dates the Plaintiff's first use of the mark in May 2002. Vaccaro Dep. at pp. 46-56 (Cornell Aff., Ex 3). DSI intends to expand its use of the Marks beyond these states. Id. at 115-17.[6]

As a result of Defendant's infringement of its Marks, and in light of the consumer confusion regarding the identities of the parties, Plaintiff's goodwill and reputation has been misappropriated by Defendant, causing Plaintiff to suffer irreparable harm and damages for which it cannot adequately be compensated by a monetary award.

## Argument

In determining whether to issue preliminary injunctive relief, a court must consider and balance four factors: (1) whether the movant has exhibited a likelihood of success on the merits of its claim; (2) whether the movant risks irreparable harm if the injunction is not granted; (3) whether the public interest will be adversely affected by the granting of the injunction; and (4) in light of the movant's likelihood of success on the merits, whether the injury complained of by the

---

[6]    Diamond Staffing Solutions[SM] intends on amending its Complaint to seek a declaratory judgment regarding its common law rights over the marks in states in which DSI has not yet commenced business but has expressed an intention

movant outweighs any harm which granting the injunction would inflict on the nonmovant.[7] I.P. Lund Trading v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998). However, "[i]n a trademark case, the key issue of the likelihood of success on the merits because the other decisions will flow from that ruling." Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1st Cir. 1989) (citation omitted). Indeed, when a party establishes a likelihood of success on the merits in a trademark case, irreparable harm is presumed. Boustany v. Boston Dental Group, 42 F. Supp. 2d 100, 111 (D. Mass. 1999); Virgin Enters., Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003).

## I.    PLAINTIFF WILL LIKELY SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST DEFENDANT.

To establish that it is likely to succeed on its claim for trademark infringement pursuant to 15 U.S.C. §1125, Diamond Staffing Solutions[SM] needs to show: (1) ownership of a mark that is distinctive or has acquired secondary meaning; and (2) its use by DSI in a manner likely to cause confusion as to the origin of the goods at issue. See Star Fin. Servs., Inc. v. Aastar Mortgage Corp., 89 F.3d 5, 9-10 (1st Cir. 1996); Northern Light Tech., Inc. v. Northern Lights Club, 97 F. Supp. 2d 96, 109, 120 (D. Mass. 2000), aff'd, 236 F.3d 57 (1st Cir. 2001).

### A.    Plaintiff's Service Marks Are Entitled To Protection.

In the First Circuit, a plaintiff must establish ownership of a mark (including its use in commerce), which is distinctive or has acquired secondary meaning, before that mark is entitled to protection under the trademark laws. See, e.g., Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 486-87 (1st Cir. 1981); Northern Light Tech., 97 F. Supp 2d at 109. The facts unearthed in expedited discovery demonstrate that Plaintiff has priority of ownership over the Marks. Moreover, Plaintiff's marks are inherently distinctive, and reflect the

---

[7] In the First Circuit, reliance on hearsay is appropriate in the context of an expedited preliminary injunction proceeding. See Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26-27 (1st Cir. 1986); CCBN.Com, Inc. v. C-Call.Com, Inc., 73 F. Supp. 2d 106, 113 (D. Mass. 1999).

sterling reputation and goodwill which Plaintiff and its President Suzanne DeVries have

painstakingly nurtured in the professional staffing arena over the past several years.

              1.     <u>Plaintiff Has Used The Marks in Commerce Since May, 2002.</u>

     Plaintiff's first use of the Marks in commerce gives it priority of use over DSI in

Massachusetts and elsewhere.  According to McCarthy:

> [I]t is *not registration*, but only *actual use* of a designation of a mark, that creates
> rights and priority over others. . . .  The rule in the United States is that ownership
> of a mark goes to the first to use, not first to file.  Trademark ownership is *not*
> acquired by federal or state registration.

2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 16:18, at 16-36 (4th

ed. 2005) (emphasis added); <u>accord</u> <u>Volkswagenwerk Aktiengesellschaft v. Wheeler</u>, 814 F.2d

812, 815-16 (1st Cir. 1987) ("'[r]egistration does not create the underlying right in a trademark.

That right which accrues from the use of a particular name or symbol, is essentially a common

law property right'").

     It is undisputed that Diamond Staffing Solutions[SM] commenced using the Marks in

commerce in May, 2002 in connection with staffing services.  DeVries Aff., ¶ 3; Verified

Complaint, <u>seriatim</u>.  In contrast, DSI commenced using the term "Diamond Staffing" no earlier

than November 8, 2003, according to its trademark application and verified statements in this

case.  Affidavit of Mary Casey, dated May 5, 2005, ¶ 5, at 2 ("Casey Aff.").  In the eighteen

months between May, 2002 and November 8, 2003, Diamond Staffing Solutions[SM] built a

nationwide base of clients with which it placed candidates, and conducted significant business on

a natural basis, including in the Commonwealth of Massachusetts.  DeVries Aff. at ¶ 4-6,8;

Gilroy Aff. ¶ 9-13.

