UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DIAMOND STAFFING SOLUTIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DIAMOND STAFFING, INC.,<br><br>Defendant. | Civil Action No. 05-40046-FDS |

## AFFIDAVIT OF MICHAEL L. CORNELL IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Michael L. Cornell, hereby depose and say as follows:

1.      I am an associate in the law firm of Nixon Peabody LLP.  I am one of the counsel of record for the Plaintiff, Diamond Staffing Solutions, Inc. ("Diamond Staffing Solutions$^{SM}$") in this matter, a member in good standing of the bar of the Commonwealth of Massachusetts, and admitted to practice in the U.S. District Court for the District of Massachusetts.  I am familiar with the facts set forth herein as a matter of personal knowledge or review of the pleadings and other files in this matter.

2.      This affidavit is offered in support of Plaintiff's Motion for a Preliminary Junction.

3.      Attached hereto as Exhibit 1 are true and accurate copies of selected pages from Annie Moore's Deposition transcript, dated June 1, 2005

4.      Attached hereto as Exhibit 2 are true and accurate copies of selected pages from Mary Casey's Deposition transcript, dated June 17, 2005.

5.    Attached hereto as Exhibit 3 are true and accurate copies of selected pages from Frank Vaccaro's Deposition transcript, dated June 1, 2005.

6.    Attached hereto as Exhibit 4 is a true and accurate copy of the U.S. Patent and Trademark Office (USPTO) Trademark Applications and Registrations Retrieval (TARR) File History for U.S. Application Serial # 78326647 for Registration of the mark "Diamond Staffing" filed by Diamond Staffing, Inc. on November 12, 2003, which Nixon Peabody LLP retrieved from the USPTO website on July 7, 2005.

7.    Attached hereto as Exhibit 5 are true and accurate copies of selected pages from Suzanne DeVries' Deposition transcript, dated June 14, 2005.

8.    Attached hereto as Exhibit 6 is a copy of a letter from Donald Mofford, predecessor counsel for Plaintiff, to DSI, dated December 5, 2003.

9.    Attached hereto as Exhibit 7 is a copy of a letter from Mary Casey, counsel for Defendant, to Donald Mofford, predecessor counsel for Plaintiff, dated December 23, 2003.

10.    Attached hereto as Exhibit 8 is a copy of a letter from Donald Mofford, predecessor counsel for Plaintiff, to Mary Casey, counsel for Defendant, dated March 19, 2004.

11.    Attached hereto as Exhibit 9 is a copy of Yankee Spirits v. Gasbarro, No. Civ. 96-10967PBS, 1998 WL 428092 (D. Mass. May 26, 1998).

12.    Attached hereto as Exhibit 10 are copies of the websites for the Plaintiff, Diamond Staffing Solutions, Inc. and the Defendant, Diamond Staffing, Inc., which Nixon Peabody pulled from the Internet on July 8, 2005.

13.    Attached hereto as Exhibit 11 is a copy of a page from the Defendant's website which lists the areas in which Defendant's staffing services are provided, which Nixon Peabody pulled from the Internet on July 8, 2005.

- 3 -

Signed under the pains and penalties of perjury this 8th day of July, 2005.

_____

Michael L. Cornell

# EXHIBIT 1

CONFIDENTIAL
Annie Moore

Page 38

1    A. I can't say. I don't know.
2    Q. Do you have any intentions of placing ads on
3  either Monster or career builder for professional
4  placement going forward?
5    A. I think down the road, yes, Monster. Yep.
6    Q. Is that in the works now?
7    A. No.
8    Q. What leads you to say that you'll be doing
9  that going forward?
10    A. I'm trying to develop -- it's quite
11  expensive to be honest with you, and I'm trying to
12  develop the business that I can afford to run an ad.
13    Q. But it's your intention to go down that road
14  sometime in the future you think?
15    A. Yes.
16    Q. Why do you say that?
17    A. Monster has a very wide hit range.
18    Q. Very wide distribution?
19    A. Yes.
20    Q. As opposed to say local newspapers?
21    A. Hm Hm.
22    Q. So you can solicit a greater range of
23  candidates by placing ads on Monster? Is that fair
24  to say?

Page 39

1    A. Yes.
2    Q. Do you have any intentions of using any
3  other online websites for advertisements?
4    A. I may. Right now I don't have any, no. But
5  down the road, certainly, we would look at, you
6  know, the best opportunity --
7    Q. What do you mean by down the road? Do you
8  think you'll be doing it this year, for example?
9    A. Perhaps.
10    Q. Would it be fair to say that as the economy
11  is picking up specifically in the professional
12  placement end, that you find yourself in a position
13  where you'd be better able to afford these types of
14  -- these types of online offerings?
15    A. Yes.
16    Q. Do you happen to know how much it cost to
17  place an ad on Monster?
18    A. I think it's anywhere --
19       (Pause.)
20    A. -- from 385 to $400 an ad.
21    Q. How much does it cost to place, you know, a
22  similar ad in The Globe?
23    A. It's hard to say. It depends on what you're
24  placing and where it's running. I mean I don't

Page 40

1  know.
2    Q. Less than that?
3    A. Yes.
4    Q. Have you ever searched for resumes for --
5  strike that.
6       Have you ever searched resumes of
7  candidates for clients of yours on monster.com as
8  opposed to placing an ad?
9    A. Yes.
10    Q. What period of time have you done that for?
11    A. Probably about a year.
12    Q. The last --
13    A. Maybe a little bit longer. We've had access
14  to, yes.
15    Q. Do you do that regularly?
16    A. Hm Hm. Yeah.
17    Q. By regularly how frequently would you say
18  you do that?
19    A. Once a day.
20    Q. Do you have to pay Monster for that -- for
21  the ability to search resumes?
22    A. Yes.
23    Q. And --
24    A. I'd like it clarified it's not just me.

Page 41

1  It's the entire company. Every office has access to
2  it. And although I don't have the exact cost, if
3  you break it up per office, it's not that expensive.
4    Q. Could you describe for me the process by
5  which you search resumes for professionals on
6  monster.com?
7    A. You search for employees. And there's a
8  search category. You type in what you're looking
9  for. In other words, field service engineer,
10  Massachusetts within the last thirty days, search.
11  It'll pull up all the candidates in Massachusetts
12  who are field service engineers.
13    Q. Okay. Is there a general sales category?
14    A. There is a general sales category.
15    Q. Do you search under that category?
16    A. Yes.
17    Q. The intent --
18    A. I search -- I try to get a search for
19  specific -- if I'm looking for a sales manager,
20  sales management, you know, all sales managers come
21  up.
22    Q. What other categories do you recall
23  searching under?
24    A. Administrative. Engineering. Sales.

11 (Pages 38 to 41)

# EXHIBIT 2

Mary C. Casey

Page 78

```
1        MR. MELTZER:  Objection.  I'm going to
2   invoke attorney-client privilege on this.  The
3   engagement directly between Diamond Staffing, Inc.
4   and their attorney is strictly privileged.
5        MR. PAPASTAVROS:  Well, what were we in
6   court for last week exactly?
7        MR. MELTZER:  We're not getting into the
8   communications, direct communications between --
9        MR. PAPASTAVROS:  In 2003?
10       MR. MELTZER:  2003.
11       MR. PAPASTAVROS:  Do you want me to go call
12  the Court right now?
13       MR. MELTZER:  Do you want to go call the
14  Court right now and say that you're inquiring into
15  direct communication between an attorney and a
16  client?
17       MR. PAPASTAVROS:  You bet.
18       MR. MELTZER:  Go call the court.
19       MR. PAPASTAVROS:  You bet.  That's exactly
20  what we're talking about.  What you delineated in the
21  court transcript was communications relating to the
22  litigation and communications relating to the advice
23  that was rendered in 2003, which goes directly to
24  intent.  What she --
```

Page 79

```
1        MR. MELTZER:  What we're talking about here
2   is exactly that.  What those conversations --
3        MR. PAPASTAVROS:  In 2003?  In the summer
4   of 2003 before there was any communications involving
5   Diamond Staffing Solutions?  How could that possibly
6   relate to litigation?
7        MR. MELTZER:  Well, since she's not going
8   to answer the question, we're not going to get into
9   that.  It does relate to the litigation and I'm
10  invoking the privilege on that.
11       MR. PAPASTAVROS:  It relates to the
12  litigation with Diamond Staffing Solutions?
13       MR. MELTZER:  I'm saying it relates to a
14  communication that directly --
15       MR. PAPASTAVROS:  Go ahead, Rob.
16       MR. MELTZER:  I'm saying the communications
17  between the client or the prospective client and the
18  attorney are privileged, and I'm instructing not to
19  answer.
20       MR. PAPASTAVROS:  And just because we had a
21  discourse on the record, these are communications in
22  the summer of 2003 between Ms. Casey and Mr. Vaccaro
23  regarding the prospective new entity, correct?  That
24  was the question.  I just want to get that crystal
```

Page 80

```
1   clear.
2        MR. MELTZER:  What I'm saying is
3   communications that related to the commencement or
4   employment relationship between the attorney and the
5   client, the purpose of providing legal service are
6   privileged and you're encroaching on that area.
7        MR. PAPASTAVROS:  Okay.  Off the record.
8        (Discussion off the record.)
9        (Recess at 11:38 a.m.,
10       resumed at 11:40 a.m.)
11       MR. PAPASTAVROS:  Before we went off the
12  record and Mr. Meltzer and Ms. Casey took a break,
13  there was a question pending concerning the
14  discussions between Ms. Casey and Mr. Vaccaro in the
15  summer of 2003 regarding a prospective new company.
16  And there was an instruction not to answer that
17  question.
18       Is the position the same?
19       MR. MELTZER:  The position is the same.
20       MR. PAPASTAVROS:  So you're instructing the
21  witness not to answer that question?
22       MR. MELTZER:  That's correct.
23  BY MR. PAPASTAVROS:
24    Q.  Are you following your attorney's -- Well,
```

Page 81

```
1   are you following Mr. Meltzer's instruction,
2   Ms. Casey?
3     A.  Yes, I am.
4     Q.  At some point in time, Ms. Casey, did you
5   have discussions with Mr. Vaccaro regarding names for
6   a new company that he was considering establishing in
7   the summer of 2003, in or about the summer of 2003,
8   I should say?
9     A.  I did have discussions.
10    Q.  What were the nature of those discussions?
11       MR. MELTZER:  I'm going to object to that,
12  attorney-client privilege, instruct not to answer.
13  BY MR. PAPASTAVROS:
14    Q.  Are you going to follow Mr. Meltzer's
15  instruction, Ms. Casey?
16    A.  Yes.
17    Q.  At some point in time, did Mr. Vaccaro
18  provide you with a list of names that have been come
19  up with concerning a new company that he was
20  considering establishing in the summer of 2003?
21    A.  Could you restate the question?
22    Q.  Yes, sure.  I'll try.  In or about the
23  summer of 2003, did Mr. Vaccaro provide you with a
24  list of names that were being considered for a new
```

21 (Pages 78 to 81)

Mary C. Casey

1  company that he was considering establishing?
2      A.  He provided me with names.
3      Q.  Do you remember how many names there were?
4      A.  I believe about a dozen.
5      Q.  And did he provide those names to you in an
6  in-person meeting?
7      A.  I don't recall.
8      Q.  It may have been over the phone or in
9  person?  You can't recall, as you sit here today?
10      A.  Correct.
11      Q.  And do you recall ever receiving a written
12  list of those names?
13      A.  I don't recall receiving a list of names,
14  a written list of names.
15      Q.  Do you recall writing down those names when
16  you spoke to Mr. Vaccaro?
17      A.  Yes.
18      Q.  Do you recall taking any other notes in
19  this discussion with Mr. Vaccaro?
20      A.  No.
21      Q.  Have you searched for that list of names in
22  conjunction with making documents available that are
23  responsive to the document request in this case?
24      A.  I looked for anything related to the case.

1  There was no list.
2      Q.  You were not able to locate such a list?
3      A.  Correct.
4      Q.  And what was the sum and substance of this
5  discussion with Mr. Vaccaro?
6          MR. MELTZER:  Objection.  I'm going to
7  instruct not to answer the terms of these
8  conversations.
9  BY MR. PAPASTAVROS:
10      Q.  Are you going to follow Mr. Meltzer's
11  instruction on that, Ms. Casey?
12      A.  Yes.
13      Q.  Was this in one conversation with
14  Mr. Vaccaro or more than one?
15      A.  More than one.
16      Q.  How many?
17      A.  I don't recall.
18      Q.  More than two?
19      A.  Yes.
20      Q.  More than three?
21      A.  Yes.
22      Q.  More than four?
23      A.  I believe so.
24      Q.  More than ten?

1      A.  I don't recall.
2      Q.  Somewhere between four and ten, do you
3  think?
4      A.  That's correct.
5      Q.  Were any of those discussions in person?
6      A.  I don't recall.
7      Q.  Can you recount for me the sum and
8  substance of any of those discussions with
9  Mr. Vaccaro, as you sit here today?
10          MR. MELTZER:  Objection.  I'm going to
11  instruct not to answer that question.
12          MR. PAPASTAVROS:  Grounds are?
13          MR. MELTZER:  Same thing.  Sum and
14  substance that's attorney-client privilege.  Instruct
15  not to answer.
16  BY MR. PAPASTAVROS:
17      Q.  Are you going to follow your attorney's
18  instruction?
19          MR. MELTZER:  I represent the corporation.
20          MR. PAPASTAVROS:  Understood, Mr. Meltzer.
21  BY MR. PAPASTAVROS:
22      Q.  Are you going to follow Mr. Meltzer's
23  instruction, Ms. Casey?
24      A.  Yes.

1      Q.  When you received this list, what did you
2  do next?  Well, strike that.  That's not completely
3  accurate.
4          The question is, after you wrote down
5  the list of the names, what did you do next?
6      A.  After I wrote a name down, I would check
7  it.
8      Q.  Did you write down all 12 names during one
9  conversation or was it over the course of more than
10  one conversation?
11      A.  I believe it was over the course of more
12  than one conversation.
13      Q.  What did you do to check the names?
14      A.  Checked with the Secretary of State's
15  Office and the Patent and Trademark Office.
16      Q.  Did you follow the same procedure with
17  respect to checking out all the names, or were there
18  any deviations?
19      A.  There were deviations.
20      Q.  As you sit here today, what are the names
21  that you can remember checking out?
22      A.  Renaissance --
23      Q.  Why don't I show you what I'll mark as --
24  Let's get the exhibit number.

Mary C. Casey

Page 90

1    A.  It may have been any of the following: Alta
2  Vista, Yahoo, Dogpile, Google.  I don't even know if
3  Google was available then.  Then there were a number
4  of other ones that were popular that they had.  I
5  don't recall their names.
6    Q.  It may have been any one of those?
7    A.  Any one of them or a couple of them.
8    Q.  What did you find out when you ran a USPTO
9  search with respect to "Diamond Staffing"?
10    A.  I could not find any other mark either
11  applied for or registered that had anything to do
12  with the goods and services that my client was
13  contemplating.
14    Q.  What were those goods and services?
15    A.  Recruiting and hiring.
16    Q.  And how did you learn that those were the
17  goods and services?
18        MR. MELTZER:  I'm going to object.  That's
19  getting into communication with client.  I'm going to
20  instruct her not to answer that question.
21  BY MR. PAPASTAVROS:
22    Q.  Are you going to follow Mr. Meltzer's
23  instruction?
24    A.  Yes, I am.

