UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS INC.,

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

## DIAMOND STAFFING SOLUTIONS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

At the June 1, 2005 deposition of Francis G. Vaccaro, Diamond Staffing, Inc.'s ("DSI") President and Chief Executive Officer, Mr. Vaccaro testified that DSI plans on "rapid growth" and pursuant to his business plan "intends on growing right on down to New York to Florida." Deposition of Francis G. Vaccaro, dated June 1, 2005 at 115-116 ("Vaccaro Dep.") (attached hereto as Exhibit 1). At the current time, DSI is not conducting business in many of the states into which it apparently intends on expanding operations. The scope of Plaintiff Diamond Staffing Solutions, Inc.'s ("Diamond Staffing Solutions[SM]") business is national, however, and plaintiff has priority of use in the states in which DSI apparently plans on commencing operations.

## II.    ARGUMENT

### Discussion

### 1.    Plaintiff Is Entitled To Amend Its Verified Complaint.

Certain of the facts on which Plaintiff bases its new claims for declaratory judg-
ment have only come to light during expedited discovery.  Fed. R. Civ. P. 15(a) and Fed.
R. Civ. P. 15(d), state that leave to amend shall be freely granted when the additional
claims relate to the same set of facts as the original Complaint and when doing so will not
cause undue delay, or prejudice.  Foman v. Davis, 371 U.S. 178, 182 (1962); Savoy v.
White, 139 F.R.D. 265, 267 (D.Mass. 1991) (absent delay or prejudice, Rule 15(a) gener-
ally requires allowance of amendments); and see Mill Run Plaza Associates v. Contrac-
tors Funding Control, Inc., C.A. Nos. 88-0329, 89-1351, 1992 WL 81328, *3 (D.Mass.
Mar. 23, 1992) quoting 6A Wright & Miller, Federal Practice & Procedure § 1504 at 187-
88 (2d ed. 1990 & Supp. 1996) (same standard under Rule 15(d)).  As the Supreme Court
stated in Foman, "[i]f the underlying facts or circumstances relied upon by a plaintiff may
be a proper subject of relief, [the plaintiff] ought to be afforded an opportunity to test his
claim on the merits."  371 U.S. at 182.

Plaintiff has unequivocally satisfied the Rule 15 standards laid out in the above
case law.  To begin with, it is indisputable that Plaintiff has submitted its Amended Veri-
fied Complaint in a timely fashion.   The instant case has only been pending since
March 2005, the preliminary injunction hearing has not taken place, discovery has only
recently commenced, no scheduling order has been entered and no dispositive motions
have been heard.  Moreover, Plaintiff completed the deposition of the Defendant's presi-
dent on June 1, 2005.  It was only then that Plaintiff  learned that Defendant intends to
expand its infringing use of Diamond Staffing[SM] to states other than those in which it cur-

- 3 -

rently does business.  Plaintiff has now moved diligently to compile the information during discovery in order to amend and supplement its Verified Complaint.  Federal courts in this Circuit have frequently granted motions to amend where the moving party was far less diligent than Plaintiff.  See, e.g., Savoy v. White, 139 FRD at 268.

Of equal importance is that Plaintiff's additional claim for declaratory judgment also relates to the same set of operative facts on which it based its initial Verified Complaint.  Specifically, as noted above, Plaintiff has recently learned, through the testimony of Defendant's president, Francis G. Vaccaro, that Defendant currently only conducts business in (at most) Massachusetts, New Jersey, Connecticut, Rhode Island, New Hampshire, and New York.[1]  Vaccaro Dep. at pp. 46-56 (Ex. 1).  Pursuant to a business plan, it apparently intends on expanding its business down the east coast of the United States.  See (Vaccaro Dep. at pp. 115-116 (Ex. 1).  More specifically, Mr. Vaccaro testified as follows:

> Q:   Okay, what does the business plan have to say about the geographic scope of the services that Diamond Staffing, Inc. is offering?
> A:   Basically, that we wanted to grow from Massachusetts right on down to New York into Florida, and that was our plan.
> Q:   So east coast expansion then?
> A:   East coast, but how this business works is if Company X sponsors you and says we want you to do work for us on site, and we're going to give you 50, 60, 70 temps to start, then you've got yourself a nice business to start...
> Q:   What does the business plan have to say, if anything, about the timing of your expansion of service offerings?
> A:   Well, we had talked over a *three year plan*, but again, flexibility was a key word.