     DSI has raised the question of whether Diamond Staffing Solutions[SM] has engaged in

sufficient activity in the State of Massachusetts prior to November 8, 2003 to acquire common

law rights in the Marks.  DSI's contention on this front is nothing more than a red herring.  To

provide rights as a "remote" good faith junior user of a service mark, DSI needs to demonstrate (1) it adopted its mark in "good faith"; and (2) that Diamond Staffing Solutions[SM] was geographically "remote" when DSI adopted the mark in the region in question.[8] Thrifty Rent-a-Car System, Inc. v. Thrift Cars, Inc., 639 F. Supp. 750, 754 (D. Mass 1986), aff'd 531 F. 2d 1177 (1st Cir. 1987); Yankee Spirits v. Gasbarro, No. Civ. 96-10967PBS, 1998 WL 428092, at *11-12 (D. Mass. May 26, 1998) (Cornell Aff., Ex. 9). DSI cannot establish either element of this test.

First, DSI cannot establish that it adopted its mark in "good faith" in Massachusetts because it knew of Diamond Staffing Solutions[SM], its services, and nature of its business prior to adopting the name for the company. "The First Circuit follows the majority view that the junior user's (DSI) *mere knowledge* of the senior user's mark is sufficient to defeat [the] defense." Yankee Spirits, 1998 WL 428092 at *12. (emphasis added). As the Thrift Cars court stated,

> [o]ne may question why trademark rights should turn on a junior user's subjective state of knowledge. The answer is twofold. First, a merchant who adopts a trademark *knowing* that another party already uses it in a remote area must surely intend to prevent the senior user from expanding into his own territory. Such behavior conflicts with a policy of allowing a merchant the maximum benefit of his goodwill. Second, a junior user's knowledge may evidence knowledge by others in the area, and a consequent lack of remoteness.

Accord 4 McCarthy, Trademarks and Unfair Competition, § 26.9, at 26-15, 26-16 (4th ed. 2005). Here, during the process of pre-clearing names for the new company, DSI's Attorney, Mary Casey, ran an Internet search engine search in the summer of 2003 – prior to DSI's commencement of operations – and located a description of Diamond Staffing Solutions[SM] and its staffing services in the results. Casey chose to ignore the existence of the plaintiff and its website, conducting *no additional due diligence* on the company, and apparently authorized Frank Vaccaro to use the name "Diamond Staffing." Casey Dep. at pp. 94-96 (Cornell Aff., Ex.

---

[8] This is known as the "Ten-Rose-Rectanus Defense")

2). Under applicable precedent, this knowledge is imputed to DSI, and prohibits DSI from being a good faith junior user who could acquire priority of use in Massachusetts.

Regardless, Diamond Staffing Solutions[SM] was well-established in Massachusetts by November 8, 2003 and had already acquired common law rights over the Marks by that juncture. Courts look to reputation, advertising, and sales with respect to the applicable territory in question to answer the question of whether sufficient market penetration has occurred for establishment of rights. Thrift Cars, 639 F. Supp. at 753. Diamond Staffing Solutions'[SM] first business activity in 2002 was to conduct an extensive search for a candidate at Whitehall Jewelers' Braintree, MA store. A candidate was eventually located and placed, netting Plaintiff $4,000.00. DeVries Aff., ¶ 5. To obtain this candidate, Diamond Staffing Solutions[SM] placed an advertisement on Monster.com, and Suzanne DeVries called numerous contacts of hers in Massachusetts, including seven Zales Jewelers' stores; three Kartens Jewelers' stores; a Belden Jewelers store, a Kay Jewelers store, and a Filene's store, among others. DeVries Aff., ¶ 17. In 2003, numerous leading jewelry industry publications were circulated into Massachusetts including Diamond Staffing Solutions[SM] advertisements, including JCK, Couture, Modern Jeweler, National Jewelers, and Professional Jewelers. DeVries Aff., ¶ 6. Diamond Staffing Solutions[SM] placed additional Massachusetts Monster.com postings (1) on September 7, 2003 for a position with Joel McFadden Jewelers in Greenfield, MA, which was eventually filled, and (2) on October 29, 2003 for Plante Jewelers in Swansea, MA, which was also eventually filled. DeVries Aff., ¶ 6; Gilroy Aff., ¶ 11. Indeed, by June of 2003, Diamond Staffing Solutions already had a significant presence in the staffing business, having placed candidates with reputable national retailers such as Whitehall Jewelers, Helzberg Jewelers and Landstrom's. Wenslow Aff., ¶ 4.

2.    The Marks Are Distinctive And Have Acquired Secondary Meaning.

In order to receive trademark protection, a mark must either be inherently distinctive or have acquired secondary meaning. I.P. Lund Trading, 163 F.3d at 39. Trademarks vary in distinctiveness and strength depending upon whether they are (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. I.P. Lund Trading, 163 F.3d at 39; Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 374 n.8 (1st Cir. 1980).