Page 91

1    Q.  Did you search a particular class of goods
2  and services in the USPTO database?
3    A.  I searched several classes but did an
4  extensive search on anything to do with "Diamond" and
5  then anything to do with "personnel," "staffing,"
6  "human resources."  So I tried to think of as many
7  combinations as I could.
8    Q.  What classes were those that you searched?
9    A.  As I said, I looked at all of the
10  "Diamonds."  But the PTO is divided up into goods and
11  services.  So I would have looked at all of the
12  services classes because they had a reclassification.
13    Q.  And what did you do with respect to the
14  three Secretary of State's Offices that you
15  referenced?
16    A.  Called and made sure the name was
17  available, or did an Internet search to made sure the
18  name was available.
19    Q.  Do you recall what you did with respect to
20  each state?
21    A.  Massachusetts I know I looked up online.
22  I may have actually called them too.  I -- I may have
23  done a name reservation.  I'm not sure.
24    Q.  Would you have printed out results from any

Page 92

1  of the online searches at that time?
2    A.  Probably not.  It would depend on how many
3  entries came back.
4    Q.  Do you recall what database you looked at
5  online for Massachusetts?
6    A.  It's the corporations division database.
7    Q.  At the Massachusetts Secretary of State's
8  Office?
9    A.  Um-hum.
10    Q.  And do you recall what names you ran
11  through that database?
12    A.  It comes back in a list form.
13    Q.  Well, did you plug in any names to generate
14  that list?
15    A.  "Diamond."
16    Q.  So you got back a list for all entities
17  that are incorporated with the name "Diamond"?
18    A.  Yes.
19    Q.  Do you know if you still have that list?
20    A.  I don't think I printed that list.
21    Q.  Right.
22    A.  It's still available.  I mean, you can go
23  on today and do it.
24    Q.  What terms did you run through the search

Page 93

1  engine or search engines?
2    A.  I don't recall.
3    Q.  What did you come up with when you ran that
4  search or searches?
5    A.  Could you be more specific?
6    Q.  What were the results of the search or
7  searches?
8    A.  There was a very prominent "Diamond Medical
9  Staffing."  There were other "Diamonds" in different
10  industries.
11    Q.  Such as what?
12    A.  I think there was a dental.  I think there
13  was a legal.  There was an asbestos.
14    Q.  Anything else?
15    A.  Which search are we talking about?
16    Q.  On the search engine.  You said there was
17  one or more searches.  That's why I'm framing it that
18  way.  You couldn't recall.  If you can recall how
19  many searches you made, please let me know.
20    A.  There was a jewelry.
21    Q.  Anything else?
22    A.  Not that I recall.
23    Q.  Was the jewelry entity the plaintiff in
24  this case, Diamond Staffing Solutions?

24 (Pages 90 to 93)

Mary C. Casey

Page 94

1    A.  I believe so.
2    Q.  And when did you run this search?
3    A.  Probably the summer of 2003.
4    Q.  Do you recall visiting Diamond Staffing
5  Solutions' Website at that time?
6    A.  I did not visit the Website.
7    Q.  Did you print out the results from this one
8  or more searches on the search engine?
9    A.  There were a lot of pages.  No, I did not.
10   Q.  Did you do anything to make sure that these
11  results wouldn't pose a problem for your client using
12  the name "Diamond Staffing"?
13   A.  Could you be more specific?
14   Q.  Well, the question is, what did you do with
15  these search engine results, if anything?
16   A.  Relayed them to my client.
17   Q.  And what did you advise your client in that
18  regard?
19        MR. MELTZER:  Objection.  I'm going to
20  instruct not to answer that question.
21        MR. PAPASTAVROS:  And the grounds are?
22        MR. MELTZER:  Attorney-client privilege
23  absolutely.
24

Page 95

1  BY MR. PAPASTAVROS:
2    Q.  Are you going to follow Mr. Meltzer's
3  instruction in that regard, Ms. Casey?
4    A.  Yes.
5    Q.  Did you reach a conclusion as to whether or
6  not Diamond Staffing Solutions posed a problem with
7  your client using "Diamond Staffing, Incorporated" at
8  the time you ran the search in the summer of 2003?
9    A.  It was so far down in the search.  I don't
10  even believe there was a Website related to it, and
11  it was exclusively in the jewelry industry.
12   Q.  How did you know it was exclusively in the
13  jewelry industry if you didn't look at the Website?
14   A.  Because it said it on the little blurb.
15   Q.  What did it say, to the best of your
16  recollection?
17   A.  I don't believe it had an address.  I
18  believe it had the name.  And I believe it had
19  "jewelry industry," focusing on the jewelry industry.
20   Q.  So it may or my not have had other things
21  in there, but you can't recall, as you sit here
22  today?
23   A.  It was very limited.
24   Q.  By "very limited," what do you mean?

Page 96

1    A.  It didn't have an address.  It didn't have
2  a telephone number.  It just had a very short
3  description.
4    Q.  Do you remember a domain name being
5  associated with it?
6    A.  No, I do not.  I don't think it had one.
7    Q.  What makes you say that?
8    A.  Because I think I would have alerted my
9  client.
10   Q.  Well, when you run Google searches or other
11  search engine searches, aren't there typically links
12  to the respective domain names?
13        MR. MELTZER:  In what year?
14        THE WITNESS:  Yes.
15        MR. PAPASTAVROS:  Let's say in the summer
16  of 2003, the time she ran this search.
17        THE WITNESS:  Not on the third page, on the
18  third or fourth page, when you're 50 or a number of
19  entries down, the information was very limited.
20  BY MR. PAPASTAVROS:
21   Q.  Is it your testimony that you came across
22  Diamond Staffing Solutions on the third or fourth
23  page of the results of this search engine search?
24   A.  It's my testimony they were not on the

Page 97

1  first page.  They were probably not on the second
2  page.  They were most likely on the third page or
3  after the third page.
4    Q.  Why were they most likely not on the second
5  page?
6    A.  I think the second page at that time had a
7  lot more description, and I don't remember much of a
8  description.
9    Q.  Is it your practice and procedure to print
10  out results from search engine searches that you ran
11  in clearing names for your client?
12   A.  If I had run anything, I would have run the
13  first page, not the 50 pages associated with it.
14   Q.  And you believe you had a conversation with
15  Mr. Vaccaro following your searches of the "Diamond
16  Staffing" name?
17   A.  Yes, I did.
18   Q.  Was that one conversation or more than one?
19   A.  I don't recall.
20   Q.  And this was also in the summer of 2003?
21   A.  May have been September.  I think the
22  summer, probably going to late summer.
23   Q.  So just to recap then, you ran a USPTO
24  search for "Diamond Staffing."  Well, strike that.

25 (Pages 94 to 97)

Mary C. Casey

Page 98

1          Do you recall the precise words you
2  put into the search engine or engines which triggered
3  the results that we've been talking about?
4      A.  I put many words in but I don't recall
5  them, all of the words that I put in.  I can only
6  guess.
7      Q.  What do you recall, as you sit here today?
8      A.  I put in "Diamond" and things associated
9  with diamonds.  And I put in "staffing" and
10 "personnel" and things associated with staffing and
11 personnel.  I probably also put in "staff."  I
12 probably put in some misspellings of "Diamond," as
13 well as other jewelry-type names.
14     Q.  Did you put in simply "Diamond Staffing"?
15     A.  Yes.
16     Q.  So does this discussion trigger your
17 recollection that there was more than one search on
18 the search engines then?
19     A.  I thought we were talking about the USPTO.
20     Q.  No.  I was talking about the search
21 engines.  And I'm sorry if there was any ambiguity.
22 But my question -- I did segue back -- my question
23 was, do you recall the precise words you put into the
24 search engine or engines that triggered the results

Page 99

1  that we've been talking about?  Not at the USPTO
2  database but on the search engine.
3          MR. MELTZER:  I thought you meant search
4  engine on the USPTO.
5          MR. PAPASTAVROS:  I understand.
6          THE WITNESS:  Yes.  What was the question
7  before that?
8  BY MR. PAPASTAVROS:
9      Q.  My question stands.  I think you understand
10 it now, right, Ms. Casey?
11     A.  Well, I was answering about the USPTO.
12     Q.  I understand.  That's why I'm reiterating
13 the question.
14     A.  I put in "Diamond Staffing" on the search
15 engines.
16     Q.  Did you put in anything else on the search
17 engine or engines?
18     A.  I believe so.
19     Q.  And what was that?
20     A.  I don't recall.
21     Q.  Now, you've been talking about results from
22 a search engine search in which you believe that the
23 reference to the plaintiff, Diamond Staffing
24 Solutions, came up on the second or, more likely, the

Page 100

1  third or following pages.  Was that the results from
2  the search "Diamond Staffing" that was entered in in
3  the search engine?
4      A.  I believe so.
5      Q.  And just to backtrack then, what were the
6  searches that you ran on the USPTO search engine?
7      A.  That was what I was talking about.
8      Q.  I understand.  I just want to make it clear
9  for the record.
10     A.  When I did the USPTO search, I did a much
11 more extensive search because it brings back better
12 information.  So that was when I would look, and I
13 would look at "Diamond" and things associated with
14 the diamond industry and then "staffing,"
15 "personnel," and things associated with anything to
16 do with placement.  So I would do a much greater
17 level of search.
18          When I did the search engine search,
19 it was a much more refined search because search
20 engines bring back so much extraneous information.
21     Q.  In the summer of 2003, did you have an
22 understanding that trademark or service mark rights
23 were acquired by priority of use and not
24 registration?

Page 101

1      A.  Could you rephrase your question?
2      Q.  Sure.  In the summer of 2003, did you have
3  an understanding that trademark or service mark
4  rights were acquired by use of a particular name
5  rather than registration?
6      A.  That is not anything that I -- that -- It's
7  just not clear what you're saying.  I wouldn't say
8  it's --
9      Q.  Let me ask you this question.  In the
10 summer of 2003, what was your understanding as to how
11 an entity acquired rights to a trademark or service
12 mark?
13     A.  You have to have a mark that is
14 registerable.  Then you have to be known in the
15 hearts and minds of your consumer as the person who
16 provides that service.
17     Q.  In the summer of 2003, did you do any
18 specific domain name search involving "Diamond
19 Staffing"?
20     A.  No.
21     Q.  Did you have any discussions with anyone at
22 Diamond Staffing, Incorporated regarding the domain
23 name that the new company would be using?
24     A.  They told me the domain name was available.

26 (Pages 98 to 101)

Mary C. Casey

Page 102

1  The domain name they wanted was available.
2      Q.  Which domain name was that?
3      A.  In the summer of 2003?
4      Q.  Correct.
5      A.  What my understanding was?  Whatever they
6  wanted as the domain name, which was something to do
7  with -- they told me Diamond Staffing, Incorporated
8  or whatever they said.  They said the domain name is
9  available.
10     Q.  Other than what you've testified about, did
11 you do any other common law searches to determine
12 whether the term "Diamond Staffing" was available?
13     A.  I don't believe so.
14     Q.  Did you have any discussions with anyone at
15 Diamond Staffing regarding the running of a full
16 search report on the term "Diamond Staffing"?
17     MR. MELTZER:  I'm going to object and
18 instruct not to answer as to questions about contents
19 of conversations.
20 BY MR. PAPASTAVROS:
21     Q.  Are you following your attorney's --
22     MR. MELTZER:  I'm not --
23 BY MR. PAPASTAVROS:
24     Q.  Are you following Mr. Meltzer's instruction

Page 103

1  on that?
2      A.  Yes.
3      Q.  What advice, if any, did you give to
4  Mr. Vaccaro regarding the availability of "Diamond
5  Staffing, Inc." as a name for a company?
6      MR. MELTZER:  I'm going to object and
7  instruct not to answer.
8      MR. PAPASTAVROS:  And the grounds are?
9      MR. MELTZER:  Attorney-client privilege.
10 BY MR. PAPASTAVROS:
11     Q.  Are you going to follow Mr. Meltzer's
12 instruction?
13     A.  Yes.
14     Q.  Did you ever ask any third party to run a
15 full search on "Diamond Staffing"?
16     A.  No.
17     Q.  Did you ever contemplate having a third
18 party run a full search on "Diamond Staffing"?
19     A.  I don't recall.
20     Q.  Did you ever ask Thomson & Thomson to run a
21 full search on "Diamond Staffing"?
22     A.  No.
23     Q.  Did you ever ask Thomson & Thomson to run
24 any search on "Diamond Staffing"?

Page 104

1      A.  No.
2      MR. PAPASTAVROS:  Take a quick break for a
3  minute.
4          (Recess at 12:26 p.m.,
5          resumed at 12:33 p.m.)
6  BY MR. PAPASTAVROS:
7      Q.  Ms. Casey, when you ran the search engine
8  search in the summer of 2003 and you came across the
9  reference to "Diamond Staffing Solutions," was there
10 a link to any sort of Website?
11     A.  No, I don't believe so.
12     Q.  Now, as you sit here today, is it fair to
13 say there could have been or there may not have been?
14 You can't recall?
15     A.  I don't believe there was.
16     Q.  What's the basis for that?
17     A.  Just my memory.
18     Q.  And did you do any other investigation with
19 respect to "Diamond Staffing Solutions" at that time?
20     A.  No.
21     Q.  Did you do any other investigation with
22 respect to "Diamond Staffing Solutions" at any point
23 in time?
24     A.  Could you be more specific?

Page 105

1      Q.  Well, let me get there.  Other than the
2  summer of 2003, did you run a search inputting the
3  name "Diamond Staffing" into a search engine or
4  engines on the Internet at any time?
5      MR. MELTZER:  Including after litigation
6  was commenced?
7      MR. PAPASTAVROS:  Well, I don't really want
8  to get into those issues.
9  BY MR. PAPASTAVROS:
10     Q.  So let's say 2003-2004.
11     A.  I don't recall.  I don't think I did.
12     MR. PAPASTAVROS:  Let's mark this as the
13 next exhibit.
14     MR. MELTZER:  I think we already marked
15 this one at one of the earlier ones.  I think it's
16 either 5 or 6.
17         (Discussion off the record.)
18 BY MR. PAPASTAVROS:
19     Q.  We'll refer back to what's been previously
20 marked as Exhibit 5 and ask you, Ms. Casey, if you
21 can please review this and let me know when you're
22 done.
23     A.  I'm done.
24     Q.  Are you familiar with this document, ma'am?

27 (Pages 102 to 105)

# EXHIBIT 3

CONFIDENTIAL
Francis G. Vaccaro

Page 50

1  Jersey are the -- well, we employ quite a few
2  people.
3      Q.  When did you first place in New Hampshire?
4      A.  I think that was last year.
5      Q.  Two thousand four?
6      A.  Yeah.
7      Q.  Do you recall when?
8      A.  Probably when Chelmsford opened.  So
9  whenever Chelmsford opened that's when we probably
10  did it 'cause Nashua is 20 minutes away from
11  Chelmsford.
12      Q.  What client did you place candidates with in
13  Nashua?
14      A.  Call center.  Customer call center.  That's
15  it.  And I think one of our clients -- we have an
16  agricultural license and one of our clients is
17  Wilson Farms of Mass. -- of Lexington, and they have
18  a farm up there.  I don't know where it is up there,
19  but they take our people and put 'em to work.
20  That's it.
21      MR. PAPASTAVROS:  Off the record.
22      (Off the record.)
23      Q.  You first placed then in New Hampshire after
24  the Chelmsford, Massachusetts office came on board

Page 51

1  in August of 2004; is that correct?
2      A.  To my knowledge, yes, sir.
3      Q.  When did you make the placements in New York
4  and Philadelphia?
5      A.  Philadelphia, -- Philadelphia's actually an
6  internal employee.  So that's -- the reason I
7  answered the question that way is because we have
8  people working in every -- every one of those
9  states.  So Philadelphia was an internal employee.
10      Q.  You didn't actually -- strike that.
11      A.  No.  I know what you're going to ask.
12  Sorry.
13      Q.  Mr. Vaccaro, if you could just wait until I
14  finish the question.  What do you mean by -- I think
15  I --
16      MR. PAPASTAVROS:  Off the record.
17      (Off the record.)
18      Q.  You indicated that you had an internal
19  employee in Philadelphia.  Could you elaborate on
20  what you mean by that?
21      A.  Yes.  Someone who works in my Jersey office
22  that commutes back and forth to Philadelphia.
23      Q.  That's not a placement with a client then?
24      A.  No, sir.  So that's wrong.