Id. (Ex. 1)

---

[1] Plaintiff expressly reserves the right to contest that the "business" which Mr. Vaccaro claims DSI conducts in these states constitutes sufficient penetration for trademark purposes, and states that Plaintiff has priority-of-use over "Diamond Staffing" in these states.

- 4 -

Plaintiff's rights in Diamond Staffing<sup>SM</sup> are accordingly at risk of being infringed upon in each state where Plaintiff currently conducts business and where Defendant intends to expand.

This gives rise, <u>inter alia</u>, to Plaintiff's new claim for declaratory judgment, and directly relates to Count I (Trademark Infringement) of the original Verified Complaint. Rather than require Plaintiff to bring suit in a new federal court every time Defendant attempts to use Plaintiff's mark in a new state, it is more expeditious to adjudicate the parties' respective rights to the mark in one forum. <u>See</u> 6A Wright & Miller, <u>Federal Practice & Procedure</u> § 1506 at 194 (2d ed. 1990 & Supp. 1996).

Defendant cannot feasibly claim that it is prejudiced by Plaintiff's Amended Verified Complaint. Plaintiff has already discovered substantial evidence to support its new claim, and envisions completing any additional discovery before the already established discovery deadline. Moreover, Defendant should not require any additional discovery because Plaintiff's new claim is founded upon the testimony of Defendant's president, who Plaintiff has already deposed and who Defendant cross-examined.

**2.    Plaintiff's Additional Claim For Relief Is Meritorious**

The Declaratory Judgment Act, 28 U.S.C. §2201, provides, in pertinent part, that "[i]n a case of actual controversy" this Court "may declare the rights and other legal relations of any interested party seeking such declaration." The applicable test is whether (1) the defendant's conduct has created a real and reasonable apprehension of liability on the part of the plaintiff, and (2) whether the parties are in a sufficiently adversarial conflict. <u>Starter Corporation v. Converse, Inc.</u>, 84 F.3d 592, 596 (2d Cir. 1996). In the trademark or service mark context, an actual case or controversy exists where a party has engaged in a course of conduct evidencing an intent and apparent ability to commence use. <u>Id.</u>; <u>and</u>

- 5 -

see <u>Hoyt Electrical Instrument Works, Inc. v. Isspro, Inc.,</u> 263 F. Supp. 2d 280, 283 (D.N.H. 2003). Here, DSI is already allegedly conducting business in Massachusetts, New Jersey, New York, New Hampshire, Rhode Island, and Connecticut, and has expressed through the unambiguous testimony of its CEO the definite intention to expand down the east coast. Considering this – as well as the pending litigation among the parties – it is clear that the requisite case or controversy exists for this Court to issue a declaration regarding the priority of Diamond Staffing Solutions[SM] service mark rights in these jurisdictions.

## CONCLUSION

The facts Plaintiff has unearthed in discovery provide more than a sufficient basis to support amendment of its Verified Complaint. Defendant will not be prejudiced by the amendment. However, if the Motion is not granted, Plaintiff will continue to suffer damages because Defendant will continue to infringe upon Plaintiff's mark in additional states. In accordance with the liberal policy underlying Fed.R.Civ.P. 15(a), this Court should grant Plaintiff's motion for leave to amend its Verified Complaint.

**DIAMOND STAFFING SOLUTIONS, INC.**

By its attorneys,

Date: July 22, 2005

Nicholas G. Papastavros (BBO#635742)
Michael L. Cornell (BBO # 651405)
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000 (telephone)
(617) 345-1300 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served upon all counsel of record by electronic service and upon Robert Meltzer, Esq. by regular mail on July 22, 2005.

_____
Michael L. Cornell

**EXHIBIT 1**

CONFIDENTIAL
Francis G. Vaccaro

46

1       Q.   That's B U O N O?

2       A.   Yes, sir.  I'm just trying to recall.  Oh.

3   Jennifer Manguel.

4       Q.   How many offices did DSI have at the time it

5   commenced operations?

6       A.   We opened up in Worcester.  Then I --

7       Q.   When was that?

8       A.   That was actually October of 2003.

9       Q.   Before Halloween you think?

10      A.   Yeah, around that time period.  I'd have to

11  go back and check.  Around that area.  The last week

12  of October I think.  Second to last week.