"Arbitrary" or "fanciful" terms bear no logical relation to the goods or services, and are thus almost always protectable. I.P. Lund Trading, 163 F. 3d at 39. A suggestive term, "which invokes the consumer's perception or imagination," "suggests rather than describes the characteristics of the goods [or services] to which it is affixed." I.P. Lund Trading, 163 F.2d at 39; Equine Techs v. Equitechnology, 68 F. 3d 542, 544 (1st Cir. 1995). The more imagination that is required to associate a mark with the product, the less likely the words used will be needed by competitors to describe their products." 2 McCarthy, Trademarks & Unfair Competition, §11.68, at 11-130 (4th ed. 2005) quoting Union Carbide Corp. v. Ever-Ready, Inc., 531 F. 2d 366 (7th Cir. 1976). If the mental leap between the word and the product;s attributes is *not almost instantaneous*, this strongly indicates suggestiveness. 2 McCarthy, Trademarks & Unfair Competition, §11.67, at 11-129 to 11-130 (4th ed. 2005) (emphasis added). So the following terms have been held to be suggestive: ACOUSTIC RESEARCH loudspeakers (See Bose Corproation v. International Jensen, Inc., 963 F. 2d 1517 (Fed. Cir. 1992)); CITIBANK Urban Bank (See Citigroup, Inc. v. City Holding Co., 171 F. Supp. 2d 333 (S.D.N.Y. 2001)); and Equine Technologies horse hoof care products (See Equine Technologies, Inc. v. Equitechnology, Inc., 68 F. 3d 542 (1st Cir. 1995)).

Suggestive terms can be protected without proof of secondary meaning, and are considered inherently distinctive. I.P. Lund Trading, 163 F.2d at 39. In contrast, a descriptive

term "merely describes a characteristic or ingredient of the article to which it refers" and is protectable only upon a showing that the mark has acquired secondary meaning. I.P. Lund Trading, 163 F.2d at 39.

The Marks are, at minimum suggestive of the services offered by Diamond Staffing Solutions[SM]. Diamond Staffing Solutions provides staffing services to the jewelry and giftware industries. DeVries Aff., ¶ 3. One cannot make an "instantaneous" mental leap from the title Diamond Staffing Solutions[SM] to the services the company offers. Indeed, Diamond Staffing Solutions[SM] could be construed to mean "top notch" or "first rate" staffing; could be construed to mean staffing services *exclusively* for diamond retailers or manufacturers; or could be construed to be consulting services for a corporate HR. In this vein, competitors do not need terms used by Diamond Staffing Solutions[SM] to describe their services; they could call their companies "Jewelry Staffing" or ""Jewelry Personnel," for example. Diamond Staffing, like ACOUSTIC RESEARCH loudspeakers, CITIBANK urban bank, and EQUINE TECHNOLOGIES horse hoof care products, is appropriately classified as a "suggestive" mark.[9]

DSI has also attempted to challenge the strength of the Marks by identifying the asbestos-removal company previously known as Diamond Staffing Services, Inc. ("DSSI") in Massachusetts, and by identifying "312 businesses in Massachusetts" and "10,000 companies nationwide" using some derivation of the name "Diamond." Diamond Staffing, Inc's Motion to Dismiss at p. 3. However, DSSI dissolved on March 25, 2002 – *before* Diamond Staffing Solutions[SM] came onto the market in May 2002. Casey Aff. at ¶ 4 at 1.[10] Any rights of DSSI in the Marks were extinguished upon its dissolution prior to Plaintiff's formation. Moreover,

---

[9] In the event DSI contends that the Marks are descriptive, Diamond Staffing Solutions[SM] contends regardless that they have acquired secondary meaning sufficient to be entitled to protection. See, e.g., Affidavits of Amy Wenslow and Mitch Horowitz submitted herewith.

separate service mark rights could undoubtedly exist for an asbestos-removal company and a professional staffing services entity, given the wholly disparate services provided and complete absence of confusion.

In this vein, Diamond Staffing Solutions'[SM] ownership rights in the Marks are not affected by DSI's random citations of other businesses with the name "Diamond." These citations are simply not relevant to ownership, and evidence of third party usage of the Marks on wholly unrelated services or products is of minimal probative value. 2 McCarthy, supra, § 15:27, at 15-41; Eclipse Ass'n Ltd. v. Data General Corp., 894 F.2d 1114, 1119 (9th Cir. 1990) ("[e]vidence of other potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law"); Charrette Corp. v. Bowater Communication Papers, Inc., 13 U.S.P.Q.2d 2040, 2043 (T.T.A.B. 1989) (evidence of third party use of unrelated goods is irrelevant). DSI's reference to telephone listings containing the word "Diamond" in an attempt to weaken the Marks also rings hollow as "there is no evidence suggesting that defendants actually contacted these companies. Thus, the telephone listings do no more than demonstrate that telephone numbers were subscribed to those names." Transamerica Corp. v. Trans Am. Abstract Serv., Inc., 698 F. Supp. 1067, 1072 (E.D.N.Y. 1988). DSI also makes no attempt to demonstrate how these entities make use of the "Diamond" term, citing only to Secretary of State records. Any significance of said references depends on a showing of *how the references are used in the marketplace*, which DSI does not even attempt to address. Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.), 544 F.2d 1167, 1173 (2d. Cir. 1976); EMC Corp. v. Hewlett-Packard Co., 59 F. Supp. 2d 147, 151 (D. Mass. 1999).