Page 52

1      Q.  DSI has never placed an employee --
2      A.  Nobody in Pennsylvania.  Take that one off
3  now that I'm thinking about it.  It's an employee of
4  mine.
5      Q.  How about New York?
6      A.  Yes.  When was that placed?  Sometime in
7  2004.  I think it's for U-Haul if you're interested.
8      Q.  What placement was that office made out of?
9      A.  New Jersey.
10      Q.  Can you place in time when this U-Haul
11  placement would have occurred?
12      A.  Sometime in 2004.  That was in Brooklyn.  So
13  it's not a -- it's 15 minutes from Elizabeth if you
14  take it over the bridge.  So it's kind of -- the
15  burrows are pretty tight.
16      Q.  Do you know if DSI's computer records enable
17  to sort this information to find out when placements
18  were made and where?
19      A.  It does not.  It does not.  Again, the paper
20  trail.  I'm going to have to look for a paper trail
21  as I stated.
22      Q.  Were both placements in New York made with
23  U-Haul, or were there two separate placements?
24      A.  No.  To my knowledge, they're both with

Page 53

1  U-Haul -- they're not there anymore.
2      Q.  Those are the only two placements that DSI's
3  ever made in New York?
4      A.  To my knowledge, yes.
5      Q.  Would anybody else have better knowledge
6  with respect to those placements than you?
7      A.  No.
8      Q.  And do you recall how many placements DSI
9  made at the Nashua, New Hampshire call center?
10      A.  Three or four.  That's it.
11      Q.  And when were the other placements made in
12  New Hampshire?
13      A.  That's the Wilson Farm people that go up to
14  six people -- that happens seasonally.  So I think
15  they go up for the fall season.  They go up once in
16  a while now in the spring.  I guess they're going to
17  take them up two now.  They just go and pick the
18  fruit.
19      Q.  Let me ask you a question.  Were those
20  placements actually made with Wilson Farms in
21  Lexington?
22      A.  Yes.
23      Q.  Then Wilson Farms might allow those
24  employees to commute back and forth to New

CONFIDENTIAL
Francis G. Vaccaro

Page 58

1    Q. You're referring to the third page of what's
2 been marked Exhibit 3?
3    A. Yes, sir. Sorry.
4    Q. That's okay.
5    A. Yeah, under D. Wake up, Frank. Dean
6 Warehouse. You can see it a little bit below the
7 middle of the page. Cumberland, Rhode Island.
8    Q. Any other placements come to mind in Rhode
9 Island?
10    A. You know, I'm just trying to think. Along
11 the way you do some business. I think Dame
12 Associates, they're in Rhode Island in Lincoln --
13 No, they're not. Strike that.
14       They're in Massachusetts. There's
15 another one that's in Rhode Island. They've come
16 and gone. Those are the two big ones in Rhode
17 Island right now. They're consistent. That's it
18 for Rhode Island to my knowledge. I pretty much
19 know all these clients.
20       (Pause.)
21    A. What may happen in our business is you get a
22 lot of client referrals. So a client may refer us
23 to someone else. I'll look at it. If a client like
24 Wilson Farms refers me to somebody else, I know it's

Page 60

1 something that's required, you know, it's up to you
2 attorneys, I can guess the answer. I believe that
3 it's probably a company that does not bill out of
4 New Hampshire. I'm having a freeze on it. It's a
5 customer service center -- call center. Pretty
6 simple job.
7       I can't find it here. I'm sorry.
8    Q. How many placements has DSI made in
9 Connecticut?
10    A. Again, over the year's time, I'd have to go
11 back and check. Right now I think we have about 20
12 to 25 people working in Connecticut.
13    Q. Are those people working for any
14 Connecticut-based enterprises?
15    A. Yes. Wizard Candle comes to mind. Yep.
16 Wizard Candle's on the last page. Kelly Wingle,
17 Putnam. They're at Putnam. We do business with
18 Staples in Connecticut. Again, all distribution.
19 We do that with a company called Talent Tree for
20 Staples. I also have Staples distribution center I
21 bill directly you'll see on there.
22       Now the problem is -- see it's Dayville
23 -- Dayville, Connecticut, I don't know what page
24 this is.

Page 59

1 a good referral, and I can attack that. So that
2 happens during the year. And I couldn't put a
3 finger on that. That happens quite often when you
4 do a good job.
5    Q. Mr. Vaccaro, what was the entity that you
6 placed candidates with that commuted to the Nashua,
7 New Hampshire call center?
8    A. What was the entity?
9    Q. Yeah, the name of the company.
10    A. I'll have to look it up. It's new to me,
11 and off the top of my head -- I'm having a brain
12 freeze, but I'll find it for you. It's on here.
13       (Pause.)
14    A. I wish I had my computer here.
15       (Pause.)
16    A. What it might be is where we bill them might
17 not be the Nashua, New Hampshire address, but I can
18 -- you know --
19    Q. In fact, I think your previous testimony was
20 that the company was not based in New Hampshire, but
21 the employees commuted?
22    A. Yeah, and I'm pretty sure that -- you know,
23 we may be billing them to another location. And I
24 don't have the answer. But, obviously, if that's

Page 61

1    Q. It's okay. It's in alphabetical order.
2 so --
3    A. Yes. Yes, it is. We do business with them.
4 We have a company, geez, that I do business with.
5 See, I've visited most of these clients. Of the
6 list of people here, I don't think there's been too
7 many clients I haven't been to. Sometimes,
8 unfortunately, in this business when you're growing
9 you can't remember every one of them. The one I'm
10 referring to is a cardboard company in Connecticut.
11 We've been with them a while.
12    Q. As you sit here today, Mr. Vaccaro, can
13 you --
14    A. Yes?
15    Q. -- at least estimate how many
16 Connecticut-based companies you've done business
17 with?
18    A. Five maybe.
19    Q. Since November 2003?
20    A. Since -- No. Since probably -- when did we
21 open Webster? March of 2004. Whenever it was I
22 opened Webster, that's when we started doing
23 business in Connecticut. That office abuts the
24 Connecticut line.

16 (Pages 58 to 61)

CONFIDENTIAL
Francis G. Vaccaro

Page 62

1          MR. MELTZER: Can we take thirty
2  seconds?
3          MR. PAPASTAVROS: (Nods head.)
4          (Off the record.)
5      Q. Did you want to change any of your
6  responses, Mr. Vaccaro?
7      A. I don't think so.
8      Q. Pursuant to your consultation with your
9  attorney?
10     A. No.
11     Q. Okay. To clarify one point, Mr. Vaccaro,
12 both the Wilson Farms placements and the call center
13 placements occurred after your Chelmsford office
14 opened --
15     A. No, no.
16     Q.  -- in August 2004?
17     A. No. Sorry. Wilson Farms --
18     Q. I should say the Wilson Farms New Hampshire
19 placements.
20     A. Wilson Farms always sent people to New
21 Hampshire since I've been doing business with them
22 which I've been doing business with Wilson Farms
23 since -- since I opened. So that one is different.
24         The other one, yes, correct, that other

Page 63

1  client, the call center, was not done until I opened
2  in Chelmsford.
3      Q. But all the Wilson Farms placements are done
4  with their Lexington, Massachusetts location, and
5  then they determine who's going to be -- just to
6  finish -- they would determine who would be employed
7  in their farm in New Hampshire?
8      A. No. That's not how it works.
9      Q. Maybe you could elaborate on it then?
10     A. Yeah, I'd be happy to. They ask us for
11 people for Wilson Farms. They tell us that they're
12 going to send 6, 10, 8, 5 -- whatever they decide;
13 it's their business -- to New Hampshire. And we
14 pick the people that we want to send because we want
15 to make sure we send the right quality person to do
16 the job out there.
17         So that's -- that's how it works.
18     Q. And are those employees sometimes employed
19 in Massachusetts and sometimes employed in New
20 Hampshire, or exclusively in New Hampshire?
21     A. When the New Hampshire business is opened
22 for temporary staffing, they keep the same people
23 for 30 days, 20 days. Then when they come back,
24 hopefully those are the cream of the crop. So we

Page 64

1  put them to work in Massachusetts.
2      Q. So it's temporary employment in New
3  Hampshire then?
4      A. Hm Hm. Yes.
5      Q. Correct?
6      A. Yes.
7          (Pause.)
8      Q. Can you give me an estimate as to how many
9  placements DSI has made in New Jersey since it was
10 incorporated?
11     A. Three thousand.
12     Q. Is DSI registered to do business in New
13 Jersey?
14     A. Yes, we are.
15     Q. Do you know if DSI has made any filing for
16 state trademark rights in New Jersey?
17     A. To my knowledge, we have.
18     Q. When did DSI first make placements in New
19 Jersey?
20     A. In November of 2003.
21     Q. Would you be able to give me an estimate as
22 to how many placements it made with clients in the
23 two months before New Year's 2004?
24     A. Fifty, 60. In that range.

Page 65

1          (Pause.)
2      A. In December 2004 we picked up another client
3  in New Jersey that was about another 50. So
4  probably a hundred in December and 50 in November to
5  my knowledge.
6          MR. PAPASTAVROS: Could we mark this as
7  the next exhibit?
8          (Exhibit No. 4 marked
9          for identification.)
10     Q. If you could please review, Mr. Vaccaro,
11 what's been marked as Exhibit 4 and let me know when
12 you're done.
13     A. Sure.
14         (Pause.)
15     A. This is a document that I signed yesterday
16 and answered these questions. I'm familiar with
17 this document.
18     Q. Could you please identify it for the record?
19     A. Yes. This is my responses to the questions
20 for -- interrogatory I guess. Is that correct? I
21 mean to the best of my knowledge.
22     Q. On page 5 of this document, Mr. Vaccaro --
23     A. Yes?
24     Q.  -- is that your signature?

17 (Pages 62 to 65)

CONFIDENTIAL
Francis G. Vaccaro

Page 78

1  conversations with her --
2      A. Yes.
3      Q. -- the followup question to which was what
4  were the nature of those conversations?
5      A. Sure.
6          MR. MELTZER: Go ahead and answer it.
7      A. Okay. Basically Mary was an advisor, and
8  there were some names on that list that she felt I
9  shouldn't even go near, even though we could have a
10 shot at having those names. And because of that
11 relationship, I just struck those names from the
12 list.
13         That was to me further extent of her
14 doing the due diligence I needed to successfully
15 acquire the name.
16     Q. Did you have a conversation with respect to
17 Diamond Staffing, Inc.?
18     A. Yes, we did.
19     Q. What was the nature of that conversation?
20     A. She felt there was no one, nothing at all
21 that would enable us from having that name.
22     Q. Did she express any reservations whatsoever
23 regarding you going with that name?
24     A. No. None to my knowledge.

Page 79

1      Q. Have any reservations been expressed
2  following that point in time?
3          MR. MELTZER: Hold on a second.
4          THE WITNESS: Sorry.
5          MR. MELTZER: Nick, now we're going from
6  -- what time frame? You're now moving from intent
7  in selecting the name to subsequent legal advice
8  after the name was selected? That's getting closer
9  to the line that I've been concerned about.
10         (Pause.)
11         MR. MELTZER: You want to do a narrower
12 time frame?
13         MR. PAPASTAVROS: I'll try to rephrase.
14         MR. MELTZER: You see the point? At
15 some point somebody mentioned -- somebody for the
16 plaintiff starts mentioning the word "lawyer," and
17 now we're into potential litigation issues. At that
18 point those communications are I think strictly
19 privileged. That's not the same as intent in
20 selecting the name.
21         The only caveat is obviously any
22 comments made by the attorney to the plaintiff's
23 attorney which he has knowledge certainly is not
24 subject to that same objection.

Page 80

1      Q. When was the first time that you became
2  aware of the plaintiff Diamond Staffing Solutions,
3  Incorporated?
4      A. About a month after I opened. Somewhere, as
5  I stated prior, an e-mail came that she was going to
6  consult her attorneys about the name, and I
7  forwarded that to Attorney Casey.
8      Q. Was this approximately a month after you
9  selected Diamond Staffing Incorporated as a name?
10     A. No. We selected Diamond Staffing
11 Incorporated back in September. So it was roughly
12 two months.
13     Q. And when was the domain name
14 diamondstaffinginc.com registered?
15     A. I don't recall. But I think we have some
16 documentation that would say it was done. Mark
17 Donabedian would probably be able to answer that. I
18 believe it was in September also. In fact, it was.
19 I just don't know what date.
20     Q. Have you ever gone onto the website
21 diamondstaffinginc.com?
22     A. The only time I went on --
23 diamondstaffing.com?
24     Q. Correct.

Page 81

1      A. Diamond Staffing, Inc., is me. Yeah, if
2  she's Diamond Staffing -- if your -- I don't know.
3  I've seen her jewelry website. If that's her
4  website.
5      Q. We'll stipulate the plaintiff -- that
6  Diamond Staffing Solution, Inc.'s website is at
7  diamondstaffing.com.
8      A. I did -- I did. I did.
9      Q. And when was the first time?
10     A. November 2003.
11     Q. After you learned of --
12     A. After I had gotten that e-mail, that's when
13 I checked it out.
14     Q. Do you know if anyone else associated with
15 Diamond Staffing, Inc., accessed the plaintiff's
16 website prior to that point in time?
17     A. No one did. We didn't know she was in our
18 radar. We didn't know she existed.
19     Q. Did you ever give -- strike that.
20         Did you ever give Mr. Donabedian
21 instructions regarding the registration of a domain
22 name for your company?
23     A. Yeah, I told him to register
24 diamondstaffinginc.com.

21 (Pages 78 to 81)

CONFIDENTIAL
Francis G. Vaccaro

Page 110

1   issue?
2       A. There were a lot of name changes going on
3   with Ultimate Personnel and the contents are
4   confidential as to what happened. Then I just
5   decided to start a new business period. Break away
6   from it altogether and start fresh with a new group
7   of owners and a new group of people.
8       Q. The commencement of the new business had
9   nothing to do with the name change then, correct?
10      A. No, not -- not solely, no. I needed to get
11  a new job. So I needed a new company. So I mean
12  that's the confidential piece -- part.
13      Q. What was the name change you mentioned in
14  paragraph 4?
15      A. What was the name going to be?
16      Q. Well, no. The sentence says that you read
17  into the record we changed our name and signed an
18  agreement. My question is what was the name change?
19      A. Ultimate Staffing which is an infringement.
20  That's why we didn't do it. We had a lot of issues.
21  There's more confidential information which, unless
22  my lawyer instructs me, you know, it's sealed and
23  done. I started a new company.
24      Q. So the name was changed from Ultimate

Page 111

1   Personnel Limited to Ultimate Staffing?
2       A. We didn't physically do that. That was the
3   name we were trying to change to, and we were
4   prohibited.
5       Q. How were you prohibited?
6       A. By a trademark for Ultimate Staffing on a
7   federal basis.
8       Q. Was there litigation regarding that?
9       A. It's closed. There's no litigation -- we
10  never got to litigation. That's why I'm very
11  cognizant of trademark infringement.
12      Q. Were you the CEO of Ultimate Personnel?
13      A. Yes, I was.
14      Q. You were involved in the change of the name
15  from Ultimate Personnel to Ultimate Staffing?
16      A. I was involved in several discussions what
17  to do with the name. There was also some
18  confidential information that happened that -- I
19  mean unless I'm forced to in a court of law I was
20  told I can't talk about it. There is ongoing
21  litigation on that. It has to do nothing with --
22  nothing to do with Diamond Staffing, Inc., which is
23  an altogether different company.
24      Q. There's ongoing litigation regarding a name

Page 112

1   change from Ultimate Personnel to Ultimate Staffing?
2       A. I can answer now? No. There's ongoing
3   litigation which refers to why Ultimate Personnel as
4   it stood does not exist right now.
5       Q. Was there ever any threatened trademark or
6   service mark-related litigation concerning the name
7   Ultimate Staffing?
8       MR. MELTZER: Nick, I'm going to object
9   at this point. Under the scope of this deposition
10  under number 1 it refers to a name change from
11  Ultimate Personnel to Diamond Staffing. He's
12  testified it wasn't a name change. I think you're
13  well beyond the scope.
14      I've let him answer the questions up to
15  this point. At this point I think you're a little
16  too far afield. He is not here to testify on behalf
17  of that company that he's stated he's no longer
18  affiliated with.
19      MR. PAPASTAVROS: Are you instructing
20  him not to answer the question?
21      MR. MELTZER: I'm stating it's beyond
22  the scope.
23      Q. You can answer the question.
24      MR. MELTZER: To the extent it's getting

Page 113

1   anywhere close to something that's the subject of
2   the confidentiality, don't answer the question.
3       THE WITNESS: We're very close to the
4   confidentiality to be honest with you.
5       MR. MELTZER: Then don't answer it. I'm
6   not going to have you running afoul of that
7   confidentiality agreement.
8       A. Then I can't answer it.
9       (Pause.)
10      Q. If I could turn your attention, Mr. Vaccaro,
11  to paragraph 7.
12      A. Sure. Sure.
13      Q. Can you read that sentence into the record,
14  sir?
15      A. "Our sales for 2004 totaled 21 million
16  dollars and our projected sales for 2005 are 35
17  million dollars."
18      Q. Turning your attention to the
19  21-million-dollar 2004 number, do those sales all
20  relate to Diamond Staffing, Inc.?
21      A. Every one of them.
22      Q. And that is from the ten locations where
23  Diamond Staffing, Inc., is currently?
24      A. Well, yes. Some of them opened in the

29 (Pages 110 to 113)

CONFIDENTIAL
Francis G. Vaccaro

Page 122

1    Q. Do you know Miss Yolanda Wilder yourself?
2    A. No, sir, do not.
3    Q. Mr. Laravey is the person at DSI who knows
4  her?
5    A. Yes, he does.
6    Q. Have you had any discussions with
7  Mr. Laravey regarding this matter?
8    A. Yes, I did.
9    Q. What were the nature of those discussions?
10    A. The nature was that -- he explained the
11  whole story to me, and I quickly called Fast Lanes,
12  couldn't get any response, told Mr. Laravey to state
13  the facts and that I would refer it to our attorney,
14  and I did. And he stated the facts. We've never
15  heard a thing again from it.
16        According to my attorney, basically the
17  charge is insignificant towards us. We did not do
18  anything wrong. We reported it when it happened,
19  and that's it.
20    Q. Have you ever had any discussions with any
21  of your clients regarding Diamond Staffing
22  Solutions, Incorporated?
23    A. No, sir. They never even heard of them.
24    Q. Have you ever had any conversations with any

Page 123

1  candidates that you were considering placing with
2  your clients regarding Diamond Staffing Solutions,
3  Incorporated?
4    A. None to my knowledge. I've never had any
5  personally.
6    Q. Has any candidate ever asked you whether
7  Diamond Staffing Solutions, Incorporated and Diamond
8  Staffing, Inc., were one and the same company?
9    A. No, sir, it's never come up.
10    Q. Never come up with either a candidate or a
11  client?
12    A. No, sir.
13    Q. Do you know if anyone else at DSI has ever
14  had any conversations with any clients of yours
15  regarding Diamond Staffing Solutions?
16    A. None to my knowledge.
17    Q. Do you know if anyone else at DSI has had
18  any conversations with any candidates of yours that
19  you were considering placing with clients regarding
20  Diamond Staffing Solutions?
21    A. None to my knowledge again. No, sir.
22    Q. Have you ever given any thought to changing
23  the name of your company from Diamond Staffing,
24  Inc.?