13      Q.   Late October, early November?

14      A.   Yes, sir.  Yes, sir.  That's correct.  And

15  then we opened up Milford and Clinton a couple weeks

16  after that.  And then proceeded to -- Let's see.

17  I'm just trying to think.  NJ, New Jersey.  We had

18  opened up -- that's where I'm born.  So I had that

19  market.

20           Then we opened up Somerville.  This is

21  going further down though --

22      Q.   When did you open up -- I'm sorry.  You said

23  New Jersey.

24      A.   Yeah.  That was --

CONFIDENTIAL
Francis G. Vaccaro

47

1    Q.   When did you open up?

2    A.   November.  November.  For Diamond Staffing.

3  And Clinton and Milford November for Diamond

4  Staffing.  First week of November, second week of

5  November.

6    Q.   Now you have more than one New Jersey office

7  now, correct?

8    A.   I do now.

9    Q.   What office did you open up in November

10  2003?

11    A.   Elizabeth.  Elizabeth, New Jersey.  Then the

12  rest we've grown over the past two years.

13  Chelmsford, Webster.

14    Q.   When was the Chelmsford office opened?

15    A.   August of last year.  Webster was March of

16  last year, I think.

17    Q.   That's Webster, Massachusetts?

18    A.   Yes, sir.  Yeah.

19    Q.   And Chelmsford, Massachusetts also?

20    A.   Yes.  Yep.

21    Q.   Okay.

22    A.   And -- two, three.  Yeah, that's it.  Two

23  more in Jersey.  Yes.  Let's see.  Perth Amboy, New

24  Jersey was September 2004.  And Plainfield, New

48

1    Jersey is -- Well, we have the lease April 1, 2005.

2    We haven't officially opened.  We're opening it this

3    week.  We hope.  Depending on --

4        Q.  When was the Elizabeth, New Jersey office

5    opened?

6        A.  November.

7        Q.  Two thousand three?

8        A.  Yes.

9        Q.  So just to recap, Worcester was opened in

10    late October, early November 2003?

11        A.  Correct.  Correct.

12        Q.  Milford and Clinton opened in November 2003?

13        A.  Correct.

14        Q.  Elizabeth, New Jersey opened in November

15    2003?

16        A.  Correct.

17        Q.  Chelmsford, Massachusetts, August 2004?

18        A.  Correct.

19        Q.  Webster, Massachusetts, March 2004?

20        A.  Correct.

21        Q.  Perth Amboy, New Jersey, September 2004?

22        A.  Correct.

23        Q.  Plainfield, New Jersey, April 1, 2005 lease

24    not officially opened yet but will do so this week?

CONFIDENTIAL
Francis G. Vaccaro

49

1    A.   Hopefully.

2    Q.   Has DSI placed candidates with clients other

3    than in Massachusetts and New Jersey?

4    A.   We have employees in Rhode Island.  We have

5    employees in Connecticut.  We have employees in New

6    Hampshire.

7    Q.   Anywhere else?

8    A.   I'm trying -- yeah.  We have employees in

9    New York, Philadelphia.  Anywhere else?  Good

10   question.  No, that's it.  They come to your offices

11   in Massachusetts, and -- or Jersey, and sometimes

12   the client requests that they work in other spots.

13   So you send them.

14   Q.   So Rhode Island, Connecticut, New Hampshire,

15   New York and Pennsylvania?

16   A.   PA and Mass. and New Jersey.

17   Q.   As you sit here today, can you tell me how

18   many placements DSI has completed in those other

19   five states?

20   A.   Rhode Island we probably have 15, 16 people

21   working in Rhode Island or have worked in Rhode

22   Island.  Connecticut, 25, 30.  New Hampshire,

23   probably 10.  New York, I think there's 2.

24   Pennsylvania, 2.  Then obviously the Mass. and New

CONFIDENTIAL
Francis G. Vaccaro

50

1    Jersey are the -- well, we employ quite a few

2    people.

3        Q.   When did you first place in New Hampshire?

4        A.   I think that was last year.

5        Q.   Two thousand four?

6        A.   Yeah.

7        Q.   Do you recall when?

8        A.   Probably when Chelmsford opened.  So

9    whenever Chelmsford opened that's when we probably

10   did it 'cause Nashua is 20 minutes away from

11   Chelmsford.

12       Q.   What client did you place candidates with in

13   Nashua?

14       A.   Call center.  Customer call center.  That's

15   it.  And I think one of our clients -- we have an

16   agricultural license and one of our clients is

17   Wilson Farms of Mass. -- of Lexington, and they have

18   a farm up there.  I don't know where it is up there,

19   but they take our people and put 'em to work.