Finally, DSI has undermined its own argument, considering that *it filed for federal registration on the Diamond Staffing term itself!* USPTO Application (Cornell Aff. Ex. 4).

---

[10] DSI's statement in footnote 3 of its motion to dismiss (p. 8) that Plaintiff could not possess good will belonging to

Third-party uses obviously did not diminish the distinctiveness of the Marks when DSI was the trademark applicant, but they apparently do when Diamond Staffing Solutions[SM] is. This inconsistency illustrates the weakness of DSI's position and establishes that, for the purposes of a preliminary injunction, the marks used by the Plaintiff and Defendant are similar and used in commerce.

### B.    Defendant's Infringement Is Causing, And Will Continue To Cause, Substantial Customer Confusion.

To determine whether there is a likelihood of confusion in the marketplace between two competing service marks (the "key element in any infringement action"),[11] this Circuit applies an eight factor test:  (1) the similarity of the marks, (2) the similarity of the services, (3) the relationship between the parties' channels of trade, (4) the relationship between the parties' advertising, (5) the classes of prospective purchasers, (6) evidence of actual confusion, (7) DSI's intent in adopting the mark, and (8) the strength of the Marks.  Boustany, 42 F. Supp. 2d at 108; Pignons, 657 F.2d at 487.

Based on the facts pled in the Verified Complaint and the exhibits appended thereto, as well as the affidavits and evidentiary materials submitted in support of Plaintiff's motion for a preliminary injunction, Diamond Staffing Solutions[SM] is likely to succeed on the merits of its infringement claim.  This is especially true considering, among other things, that the marks are identical or, at minimum, extremely similar; that the services offered by the parties are very similar (indeed, both parties have sought federal registration of the "Diamond Staffing" mark under the same USPTO class of services); and that there are already numerous instances of actual confusion (for example, numerous misdirected e-mails).  Verified Complaint, ¶ 7-20; DeVries Aff, ¶ 13.  No one factor is conclusive as to the likelihood of confusion and, therefore, each

---

the Diamond mark in Massachusetts in 2002-2003 given DSSI's existence  is disingenuous and inconsistent with the facts, given the dissolution of DSSI in early 2002.

[11] Calamari Fisheries, Inc. v. Village Catch, Inc., 698 F. Supp. 994, 1009 (D. Mass. 1988).

factor must be considered.  Keds Corp. v. Renee Intl'l Trading Corp., 888 F.2d 215, 222 (1st Cir. 1989).

          1.     Similarity Of The Marks

Similarity "is determined on the basis of the total effect of the designation, rather than a comparison of individual features." I.P. Lund Trading, 163 F.3d at 43 (quoting Pignons, 657 F.2d at 487).  Moreover, trademark plaintiffs need not show exact copying to succeed because "few would be stupid enough to make exact copies of another's mark or symbol." Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 30 (1st Cir. 1989).  Indeed, "[w]ords may be recognized as similar because of sound, appearance, and meaning, [] and a finding of similarity may be based on appearance alone." Volkswagenwerk, 814 F.2d at 817 (citation omitted) (finding confusion between "Beetle" and "Beetle Barn"); see also Equine Techs., 68 F.3d at 546-47 (finding confusion between "Equine Technologies" and "Equitechnologies").

As discussed above, the marks of Plaintiff and Defendant are nearly identical.  Defendant has brazenly copied Plaintiff's mark "Diamond Staffing" and has taken the term "a cut above the rest" directly from Plaintiff's website. DeVries Dep. at pp. 141-48 (Cornell Aff., Ex. 5).  Indeed, "Diamond Staffing" is the dominant element of both parties' corporate names.  The picture of a diamond accompanied by the phrase, "a cut above the rest," which appears on DSI's website is strikingly similar to the picture of a diamond accompanied by the phrase, "on the cutting edge," which appears on Diamond Staffing Solutions[SM]'s website. See Cornell Aff., Ex. 10.  Moreover, the Defendant seemingly took the phrase "a cut above the rest" from Diamond Staffing Solutions[SM]'s website.  DeVries Dep. at 141-148 (Cornell Aff., Ex. 5).

Thus, the similarity of marks factor clearly weighs in Plaintiff's favor.