Page 124

1    A. No, sir.
2    Q. Do you know if anyone else has at your
3  company?
4    A. They can't without me, but no.
5        MR. PAPASTAVROS: We can take a quick
6  break. I may be pretty close.
7        THE WITNESS: All right, sir.
8        (A recess was taken.)
9        MR. PAPASTAVROS: I just have a few more
10  questions.
11    Q. Has DSI ever placed a candidate in temporary
12  or permanent employment with a jewelry manufacturer,
13  sir?
14    A. No, sir.
15    Q. How about with a manufacturer of goods that
16  are supplied to the jewelry industry?
17    A. None to my knowledge.
18    Q. How about a jewelry retailer?
19    A. No, sir.
20    Q. How about a jewelry wholesaler?
21    A. No, sir.
22    Q. Has any company of which you were previously
23  associated ever done any business with a jewelry
24  industry company?

Page 125

1    A. No, sir.
2    Q. You can state that with certainty as you sit
3  here today?
4    A. The ones I've been associated with, yes,
5  sir, I can.
6    Q. I think you had indicated before that a good
7  percentage of DSI's business came in the light
8  industrial field?
9    A. Yeah, I'd say 70, 75 percent.
10    Q. How do you define light industrial?
11    A. Distribution, manufacturing, packaging.
12  That's the primary definitions.
13    Q. Okay. In various types of industries?
14    A. Anything from the fruit business to
15  corrugated boxes to computer chips to -- you name
16  it. You can see by my client list it's pretty --
17    Q. Plastics?
18    A. Plastics, yes, sir.
19    Q. What's the other 25 percent of your
20  business?
21    A. I'd say maybe 3 percent medical, 1 percent
22  -- a little less than 1 percent professional
23  staffing, and the rest would be what I would be
24  calling clerical which would be data entry, call

32 (Pages 122 to 125)

JONES REPORTING COMPANY
617-451-8900

# EXHIBIT 4

**Thank you for your request. Here are the latest results from the TARR web server.**

**This page was generated by the TARR system on** 2005-07-07 16:15:10 ET

**Serial Number:** 78326647

**Registration Number:** (NOT AVAILABLE)

**Mark**


# Diamond Staffing


**(words only):** DIAMOND STAFFING

**Standard Character claim:** Yes

**Current Status:** An opposition is now pending at the Trademark Trial and Appeal Board.

**Date of Status:** 2004-11-08

**Filing Date:** 2003-11-12

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 106

**Attorney Assigned:**
SALEMI DOMINICK J Employee Location

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2004-08-24

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

---

1. Diamond Staffing, Inc.

**Address:**
Diamond Staffing, Inc.
146 West Boylston Drive

Worcester, MA 01609
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Massachusetts
**Phone Number:** (508) 831-0900

## GOODS AND/OR SERVICES

**International Class:** 035
Employment hiring, recruiting, placement and staffing services
**First Use Date:** 2003-11-08
**First Use in Commerce Date:** 2003-11-08

**Basis:** 1(a)

## ADDITIONAL INFORMATION

**Disclaimer:** "staffing"

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

## PROSECUTION HISTORY

2004-11-08 - Opposition instituted for Proceeding

2004-11-03 - Opposition papers filed

2004-10-05 - Published for opposition

2004-09-15 - Notice of publication

2004-08-05 - Law Office Publication Review Completed

2004-08-05 - Assigned To LIE

2004-07-29 - Approved for Pub - Principal Register (Initial exam)

2004-07-29 - Teas/Email Correspondence Entered

2004-07-19 - Communication received from applicant

2004-07-19 - TEAS Response to Office Action Received

2004-06-27 - Non-final action e-mailed

2004-06-12 - Case file assigned to examining attorney

2003-12-08 - New Application Entered In Tram

## CORRESPONDENCE INFORMATION

**Correspondent**
Mary C. Casey (Attorney of record)

MARY C. CASEY
THE HARBOR LAW GROUP
48 MAPLE AVENUE
SHREWSBURY, MA 01545

**Phone Number:** (508) 842-9244
**Fax Number:** (508) 842-9311

# EXHIBIT 5

Page 134

1     Q. Was this e-mail we marked as Number 25, in
2 response to an e-mail you had sent to David
3 Hallmark?
4     A. Yes.
5     Q. Okay. There is a prior e-mail, then, that
6 would be responsive to this, that he is responding
7 to?
8     A. Responsive at conversation, as well.
9     Q. Okay. There would be a prior e-mail in this
10 series to which he is responding?
11         MR. PAPASTAVROS: Objection.
12     Q. I'm just trying to clarify what you said.
13     A. I don't know if it was a prior e-mail or
14 conversation.
15     Q. Have you looked to see if there was a prior
16 e-mail?
17     A. No.
18         MR. MELTZER: Nick, I would like to see
19 it to have it. See if there is another prior
20 e-mail.     MR. PAPASTAVROS: I'll check.
21
22     Q. Do you know if Don Mofford contacted anybody
23 at Diamond Staffing Inc. in October of 2003?
24     A. No.

Page 135

1     Q. Do you know if Don Mofford contacted anyone
2 at Diamond Staffing, Inc. in November of 2003?
3     A. Do I know if he did or did not?
4     Q. Yes.
5     A. No, he did not.
6     Q. Do you know if he contacted anybody at
7 Diamond Staffing, Inc. in December of 2003?
8     A. No, he did not.
9     Q. How about in January of 2004?
10     A. No.
11     Q. February of 2004?
12     A. No.
13     Q. March of 2004?
14     A. No.
15         MR. PAPASTAVROS: One second. How are
16 you defining Diamond Staffing, Inc.? Are you
17 including its attorneys and agents, or just the
18 company itself?
19         THE WITNESS: The company itself.
20     Q. So that would not include Miss Casey?
21     A. Not include Miss Casey.
22     Q. The answer is "no."
23         Do you know if Don Mofford contacted
24 counsel for Diamond Staffing, Inc. in October of --

Page 136

1     A. Yes.
2     Q. Let me finish the question. In October of
3 2003?
4     A. I don't know if it was October of 2003 or
5 the first part of November 2003.
6     Q. It's your testimony that Attorney Mofford
7 spoke to an attorney for Diamond Staffing, Inc.?
8     A. Yes.
9     Q. Were you told the substance of the
10 conversation between Attorney Mofford and the
11 Attorney for Diamond Staffing, Inc.?
12     A. Yes.
13     Q. What was the substance of that conversation?
14         MR. PAPASTAVROS: I'm going to caution
15 the --
16         MR. MELTZER: I'm asking.
17         MR. PAPASTAVROS: No, let me finish.
18     I would caution the witness.
19     I'm not instructing her not to answer
20 the question.
21     I would caution you to limit your
22 response to the substance of the communication
23 between Mr. Mofford and Miss Casey, and not any
24 related legal advice that may have ensued in that

Page 137

1 conversation.
2         THE WITNESS: The basic conversation was
3 just the use of Diamond Staffing, Inc.
4     Q. That conversation, to the best of your
5 recollection, took place in November of 2003?
6     A. The first part of November 2003. Might have
7 been the end of October. I'm not quite, I'm not
8 quite sure.
9     Q. At some point, did you ask Ken Peterson to
10 contact Diamond Staffing, Inc.?
11     A. I did.
12     Q. When was that?
13     A. Around October 28th or 29th, 2003.
14     Q. Why did you ask Ken Peterson to contact
15 Diamond Staffing, Inc.?
16     A. Because they were using the name Diamond
17 Staffing, Inc., and I was receiving a barrage of
18 e-mails from them.
19     Q. What did you want Ken Peterson to do about
20 it?
21         MR. PAPASTAVROS: Objection.
22     Q. Did you want Ken Peterson to do something
23 about it?
24     A. I wanted Ken Peterson to identify why they

35 (Pages 134 to 137)

457b22de-680d-44b6-a5b9-4fe807957191

Page 138

1  were using my name.
2      Q. Did you ask him specifically to contact
3  Diamond Staffing, Inc.?
4          MR. PAPASTAVROS: Again, the company as
5  opposed to counsel?
6          MR. MELTZER: Yes.
7          THE WITNESS: I asked him specifically
8  to call the company and find out who their attorney
9  was.
10     Q. And to the best of your knowledge, did he do
11 that?
12     A. Yes.
13     Q. And when was that?
14     A. In or about October 29th or so.
15     Q. Do you take notes of telephone
16 conversations?
17     A. Usually.
18     Q. Do you take notes of your conversations with
19 Don Mofford?
20     A. Usually.
21     Q. Okay.
22         In this case did you, in October or
23 November of 2003?
24     A. Yes.

Page 139

1      Q. Do you still have those?
2      A. Probably.
3          MR. MELTZER: Nick, I realize we may
4  have an issue of attorney/client privilege on those
5  notes.
6          MR. PAPASTAVROS: We will check to see
7  if there is anything there that would not implicate
8  the privilege.
9          MR. MELTZER: Even if it implicates the
10 privilege, let me know if they exist and we could
11 determine if we need to bring them to the Court's
12 attention.
13         MR. PAPASTAVROS: One thing we have not
14 done is neither party has exchanged privilege logs
15 in this case. I don't know if that is something you
16 want to contemplate doing or not; I haven't,
17 considering the accelerated nature of this case, I
18 haven't.
19         MR. MELTZER: Let's wait and see if the
20 document exists.
21     Q. Do you have any notes from Ken Peterson?
22     A. Yes.
23     Q. From the October/November time frame?
24     A. Not on that particular conversation that

Page 140

1  you're talking about, the initial conversation,
2  because I was driving at the time.
3      Q. It's your understanding that at some point
4  Ken Peterson spoke to someone at Diamond Staffing,
5  Inc.?
6      A. He talked to counsel at Diamond Staffing,
7  Inc.
8      Q. Who is counsel?
9      A. Mary Casey.
10     Q. Do you know what date he spoke to Mary
11 Casey?
12     A. In or about October 29th.
13     Q. Do you have any notes from communication
14 with Ken Peterson about that conversation?
15     A. No.
16     Q. What did Ken Peterson say about this
17 conversation with Attorney Casey?
18     A. He said that he had spoken to her about the
19 content, the use of the name; why they were using
20 it; content on the website; duplicate information
21 that was on the website.
22     Q. Let's take that one at a time.
23         What content are you referring to?
24     A. Certain use of verbiage.

Page 141

1      Q. Do you recall what verbiage that is?
2      A. I do not.
3      Q. Hold on one minute. When did you look at
4  that web page?
5          MR. PAPASTAVROS: Objection. Time
6  frame?
7      Q. When you first checked the web page and
8  noticed some more verbiage.
9      A. End of October.
10     Q. I'll show you what was marked as Exhibit
11 Number 14, and ask if you recognize that?
12     A. Yes.
13     Q. What is Exhibit Number 14, if you recognize
14 it?
15     A. As their website.
16     Q. Why don't you point out to me what verbiage
17 on there you thought was the same as on yours?
18     A. They have since taken down some of that
19 verbiage.
20     Q. Okay. Why don't you tell me what the
21 verbiage was?
22     A. First of all, the "cut above the rest" and I
23 don't recall what the other duplicate information
24 is.

36 (Pages 138 to 141)

457b22de-680d-44b6-a5b9-4fe807957191

Page 142

1    Q. What's the problem with the phrase, "cut
2  above the rest"?
3        MR. PAPASTAVROS: Objection.
4    Q. What do you think the problem was with "cut
5  above the rest"?
6    A. "Cut above the rest." Restate the question,
7  please.
8    Q. What was your problem with the language,
9  "Cut above the rest."
10        MR. PAPASTAVROS: Same objection.
11    Q. I'm asking, why do you think it was a
12  problem?
13        MR. PAPASTAVROS: Lacks a foundation.
14    Q. Do you think "cut above the rest" was a
15  problem?
16    A. Yes.
17    Q. Why?
18    A. It's a takeoff on some of the verbiage that
19  we had on ours.
20    Q. You're saying "cut above the rest" is a
21  takeoff on the verbiage on your website?
22    A. Some of ours, yes.
23    Q. Did you have a "cut above the rest" in
24  yours?

Page 143

1    A. No.
2    Q. So what was "cut above the rest" a takeoff
3  on?
4    A. "A cut above the rest" is implying that
5  they are a cut above the rest, just like ours is on
6  ours; it's above our verbiage on our site.
7    Q. Did it say, "cut above the rest" on yours?
8    A. No.
9    Q. So the verbiage wasn't the same?
10    A. No.
11    Q. Well, try this again. Did yours say, "Cut
12  above the rest"?
13    A. No.
14    Q. So what verbiage was on there that was
15  yours?
16    A. I'm not sure on that, because it's not on
17  there right now; they took it down. I don't have it
18  with me.
19        MR. PAPASTAVROS: If you could show her
20  a printout of the website maybe that would refresh
21  her memory.
22        THE WITNESS: Well, wait. It is the
23  first --
24    Q. So it's your testimony this has been changed

Page 144

1  (indication)?
2    A. Yes.
3    Q. What I'm asking for is why would you have an
4  objection to "A cut above the rest"?
5        MR. PAPASTAVROS: I think -- objection.
6  It is asked and answered and if you want to refresh
7  her memory with a copy of the website, maybe that
8  would help her.
9        MR. MELTZER: Let's take five minutes.
10        (Off the record.)
11        MR. PAPASTAVROS: I think Suzanne just
12  wanted to clarify one thing.
13        THE WITNESS: The cut above the rest.
14        MR. PAPASTAVROS: About the information
15  that was taken down.
16        Which one, go ahead?
17        THE WITNESS: "A cut above the rest,"
18  as I remember, was on our original website that was
19  put up on March 6th, 2003.
20    Q. I'm sorry, "a cut above the rest" was on
21  your original?
22    A. Website, as I recall it. And also, this is
23  very close to our "on the cutting edge" of the
24  jewelry staffing business, jewelers' business, "on

Page 145

1  the cutting edge" of which we used on ours.
2    Q. So the problem is the juxtaposition of "a
3  cut above" and the diamond?
4    A. And the twirling of the diamond.
5        MR. PAPASTAVROS: Object.
6        THE WITNESS: The twirling of the
7  diamond and the diamond are similar to what we had
8  on our original website as well.
9    Q. You testified that you --
10        MR. PAPASTAVROS: Also with respect to
11  what was taken down, I think you had wanted to
12  clarify.
13        THE WITNESS: And with respect to what
14  was taken down, I don't recall what was taken, that
15  Ken asked them to take down and it was taken down.
16    Q. You are saying that something was taken off
17  of the Diamond Staffing web page?
18    A. Yes.
19    Q. And so if Diamond Staffing, Inc. were to
20  testify this is exactly as it was in 2003, you are
21  saying they are not right?
22    A. That is exactly. That they're not right,
23  yes. There was other content in this.
24    Q. I want to clarify this. You have seen

37 (Pages 142 to 145)

457b22de-680d-44b6-a5b9-4fe807957191

Page 146

1 Diamond Staffing, Inc. content on the first page,
2 that is different than this, in 2003?
3     A. No.
4         MR. PAPASTAVROS: Objection.
5     Q. What are you trying to tell me? You are
6 saying this is not the web page as it existed in
7 2003?
8         MR. PAPASTAVROS: Objection. What do
9 you mean by "web page"? Are you talking about the
10 entire -- please let me finish, okay?
11         If you needed to look through this, Miss
12 DeVries, carefully, to determine whether this was
13 what was up by the end of 2003 when DSI came onto
14 the market, you should take the time to do so.
15         THE WITNESS: This front page was up at
16 the end of 2003. There was other content in the web
17 page that has been taken down.
18     Q. As a result of a conversation with Ken
19 Peterson?
20     A. Yes.
21     Q. What was that content?
22     A. I don't remember what that was.
23     Q. Who told you the content was taken down as
24 an ultimate result of a conversation with Ken

Page 147

1 Peterson?
2         MR. PAPASTAVROS: Objection.
3     Q. How do you know that content was removed?
4         MR. PAPASTAVROS: Because he asked them
5 to remove some of the content on there and they did.
6     Q. What, exactly, did he ask you to remove,
7 Diamond Staffing to remove, if you know?
8     A. I don't remember.
9     Q. As you sit here today, is there content you
10 remember seeing in October or November of 2003, that
11 is not on Exhibit Number 14?
12         MR. PAPASTAVROS: Objection, asked and
13 answered twice now.
14     Q. I have heard it clarified. I'm trying to
15 get a straight answer.
16         Are you saying, looking at this
17 Exhibit 14, that you recall content in October/
18 November of 2003, that is no longer on that fax, on
19 that --
20         MR. PAPASTAVROS: Objection. Asked and
21 answered.
22         MR. MELTZER: If I could get an
23 unequivocal answer we could move on.
24         Now, the testimony is that the front

Page 148

1 page hadn't changed. There is content in the web
2 site that changed; she said that twice. That is not
3 a clearance.
4     Q. Why do you think content was removed as a
5 result of communication with Ken Peterson and
6 someone at Diamond Staffing, Inc.?
7     A. It wasn't someone at Diamond Staffing, Inc.;
8 it was between Mary Casey and Ken Peterson; let me
9 make that clear.
10         MR. MELTZER: Just give me one second.
11         (Off the record.)
12     Q. Did you print out a copy of the Diamond
13 Staffing, Inc. web page in November, October of
14 2003?
15         THE WITNESS: I don't remember.
16     Q. Do you know if Ken Peterson printed out a
17 copy of the Diamond Staffing, Inc. web page?
18     A. I don't.
19     Q. How about David Hallmark?
20     A. I do not know.
21     Q. Earlier today when you arrived, your
22 attorney handed me a copy of documents, and I ask if
23 you could identify what that clipped package of
24 documents is?