20   That's it.

21             MR. PAPASTAVROS:  Off the record.

22             (Off the record.)

23       Q.   You first placed then in New Hampshire after

24   the Chelmsford, Massachusetts office came on board

CONFIDENTIAL
Francis G. Vaccaro

51

1    in August of 2004; is that correct?

2        A.   To my knowledge, yes, sir.

3        Q.   When did you make the placements in New York

4    and Philadelphia?

5        A.   Philadelphia, -- Philadelphia's actually an

6    internal employee.  So that's -- the reason I

7    answered the question that way is because we have

8    people working in every -- every one of those

9    states.  So Philadelphia was an internal employee.

10       Q.   You didn't actually -- strike that.

11       A.   No.  I know what you're going to ask.

12   Sorry.

13       Q.   Mr. Vaccaro, if you could just wait until I

14   finish the question.  What do you mean by -- I think

15   I --

16               MR. PAPASTAVROS:  Off the record.

17               (Off the record.)

18       Q.   You indicated that you had an internal

19   employee in Philadelphia.  Could you elaborate on

20   what you mean by that?

21       A.   Yes.  Someone who works in my Jersey office

22   that commutes back and forth to Philadelphia.

23       Q.   That's not a placement with a client then?

24       A.   No, sir.  So that's wrong.

CONFIDENTIAL
Francis G. Vaccaro

52

1    Q.  DSI has never placed an employee --

2    A.  Nobody in Pennsylvania.  Take that one off

3    now that I'm thinking about it.  It's an employee of

4    mine.

5    Q.  How about New York?

6    A.  Yes.  When was that placed?  Sometime in

7    2004.  I think it's for U-Haul if you're interested.

8    Q.  What placement was that office made out of?

9    A.  New Jersey.

10   Q.  Can you place in time when this U-Haul

11   placement would have occurred?

12   A.  Sometime in 2004.  That was in Brooklyn.  So

13   it's not a -- it's 15 minutes from Elizabeth if you

14   take it over the bridge.  So it's kind of -- the

15   burrows are pretty tight.

16   Q.  Do you know if DSI's computer records enable

17   to sort this information to find out when placements

18   were made and where?

19   A.  It does not.  It does not.  Again, the paper

20   trail.  I'm going to have to look for a paper trail

21   as I stated.

22   Q.  Were both placements in New York made with

23   U-Haul, or were there two separate placements?

24   A.  No.  To my knowledge, they're both with

CONFIDENTIAL
Francis G. Vaccaro

53

1   U-Haul -- they're not there anymore.

2       Q.   Those are the only two placements that DSI's

3   ever made in New York?

4       A.   To my knowledge, yes.

5       Q.   Would anybody else have better knowledge

6   with respect to those placements than you?

7       A.   No.

8       Q.   And do you recall how many placements DSI

9   made at the Nashua, New Hampshire call center?

10      A.   Three or four.  That's it.

11      Q.   And when were the other placements made in

12  New Hampshire?

13      A.   That's the Wilson Farm people that go up to

14  six people -- that happens seasonally.  So I think

15  they go up for the fall season.  They go up once in

16  a while now in the spring.  I guess they're going to

17  take them up two now.  They just go and pick the

18  fruit.

19      Q.   Let me ask you a question.  Were those

20  placements actually made with Wilson Farms in

21  Lexington?

22      A.   Yes.

23      Q.   Then Wilson Farms might allow those

24  employees to commute back and forth to New

CONFIDENTIAL
Francis G. Vaccaro

54

1   Hampshire?

2       A.   They would commute them.  They would commute

3   them to their farm up there.  But they did happen in

4   Lexington, but you asked me if there were employees

5   working in another state.  So I didn't want to not

6   give you the right information.

7       Q.   Would it be fair to say that those six

8   placements were actually made in Massachusetts but

9   those employees happen to work in New Hampshire from

10  time to time?

11      A.   All our placements are made in Massachusetts

12  -- were made in Massachusetts that work in new.

13  They just happen to work there for the client.

14      Q.   So the Nashua, New Hampshire call center,

15  those placements were actually made with a

16  Massachusetts company and those employees commuted

17  for a period of time up to Nashua?