2.     Similarity of Services

Not only are the parties' respective marks nearly identical, but their respective services are similar since both parties offer staffing services which fall within the same USPTO classification.  It is noteworthy that *the vast majority* of modern decisions have adopted the rule that competition *is not necessary* for there to be a likelihood of confusion.  4 McCarthy, Trademarks and Unfair Competition, § 24.13, at 24-29, 30 (emphasis added).  Infringement has frequently been found in circumstances in which the goods or services were *less similar* than the case at bar.  For example, in Northern Light Tech, Inc. v. Northern Lights Club, 97 F. Supp. 2d 96, 111 (D. Mass. 2000) plaintiff offered customers a web search engine at www.northernlight.com, and defendants offered a vanity e-mail service, links and a disabled search function at www.northernlights.com.  After identifying the differences in the web navigational aids, the Court concluded that the services were "sufficiently similar" and stated that "it would be very different if a web user accessed northern lights.com and found a site advertising oil drilling."

The similarity of services in the instant case is best exemplified by the confusion which has appeared in the marketplace over the past two years.  For example, after potential Diamond Staffing Solutions[SM] customer Mark Olsen of Kirschner Corporation contacted DSI mistakenly looking for Suzanne DeVries, DSI indicated that it could help Kirschner solve its staffing needs by locating candidate(s) for its sales representative position.  Olsen Aff., ¶ 2-3, 7-9.  Indeed, DSI promotes itself on its own website as filling sales positions (and informed Mr. Olsen that it *specialized in* retail)[12] and Diamond Staffing Solutions[SM] specializes in placement of retail and wholesale representatives in the jewelry and giftware industries.  Moreover, several candidates filled out on-line feedback forms at Diamond Staffing Solutions[SM] website over the past year or

---

[12] Olsen Aff., ¶ 9.

so, when they had intended to contact DSI (in certain circumstances, based on having *been in DSI's offices previously*). DeVries Aff., ¶ 14. Both companies provided temporary and permanent candidates for employment positions, and these services are clearly sufficiently similar to militate in favor of an injunction. Compare Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565 (Fed Cir. 1983) (confusion found between GIANT FOOD supermarket and GIANT fast food hamburgers; "[w]hile we recognize that the average consumer makes a distinction between fast food restaurants and supermarkets, we are satisfied that, if the marks themselves are confusingly similar, customers of the fast-food restaurant would be likely to believe that [the supermarket] owned, sponsored or supplied that business."); In re: Opus One, Inc., 60 U.S.P.Q. 2d 1812, 2001 WL 1182924 (T.T.A.B. 2001) (confusion found between OPUS ONE wine and OPUS ONE restaurant).

> 3.    Relationship Between Parties' Channel Of Trade And Advertising And Classes Of Prospective Purchasers

In the First Circuit, the parties' channels of trade, the relationship between the parties' advertising, and the classes of prospective purchasers are often analyzed together. See, e.g., Boston Athletic Ass'n, 867 F.2d at 30; Volkswagenwerk, 814 F.2d at 818; Pignons, 657 F.2d at 488. A collective consideration of these factors demonstrates a strong likelihood of customer confusion.

> (a)    Sophistication of Customers

"[A] court called upon to assess likelihood of confusion must ponder the sophistication of the class [of potential customers], thereby taking account of the context in which the alleged infringer uses the mark." Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 123 (D.Mass. 1999) (quoting International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 204 (1st Cir. 1996)). Here, many employment candidates for both entities are of ordinary sophistication at most. Indeed, as its website attests, DSI specializes

in matching candidates with unsophisticated positions such as administrative assistants, customer service specialists, data entry, light industrial staffing, and executive assistants, among others. See Cornell Aff., Ex. 11.  Similarly, Diamond Staffing Solutions<sup>SM</sup> places sales representatives and managers in jewelry and giftware outlets, many of which are talented employees but not highly educated.  DeVries Aff., ¶ 18.  "A user of ordinary sophistication will likely be confused. . . . When dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." Northern Light Tech., Inc. v. Northern Lights Club, et al., 97 F. Supp. 2d 96, 113 (D. Mass. 2000) (quoting Brookfield Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1060 (9th Cir. 1999)).  Here, a number of DSI candidates have not only accessed Diamond Staffing Solutions<sup>SM</sup> website – they have filled out "feedback" forms *online* and forwarded them to the *wrong entity*.  Furthermore, much of the interaction between the parties and their prospective customers takes place on the Internet "where users are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." Id. at 112 (quoting Brookfield Communications, 174 F.3d at 1057).

(b)    Channels of Trade and Advertising

While Plaintiff conducts significant advertising in jewelry industry publications, and DSI advertised heavily in local newspapers, their channels of trade and advertising overlap on the internet – and promise to overlap even more extensively on a going forward basis.