Page 149

1     A. Records.
2         MR. PAPASTAVROS: Are you asking her to
3 look through the entire packet?
4         MR. MELTZER: I'm just asking her what
5 was produced today.
6         MR. PAPASTAVROS: I will stipulate for
7 the record, certain phone records were produced
8 today. If you want her to identify all those phone
9 records, it's a different matter.
10         MR. MELTZER: Which telephone is it?
11         MR. PAPASTAVROS: Objection.
12         MR. MELTZER: Is it a particular
13 telephone?
14         MR. PAPASTAVROS: Are all the records
15 from a particular telephone?
16         MR. MELTZER: That's what I'm asking.
17         MR. PAPASTAVROS: Please look through
18 them and you could let him know.
19         THE WITNESS: (Witness complies.)
20         MR. PAPASTAVROS: It probably will take
21 you a few minutes to do it. I don't know if you
22 want to take a break while she looks through them
23 all.
24         MR. MELTZER: Okay, five minutes,

# EXHIBIT 6

# DALY, CROWLEY & MOFFORD, LLP

275 Turnpike Street - Suite 101
Canton, Massachusetts 02021-2354

TELEPHONE: 781-401-9988        FACSIMILE: 781-401-9966

CHRISTOPHER S. DALY
JUDITH C. CROWLEY
DONALD F. MOFFORD
PAUL D. DURKEE

*Of Counsel*
RICHARD M. SHARKANSKY
CATHY L. PETERSON

KERMIT ROBINSON
DAVID W. ROUILLE
ROBERT V. KLAUZINSKI

www.dc-m.com

Via Certified Mail No.: 7002 2410 0002 6786 5484
Return Receipt Requested
December 5, 2003

President
Diamond Staffing, Inc.
146 West Boylston Drive
Worcester, MA  01606-2799

Re:    Diamond Staffing Trademark Controversy
       Our File No.: DIAM-002MUS

Dear Sir or Madam:

This firm represents Diamond Staffing Solutions, Inc., of Derry, New Hampshire in its trademark matters. In that capacity, we have been authorized to notify you that a serious matter of trademark infringement has occurred as result of your use of the mark DIAMOND STAFFING in connection with your recruiting services.

Since at least May 6, 2002, Diamond Staffing Solutions, Inc has used the mark DIAMOND STAFFING in conjunction with providing professional staffing services. Diamond Staffing Solutions, Inc. has developed significant goodwill associated with its DIAMOND STAFFING mark throughout the United States, and the mark is well-known to the consuming public as a source identifier for those services.

We are aware that you recently began using the identical mark DIAMOND STAFFING in conjunction with identical services. Your use of the identical mark for identical services is bound to cause confusion, mistake, and deception of the consuming public as to the source of your client's services. Customers and potential customers will believe that your client's services emanate from, or are licensed or approved by, Diamond Staffing Solutions, Inc. The plethora of e-mail Diamond Staffing Solutions, Inc has been receiving is demonstrating the likelihood of confusion by the public. Any dissatisfaction with your client's services will reflect upon and irreparably damage our client's hard-won reputation embodied in its DIAMOND STAFFING mark.

**DSS 000331**

DALY, CROWLEY & MOFFORD, LLP

Diamond Staffing, Inc
146 West Boylston Drive
Worcester, MA 01606-2799
December 5, 2003
Page 2

Your use of the DIAMOND STAFFING mark constitutes, *inter alia*, a blatant infringement of Diamond Staffing Solutions, Inc's trademark rights under state law, and a clear violation of Section 43(a) of the Lanham Act. As you surely know, by reason of its illegal actions, you could be subject to an injunction against further use of the mark, liability to Diamond Staffing Solutions, Inc for damages and profits resulting from the infringement, and costs and attorney's fees incurred in halting that infringement.

Diamond Staffing, Inc. is willing, however, to resolve this matter amicably on the following terms: You must promptly confirm in writing: (1) that you will take *immediate* steps to discontinue use of the DIAMOND STAFFING mark in connection with staffing services (2) that you will not hereafter use a mark confusingly similar to Diamond Staffing Solutions Inc's DIAMOND STAFFING mark, and (3) that you will immediately file a change of name for your incorporation. Diamond Staffing Solutions, Inc. will, in turn, sign a mutual release that will exempt you from liability for past infringement of the DIAMOND STAFFING mark.

If you do not agree to these terms, Diamond Staffing Solutions, Inc. will take legal action to enforce its rights in the DIAMOND STAFFING mark, and will seek all injunctive and monetary relief to which it is entitled.

Please contact me with in the next ten (ten) business days to advise as to your intentions.

This letter is written without prejudice to my client's legal rights and remedies, all of which are specifically reserved.

Very truly yours,

Donald F. Mofford
*dfm@dc-m.com*

DFM/pam
cc:    Ms. Suzanne DeVries
Q:\diam-002mus\ltr to pres diamond staffing, inc.doc

DSS 000332

# EXHIBIT 7



**THE HARBOR LAW GROUP**



48 Maple Avenue • Shrewsbury, MA 01545 • Phone (508) 842-9244 • Fax (508) 842-9311 • www.harborlaw.com

Sent via facsimile (781) 401-9966
and regular mail

December 23, 2003

Donald F. Mofford, Esq.
Daly, Crowley & Mofford, LLP
275 Turnpike Street – Suite 101
Canton, Massachusetts 02021-2354

     Re:   Diamond Staffing, Inc.
            Your File No. DIAM-002MUS

Dear Mr. Mofford:

This firm represents Diamond Staffing, Inc. of Worcester, Massachusetts. This is in response to your letter of December 5, 2003 regarding your client's claim of alleged trademark infringement.

Our client has applied for Federal Trademark protection (Serial # 78326647), which was filed on November 12, 2003, as well as received State Trademark protection (#63699) on the mark "Diamond Staffing" Before using the name and applying for protection a diligent search was conducted on the Patent and Trademark Office's database for any federally protected use of the mark "Diamond + Staffing" and no live mark was found. A similar search was conducted with the Massachusetts Secretary of State's office. An Internet search to determine if there was common law usage found several similar marks, including Diamond Medical Staffing, supporting the medical industry, and Diamond Staffing Solutions, Inc., servicing the jewelry industry exclusively. A more recent search reveals that your client, Diamond Staffing Solutions, Inc. filed for trademark protection after our client, on November 20, 2003.

You indicate in your letter that our client is in violation by using the mark "Diamond Staffing." in conjunction with identical services as your client's. I respectfully maintain that this, in fact, is not the case. According to your client's own website, Diamond Staffing Solutions, Inc. deals exclusively in the recruitment and placement of personnel for the jewelry and diamond business. Our client, Diamond Staffing, Inc., is **not** a service provider exclusively to the jewelry business. Your client's use of the word "Diamond" in his mark certainly does not constitute a strong trademark. His use is

DSS 000333

arguably descriptive, thereby rendering his mark weak in terms of meeting trademark requirements.

The "plethora" of email your client claims to have received were, most likely, not business related, but quasi-internal "friendly" but misdirected messages due to incorrectly addressed email by some individuals connected with Diamond Staffing, Inc. In fact, on or about mid-November, when Ken Peterson (representing your client) called, he indicated that his company provided staffing to the jewelry industry exclusively. His only objection was to the verbiage, "cutting edge solution." We concluded our conversation amicably and I stated that if my client did use the phrase we would omit it from any further documentation. This usage, however, did not appear on my client's website, nor is it the exact phrase used on your client's website. I expected the matter to be resolved and was surprised to have received your letter.

We do not believe that our client is in violation of the Lanham Act. Neither the marks nor the services are identical. In fact, as the principal registrant of the mark, we believe that our client has prior constructive use rights to the mark under the law, and that our client's mark is stronger.

Our client, Diamond Staffing, Inc., is also very willing to resolve this matter amicably. We suggest that you call this office so that we may explore a fair and practical solution that will meet the needs of both our clients.

I look forward to hearing from you.

Sincerely,

Mary Casey,
Managing Attorney

MCC: ah

# EXHIBIT 8

# DALY, CROWLEY & MOFFORD, LLP

275 Turnpike Street · Suite 101
Canton, Massachusetts 02021-2354

Telephone: 781-401-9988          Facsimile: 781-401-9966

KERMIT ROBINSON
DAVID W. ROUILLE
ROBERT V. KLAUZINSKI

www.dc-m.com

CHRISTOPHER S. DALY
JUDITH C. CROWLEY
DONALD F. MOFFORD
PAUL D. DURKEE

OF COUNSEL
RICHARD M. SHARKANSKY

Via FAX and First Class mail
March 19, 2004

Mary Casey, Esq.
The Harbor Law Group
48 Maple Ave.
Shrewsbury, MA  01545

Re:    Diamond Staffing Trademark Controversy
       Our File No.: DIAM-002MUS

Dear Ms Casey:

In response to our earlier communications, this letter is to inform you my client continues to be very irate regarding the number of e-mail she is getting that appear to be meant for your client, Diamond Staffing Inc. She continues to get e-mail, which at a first glance appears to be intended for her, but after reviewing the content of the e-mail, is found not to be. This confusion is a nuisance and time consuming for my client having to vet this unwanted misdirected e-mail and is quite infuriating.

Notwithstanding the trademark controversy, my client is concerned about the amount of correspondence being sent to her company that includes information that is not normally available to the public. Your letter of December 23, 2003 indicated that the "plethora" of email my client claims to have received was, most likely, not business related, but quasi-internal "friendly" but misdirected messages due to incorrectly addressed email by some members connected with Diamond Staffing, Inc. This is not the case.

My client wishes for me to bring to your attention that she continues to get many emails a day, many from senders who are not associated with Diamond Staffing, Inc. including vendors and customers. It is becoming quite apparent that your client's new use of the Diamond Staffing name is causing confusion and the confusion is a nuisance and irritation, and actually very infuriating to my client. Furthermore, the type of information being sent is information that should not be transmitted in the public domain. Financial information of your client, social security numbers of your client's employees, and employee appraisals include the type of

DSS 000318

Mary Casey, Esq.
The Harbor Law Group
March 19, 2004
Page 2

information being freely emailed about in the clear. Please note that the originators of the correspondence are different senders from multiple companies and not an isolated occurrence. She continues to get correspondence requesting to fill temporary positions, e-ticket confirmations, payroll tracking sheets and the like. As we discussed, I would think your client would be concerned about the latter and, furthermore, concerned about loosing business due to the confusion.

Please contact me so that we can discuss what steps your client is taking to correct this confusion with your client's employees, vendors and customers.

Very truly yours,

Donald F. Mofford
dfm@dc-m.com

DFM/sh
cc:    Ms. Suzanne DeVries

DSS 000319

# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.

Page 1

1998 WL 428092 (D.Mass.)

(Cite as: 1998 WL 428092 (D.Mass.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.
YANKEE SPIRITS, INC., Plaintiffs
v.
William P. GASBARRO and Yankee Spirits, Inc.,
Defendants
**No. Civ. 96-10967PBS.**

May 26, 1998.

FINDINGS AND RECOMMENDATION

ALEXANDER, Chief Magistrate J.

ON
Plaintiffs' Motion for Partial Summary Judgment
*1 Parties appeared before this Court on Plaintiff's
Motion for Partial Summary Judgment. YSMA
alleges that YSRI, as a business entity, and William
P. Gasbarro, in his individual capacity, engaged in
the following actions: (1) unfair competition under §
43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and
(2) unfair and deceptive trade practices under the
common law of both Massachusetts and Rhode
Island with respect to the use of the words "Yankee
Spirits."

Attorneys Dickison and Lawson appeared on
behalf of Yankee Spirits, Inc. ("YSMA") and
Attorneys Gildea and Marzilli appeared on behalf
of William Gasbarro ("Gasbarro") and Yankee
Spirits, Inc. ("YSRI"). At the conclusion of the
hearing this Court took the matter under advisement
and now decides. After great deliberation over the
myriad issues presented herein and for the following
reasons, Plaintiff's motion is hereby ALLOWED.

The relevant facts are as follows. [FN1] The
trademark "Yankee Spirits" was first registered in
Massachusetts on November 14, 1963 by
predecessors of YSMA in connection with their
retail business of selling alcoholic beverages. On
January 1, 1970 the plaintiffs incorporated their
business under the name of "Yankee Spirits, Inc.".
Since 1970, YSMA has engaged in the sale of
alcoholic beverages, under the business and product
name "Yankee Spirits." Each YSMA store [FN2] is
extremely large (each exceeding 22,000 square feet)
and offers a wide variety of alcoholic beverages
(approximately 35,000 varieties). Since 1978,
YSMA has advertised "Yankee Spirits" alcoholic
beverages throughout Massachusetts, Connecticut,
and Rhode Island. Advertising costs during this
time total $2,300,000. YSMA displayed these
advertisements in several media including cable
television, newspapers, magazines and bill boards.
For the last three years, YSMA has sold over
twenty-million dollars ($20,000,000) of its product.

> FN1. Given the procedural posture of the
> case sub judice, this Court construes the
> facts in a light most favorable to YSRI.

> FN2. There are currently three
> Massachusetts locations: Sturbridge,
> Rockland and Attleboro. Attleboro, the
> newest store opened on or about May 18,
> 1996.

YSMA renewed the trademark registration
(Renewal Reg. No. 36123 dated December 11,
1984) but the registration expired in January 1995.
As a result, YSMA did not have a registered
trademark in the Commonwealth of Massachusetts
from January 1995 until May 23, 1996 when it
re-registered its Massachusetts trademark.

YSMA is also the owner of a trademark registered
in the State of Rhode Island of the mark "Yankee
Spirits of Rhode Island" originally issued to Joseph

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

N. Medieros and Margaret M. Medieros d/b/a/ Tiverton Liquors on February 9, 1996. On June 6, 1996 Tiverton Liquors sold, assigned and transferred the trademark "Yankee Spirits of Rhode Island" to YSMA. Four days later, the State of Rhode Island issued a Certificate of Trademark Registration for the mark "Yankee Spirits of R.I." (No. 96-2-5) to YSMA. Despite having a registered trademark in Rhode Island, YSMA does not own or operate any liquor store there.

Although YSMA had a trademark in both Massachusetts and Rhode Island, YSMA did not file for a federal trademark for the mark "Yankee Spirits" until May 14, 1996. (Serial no. 75/10361).