18      A.   Correct.

19      Q.   Were the Rhode Island placements that you

20  previously testified to also made with Massachusetts

21  companies?

22      A.   Yes.  Massachusetts -- or Massachusetts

23  offices.  Some of them are Rhode Island companies,

24  but through our Massachusetts offices.

CONFIDENTIAL
Francis G. Vaccaro

55

1    Q.   Okay.  But do you know how many Rhode Island

2    -- strike that.

3           Do you know how many placements were

4    made with Rhode Island companies as opposed to

5    companies elsewhere?

6    A.   Can you rephrase?

7    Q.   Yeah, sure.  I think it might be easiest,

8    Mr. Vaccaro, for you to just tell me about the Rhode

9    Island placements that you know DSI has made.

10   A.   Okay, that's fine.  We have some clients in

11   Rhode Island that solicit our business and they take

12   our temps from Massachusetts.  There are to my

13   knowledge --

14   Q.   Are those companies located on the customer

15   contact list?

16   A.   Yes.  Oh, yeah, they sure are.  I'm sure you

17   can find them on here.  God.  Well, everything's

18   here.

19   Q.   Okay.

20   A.   I mean feel free to --

21   Q.   That's fine.  Do any of those companies come

22   to mind as you sit here today?

23   A.   Yeah, Zebra Technologies only because my

24   friend she's in charge.  That's why I got the

56

1    business.  So that one came right to mind.

2          Q.   And they're in Warwick, Rhode Island?

3          A.   Yes, they are.

4          Q.   How many candidates have you placed there?

5          A.   Now I have five people working.  Prior to

6    that?  I don't know.  Could be 40, 50, 60 over the

7    years.  She uses them when she needs them.  So she's

8    one.  Then I have --

9          Q.   Before you move on, when were those

10   placements first made with Zebra Technologies?

11         A.   December 2003.

12         Q.   And how many --

13         A.   Maybe November.

14         Q.    -- candidates did you place at that time?

15         A.   I think she asked for 10.  We provided her

16   with 10.

17         Q.   Now you had testified previously that you'd

18   placed -- you made 15 or 16 total placements in

19   Rhode Island?

20         A.   I testified that we have 15 or 16 people

21   working now.

22         Q.   Okay.

23         A.   Placements in Rhode Island's an altogether

24   different question.

CONFIDENTIAL
Francis G. Vaccaro

115

1              (Pause.)

2       Q.   Turning your attention back to paragraph 5

3   of this affidavit, Mr. Vaccaro --

4       A.   Yes, sir.

5       Q.    -- do you see the sentence -- the final

6   sentence of that paragraph, sir?

7       A.   The one that starts with because?

8       Q.   Yes.  Do you want to read that into the

9   record, sir?

10      A.   "Because we intended to engage in rapid

11  growth and brand marketing, it was important for us

12  to pick a name that was not previously subject to

13  trademark protection by another company."

14      Q.   It was Diamond Staffing, Inc.'s intention to

15  engage in rapid growth and brand marketing, sir?

16      A.   It was.

17      Q.   At the time of incorporation?

18      A.   I laid out a business plan, and my intent

19  was to follow that business plan, yes.

20      Q.   Okay.  What does the business plan have to

21  say about the geographic scope of the services that

22  Diamond Staffing, Inc., is offering?

23      A.   Basically that we wanted to grow from

24  Massachusetts right on down to New York into

CONFIDENTIAL
Francis G. Vaccaro

116

1    Florida, and that was our plan.

2        Q.   So east coast expansion then?

3        A.   East coast but how this business works is if

4    Company X sponsors you and says we want you to do

5    work for us on site, and we're going to give you 50,

6    60, 70 temps to start, then you've got yourself a

7    nice business to start, and you can effectively

8    start a company with that company as your sponsor.

9             So I have to be open minded to a

10   company, for instance, that may want us in Miami or

11   may want us in Chicago or may want us anywhere.  We

12   haven't done that yet because in order to manage the

13   processes, you know, -- I'm one person managing the

14   processes with my people -- we've got to go step by

15   step.

16       Q.   What does the business plan have to say, if

17   anything, about the timing of your expansion of

18   service offerings?

19       A.   Well, we had talked over a three-year plan,

20   but, again, flexibility was a key word.  I mean the

21   beauty part about being the principal owner of this

22   company is I pretty much can decide the direction

23   and, you know, I have a board and we meet, but

24   basically that's -- that's the perk of owning a