The issue of "whether the plaintiff and defendant [are] likely to use the same advertising media" is relevant to the issue of likelihood of confusion.  See Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1122 (5th Cir. 1991); see also Digital Equip. Corp., v. Altavista Tech., Inc., 960 F. Supp. 456, 477 (D. Mass. 1997) ("[t]he overlap between the parties' trade channels, *advertisers*, and markets are three factors conventionally analyzed together [in

determining likelihood of confusion]") (emphasis added).  Even a demonstration of "some overlap" is sufficient for the channels of trade and advertising to militate in favor of an injunction. In <u>Boustany v. Boston Dental Group, Inc.</u>, 42 F. Supp. 2d 100, 109-10 (D. Mass. 1999), for example, the Court noted that the parties had different target markets and employed "different advertising and marketing schemes," with the defendant focusing on direct contact with executives of managed care plans, while the plaintiff focused on "signage, business cards, flyers and mailers." <u>Id</u>.  The Court concluded, however, that the factor favored entry of injunctive relief, stating that it "appears that the plaintiff is likely to be able to show at trial *at least some overlap* between the targets of his advertising and those of BDG." <u>Id</u>. (emphasis added).

Here, both Diamond Staffing Solutions[SM] and DSI allow prospective candidates to apply for positions with clients in exactly the same manner – by in person visits to their offices, submitting through email or fax, or by applying on-line through the party's website.  In addition, both parties advertise on Monster.com and through their own websites, www.diamondstaffing.com and www.diamondstaffinginc.com.  Indeed, since commencing operations in 2002, Diamond Staffing Solutions has placed over 100 postings on Monster.com, totaling approximately $17,000.00 in expenditures, and has searched resumes.  Likewise, DSI has purchased access to Monster.com's resume database, had advertised for candidates on Monster, and clearly intends in expanding its advertising on Monster going forward.  Gilroy Aff. ¶ 6; Moore Dep., at 38-39 (Cornell Aff., Ex. 1).

4.    Evidence of Actual Confusion

It is well-established that a plaintiff need not provide evidence of actual confusion to prevail on a motion seeking preliminary injunctive relief.  <u>See, e.g.</u>, <u>Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.</u>, 982 F.2d 633, 640 (1st Cir. 1992) ("In suing under any of the three

Lanham Act provisions, a plaintiff need only show a likelihood of confusion; a showing of actual confusion is not required.") (citation omitted); <u>Volkswagenwerk</u>, 814 F.2d at 818; <u>Pignons</u>, 657 F.2d at 490.  Although not required, "[a]ctual confusion is often taken to be the *most persuasive possible evidence* that there is a likelihood of confusion," and is established by "even a minimal demonstration . . . ."  <u>Copy Cop, Inc. v. Task Printing, Inc.</u>, 908 F. Supp. 37, 45 (D. Mass. 1995) (citations omitted) (emphasis added).

In <u>Beacon Mutual Ins. Co. v. One Beacon Ins. Group</u>, 376 F. 3d 8, 15-16 (1st Cir. 2004), the First Circuit held in a precedential opinion that "actual confusion is commercially relevant if the alleged infringer's use of the mark could inflict commercial injury in the form of a diversion of sales, damage to goodwill, or loss of control over reputation on the trademark holder." <u>Id.</u> at 15 (internal quotations omitted).  "The likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes others whose confusion threatens the trademark owner's commercial interest in its mark." <u>Id.</u> at 16.  According to the Court, "*the fact that the injury is to a company's reputation or goodwill, rather than directly to its sales, does not render the confusion any less actionable*." <u>Id.</u> (emphasis added) (quoting <u>Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.</u>, 128 F. 3d 1111, 1118 (7th Cir. 1997)).

The numerous instances of actual confusion which have transpired in the marketplace since DSI commenced operations in November of 2003 demonstrate unequivocally that Diamond Staffing Solutions'[SM] reputation and goodwill is being significantly affected by DSI and its continuing infringement of the Marks.  This is of particular concern in the jewelry and giftware industries, which are "uniquely, financially and professionally dependent on credibility, reputation and trust." Wenslow Aff., ¶3.  Chief among the disconcerting incidents are:

(1)     the MCAD Complaint served on Diamond Staffing Solutions[SM] in September, 2004, which was intended for DSI barred on the allegedly discriminatory acts of DSI employees (DeVries Aff., ¶ 15) and

(2)     the Complaint of a DTA employee regarding the "rude" conduct of a DSI staffer (Darling Aff., ¶ 3-10)

Legal proceedings erroneously commenced against a trademark or service work holder constitute actionable confusion. <u>CNA Financial Corporation v. Brown</u>, 922 F. Supp. 567, 573 (M.D. Fla. 1996). Moreover, it is apparent that DSI may not be as circumspect in its business affairs as Diamond Staffing Solutions[SM] as a result of the *substance* of these instances of confusion. DSI's conduct clearly endangers Diamond Staffing Solutions'[SM] reputation and goodwill. In addition, DSI's Annie Moore attempted to solicit a potential client of Diamond Staffing Solutions[SM] in February, 2005 by indicating that DSI could service Kirschner Corporation's needs for a West Coast sales representative. Olsen Aff., ¶ 9. This is exactly the type of actionable commercial injury suggested by <u>Beacon Mutual</u>. Another important client of Diamond Staffing Solutions,[SM] John Joseph of Joseph Jewelers, languished on DSI's website for upwards of five minutes in late 2004, substantively reviewing several pages, before concluding that he *must* have the wrong website since he *already knew* that Diamond Staffing Solutions[SM] was based in New Hampshire, not Massachusetts. While not "point of purchase" confusion, this significant confusion is also actionable. <u>EMC Corporation v. Hewlett Packing Company</u>, 59 F. Supp. 2d 147, 150 (D. Mass 1999). Finally, Diamond Staffing Solutions[SM] has received numerous misdirected emails over the course of the last eighteen months; has received several on-line inquiries from potential candidates who were actually attempting to reach DSI, and has inadvertently received communications involving DSI bank statements and documents with social security numbers of