**\*2** Defendant Gasbarro incorporated "Yankee Spirits, Inc." ("YSRI") in Rhode Island on March 20, 1996. This was done upon the advice of Thomson & Thomson, a reputable trademark research company, which determined that the name "Yankee Spirits" was available for use in Rhode Island and throughout the country except for the areas of Sturbridge and Rockland in Massachusetts. On March 26, 1996, Gasbarro applied for a Federal Trademark Registration of the mark "Yankee Spirits" and stated under pains of perjury that to his knowledge no other person or corporation had the right to use the mark "Yankee Spirits" in commerce.

On May 3, 1996, YSRI began an advertising campaign in Rhode Island and Southeastern Massachusetts to advertise its opening in Rhode Island. [FN3] The advertisements all displayed the term "Yankee Spirits" and the fact that William Gasbarro was acting president of the company. Despite its May advertisements, YSRI only began selling liquor in Rhode Island under the name "Yankee Spirits" in July of 1996.

> FN3. YSRI used the "Yankee Spirits" mark for a limited time of twenty-five (25) days.

At his November 12, 1996 deposition, defendant Gasbarro acknowledged his familiarity with the name "Yankee Spirits" as a retail liquor store. He testified that he first heard that the name "Yankee

Spirits" applied to a retail liquor store in November 1994 when he attended a liquor licensing hearing in Attleboro with his father, the former president of the Rhode Island Liquor Stores Association, regarding YSMA's acquisition of an Attleboro license. (Gasbarro dep., at 24). Indeed, after this hearing, defendant Gasbarro agreed to represent twenty-five (25) taxpayers who opposed YSMA's acquisition of the license. (Gasbarro dep., at 28). When asked during the deposition whether he was aware that YSMA had been using the mark "Yankee Spirits", Gasbarro stated: "I was only aware that YSMA had used the name in Sturbridge and Rockland...." And, when asked why he decided to get back into the liquor business Gasbarro stated, in part: "Okay, okay. I also decided to get back into it because I thought the opportunity was right at this time. There was a window of opportunity, a license became available, I was able to acquire a location ... and Yankee Spirits Massachusetts had let their trademark lapse...." (Gasbarro dep., at 43--44).

YSRI contracted with Alpha Research Associates to perform a survey regarding YSMA's Attleboro store. From June 3 through June 6, 1996 the firm conducted a telephone survey within an eight mile radius of YSMA's newly opened Attleboro store. Twenty-nine percent (29%) of those surveyed indicated that they had heard of business named Yankee Spirits which retailed alcoholic beverages.

YSMA brings this action alleging: (1) unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and (2) unfair and deceptive trade practices under the common law of both Massachusetts and Rhode Island with respect to the use of the words "Yankee Spirits." YSMA now moves this Court to find as a matter of law that YSMA owns the "Yankee Spirits" trademark, that the "Yankee Spirits" mark is entitled to protection, and that YSRI's use of the mark is likely to cause confusion among consumers.

**\*3** While not pertinent for purposes of this motion, Defendants assert counterclaims against YSMA alleging (1) unfair competition under the Lanham Act, (2) unfair competition, and (3) dilution under statutory and common law under the state of Rhode

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

Island.

" 'While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so." ' *Black Dog Tavern Co. v. Hall,* 823 F.Supp. 48, 52 (D.Mass.1993) (citing *Kazmaier v. Wooten,* 761 F.2d 46, 48-49 (1 st Cir.1985)). *See also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 486 (1 st Cir.1981) ("While summary disposition is usually inappropriate in complex infringement and unfair competition cases, it is not unheard of.").

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)." A factual dispute is material if it "affects the outcome of the litigation," and genuine if manifested by "substantial" evidence "going beyond the allegations of the complaint." *Volkswagenwerk v. Wheeler,* 814 F.2d 812, 815 (1 st Cir.1987). When viewing the evidence, the Court must assess the record in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *Id.* at 815. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. The movant may discharge its burden by showing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has properly supported its motion for summary judgment, a "party opposing ... may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

YSRI contends that (1) whether YSMA seeks protection for "Yankee Spirits" or "Yankee Spirits Discount Liquors", (2) whether the term for which YSMA seeks protection should be characterized as inherently distinctive or descriptive, and (3) whether YSRI's advertisement is likely to confuse consumers present material issues of fact that preclude summary judgment in favor of YSMA.

As a preliminary matter, this Court addresses whether YSMA seeks protection for either "Yankee Spirits" or "Yankee Spirits Discount Liquors." YSRI contends it is not "clear what YSMA believes its trademark right is [because] [t]he focus of YSMA's advertising is low pricing." Def.'s Mem. at 11. YSRI points out that Donald Cimini stated in his deposition that he objected to the use of "Yankee Spirits Discount Liquors" and that YSMA makes repeated reference to the fact that it offers a wide selection as well as low prices. These considerations, however, do not confuse the issue to such a degree that resolution cannot be made. YSMA has a registered trademark in the state of Rhode Island which is "Yankee Spirits of Rhode Island", Cimini Aff., Ex. C; YSMA inadvertently allowed the "Yankee Spirits" trademark to expire in Massachusetts but then renewed the trademark under the same name on May 23, 1996, Cimini Aff., Ex. B; YSMA applied to the Patent and Trademark Office on May 15, 1996 to register the mark "Yankee Spirits", Cimini Aff., Ex. D. This Court finds that whether some advertisements have additional text is insufficient to change the nature of the mark for which protection is sought. Accordingly, this Court reviews the substance of YSMA's motion relative to the mark "Yankee Spirits." [FN4]

> FN4. The fact that YSMA did not have a valid registration during the relevant time period also does not change the nature of the mark. "[T]rademark ownership is not acquired by federal or state registration [,]" 2 McCarthy, supra § 16:18 at 16-26.1. Nor is it necessarily lost from a lack thereof; rather, use of the mark is the critical consideration.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

**\*4** YSMA's primary claim is based upon § 43(a) of the Lanham Act which also covers unregistered trademarks. Section 43(a) prohibits a person from using:

> (1) ... in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

15 U.S.C. 1125(a) (§ 43(a) of the Lanham Act). Therefore, to succeed on a claim under § 43(a), the party claiming ownership of a mark must show that (1) the mark is entitled to protection; (2) it made use of the mark in commerce; and (3) the alleged infringing mark is likely to cause confusion to consumers. *See Boston Beer Co. v. Slesar Bros. Brewing Co., Inc.,* 9 F.3d 175, 180 (1 st Cir.1993).

A court's inquiry into whether a term merits trademark protection starts with the classification of that term along a spectrum of "distinctiveness." *Boston Beer,* 9 F.3d at 180. To determine "distinctiveness," trademarks are classified as either (1) Generic; (2) Descriptive; (3) Suggestive; or (4) Arbitrary or Fanciful. *See Black Dog Tavern Co., Inc. v. Hall,* 823 F.Supp. 48, 53 (D.Mass.1993); *Brown v. Quiniou,* 744 F.Supp. 463, 468 (S.D.N.Y.1990). The latter two categories are considered "inherently distinctive" marks. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:2 (4 th ed.1997).

At one end of the spectrum are generic names which are not afforded trademark protection. *Boston Beer,* 9 F.3d at 180; McCarthy, supra at § 12:23. Examples of generic terms include aspirin, cola, and baby oil. In the middle of the spectrum are descriptive terms, such as chap stick, beer nuts, and Bufferin, to which courts afford trademark

protection only if the term has acquired "secondary meaning"; that is, consumers associate the product with a particular source. *Id.* (citing *Two Pesos,* 505 U.S. at 769); *Volkswagenwerk,* 814 F.2d at 816. At the other end of the spectrum are inherently distinctive marks which immediately function as trademarks without proof of secondary meaning. *Two Pesos,* 505 U.S. at 768-69; *Boston Beer,* 9 F.3d at 180. "Kodak" and "Xerox" are examples of marks that are inherently distinctive because they are considered arbitrary or fanciful.

YSRI directs this Court's attention to the fact that, in this circuit, whether a term is generic, descriptive, or inherently distinctive is a question of fact. *See Equine Technologies, Inc. v. Equitechnology, Inc.,* 68 F.3d 542, 544 (1 st Cir.1995); *Boston Beer,* 9 F.3d at 180. Consequently, YSRI argues that summary disposition is inappropriate here. It cannot be the case, however, that no trademark dispute can be decided at the summary judgment stage or that a party can in all cases defeat a motion for summary judgment by merely contesting the ultimate finding. *See e.g.,* Def.'s Supp. Mem. at 3 (attempting to defeat the present motion by contesting the ultimate finding: "[T]here is most definitely a genuine issue of material fact raised in the record with respect to where the words YANKEE SPIRITS are placed on the spectrum of marks."). Similar to a dispute in any other area of law, if there is no genuine dispute over the material facts presented, then summary resolution is entirely appropriate. Much of the discussion presented herein pertains to disputes over *conclusions* to be drawn from the facts presented rather than disputes as to the *facts themselves.* Consequently, the point that locating the mark on the spectrum of distinctiveness is a finding of fact does not and cannot preclude this Court from acting on the present motion unless the facts themselves so warrant.

**\*5** YSMA contends that its mark is inherently distinctive (suggestive), as opposed to descriptive, and is, therefore, entitled to trademark protection without proof of secondary meaning. A "suggestive" mark employs terms which do not describe but merely suggest the features and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 5

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

functions of the product, requiring the consumer to use "imagination, thought or perception" in order to connect the mark and the product sold. *Equine,* 68 F.3d at 544 (finding term "Equine Technologies" suggestive mark); *Black Dog,* 823 F.Supp. at 53.

In *Equine Technologies,* the First Circuit stated that while the term "Equine Technologies" describes horses, it does not immediately conjure up the thought of the plaintiff's product (horse pads). As such, the court found the term inherently distinctive. Similarly, in *Black Dog,* this court held that the term "The Black Dog Tavern", printed on t-shirts did not allude to the goods offered by the plaintiff. The court found the mark inherently distinctive because "[i]t can hardly be suggested that the name 'The Black Dog Tavern' alludes to a dish on the plaintiff's menu." *Black Dog,* 823 F.Supp. at n. 6.

"Yankee Spirits" does not rise to the level of distinctiveness evident in either *Equine Technologies* or *Black Dog.* Stated differently, the requisite mental step necessary to elevate "Yankee Spirits" from mere description to the level of suggestion is absent here. Notwithstanding YSMA's creative attempt to construct this critical step using YSRI's survey evidence and dictionary definitions, after a review of case law and an appeal to common experience, this Court believes that liquor consumers need not use their imagination in order to connect the mark "Yankee Spirits" with the sale of alcoholic beverages. *See Equine Technologies,* 68 F.3d at 545 (finding the mark suggestive according to a review of "case law, and ... basic common sense.").

Because the mark is not inherently distinctive this Court must consider whether the mark is entitled to trademark protection by virtue of being a descriptive term which has attained secondary meaning.

A term is descriptive if it conveys an immediate idea of the ingredients, qualities, characteristics, or subject of the goods. *Equine,* 68 F.3d at 544- 45. Terms that are descriptive usually "describe a product" but do not "inherently identify a particular source." *Two Pesos,* 505 U.S. at 769-71. Using

these guidelines, this court finds that the mark "Yankee Spirits" is descriptive. Taken as a whole, [FN5] the name conveys an immediate idea of the characteristics of the product. That is, a consumer over the age of twenty-one (21) need not invoke his or her imagination to associate the term "Yankee Spirits" with liquor; rather, that same consumer could immediately identify the general nature or characteristics of the goods sold.

> FN5. "The commercial value of a trademark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety." *Estate of P .D. Beckwith's, Inc. v. Commissioner of Patents,* 252 U.S. 538, 545-46, 40 S.Ct. 414, 64 L.Ed. 705 (1920) ; *Equine,* 68 F.3d at 545.

Having determined that the term "Yankee Spirits" as applied to YSMA's product is descriptive, the Court now determines whether the mark has acquired secondary meaning. Secondary meaning is the "magic wand of consumer recognition which may transform even the most common descriptive term into a well-known and 'strong' mark entitled to all the protection the law affords." 2 McCarthy, supra § 15:8. The primary element of secondary meaning is a mental association in the buyers' minds between the alleged mark and a single source of a product. *Boston Beer,* 9 F.3d at 181. [FN6]

> FN6. Various judicial definitions of secondary meaning exist. For example: Secondary meaning is created when (1) the mark used "has come to indicate that the goods in connection with which it is used are the goods manufactured by the [alleged owner];" (2) the mark is "closely identified with the goods of one producer or has otherwise gained public recognition"; (3) "the public has learned to identify the name of the product with its source;" (4) the mark achieves a "meaning which suggests the company to the public at the very mention of the trade name;" (5) an "association in the minds of a substantial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

portion of the consuming public of the trademark with the product of the alleged proprietor" is created; or (6) "the primary significance of the term in the minds of the consuming public is not the product but the producer." 2 McCarthy, supra § 15:7. (citations omitted).

**\*6** The party seeking protection of the mark bears the burden of proving the attachment of secondary meaning by a fair preponderance of the evidence. *Boston Beer,* 9 F.3d at 181. Each case must be decided on its own facts considering such factors as:

> (1) the length of time the party used the mark; (2) the nature and extent of advertising and promoting the mark; (3) the amount of sales and number of customers; (4) surveys; (5) proof of intentional copying; (6) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name of the mark and a particular product or venture; and (7) direct consumer testimony.

*Boston Beer,* 9 F.3d at 182; *Volkswagenwerk,* 814 F.2d at 816; *Kusan, Inc. v. Fairway Siding Corp.,* 7 U.S.P.Q.2d 1202 (D.Mass.1988). All of these elements need not be proved in order for a plaintiff to establish secondary meaning and no single factor is determinative.

Applied to the facts of this case, YSMA must prove that, when read or heard by consumers in connection with the retail sale of alcoholic beverages, consumers identify YSMA as the single source of "Yankee Spirits" products.

This Court begins with YSRI's intent to imitate or copy YSMA's mark because it is very telling. Gasbarro knew of the mark "Yankee Spirits" as early as 1994 and knew that YSMA was in the process of opening its Attleboro stores when he incorporated YSRI in March, 1996 and began using the mark "Yankee Spirits" in May 1996. The issue is what weight this Court is to afford Gasbarro's knowing actions; or, more specifically, what inferences or presumptions arise from a defendant's knowing or intentional actions. *See Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779 (E.D.N.Y.1984)

(concluding that conscious imitation was strong evidence of secondary meaning).

This case presents extraordinary evidence of intentional copying. Gasbarro's attempt at presenting a good faith justification for using the term "Yankee Spirits" both during his deposition and in his memorandum is disingenuous to say the least. Gasbarro's family has been involved in the business of selling alcohol for approximately eighty (80) years. Gasbarro Dep. at 54. Gasbarro himself has been involved in the liquor industry for more than thirty (30) years. *Id.* In November, 1994, he, with his father who was once the president of the Rhode Island Liquor Stores Association, [FN7] attended a meeting to oppose YSMA's attempt to open a store in Attleboro, Massachusetts. At the conclusion of that meeting, Gasbarro was asked to represent twenty-five (25) taxpayers in their attempt to oppose YSMA's store opening. On February 26, 1996, the Massachusetts Alcohol and Beverage Control Commission ("ABCC") approved YSMA's application to open a store in Attleboro, Massachusetts. On March 20, 1996 less than one month after the ABCC approved YSMA's application to open its Attleboro store, Gasbarro incorporated a business under the name "Yankee Spirits, Inc." for the purpose of selling alcohol.

> FN7. In fact, Gasbarro himself was once the president of the Rhode Island Liquor Stores Association. Gasbarro also spoke for the Governor's board, was instrumental in drafting legislation, and spoke before many committees of the State House. Gasbarro Dep. at 54.

**\*7** In his deposition, Gasbarro gave several reasons why he decided to use the name "Yankee" in his new business venture. These reasons range from the absurd to the unconvincing. They are (1) he watched "Connecticut Yankee in King Arthur's Court"; (2) he likes the New York Yankees, even though he "doesn't follow them but for Babe Ruth and DiMaggio"; and (3) "Yankee" to him means New England or "a person born and bred in New England." Gasbarro Dep. at 45.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In response to why he decided to get back into the liquor business, part of Gasbarro's response was that YSMA "had let their Massachusetts trademark lapse as of, I believe, January of '95, had no federal trademark and had no Rhode Island trademark, so the opportunity was there, the window of opportunity was there to go back in it at this time." (Gasbarro Dep. at 44).