DSI employees. DeVries Aff., ¶ 13,14. This activity has persisted -- even increased -- into 2005, and strongly supports entry of injunctive relief here.

        5.    Defendant's Wrongful Intent

It is similarly unnecessary to establish any intent to confuse consumers in order to prevail on a trademark infringement claim. See I.P. Lund Trading, 163 F.3d at 44. Nonetheless, proof that defendant knew of Plaintiff's marks at the time defendant chose its mark is often bad faith and evidence of an intention to trade on another's goodwill. Wynn Oil Co. v. AmWay Serv. Corp., 943 F. 2d 595, 603 (6th Cir. 1991); 3 McCarthy Trademarks and Unfair Competition, § 23:115, at 23-281. "When one adopts a mark similar to one already in use, there is an affirmative duty to avoid any likelihood of confusion." Volkswagenwerk, 814 F.2d at 817 (citations omitted).

In this case, evidence of Defendant's deceitful, intentional conduct exists, based on Ms. Casey's apparent recommendation to Frank Vaccaro that it was permissible to select "Diamond Staffing Inc." as a name for a company *with full knowledge* of Diamond Staffing Solutions$^{SM}$ and its services. In his affidavit, Defendant's President, Frank Vaccaro, unambiguously stated that he relied upon his attorney's advice when adopting the mark: "Before selecting our name we proposed several names to our attorney who checked the names on various databases to determine whether the names were available and free for our use. She approved our usage of Diamond Staffing following her due diligence investigation." Affidavit of Francis Vaccaro in Support of the Defendant's Motion to Dismiss for Failure to State a Claim, at ¶ 5. However, in pre-clearing names for DSI in the summer of 2003, DSI's attorney, Ms. Casey, located a description of the plaintiff Diamond Staffing Solutions$^{SM}$ after running an internet search on a search engine. Casey Dep. at 94-95 (Cornell Aff., Ex. 2). Casey chose to ignore the existence of the plaintiff and its website, conducting *no additional due diligence* on the company, and

apparently authorized Frank Vaccaro to use the name "Diamond Staffing." Casey Dep. at pp. 94-96 (Cornell Aff., Ex. 2).[13]

Thus, the wrongful intent factor clearly weighs in Plaintiff's favor.

### 6.    Strength of Plaintiff's Mark

As discussed above, the Marks are inherently distinctive, have secondary meaning, and, accordingly are strong marks which support the grant of injunctive relief.

## II.    PLAINTIFF WILL SUFFER IRREPARABLE INJURY IF AN INJUNCTION DOES NOT PROHIBIT DEFENDANT FROM ERODING THE REPUTATION AND GOODWILL ASSOCIATED WITH THE PLAINTIFF'S MARKS.

The First Circuit has held that "irreparable harm flows from an unlawful trademark infringement as a matter of law." Nestle, 982 F.2d at 640; see also I.P. Lund Trading, 163 F.3d at 33. Indeed, "[b]y its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot be adequately compensated." Nestle, 982 F.2d at 640; see also Keds, 888 F.2d at 220.

When a party establishes a likelihood of success on the merits, irreparable harm is presumed. Boustany, 42 F.Supp.2d at 111; Virgin Enters., Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003).

Here, the inherent irreparable injury to Diamond Staffing Solutions[SM] supports the granting of a preliminary injunction in order to stem further instances of trademark infringement by the Defendant and the resultant client and candidate confusion. This irreparable injury is not rebutted by the passage of time between the time Diamond Staffing Solutions[SM] first learned of Defendant's infringing activity and the present; during that time, Diamond Staffing Solutions[SM] made repeated attempts to resolve the dispute, and filed an Opposition to Defendant's attempted

---

[13]    Plaintiff's Emergency Motion For Sanctions in conjunction with the Casey deposition (based on the fact that DSI refused to allow Ms. Casey to furnish answers to additional questions germane to the intent element) was

registration of the "Diamond Staffing" service mark in the USPTO.  See Verified Complaint, ¶¶ 18, 19; see also Boustany, 42 F. Supp. 2d at 112 (presumption of irreparable harm not rebutted notwithstanding passage of eight months between time learned of use of mark and initiation of litigation; in interim period of time, plaintiff not "indolent or passive," since he had meetings with staff, sought advice of counsel, and engaged in cease and desist communications); Supercuts, Inc. v. Super Clips, 18 U.S.P.Q.2d 1378 (D. Mass. 1990) (presumption of irreparable harm not rebutted notwithstanding passage of ten months).