Two points require discussion based on the foregoing. First, even if this court believed Gasbarro's explanation for using "Yankee", [FN8] Gasbarro has utterly failed to explain why he used "Yankee" in conjunction with "Spirits." "Yankee Liquors", "Yankee Cocktails", "The Spirited Yankee", or even "Yankee Distilled Goods" all include "Yankee" without directly copying Plaintiff's mark. In fact, if Gasbarro wanted to be truly distinctive in selecting the name of his business he could include the term "Yankee" without any reference to alcohol whatsoever. [FN9] One can clearly see that the universe of possible names with the term "Yankee" is large, indeed. [FN10] Yet, from all of the possible combinations of words and phrases, Gasbarro chose the mark used by a business which he opposed in proceedings before the ABCC for more than a year.

> FN8. It is curious to note that although having a deep attachment to the term "Yankee" and although being involved in the liquor industry for nearly thirty years, Gasbarro never once used the name for any of his previous ventures.

> FN9. Gasbarro could have even used his own name. The Defendant asserts that a distinguishing feature (if not *the* distinguishing feature) between the advertisements run by YSRI and those run by YSMA is the fact that YSRI's advertisements clearly show Gasbarro as YSRI's president. Because Gasbarro is well known in the industry in Rhode Island, Defendant claims that the public would not associate Gasbarro's store with YSMA. It was this name recognition that prompted Gasbarro to advertise in

Attleboro. Gasbarro Dep. at 54-55 ("I wasn't hoping to capture any of the Massachusetts market because I think it's much too far away, but I wanted to make sure that people there, that would know me and have heard of me and knew me in the past, would now say to their friends or relatives that would be closer, Bill Gasbarro is getting back into the liquor business."). Interestingly, Defendants implicitly deny that the same could hold true for YSMA's advertisements in Rhode Island or in the surrounding area.

> FN10. A more eloquent presentation of this concept is the following:
> It is so easy for the honest businessman, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.
> *Florence Mfg. Co. v. J.C. Dowd & Co.*, 178 F. 73 (2d Cir.1910).

Second, it is clear from Gasbarro's statement that he knew he was using the exact mark used by YSMA. His "window of opportunity" was a lapse in YSMA's formal trademark protection; his apparent hope in seizing that opportunity was to obtain sanctuary behind a shield of technical formalities and legal fictions. Believing Gasbarro's intent to copy and, concomitantly, to use YSMA's good will is beyond doubt, this Court refuses to undermine the very purpose of trademark law by allowing one to transmogrify the sword that should shred one's inimical designs into a shield for a bad faith newcomer. Accordingly, this factor weighs heavily in favor of YSMA.

Furthermore, at the time YSMA filed the underlying complaint, YSMA had continuously

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

used the mark "Yankee Spirits" for approximately thirty-three years (1963-1996). While no fixed length of time must pass before a mark can achieve secondary meaning, several courts have held that secondary meaning can be established by the long use of a mark or name. *See A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903 (7 th Cir.1986) (13 years); *Conagra, Inc. v. Singleton,* 743 F.2d 1508 (11 th Cir.1984) (25 years); *Winning Ways, Inc. v. Holloway Sportswear, Inc.,* 913 F.Supp. 1454 (D.Kan.1996) (no fixed period of time to achieve secondary meaning; *Shames v. Coontz,* 882 F.Supp. 1173, 1174 (D.Mass.1995) (16 years); *Kusan, Inc. v. Fairway,* 7 U.S.P.Q.2d 1202 (D.Mass.1988) (56 years); *CPC Int'l, Inc. v. Skippy, Inc.,* 651 F.Supp. 62 (E.D.Va.1986) (approximately 53 years); *House of Hunan, Inc. v. Hunan at Pavilion,* 227 U.S.P.Q. 803 (D.Col.1985) (2 1/2 years); *Cf.* 15 U.S.C. § 1052(f) (in registration context, five years of continued use creates presumption of secondary meaning). *But see Security Works!, Inc. v. Security World Int'l,* 1994 WL 806086 (S.D.Fla.1994) (no secondary meaning when mark used for only 4 1/2 years).

**\*8** In addition, the amount, scope, nature and duration of advertising is a factor aiding a court's determination of whether or not a mark has acquired secondary meaning. *Volkswagenwerk,* 814 F.2d at 816. In *Aromatique, Inc. v. Gold Seal, Inc.,* the court stated that "[e]xpenditures on advertising and promoting a trademark may be relevant to a determination of secondary meaning because the amount spent may be indicative of the extent to which the public associates the advertised mark with the source of the product bearing the mark." 28 F.3d 863, 872 (8 th Cir.1994). Courts have found lesser investments in advertising than those involved here to be "significant" and "pervasive". *See Trak Inc. v. Benner Ski KG,* 475 F.2d 1076, 1081 (D.Mass.1979) ($300,000 over five-year period significant investment in promotional activities); *Shames v. Coontz,* 882 F.Supp. 1173, 1175 (D.Mass.1995) ($300,000 in ten year period in wide variety of media was pervasive advertising expenditure).

YSMA has provided this court with information

regarding its advertising expenditures. It has presented evidence indicating that it has expended approximately $600,000 per year from 1993 to the present, and $100,000 annually from 1978 through 1983, on advertising and promoting the mark "Yankee Spirits." YSMA has advertised on four cable television stations, six newspapers, two magazines and several bill boards across Massachusetts, Connecticut and Rhode Island. *See* Parmenter Aff. ¶ 10 (documenting YSMA's substantial advertising campaigns).

Moreover, YSMA has had considerable commercial success with sales exceeding twenty (20) million dollars during the last three years. Case law shows that extensive commercial activity is a factor demonstrating that a mark has acquired secondary meaning. *See TEC Eng'g Corp. v. Budget Molders Supply, Inc.,* 927 F.Supp. 528, 534 (D.Mass.1996) (sales of $3,000,000 in one year created secondary meaning); *Kraft Gen. Foods v. Allied Old English,* 831 F.Supp. 123 (S.D.N.Y.1993) (annual sales of $45 million and 9.5 percent market share of barbecue sauce sales sufficient to establish secondary meaning); *CPC Int'l, Inc. v. Skippy, Inc.,* 651 F.Supp. 62 (E.D.Va.1986) (secondary meaning when sales of peanut butter exceeded $150 million annually for 5 year period).

YSRI asserts that notwithstanding the above, "YSMA has not shown that it tries to promote its mark nor that it has been effective in causing a consumer to associate a 'single thing coming from a single source.' ' Def.'s Mem. at 8 (citing *Carter Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794 (9 th Cir.1970)). YSRI argues that (1) YSMA's $20,000,000 in sales "does not establish that its name acquired secondary meaning in Rhode Island and Southeastern Massachusetts", Def.'s Mem. at 9, and (2) "YSMA advertisements vary and sometimes refer only to 'Yankee'' or "Yankee Spirits Discount Liquors." Def.'s Mem. at 10.

**\*9** YSRI's contentions are well taken; however, "while secondary meaning is shown by the success rather than by the mere fact of an enterprise's promotional efforts, ... the normal consequence of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 428092 (D.Mass.)

(Cite as: 1998 WL 428092 (D.Mass.))

substantial publicity may be inferred." *President & Trustees of Colby College v. Colby College-New Hampshire,* 508 F.2d 804 (1 st Cir.1975). The same can be said for significant sales. As the Court of Appeals for the District of Columbia pointed out, "[t]o say proof of extensive advertising and substantial sales may not be probative of secondary meaning is to defy both logic and common sense." *Reader's Digest Ass'n v. Conservative Digest,* 821 F.2d 800 (D.C.Cir.1987). Accordingly, YSMA's advertising expenditures and concomitant sales are relevant, though clearly not dispositive, to the determination of secondary meaning.

Survey evidence has become a well-recognized means of establishing secondary meaning. *Boston Beer,* 9 F.3d at 182. Consumer surveys, conducted on the appropriate "survey universe," are direct evidence on this question. *Boston Beer,* 9 F.3d at 182; *Brooks Shoe Manufacturing Co. v. Suave Shoe Corp.,* 716 F.2d 854, 961 (11th Cir.1983) (indicating the appropriate consumer universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services). In fact, the Ninth Circuit has gone so far as to say that "an expert survey of purchasers can provide the most persuasive evidence of secondary meaning." *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609 (9 th Cir.1989).

In order to indicate secondary meaning, consumer surveys must prove more than a "relatively small number of people" associate the mark with the source of the product. 2 McCarthy at § 15:42. Often, consumer recognition below 25% fails to establish secondary meaning. *See e.g., Zippo Mfg. Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670 (S.D.N.Y.1963) (25% insufficient); *Roselux Chemical Co. v. Parsons Ammonia Co.,* 49 C.C.P.A. 931, 299 F.2d 855 (C.C.P .A.1962) (10% insufficient). [FN11]

> FN11. YSMA has made no allegation that the survey was conducted improperly. This Court, therefore, does not address the issue.

In this case, YSMA has failed to submit its own consumer survey. Instead, YSMA cites YSRI's

survey to prove that a sufficient percentage of consumers are familiar with a business by the name of "Yankee Spirits." YSMA explains that 29% of the participants in the survey (residents within an eight (8) mile radius of YSMA's store) had heard of "Yankee Spirits" in June of 1996. It contends that this correlation proves secondary meaning because whenever the public sees or hears the term "Yankee Spirits", it will associate the product with the retail sale of alcoholic beverages and identify YSMA as the single source of this product.

YSRI, on the other hand, argues that 29% is not sufficient as a matter of law to warrant a finding of secondary meaning. "Of this group 62% identified the store as being in Attleboro ..., and more than one-half (56%) of this group first became aware of YANKEE SPIRITS Discount Liquor within two (2) months immediately before the survey was taken in June of 1996. Such evidence, complied (sic) with Plaintiff's total lack of direct evidence, raises at least a genuine issue of material fact on the issue of lack of secondary meaning." Def.'s Supp. Mem. at 6. YSRI argues further that "Plaintiff has preferred no direct evidence whatsoever on the issue of secondary meaning. It has not put forth any direct consumer testimony, by way of affidavits, relative to their state of mind, nor has Plaintiff put forth any evidence at all on this issue by way of a consumer survey. Such an omission is fatal." Def.'s Supp. Mem. at 6.

*10 YSMA's failure to produce its own survey evidence and the fact that YSMA presents statistics taken from YSRI's survey are far from fatal to YSMA's cause. Of particular importance is the fact that YSRI's survey was conducted within one month of the opening of YSMA's store in Attleboro. YSMA started advertising in the Attleboro area in May, 1996 for a grand opening in late May, 1996. YSRI commissioned the survey in June, 1996. Given this limited time period, it is understandable that there was little if any name recognition in the Attleboro area; rather, this court finds it significant that nearly one-third of those surveyed identified "Yankee Spirits" as engaged in the business of selling alcoholic beverages.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

Another factor used to establish secondary meaning is the effort made to the public to connect a name or mark with the particular product or venture. *Volkswagenwerk,* 814 F.2d at 816. The First Circuit has held that advertising a Volkswagen sedan, since the 1960's, as a "Beetle" sufficiently provided a conscious connection in the public's mind between the mark "Beetle" and the sale of Volkswagen automobiles. *Id.* Similarly, in *Donoghue v. IBC/USA, Inc.,* 886 F.Supp. 947 (D.Mass.1995), *aff'd,* 70 F.3d 206 (1 st Cir.1995), this court found that twenty-two years of experience as a mutual fund expert was sufficient to form a "widely known" association in the public mind between the plaintiff's surname and its strategic investment venture. *Id.* at 953. Likewise, the Ninth Circuit has phrased this conscious connection as the public's familiarity of a mark with a unique, albeit unknown, source.

For YSMA to succeed on this factor, it must prove that it made an effort, towards the consuming public, to connect the term "Yankee Spirits" with its product--alcoholic beverages. The court is persuaded that YSMA's mark has fulfilled this requirement. Like the court in *Donoghue* this court finds that YSMA's efforts over thirty-three years as a successful retailer of alcoholic beverages as well as YSMA's continuous use of the mark "Yankee Spirits" in numerous liquor advertisements sufficiently demonstrates a conscious effort by YSMA to connect in the public's eye, the mark "Yankee Spirits" with the sale of liquor.

The fact that YSMA has not provided evidence of direct consumer testimony is not surprising here given the fact that YSMA's Attleboro store was not open for even one full month during the relevant time period. Moreover, Gasbarro's use of the mark "Yankee Spirits" lasted only twenty-five (25) days. Accordingly, the negative implication normally associated with an absence of direct consumer testimony is considerably discounted, if not non-existent given the circumstances.

Given the foregoing, this Court finds that YSMA has established that its mark "Yankee Spirits" has acquired secondary meaning. Consequently,

"Yankee Spirits" is entitled to protection under the law.

This Court now turns to the pivotal inquiry of whether YSRI's allegedly infringing mark is likely to cause consumer confusion. *See* 15 U.S.C. § 1114(1) (prohibiting the use of a mark that is "likely to cause confusion, or to cause mistake, or to deceive."). The determination as to whether a likelihood of confusion exists requires this Court to examine the following factors: similarity of the marks; similarity of goods; channels of trade, advertising, and class of prospective purchasers (the custom in this circuit is to analyze these factors together, *see Aktiebolaget Electrolux v. Armatron Int'l, Inc.,* 999 F.2d 1, 3 n. 3 (1 st Cir.1993)); evidence of actual confusion; defendant's intent in adopting the mark; and the strength of the mark. No individual factor is necessarily determinative, but each must be considered. *Keds Corp.,* 888 F.2d at 222 (citing *Volkswagenwerk,* 814 F.2d at 817).

**\*11** As an initial matter, this Court delineates the *Tea-Rose-Rectanus* doctrine because (1) it is interconnected with Gasbarro's intent, and (2) YSRI attempts to invoke the doctrine to raise an issue of fact as to secondary meaning and to end the inquiry into whether YSRI's mark is likely to confuse the public.

One can find the genesis of the *Tea Rose-Rectanus* doctrine in two Supreme Court cases: *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916) and *United Drug Co. v. Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). In *Hanover Star,* the Supreme Court determined the respective rights of two parties who had independently and in good faith adopted the mark "Tea Rose" for the sale of flour. Plaintiff had established its trade in 1872, making sales in Ohio, Massachusetts, and Pennsylvania. Without knowledge of plaintiff's prior use, defendant began using the mark in 1904 making sales in Mississippi, Alabama, Georgia, and Florida. Plaintiff sought to enjoin defendant's use of the "Tea Rose" mark even though plaintiff had not entered the southeast market. The Supreme Court held that plaintiff's prior appropriation of the mark was "legally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 11

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

insignificant" because defendant had not "selected the mark with some design inimical to the interest of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like." *Id.* at 415. Also significant for purposes of the case sub judice is the fact that the Supreme Court noted it was "not dealing with a case where the junior appropriator of a trade-mark is occupying territory that would probably be reached by the prior user in the natural expansion of his trade, and need pass no judgment upon such a case." *Id.* at 420. Such is not the case here.

In *United Drug Co. v. Rectanus Co.,* defendant began using the mark "Rex" in Kentucky to market a "blood purifier" approximately six years after plaintiff began using the mark in Massachusetts to market medicinal preparations. 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141. As in *Hanover Star,* defendant began using the mark without knowledge of plaintiff's prior use. In fact, the Supreme Court found that there was "no suggestion of a sinister purpose...." 248 U.S. at 101. The two companies came into conflict when plaintiff sent some drugs into Kentucky to be sold using the "Rex" mark. The Supreme Court held in favor of the defendant (subsequent user) because

the adoption of a trade-mark does not, at least in the absence of some valid legislation enacted for the purpose, project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade.

248 U.S. at 97-98.

The result of the *Tea Rose* and *Rectanus* cases can be stated in the following manner: as to the rights attached to a mark, those of a prior appropriator are subordinate to those of a remote good-faith subsequent user. Two inquiries, therefore, must be made before the doctrine may be applied: first, whether the subsequent user adopted the mark in "good faith"; and, second, whether the subsequent user was "remote" when it adopted the mark. *See* McCarthy, supra § 24:4, at 26-10 (stating that majority of cases applying the doctrine hold that a defendant must establish both good faith and

remoteness in order to invoke the defense).

*\*12* Most cases hold that knowledge of the senior appropriator's use of the mark is sufficient to defeat a claim of good faith. *See e.g., Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 876-77 (E.D.N.Y.1978)(citing cases) and *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 408 F.Supp. 1219, 1239-40 (D.Colo.1976). [FN12]

> FN12. The minority view adopted by the Restatement is that mere knowledge is insufficient, rather, the "ultimate focus is on whether the second user had the intent to benefit from the reputation or goodwill of the first user." *GTE Corp. v. Williams,* 904 F.2d 536 (10 th Cir.1990). This view allows knowledge of the prior user's mark to form an inference of bad faith but not a conclusion thereof. Even the minority view, however, is contrary to YSRI's contention. That is, knowledge does create an inference even if the subsequent use is done to forestall expansion of the senior user's business rather than interrupt existing trade. As the drafters of the Restatement point out, an inference of bad faith may be made "if the designation is adopted by the subsequent user for the purpose or with the expectation of forestalling expansion under the mark by the prior use or causing injury to the prior user's reputation or good will." Rest. (3d) of Unfair Competition, § 19, comment(d)(1995).