Moreover, particularly telling instances of confusion have transpired in recent months which heightened Diamond Staffing Solutions'[SM] awareness of and concern about the infringement problem, including:  the June 22, 2005 Complaint from the Massachusetts Department of Transitional Assistance intended for DTA; additional requests for feedback on Diamond Staffing Solutions'[SM] website, including a request on June 9, 2005, which were intended for DSI; the February 11, 2005 instance of actual customer confusion concerning prominent jewelry wholesaler Kirschner Corp.; the October, 2004 confusion experienced by Diamond Staffing Solutions[SM] client Josephs Jewelers; and the Plaintiff mistakenly being named in the MCAD Complaint in September, 2004.  These events militates in favor of a finding that the presumption of irreparable harm is not rebuttable on these facts.  See Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F.Supp. 994 (D. Mass. 1988) (finding of irreparable harm notwithstanding passage of twenty-one (21) months since first use of mark; level of confusion exacerbated considerably in weeks prior to filing of preliminary injunction motion, accordingly delay does not justify finding of no irreparable harm).[14]

---

filed on June 24, 2005 and remains pending.

[14] The Second Circuit has noted that "[t]he cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right *had concluded that there was no infringement, but later brought an action because of the strength of the commercial competition. . . . In these cases, it appeared indisputable that the trademark or copyright owners were well aware of their rights and had concluded that they were not violated.*"  Tom Doherty Assocs., Inc. v.

## III.   THE IRREPARABLE INJURY THAT PLAINTIFF SUFFERS OUTWEIGHS ANY HARM TO DEFENDANT FROM ITS INABILITY TO CONTINUE INFRINGING ON PLAINTIFF'S MARKS.

Not only does Plaintiff's likelihood of success on its claims establish irreparable harm, but this harm outweighs any injury to Defendant that would flow from an injunction.  Indeed, harm to defendants as a result of an injunction is of little consequence to the preliminary injunction analysis.  See National Rural Elec. Corp. Ass'n v. Nat'l Agric. Chem. Ass'n, 26 U.S.P.Q.2d 1294, 1298 (D.D.C. 1992) ("The balance of harms cannot favor a defendant when his injury results from his knowing appropriation of the plaintiff's rights.  To hold otherwise would permit an infringer to continue infringing as long as he had invested sufficient fund in the unlawful activity.").  Plaintiff has built substantial reputation and goodwill into its marks Diamond Staffing[SM] and Diamond Staffing Solutions[SM] through hard work and fair competition.  By contrast, Defendant just recently began operating under the "Diamond Staffing" name and, during this time, has engaged in deceptive tactics in an attempt to capitalize on Plaintiff's goodwill and name recognition.  Therefore, a preliminary injunction should issue.

## IV.   ENJOINING DEFENDANT FROM FURTHER INFRINGING ON PLAINTIFF'S MARKS WILL PROMOTE THE PUBLIC INTEREST AND PREVENT FURTHER CONFUSION OF CONSUMERS.

In trademark cases, the public interest almost always favors the granting of injunctions.  See, e.g., I.P. Lund Trading, 163 F.3d 27; Keds, 888 F.2d at 223; Northern Light Tech., 97 F. Supp. at 121.  The present case is no different.  Courts weigh two factors when considering this factor of the preliminary injunction analysis: (1) the societal value of full disclosure and fair competition; and (2) the policy of protecting established trade names.  Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 700 (1st Cir. 1987).  Accordingly, courts routinely find that the public interest will be served by preliminary injunctive relief where, as here, the moving

---

Saban Entertainment, Inc., 60 F.3d 27, 39 (2d Cir. 1995) (citations omitted).  Certainly Diamond Staffing Solutions[SM] has at no point in time concluded that its rights were not violated, given its persistent course of conduct

party demonstrates a likelihood of customer confusion. See, e.g., Northern Light Tech., 97 F. Supp. at 121. As demonstrated above, Defendants' use of Diamond Staffing$^{SM}$ in association with its services is causing confusion in the marketplace. Therefore, the public interest would be served with the entry of an injunction prohibiting further infringement by Defendant on Plaintiff's marks.

## CONCLUSION

Based on the foregoing, entry of the preliminary injunctive relief proposed by the Plaintiff is proper.

DIAMOND STAFFING SOLUTIONS, INC.

By its attorneys,

Nicholas G. Papastavros (BBO#635742)
Michael L. Cornell (BBO # 651405)
Gina M. McCreadie (BBO # 661107)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000 (telephone)
(617) 345-1300 (facsimile)

Date: July 5, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for Defendant by electronic service on July 8, 2005.

Michael L. Cornell

---

in identifying infringement, seeking a resolution, and opposing DSI's actions in the USPTO.