The First Circuit follows the majority view that the junior user's mere knowledge of the senior user's mark is sufficient to defeat a defense based on the *Tea Rose--Rectanus* defense. While addressing the "good faith" requirement of the *Tea Rose-Rectanus* defense, the court in *Thrifty Rent-A-Car System, Inc. v. Thrift Carts, Inc.,* 639 F.Supp. 750 (D.Mass.1986), *aff'd,* 831 F.2d 1177 (1 st Cir.1987) stated

One may question why trademark rights should turn on a junior user's subjective state of *knowledge.* The answer is two-fold. First, a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 12

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

merchant who adopts a trademark *knowing* that another party already uses it in a remote area must surely intend to prevent the senior user from expanding into his own territory. Such behavior conflicts with a policy of fostering trade by allowing a merchant the maximum benefit of his good will. Second, a junior user's *knowledge* may evidence *knowledge* by others in the area, and a consequent lack of remoteness. *Id.* at 754 n. 3 (citing 2 McCarthy, § 26:4 at 292-93 )(emphasis added). In *Raxton Corp. v. Anania Assoc., Inc.,* 635 F.2d 924 (1 st Cir.1980), the court identified the spectrum of liability created by one's knowing subsequent use of another's mark. In doing so, the court rejected a "natural expansion" doctrine that imposed liability on "innocent" subsequent users:

> The unfairness of this doctrine vanishes if the hypothesis of an innocent subsequent user is dropped, *or* if it is shown that the disputed trademark is known to consumers in the area of subsequent use prior to the subsequent user's adoption. In these cases it can be presumed *unless demonstrated to the contrary* that the subsequent user *knowingly* copied the mark. At the least, this suggests that the subsequent user should have been more careful to select a name free of prior rights and should be held to assume the risk of its negligence. At worst, this indicates a design to appropriate the good will of another.

*Id.* at 930.

Gasbarro's attempt to invoke the doctrine, therefore, fails because Gasbarro clearly knew of YSMA's prior use of the mark "Yankee Spirits" and of YSMA's intent to use the mark in Attleboro. Yet, Gasbarro chose to open his business questionably close to YSMA's intended location and even advertised in Attleboro. Gasbarro, consequently, is far from showing good faith adoption of the mark. Moreover, given the teaching of *Thrifty Rent-A-Car System, Inc* and *Raxton Corp.,* this Court may infer that the respective market areas are not, in fact, remote, [FN13] and that Gasbarro's actions fall on the spectrum between negligence and intentional appropriation of another's good will. Clearly, given his knowledge of YSMA's mark, Gasbarro's actions fall well beyond negligence and any hope of

establishing good faith.

> FN13. YSRI's contentions based on the alleged remoteness of plaintiff's and defendant's respective markets, therefore, completely miss the mark and are irrelevant here. See Def.'s Mem. at 14 ("YSMA offers no competent evidence of market penetration in these areas at the time YSRI incorporated and began its marketing efforts...."); Def.'s Supp. Mem. at 13 (claiming that Plaintiff "mischaracterizes the law" because "[m]ere knowledge (by a junior user) of a senior user's mark in a remote geographical area is *not* enough, by itself, to defeat a claim of good-faith adoption.")(emphasis in original); *id.* (concluding that YSRI "cannot be found to have acted in bad faith merely by adopting and using YANKEE SPIRITS in an area where Plaintiff had heretofore not used the mark and wished to expand into.").

**\*13** Moreover, the First Circuit presumes a likelihood of confusion from a junior user's knowing use of a senior user's mark. *See WCVB-TV v. Boston Athletic Ass'n,* 926 F.2d 42 (1 st Cir.1991)("It makes sense to presume confusion about a relevant matter (namely, official sponsorship) from such an intent, at least in the absence of contrary evidence.")(citing *Boston Athletic Association v. Sullivan,* 867 F.2d 22 (1 st Cir.1989)). *See also* 3 McCarthy, supra § 23:115 at 23-217 ("Proof that defendant knew of plaintiff's mark at the time defendant chose its mark has often been relied upon as evidence of bad faith and an intention to trade upon another's good will."). Recently, this Court has stated that:

> If a defendant has intentionally copied the trade dress of the plaintiff's product, the plaintiff is entitled to a rebuttable presumption of likelihood of confusion.... '[W]hen there is intentional copying of a product's trade dress, 'the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded." ... The presumption 'works with maximum efficiency in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

the commercial setting .'
*Big Top, U.S.A. v. Wittern Group,* 998 F.Supp. 30, 1998 WL 84582 at *24 (D.Mass.1998) (citations omitted). In *Big Top,* the court distinguished between intent to copy and " 'intent to derive a benefit from the reputation of another." ' *Id.* (citing *Esercizio v. Roberts,* 944 F.2d 1235, 1243 (6 th Cir.1991) (quoting *Zin-Plas Corp. v. Plumbing Quality AGF Co.,* 622 F.Supp. 415, 420 (W.D.Mich.1985))). The court found that it was not clear from the facts presented that defendant intended to use plaintiff's reputation. Therefore, the court held that although plaintiff was "entitled to a presumption of confusion due to [defendant's] intent to copy, the particular facts of [the] case weaken that presumption." *Id.* at *25.

*Big Top,* however, is distinguishable from the case sub judice. In that case, the following factors acted in defendant's favor by weakening the rebuttable presumption of customer confusion arising from defendant's intentional copying:
> (1) the high level of sophistication of the vendors; (2) compelling evidence that the vendors were never confused and fully understood that [defendant] manufactured [the allegedly infringing articles]; (3) little possibility that consumers are likely to be confused based on the large differential in price between the machines; (4) the relative weakness of the [plaintiff's] trade dress given [plaintiff's] new appearance in the ... market; and (5) the lack of evidence that [plaintiff] had established goodwill in the marketplace." This Court concludes that [defendant] has rebutted the presumption of confusion against it by demonstrating to the Court that confusion by purchasers in the relevant ... market has not occurred and is not likely to occur in the future.

*Big Top,* supra at *25. Here, however, contrary to YSRI's characterization, average consumers are not going to scrutinize their purchases to the same degree as if they were making a purchase involving significant financial risk; even if the prices between the stores show some variation, this will not suffice to put the average consumer on notice that YSRI has no affiliation with YSMA; and YSMA has been in the market for more than thirty years, consistently using the "Yankee Spirits" mark for a majority of that time period. Simply stated, YSRI has not rebutted the presumption of a likelihood of confusion.

*14 This court now turns to the other factors used to determine whether there is a likelihood of confusion. "[B]ecause the listed factors must be evaluated in context, any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark." *Big Top,* 998 F.Supp. 30, 1998 WL 84582, at *19 (citation omitted).

Similarity between the marks is "determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons,* 657 F.2d at 487 (citations omitted). Marks may be recognized as similar based on their appearance, sound and meaning. *See Sullivan,* 867 F.2d at 29 ("Meaning alone ... may be sufficiently close to constitute similarity."); *Volkswagenwerk,* 814 F.2d at 817 ("[A] finding of similarity may be based on appearance alone.").

Here, the marks are identical in sound--both use "Yankee Spirits." They are similar in meaning relative to the sale of alcohol, though there is some difference in terms of the size of the respective stores and the selection offered. Visually, they are different in the sense that YSRI's ads show that Gasbarro is the president of the company and they do not display a stars-and-stripes logo sometimes used by YSMA.

YSRI attempts to distinguish the similarity between the logos on the following grounds. First, "Plaintiff uses YANKEE SPIRITS with the words Discount Liquors and a stars and stripes logo", Def.'s Supp. Mem. at 11, while Defendant's advertisements had no such pattern. Second, YSRI's ads explicitly stated that Gasbarro was the president of the company. Third, "Plaintiff's services are rendered through very large, discount-type liquor stores.... Defendants, on the other hand, render their services at a small, regular price 'mom and pop' type of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

liquor store." *Id.* Finally, YSRI contends that "[a] consumer of ordinary intelligence exercising a minimum of care would be aware that the sale of alcoholic beverages is heavily regulated by each individual state and that liquor retailers in different states are generally separate and distinct entities." Def.'s Mem. at 13.

As the Big Top court pointed out, however, "[t]he fact that there are some differences between [plaintiff's mark] and [defendant's mark] misses the point: 'It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." ' *Big Top,* supra at *20 (citations omitted); *see also AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1543 (11 th Cir.1986)(stating that an intent to "come as close as the law will allow" is still "probative on the likelihood of confusion issue."). This Court, like the *Big Top* court, is not confused.

YSRI's first and second distinguishing features can be disposed of quickly. In *Black Dog,* supra, the court noted that "[i]n some infringement cases, the likelihood of confusion inquiry also focuses upon whether members of the purchasing public are likely to believe that the plaintiff produces, licenses, or otherwise endorses the defendant's products." *Id.* at 54 (citing *Sullivan,* 867 F.2d at 28-29); *see also Pignons,* 657 F.2d at 490 ("Confusion over the nature of the parties' business relationship may be as objectionable for purposes of trademark infringement as is confusion between their goods."). One potential source of confusion in the case sub judice, therefore, is that a consumer would assume that YSMA granted a license for the use of its mark to Gasbarro. Consequently, the distinguishing characteristics cited by Defendant are insufficient.

*\*15  YSRI's third contention was implicitly addressed in both *Black Dog* and *Volkswagenwerk.* In both cases, the defendant was an entity that was considerably "smaller" than the plaintiff in terms of physical size, selection, and services rendered. Yet, the courts in those two cases did not consider this an important factor in making their respective determinations. Furthermore, the Lanham Act

"forbids a competitor from luring potential customers from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated." *Dorr-Oliver, Inc. v. Fluid-Quipp, Inc.,* 94 F.3d 376, 382 (7 th Cir.1996). In other words, one would not know that YSRI's store is a "mom and pop" operation until one visited the store; by that time, the harm would be manifest. This Court, therefore, finds the distinction Defendants present here between a large-scale business and a "mom and pop" operation is of minimal relevance.

YSRI's last contention is disingenuous at best. In fact, a case YSRI cites makes the following observation:

As the Second Circuit has observed, 'every product has its own separate threshold for confusion of origin.' ... In that case, the court noted that '[w]ine is a product whose quality is accepted by many simply on faith in the maker.' ... Hence, a confusing similarity in names on the wine bottles was likely to result in confusion among ordinary purchasers.

*Perini Corp. v. Perini Construction, Inc.,* 915 F.2d 121 (4 th Cir.1990)(citing *Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 733 (2 nd Cir.1978)). The same holds true for wine retailers. YSRI's categorization of the "consumer of ordinary intelligence" defies common sense.

The goods to be sold here are very similar--alcoholic beverages. Though during the relevant time period YSRI did not have a liquor license and, therefore, did not sell any alcohol, this Court finds this contention of minimal importance for purposes of determining a likelihood of confusion. Upon acquiring the license to sell alcohol, it is very clear that both Plaintiff and Defendant would be engaged in the business of selling the same product.

The First Circuit examines three factors in assessing trademark or trade dress strength: " 'the length of time a mark has been used and the relative renown in its field; the strength of the mark in plaintiff's field of business; and the plaintiff's action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

in promoting the mark." ' *Equine Techs.,* 68 F.3d at 547 (quoting *Keds Corp.,* 888 F.2d 215, 222 (1 st Cir.1989)). By the time Defendant began using the mark "Yankee Spirits", Plaintiff had already used same for more than thirty years. As described infra, YSMA has shown through sales and advertising expenditures that its mark has gained some renown in the retail sale of alcohol and that plaintiff has incurred considerable expense in promoting its mark. Though YSMA varied the presentation of its mark and included other words within advertisements, this does not weaken YSMA's mark to a sufficient degree such that it would act in YSRI's favor here.

**\*16** The custom in this circuit is to analyze the following factors together: channels of trade, advertising, and class of prospective purchasers. *See Aktiebolaget,* 999 F.2d at 3 n. 3. YSRI disputes the contention that Plaintiff and Defendant advertise in the same media. YSRI claims it does not advertise on cable television; nor did it advertise in The Boston Globe, The Boston Herald, The Hartford Courant, or the Worcester T & G. YSRI also claims there is a genuine issue as to the parties' channels of trade and class of purchasers because their survey reveals that 85% of respondents traveled three (3) miles or less to make a purchase of alcohol. Def.'s Supp. Mem. at 13. "Moreover, 76% of the respondents identified a convenient location as being very or somewhat important to their decision on choosing a liquor store." *Id.* YSRI's argument, therefore, is that because the parties' respective advertisements do not overlap, and because YSMA's store is located more than three miles from YSRI's, the purchasers who will patronize YSMA's store will not be the same purchasers who patronize YSRI's store.

There is sufficient evidence in the record to undermine the import of YSRI's argument. YSRI distributed flyers as part of its advertising campaign in parts of Rhode Island and Massachusetts, including Attleboro. These advertisements included the statement "Serving Rhode Island *and Massachusetts."* (Emphasis added.) Both YSRI and YSMA advertised in the *Providence Journal* and two Massachusetts newspapers, the *Seekonk Star*

and the *Sun Chronicle,* an Attleboro newspaper. These overlapping advertisements, considered in conjunction with the teachings of the *Tea Rose-Rectanus* line of cases holding that defendant's knowing imitation implies that the parties are not remote, *see infra* at 23- 24, the notion that the class of purchasers who may patronize YSRI's establishment is identical to the class who may patronize YSMA's store, *see infra* at 29, and the fact that Gasbarro testified that he at least hoped to reach those individuals in the Attleboro area who would tell their friends in the Providence area of Gasbarro's re-entry into the market, *see Big Top, supra* 1998 WL 84582,\*21 (D.Mass.1998)("[I]n light of the broad remedial nature of the Lanham Act, there is a strong argument that in some circumstances, a non-purchaser with substantial influence over the buying decision of a purchaser could potentially be deemed a consumer for purposes of a likelihood of consumer confusion analysis"), this Court finds that the channels of trade and class of purchasers, either standing alone or in conjunction with any other factor(s), are not sufficiently dissimilar to rebut the presumption of a likelihood of confusion.

There is no evidence here of actual confusion. This is not detrimental to YSMA's motion, however, given the short amount of time that YSRI actually used YSMA's mark (less than one month). Consequently, this factor, either standing alone or considered along with other factor(s), is not sufficient to rebut the presumption of a likelihood of confusion.

**\*17** Accordingly, this Court hereby ALLOWS Plaintiff's motion for partial summary judgment relative to its claims arising under § 43 of the Lanham Act. It is also recommended that the court decline pendent jurisdiction over the Massachusetts and Rhode Island state law claims.

SO ORDERED.

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 428092 (D.Mass.)

**(Cite as: 1998 WL 428092 (D.Mass.))**

who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See United States v. Valencia-Copete,* 792 F.2d 4 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378-79 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

1998 WL 428092 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

- 1:96CV10967 (Docket)

(May. 10, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10



Copyright 2005 © Diamond Staffing Solutions, Inc.

Designed by: Idea Outfitters

Diamond Staffing Solutions, Inc.

DIAMOND STAFFING & DIAMOND STAFFING SOLUTIONS

are service marks of Diamond Staffing Solutions, Inc. All rights reserved.

# Diamond Staffing, Inc.

*...A Cut Above the Rest!*



**Our Mission**        **Job Search**        **Opportunities**        **Locations**

Are you in search of an agency that is a cut above the rest?

If your answer is yes!!!, then talk to us at Diamond Staffing.  Our team approach and creative strategies can be implemented into your company needs and help assure that you exceed your recruitment goals, whatever those may be.

If you want the ultimate in Health Care staffing, visit our health care division at Horizons Healthcare.

**Diamond Staffing, Inc.**
146 West Boylston Drive Worcester, MA
508-459-5005
508-459-5014 (fax)
*resume@diamondstaffinginc.com*

# EXHIBIT 11



Diamond
Staffing, Inc.



## Opportunities

Contact Us

Diamond Staffing, Inc. offers a wide array of services such as direct hire, temp, temp to perm and contract. Businesses can depend on us to provide talent for short or long term assignments. Looking to gain experience? Temporary employment can provide a chance to learn new skills and offers flexibility.

## Services Provided:

Copyright © 2003
Diamond Staffing,
Inc. Worcester MA

Administrative Assistants
Customer Service Specialists
Data Entry
Engineering
Executive Assistants
Finance & Accounting

Information Technology
Legal Secretaries
Light Industrial Staffing
Sales
Telesales