UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS, INC.,

Plaintiff,

v.

DIAMOND STAFFING, INC.,

Defendant.

Civil Action No. 05-40046-FDS

## DIAMOND STAFFING SOLUTIONS, INC.'S REPLY BRIEF
## IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

The picture of an innocent, geographically remote junior user of the term "Diamond Staffing" painted by defendant Diamond Staffing, Inc. ("DSI") in its Opposition brief ("Opposition") dissipates upon close consideration of the facts in this case. DSI knew full well of the existence of Diamond Staffing Solutions[SM] prior to DSI's decision to incorporate in the fall of 2003 and prior to its commencement of operations, but disregarded Diamond Staffing Solutions'[SM] existence. After being alerted by Diamond Staffing Solutions[SM] of its concerns regarding DSI's adoption of the "Diamond Staffing" name in the fall of 2003, DSI refused to change its name or otherwise attempt to resolve the pending dispute, even in the face of mounting evidence of actual confusion. Trademark law protects large and small companies alike, and DSI should not be allowed to callously disregard Diamond Staffing Solutions'[SM] service mark rights simply because it may be a larger company.

Each of the legal arguments advanced by DSI in support of its Opposition is fundamentally flawed and should be rejected. More specifically:

- Last year, the First Circuit *effectively overturned* the caselaw relied on by DSI to support its proposition that the only relevant actual confusion involves actual

customers at the point-of-purchase, holding that confusion is relevant if it is likely to harm the service mark holder's goodwill and reputation[1] (meaning that the *two additional instances* of actual confusion received in the last week are cognizable);

- The First Circuit has repeatedly held that a remote junior user cannot rely on a senior user's purported absence of common law rights based on inadequate market penetration when the junior user *did not operate in good faith*, a legal standard which DSI *does not even attempt to contest*;

- Diamond Staffing Solutions[SM] has offered evidence of its market penetration in relevant jurisdictions, and DSI has offered virtually none, including in four other states in which DSI is currently infringing on Diamond Staffing Solutions'[SM] service mark rights (New Hampshire, Connecticut, Rhode Island and New York);

- First Circuit caselaw (again, wholly unrefuted by DSI) demonstrates conclusively that the Diamond Staffing[SM] and Diamond Staffing Solutions[SM] service marks (collectively, the "Marks") are inherently distinct, because the Marks do not immediately convey the characteristics of the services offered by Diamond Staffing Solutions[SM] and because competitors are left with a variety of terms to describe their competing services; and

- The caselaw cited by DSI to support its contention that the marks, services and prospective purchasers are dissimilar is inapposite given the facts of this case.

Finally, DSI significantly distorts the harm it would incur (if any) should this Court enter injunctive relief. DSI is *not* a 1600 person company; in that calculation, DSI is factoring in *all* the temporary workers which it has placed third parties. As the testimony of DSI's President reflects, DSI employs only 47 full time workers, and has offered no evidence whatsoever to show what expense and hardship would accompany the changing of its name and how its brand is even remotely material to its services.

---

[1]     As set forth in greater detail below, the "reverse confusion" in effect in the instant case further supports the entry of injunctive relief on these facts.

## ARGUMENT

**I.    Diamond Staffing Solutions[SM] Is Likely To Succeed On The Merits Of Its Claims.**

> A.    The "Actual Confusion" Standard Invoked By DSI Has Been Rejected By The First Circuit, And Plaintiff Has Shown Actionable Actual Confusion.

Relying on <u>Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.</u>, 718 F.2d 1201 (1st Cir. 1983), DSI states that "[i]n order to make a case of trademark infringement, the Plaintiff must show actual confusion *by customers*." Opposition at 22. As the recent decision in <u>Beacon Mutual Insurance Company v. One Beacon Insurance Corp.</u>, __ F.Supp.2d __, 2005 WL 1655201 (D. R.I. July 15, 2005) (attached hereto as Exhibit 1) states, however,

> Without addressing its earlier holding in <u>Astra</u> that the relevant confusion *must* be shown to exist in customers or purchasers, the First Circuit *implicitly abdicated* the <u>Astra</u> standard by concluding that evidence of actionable commercial injury in a case such as this was "not restricted to the loss of sales to actual and prospective buyers of the product in question." Instead, the First Circuit enunciated a *new standard* for what constitutes actionable confusion: "Confusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision *or* persons whose confusion presents a significant risk to the sales, goodwill or reputation of the trademark owner." Further, relevant commercial injury includes not only loss of sales, but also harm to the trademark holder's goodwill and reputation.

<u>Beacon Mut. Ins. Co. v. OneBeacon Ins. Group</u>, 376 F.3d 8, 10 (1st Cir. 2004) (emphasis added). <u>Accord</u> 3 McCarthy, <u>Trademarks & Unfair Competition</u>, § 25.5 (4th ed. 1996). As the First Circuit indicated in <u>Beacon Mutual</u>, public confusion among non-purchasers is relevant if it adversely affect[s] the plaintiff's ability to control his reputation, even in the absence of lost sales. <u>Id.</u> at 15 (citations omitted). So in that case, the First Circuit considered a series of misdirected communications, including telephone and e-mail inquiries from the public and misdirected mail, indicating confusion about the distinction between the two parties, as actionable evidence of actual confusion. <u>Beacon Mutual Insurance Company v. One Beacon Insurance Corp.</u>, __ F. Supp. 2d __, 2005 WL 1655201, at *6.

Under the <u>Beacon Mutual</u> standard, the numerous instances of actual confusion (*including but not limited* to the confusion experienced by potential customers) are actionable, particularly because they affect Diamond Staffing Solutions'[SM] ability to control its reputation. This includes the MCAD Complaint and the complaint of a Department of Transitional Assistance employee regarding a "rude" DSI staffer; the numerous misdirected e-mails; the misdirected on-line inquiries from candidates who were actually attempting to reach DSI; misdirected phone calls; and misdirected correspondence. Indeed, *just over the past week* Diamond Staffing Solutions[SM] received yet another feedback form from a candidate that was apparently attempting to reach DSI (<u>see</u> Fourth Affidavit of Suzanne DeVries, dated July 26, 2005, ¶ 9 ("DeVries Aff. -4") ) and received a phone call looking for a DSI staffer (<u>see</u> Affidavit of Emily Murphy, dated July 26, 2005, ¶ 3 ("Murphy Aff."). The confusion continues to escalate, justifying entrance of immediate injunctive relief.

The repeated instances of individuals contacting Diamond Staffing Solutions[SM] in search of the larger company, DSI, demonstrates that a different phenomenon may be in play here that also justifies entry of relief in Diamond Staffing Solutions'[SM] favor – "reverse" confusion. Reverse confusion occurs "when a larger, more powerful company uses the trademark or service mark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." <u>Fisons Horticulture, Inc. v. Vigoro Industries, Inc.</u>, 30 F.3d 466, 474 (3d Cir. 1994); <u>Star Financial Services, Inc. v. AAStar Mortgage Corp.</u>, 89 F.3d 5, 9-10 (1st Cir. 1996) (harm caused by confusion may be attributable to the reduction in the value of the mark by virtue of the association of the plaintiff with the defendant's own bad name) (<u>citing</u> <u>DeCosta v. Viacom International, Inc.</u>, 981 F.2d 602, 608 (1st Cir. 1992). DSI is by its own admission a considerably larger company that would allegedly suffer harm should

injunctive relief be entered given its size and employee base.  But in reality, it is the smaller senior user of the Marks which has expended significant effort to grow its business and build a brand (in the jewelry and giftware industries that are extremely brand conscious), and whose efforts are now being jeopardized by incidents such as the MCAD action erroneously commenced against it and rude and indignant DSI employees.

> B.    The Absence of "Good Faith" On The Part of DSI Undermines Its Priority-Of-Use Argument, And Diamond Staffing Solutions[SM] Has Nonetheless Established Its Priority In The Relevant Markets.

In contending that Diamond Staffing Solutions[SM] "cannot demonstrate market penetration in the defendant's market area," DSI misrepresents certain facts, ignores others, and misstates the applicable legal standard.  DSI's argument along these lines should accordingly be rejected.

First and foremost, DSI ignores the knowledge of Mary Casey, which is imputed to DSI as its agent.  See, e.g. Ruml v. Ruml, 50 Mass.App.Ct. 500, 507 (2000). The First Circuit follows the majority view that "the junior user's *mere knowledge* of the senior user's mark is sufficient to defeat a defense based on the *Tea Rose-Rectanus* doctrine."  Yankee Spirits, Inc. v. Gasbarro, 1998 WL 428092 (D. Mass. May 26, 1998) ; 4 McCarthy, Trademarks and Unfair Competition, § 26.9, at 26-15, 26-16 (4th ed. 2005).  DSI does not dispute this standard.  Moreover, the case principally relied on by DSI, Raxton Corporation v. Anania Associates, Inc., 635 F.2d 924, 930 (1st Cir. 1980) strongly supports plaintiff's position, as the court stated in reference to the "zone of natural expansion" argument that:

> [t]he unfairness of this doctrine vanishes if the hypothesis of an innocent subsequent user is dropped, or if it is shown that the disputed trademark is known to consumers in the area of subsequent use prior to the subsequent user's adoption...[a]t the least, this suggests that the subsequent user *should have been more careful to select a name free of prior rights and should be held to assume the risk of negligence.*  At worst, this indicates a design to appropriate the good will of another.

(emphasis added).

Ms. Casey testified unequivocally that she located a reference to Diamond Staffing Solutions[SM] while conducting an internet search in preclearing names at Mr. Vaccaro's request in the summer of 2003. See Memorandum In Support of Motion for Preliminary Injunction ("Opening Memo") at 11-12, 24. This knowledge precludes DSI from contending that Diamond Staffing Solutions[SM] has failed to establish sufficient market penetration to obtain common law rights to the Marks. More specifically, Ms. Casey testified that she ran an internet search in the summer of 2003 (Deposition of Mary Casey, dated June 17, 2005, at 89 ("Casey Dep.")) (Cornell Aff., Ex. 4); that she came across the reference to the plaintiff Diamond Staffing Solutions[SM] and a description of its services (Id. at 94-96); and that she did nothing further other than to relay the results to Mr. Vaccaro and let him know that there wouldn't be a problem with adopting the name "Diamond Staffing" for his new company (Id. at 94; Deposition of Francis Vaccaro, dated June 1, 2005, at 78 ("Vaccaro Dep.") (Cornell Aff., Ex. 3) Ms. Casey did not go to Diamond Staffing Solutions'[SM] domain name, run any additional internet searches, ask the Thomson & Thomson vendor to generate a full search report, or conduct any additional due diligence. Casey Dep. at 103-105 (Cornell Aff. Ex. 4).[2] The carelessness of DSI's attorney should be imputed against it now.

Moreover, DSI distorts the record and misrepresents its market area when it states that "[t]here is absolutely no evidence that the Plaintiff was engaging in business in Massachusetts during the Common Law Period, let alone that the Plaintiff was using the mark in the Commonwealth of Massachusetts." Opposition at 15. This statement inexplicably ignores

---

[2]    As a result, DSI's statements that it adopted its name in part "because there was no evidence that anyone else had established any trademark rights in the name either by common law or through registration" and "[t]here was no intent or possibility of capitalizing from someone else's prior use" (see Opposition at 9) are inaccurate.

Diamond Staffing Solutions'[SM] advertising, solicitations and placements, as set forth in its

Opening Memo and the Third Affidavit of Suzanne DeVries.  See also DeVries Aff.-4

(additional examples of advertisements disseminated into Massachusetts prior to DSI's

commencement of operations).  And DSI is not infringing only in Massachusetts; Diamond

Staffing Solutions[SM] also has priority-of-use in the other states in which DSI is conducting

business.  More specifically, DSI first conducted business in Rhode Island in December, 2003

(Vaccaro Dep. at 56) (Cornell Aff., Ex. 3); New York sometime in 2004 (Vaccaro Dep. at 52)

(Cornell Aff., Ex. 3); Connecticut in March, 2004 (Vaccaro Dep. at 61) (Cornell Aff., Ex. 3); and

New Hampshire after August, 2004 (Vaccaro Dep. at 50) (Cornell Aff., Ex. 3).  Diamond

Staffing Solutions[SM] placed advertisements and conducted business in each of these states prior

to DSI's entry into the marketplace.  DeVries Aff. -4, ¶ 4-8; Affidavit of Kathleen Gilroy, dated

July 7, 2005, ¶ 9-10, Ex. 3.

> C.     Diamond Staffing Solutions[SM] and Diamond Staffing[SM] Are Distinctive Marks,
>        And Have Acquired Secondary Meaning.

DSI conclusively states that "the mark claimed by the Plaintiff is a descriptive mark, the

Plaintiff, by admission, provides staffing solutions for diamond sellers."  Opposition at 14.  The

inquiry is far from this simple, however (as is tacitly supported by the fact that DSI cites *no*

*authority* to support this summary conclusion).  Diamond Staffing Solutions[SM] provides services

in the giftware industry (as evidenced by its client, Svarofski AG) Affidavit of Suzanne DeVries,

May 9, 2005 ¶ 10 p. 3; has staffed for a software company, ASC Software (*see* DeVries Aff.-4, ¶

11); and staffs for all types of jewelry retailers, wholesalers and manufacturers, not simply those

specializing in diamonds. Affidavit of Suzanne DeVries, ¶ 3 p. 1.  The mental leap from the

name of plaintiff's company to the services Diamond Staffing Solutions[SM] provides is not almost

instantaneous, and this Court should accordingly hold that the marks are suggestive and inherently distinct.

For example, in <u>Public Service Company of New Mexico v. Nexus Energy Software, Inc.</u>, 36 F.Supp.2d 436 (D. Mass. 1999), the Court held that the term "Energy Place" for a site providing (1) information services regarding the most efficient and cost-effective use of energy resources; (2) energy audits; (3) energy consulting services; and (4) promoting public awareness for the need for more efficient and cost-effective use of energy resources "did not convey an immediate idea of the ingredients, qualities or characteristics of the services [plaintiff] offers," and was suggestive and inherently distinct.   As the Court stated in reaching its conclusion, "competitors are left with a variety of terms to describe their competing services, one example being energy information services."   <u>Id.</u> at 438-39.

Similarly, in <u>Tanel Corporation v. Reebok International, Ltd.</u>, 774 F.Supp. 49 (D. Mass. 1990), the Court found that the trademark "360°" was suggestive of a sneaker known for pivotability, not descriptive.   The Court stated in its ruling that "[d]efendant has no need to use 360° to describe its shoes or any characteristic of its shoes" and that while 360° may be connected to pivotability through the idea of circular movement, "other equally effective words are available."

As in <u>Nexus Energy</u> and <u>Reebok</u>, competitors of Diamond Staffing Solutions[SM] are left with a number of alternate names to describe their services ("Jewelry Staffing," "Gem Staffing" and "Jewelry Employment Services" are three that immediately come to mind).   Moreover, the mental leap from the Marks to the services Diamond Staffing Solutions[SM] provides is not almost instantaneous.   Questions which come to mind include:  do the services relate to diamond manufacturers/retailers exclusively, or other types of jewelry purveyors?  Do they relate to "top

- 9 -

notch" or "premier" staffing services?  Does Diamond Staffing Solutions[SM] solve its clients'

staffing problems on a consulting basis (as is suggested by the "solutions" suffix) or does it

actually place personnel?  Asking these questions leads one to the conclusion that the Marks are

as likely to conjure up an arbitrary connotation as they are to identify Diamond Staffing

Solutions'[SM] services.  This is the touchpoint of a suggestive classification.

Regardless, contrary to DSI's contention Diamond Staffing Solutions[SM] has previously

put forth numerous examples of its recognition in the marketplace prior to DSI's entry (see, e.g.,

exhibits to the Gilroy Affidavit) and has set forth additional evidence of its presence in the

marketplace during this time in the Fourth Affidavit of Suzanne DeVries, submitted herewith.

Given the *complete absence* of cognizable evidence submitted by DSI regarding the date it made

sufficient market penetration to purportedly acquire any rights in "Diamond Staffing," Diamond

Staffing Solutions[SM] should be accorded additional time (at minimum, into 2004) to establish

secondary meaning.  Indeed, it appears from the July 13, 2005 Affidavit of Frank Vaccaro

("Vaccaro Aff.-2") that the first time DSI ever even allegedly attempted to develop its name and

goodwill was *December 23, 2003*.  Vaccaro Aff.-2, ¶ 3, at 2.

    D.    <u>The Similarity of The Marks And Goods Supports Entry of The Relief Requested</u>

DSI relies heavily on the unpublished decision <u>Q Division Records, LLC v. Q Records</u>

2000 WL 294875 (D. Mass. Feb. 11, 2000) (attached hereto as Exhibit A) for the proposition

that "the distinctions in the marks are greater than the similiarities."  Opposition at 16.  But <u>Q</u>

<u>Division</u> is wholly distinguishable on its face.  In <u>Q Division</u>, the plaintiff's logo contained an

illustration with the word "QDIVISION" in block letters beneath it (and the word "RECORDS"

in much smaller font below "QDIVISION"), while the defendant featured a stylized letter Q

above the word "RECORDS".   Judge O'Toole noted that "[b]oth graphically and as a matter of

phrasing, the two marks run quite close together, with *one significant exception*: in both the logo and the phrase, the word "DIVISION" separates Q Division's mark from Q Records' mark." Id. at *3. The Court went on to state that "Division" is used in an entirely arbitrary fashion here...*its presence is sufficient to render the marks dissimilar*." Id. In this case, there is no dispute that plaintiff and defendant both use "Diamond Staffing" *together*, and the presentation of both entities' names is accompanied by a diamond. Cornell Aff., ¶ 12, Ex. 10. So the analysis here is wholly distinct from the analysis in Q Division. Moreover, in Q Division the plaintiff proffered only *one* piece of evidence concerning actual confusion – a misdirected e-mail. Here, as set forth supra and in its Opening Memo Diamond Staffing Solutions[SM] has introduced numerous pieces of evidence concerning the actual confusion between the entities.

In this vein, DSI's attempts to distinguish between the type of staffing services it provides and the services provided by Diamond Staffing Solutions[SM] are belied by the verified evidence. DSI claims in conclusory fashion that " the Plaintiff provides supposedly unique employees to fit a particular retail problem" and that it "markets herself [sic] as appealing to a sophisticated customer, the crème de la crème of the jewelry industry." Opposition at 16. But Ms. DeVries stated clearly in her affidavit that "a significant percentage of the candidates Diamond Staffing Solutions[SM] places with its clients are involved with sales or retail positions, and are not educated beyond high school." Third Affidavit of Suzanne DeVries, ¶ 18, at 7. Diamond Staffing Solutions[SM] places numerous uneducated candidates with retail stores like Helzberg's, Zales' and Borsheim's who do not differ significantly in sophistication from the office workers, administrative assistants, IT support specialists and warehouse employees DSI places. Moreover, DSI's claim that the "Plaintiff provides permanent staffing exclusively in the jewelry industry while [DSI] provides temporary staffing outside the jewelry industry

(Opposition at 21) rings hollow, again in light of Diamond Staffing Solutions'[SM] evidentiary submissions. Mark Olson of Kirschner Corporation submitted an affidavit stating that DSI's Annie Moore "tended to work on *retail placements*" and that "she could help Mr. Olson find a sales representative to meet Kirschner Corporation's needs." Affidavit of Mark Olson, dated July 1, 2005, ¶ 9, at 2 (emphasis added). DSI's President Frank Vaccaro testified that "{w]e decided to go after professional placement full time vs. part time" in December 2004 and that Annie Moore "now devotes a hundred percent of her time to professional placement." Vaccaro Dep. at 18 (Cornell Aff., Ex. 3) Similarly, Vaccaro testified that an affidavit submitted in support of DSI's Motion to Dismiss was inaccurate, insofar as DSI was incorporated to provide temporary AND permanent staffing services in 2003. Id. at 109 (Cornell Aff., Ex. 3).

     E.    DSI Mischaracterizes The Relevant Evidence
             Regarding Marketing Channels and Purchasers.

     Stating that "[i]t is absolutely crucial in proving a claim under the Lanham Act that the marketing channel and business type be *so identical* as to create the *certainty* of actual confusion" (see Opposition at 20), DSI contends that this factor supports denial of the injunctive relief requested. But this is not the applicable test. Indeed, in the case *relied on* by DSI, Boustany v. Boston Dental Group, 42 F.Supp.2d 100, 104 (D. Mass. 1999), plaintiff focused its marketing on signage, business cards, flyers and mailers, while the defendant focused its advertising on direct contact with providers of managed dental care. Even with only minimal overlap in marketing, the court referenced the actual confusion and noted in issuing an injunction that "plaintiff is likely to be able to show at trial at least some overlap between the targets of his advertising and those of BDG." Id. Similarly, here both parties are personnel placement firms that advertise and search resumes on www.monster.com. DSI intends on increasing its

professional personnel advertising on this site going forward. As demonstrated in the Opening

Memo, this factor too supports plaintiff.[3]

## II.   The Balance of Hardships and Public Interest
         Favors Diamond Staffing Solutions[SM].

In his July 13, 2005 Affidavit, Mr. Vaccaro offers the statements that "[i]n the period

between December 23, 2003 and March, 2005, Diamond Staffing, Inc. spent $163,000 in

developing its name and goodwill"; that injunctive relief "would have a devastating effect on our

business including irreparable harm" based on losses to "over 400 customers and 1,500

temporary employees who rely on Diamond Staffing, Inc. for their staffing needs and their

weekly paychecks" and that plaintiff's "relative silence after December, 2003" "caused Diamond

Staffing, Inc. to assume that the Plaintiff was willing to accept the two marks' co-existence in

their relative market segments." Vaccaro Aff.-2, ¶ 4-5, at 2. These conclusory, unsubstantiated

remarks do not shift the balance of hardships.

As the Third Circuit recently noted in Kos Pharmaceuticals v. Andrx Corporation, 369

F.3d 700, 728 (3d Cir. 2004) (a trademark case), "a party can hardly claim to be harmed [where]

it brought any and all difficulties occasioned by the issuance of an injunction upon itself." The

Kos court went on to note that the amount of the product at issue could simply be shipped under

a different name, and that the costs of changing the labeling and product inserts, trademark

clearance services, product relaunch advertising and the reestablishment of goodwill "are

compensable by money damages and thus do not constitute irreparable harm as a matter of law."

Id. Particularly telling, the Kos court rejected Andrx's argument that the 13 month delay in

---

[3]     The case heavily relied on by defendant, Bay State Sav. Bank v. Baystate Fin. Servs., LLC, 338 F.Supp.2d 181
(D. Mass. 2004) is wholly distinguishable on these facts. In that case, the court found that plaintiff's mark was
geographically descriptive and that secondary meaning had not been established. Moreover, in that case there
parties had co-existed for upwards of twenty years without a showing of actual confusion in the marketplace.

- 13 -

filing suit demonstrated that Kos was not being irreparably harmed, stating that "Kos sought relief directly and through administrative proceedings from the time it learned of the proposed use through the time it filed this suit." Id. at 727. Accord CNB Financial Corp. v. CNB Community Bank, 2004 WL 2414842, *2 (E.D. Pa. Oct. 26, 2004) ("in this modern society, where mergers and acquisitions are common business practice, consumers and bankers are not unaccustomed to name changes.") (attached hereto as Exhibit B); Ty, Inc. v. The Jones Group, Inc., 237 F.3d 891, 902-903 (7th Cir. 2001) ("it cannot be said that [defendant] was lulled into a false sense of security or that [defendant] in any way relied on [plaintiff's] delay.")

In this case, the purported harm that DSI would experience simply does not outweigh Diamond Staffing Solutions^SM irreparable harm. DSI summarily claims that it has spent $163,000 in developing its name and goodwill, but does not indicate *what* specifically that money was spent for. Indeed, the *only* advertisements and promotional pieces furnished by DSI in expedited discovery were small advertisements in local newspapers, and the name of the company was typically not prominent whatsoever. See documents appended to the Second Affidavit of Michael Cornell, dated July 26, 2005. DSI has presented *no* cognizable evidence demonstrating how it has built its name brand and reputation over the past eighteen months. In contrast, Diamond Staffing Solutions^SM hired Idea Outfitters, a graphic design firm, to develop a design and logo for the company; created branded business cards, stationary and envelopes; hired a communications firm to put together a comprehensive press/marketing kit that included a background/fact sheet, a personal bio, testimonial profiles and press releases; and became involved with organizations such as the Women's Jewelry Association, the Manufacturing Jewelers and Suppliers of America, the Continental Buying Group and the American Gem Society. DeVries Aff.-4, ¶ 10. Similarly, Suzanne DeVries writes monthly articles for *National*

*Jewelers, Professional Jewelers* and *InStore Magazine*, Diamond Staffing Solutions[SM] has

sponsored a luncheon for Steve Forbes at then J.A. Show in New York City and promoted itself

at numerous other trade shows, and on numerous occasions has turned down business from

retailers with poor reputations or business practices. See Third Affidavit of Suzanne DeVries,

dated July 8, 2005, ¶¶ 6-12, at 2-4. The harm that would purportedly occur to DSI's customers

and employees is accordingly a red herring; DSI has not spent considerable amounts in building

a brand, and indeed has *only forty-seven* full time employees. Vaccaro Dep. at 111-112 (Cornell

Aff. Ex. 3).

Moreover, the lack of importance of a particular name to a staffing agency of DSI's ilk is

illustrated by the numerous entities Mr. Vaccaro has previously been involved with. Mr.

Vaccaro's previous business, founded in May, 2001, was named "Ultimate Personnel". Vaccaro

Dep.-2 at 107 (Cornell Aff. Ex. 3). Mr. Vaccaro tried to change the name of the company from

Ultimate Personnel to Ultimate Staffing, but was prohibited from doing so *due to an existing*

*trademark on Ultimate Staffing.* Id. at 110-111 (Cornell Aff. Ex. 3). Mr. Vaccaro testified that

there *were a lot of name changes going on with Ultimate Personnel.* Id. at 110 (Cornell Aff. Ex.

3).

Finally, DSI's claim that laches applies, and that Diamond Staffing Solutions'[SM] motion

should be denied, misses the mark. Diamond Staffing Solutions[SM] filed its own federal

trademark registration in the fall of 2003, and complained to DSI about ongoing actual confusion

by correspondence from counsel as late as March 19, 2004. See Cornell Aff., Ex. 8. Moreover,

Diamond Staffing Solutions[SM] opposed DSI's attempt to obtain a federal registration through a

filing with the United States Patent & Trademark Office ("USPTO") on November 3, 2004. See

Complaint, Exhibit G. DSI responded to this Opposition through an Answer filed with the

USPTO on February 7, 2005.  See Cornell Aff. ¶ 6, Ex. 4.  One month later, Diamond Staffing

Solutions<sup>SM</sup> commenced this litigation.  So any contention that DSI was lulled into a false sense

of security or that DSI in any way relied on a delay should be summarily rejected.  The

applicable caselaw is in accord.  <u>Kos Pharmaceuticals v. Andrx Corporation</u>, 369 F.3d at 727;

<u>Ty, Inc. v. The Jones Group, Inc.</u>, 237 F.3d at 902-903; <u>Boustany v. Boston Dental Group</u>, 42

F.Supp.2d 100, 108 (D. Mass. 1999); <u>Calamari Fisheries, Inc. v. The Village Catch, Inc.</u>, 698

F.Supp. 994 (D. Mass. 1988).

## CONCLUSION

Based on the foregoing, Diamond Staffing Solutions<sup>SM</sup> respectfully reiterates its request

for relief, as set forth in its Motion and Opening Memo.


DIAMOND STAFFING SOLUTIONS, INC.

By its attorneys,

Nicholas G. Papastavros (BBO#635742)
Michael L. Cornell (BBO # 651405)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000 (telephone)
(617) 345-1300 (facsimile)

Date:  July 26, 2005

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was served upon all counsel of record by electronic service and upon Robert Meltzer, Esq. by courier on July 26, 2005.

Michael L. Cornell

# EXHIBIT 1

Westlaw.

2005 WL 1655201                                                                                      Page 1
--- F.Supp.2d ---
(Cite as: 2005 WL 1655201 (D.R.I.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Rhode Island.
The BEACON MUTUAL INSURANCE
COMPANY, Plaintiff,
v.
ONEBEACON INSURANCE CORP., Defendant.
**No. C.A.01-354S.**

July 15, 2005.

**Background:** Insurance company sued competitor for service mark infringement and trademark dilution and violation of state and federal unfair competition laws. The United States District Court for the District of Rhode Island, William E. Smith, J., 290 F.Supp.2d 241, granted summary judgment for competitor. Company appealed. The Court of Appeals, 376 F.3d 8, reversed and remanded.

  **Holdings:** Following bench trial, the District Court held that:
  (1) company's descriptive mark "The Beacon" and related marks had secondary meaning;
  (2) substantial likelihood of confusion existed with respect to parties' marks; and
  (3) competitor would be enjoined from using "OneBeacon" name and lighthouse logo in Rhode Island.
  Judgment for company.

**[1] Trademarks** 🔑1421

382Tk1421 Most Cited Cases
To make out claim for infringement of unregistered mark, owner of unregistered mark must establish that its mark is (1) either inherently distinctive or has acquired secondary meaning, and (2) is likely to be confused with defendant's mark. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

**[2] Trademarks** 🔑1033
382Tk1033 Most Cited Cases
In analyzing whether a mark is distinctive, marks are divided into four categories: (1) generic, (2)

descriptive, (3) suggestive, and (4) arbitrary or fanciful.

**[3] Trademarks** 🔑1033
382Tk1033 Most Cited Cases
Suggestive, arbitrary and fanciful marks are considered inherently distinctive, while descriptive marks are deemed distinctive only upon a showing that they have acquired secondary meaning.

**[4] Trademarks** 🔑1034
382Tk1034 Most Cited Cases
Generic marks are generally not protected under trademark law.

**[5] Trademarks** 🔑1689
382Tk1689 Most Cited Cases
Whether a mark is inherently distinctive, for trademark protection purposes, is a question of fact.

**[6] Trademarks** 🔑1039
382Tk1039 Most Cited Cases
To be classified as "fanciful," terms usually must have been invented solely for their use as trademarks.

**[7] Trademarks** 🔑1039
382Tk1039 Most Cited Cases
"Arbitrary marks" are common words applied in an unfamiliar way.

**[8] Trademarks** 🔑1038
382Tk1038 Most Cited Cases
Suggestive marks require imagination, thought, and perception to reach a conclusion as to the nature of goods.

**[9] Trademarks** 🔑1036
382Tk1036 Most Cited Cases
Term is "descriptive," in trademark context, if it forthwith conveys an immediate idea of the ingredients, qualities, or characteristics of the goods.

**[10] Trademarks** 🔑1036
382Tk1036 Most Cited Cases

**[10] Trademarks** 🔑1058
382Tk1058 Most Cited Cases
Insurance company's unregistered mark "The Beacon" was descriptive, and thus had to have secondary meaning to fall within protection of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1655201                                                                    Page 2
--- F.Supp.2d ---
**(Cite as: 2005 WL 1655201 (D.R.I.))**

Lanham Act, given that word "beacon" was intended to suggest that company would serve as good guide to consumers, that name "beacon" was used with lighthouse logo, which was widespread practice by companies around country, and that company capitalized upon descriptive significance of mark by putting out newsletter entitled "Guiding Light." Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

**[11] Trademarks** 🔑**1032**
382Tk1032 Most Cited Cases
General.

**[11] Trademarks** 🔑**1628(1)**
382Tk1628(1) Most Cited Cases
A mark that is not inherently distinctive is protected under the Lanham Act only upon a showing by the mark owner, by a fair preponderance of the evidence, that the mark has acquired secondary meaning. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

**[12] Trademarks** 🔑**1032**
382Tk1032 Most Cited Cases
A mark has acquired secondary meaning only if its primary significance in the minds of the public is to identify the source of the product or service.

**[13] Trademarks** 🔑**1032**
382Tk1032 Most Cited Cases

**[13] Trademarks** 🔑**1628(3)**
382Tk1628(3) Most Cited Cases
Market surveys are one means of establishing secondary meaning of mark, and other factors court may look to in determining whether term has acquired secondary meaning are (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark, and (3) the efforts made in the direction of promoting a conscious connection between the name and a particular product.

**[14] Trademarks** 🔑**1037**
382Tk1037 Most Cited Cases
Insurer's descriptive service marks "The Beacon," "Beacon Insurance," and "The Beacon Mutual Insurance Company" had secondary meaning, as shown by results of
three surveys indicating that persons in state responsible for, or influential in, selecting their company's workers' compensation or commercial or industrial insurance were familiar with insurer's name

and lighthouse logo and associated it with particular source of insurance, and given insurer's extensive promotions and large market share. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

**[15] Trademarks** 🔑**1032**
382Tk1032 Most Cited Cases

**[15] Trademarks** 🔑**1112**
382Tk1112 Most Cited Cases
Secondary meaning of mark is determined on the basis of purchaser perception, and non-purchasers are relevant for purposes of finding an actionable likelihood of confusion.

**[16] Trademarks** 🔑**1112**
382Tk1112 Most Cited Cases

**[16] Trademarks** 🔑**1628(3)**
382Tk1628(3) Most Cited Cases
Plaintiff asserting infringement of descriptive mark may establish secondary meaning via a survey of those individuals likely to influence purchasing decisions while establishing likelihood of confusion among a broader population.

**[17] Trademarks** 🔑**1084**
382Tk1084 Most Cited Cases

**[17] Trademarks** 🔑**1421**
382Tk1421 Most Cited Cases
Likelihood of confusion is an essential element of a claim of trademark infringement, under which plaintiff must prove that there exists a substantial likelihood that the public will be confused as to the source of the relevant goods or services.

**[18] Trademarks** 🔑**1081**
382Tk1081 Most Cited Cases
Eight factors to be used in trademark infringement case as guides in assessing likelihood of confusion as to source or affiliation of goods or services include (1) the similarity of the marks, (2) the similarity of the goods, (3) the relationship between the parties' channels of trade, (4) the relationship between the parties' advertising, (5) the classes of prospective purchasers, (6) evidence of actual confusion, (7) defendant's intent in adopting its mark, and (8) the strength of plaintiff's mark; no one factor is necessarily determinative, but each must be considered.

**[19] Trademarks** 🔑**1096(3)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1655201
--- F.Supp.2d ---
(Cite as: 2005 WL 1655201 (D.R.I.))

382Tk1096(3) Most Cited Cases
Substantial likelihood of confusion existed with respect to use of "The Beacon" and related marks and lighthouse logo by Rhode Island insurance company and of "OneBeacon" mark and lighthouse logo by competitor, even though relevant class of consumers was sophisticated and had professional incentive to make informed judgments, and even though competitor adopted its mark and logo in good faith, given that marks were fundamentally similar, despite differences in font and presentation, that competitor offered same workers' compensation insurance coverage as that offered by company in state, that employers, employees, vendors, doctors, court personnel, and others in state had shown confusion over relationship between company and competitor, and that company's marks were strong marks. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

[20] Evidence 508
157k508 Most Cited Cases
in

[20] Evidence 555.2
157k555.2 Most Cited Cases
Expert could not testify, in insurer's trademark infringement action against competitor, respecting results of survey conducted to demonstrate lack of likelihood of confusion as to source of parties' services among agents for competitor in Rhode Island, in that court, conducting bench trial, did not need expert to testify to conclusion that competitor's Rhode Island agents were not confused between competitor and company, and expert's methodology raised questions as to reliability of her conclusions. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[21] Evidence 314(1)
157k314(1) Most Cited Cases
"Confusion matrix" in which insurance company summarized evidence of actual confusion experienced by employers, employees, vendors, doctors, court personnel, and others in state with respect to relationship between company and competitor was "hearsay" and was not admissible at trial on company's trademark infringement claim. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

[22] Evidence 351
157k351 Most Cited Cases
"Confusion matrix" used by insurance company to summarize evidence of actual confusion experienced

by employers, employees, vendors, doctors, court personnel, and others in state with respect to relationship between company and competitor was prepared by company in anticipation of litigation, and thus was not admissible under business record exception to hearsay rule in trial on company's trademark infringement claim. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

[23] Evidence 121(1)
157k121(1) Most Cited Cases
"Confusion matrix" summarizing evidence of actual confusion experienced by employers, employees, vendors, doctors, court personnel, and others in state with respect to relationship between insurance company and competitor could not be admitted under exception to hearsay rule, in company's trademark infringement claim, as recorded present sense impression of another's then-existing mental state. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

[24] Evidence 123(1)
157k123(1) Most Cited Cases
"Confusion matrix" that summarized evidence of actual confusion experienced by employers, employees, vendors, doctors, court personnel, and others in state with respect to relationship between insurance company and competitor did not disclose time between formation of impression and recording of information, and thus could not be admitted under exception to hearsay rule, in company's trademark infringement claim, as recorded present sense impression of non-hearsay behavior indicating confusion. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

[25] Trademarks 1426
382Tk1426 Most Cited Cases
Insurance company did not have to prove harm to its goodwill or reputation to establish trademark infringement claim under Lanham Act. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125(a)(1)(A).

[26] Trademarks 1113
382Tk1113 Most Cited Cases

[26] Trademarks 1714(2)
382Tk1714(2) Most Cited Cases
Injunction prohibiting competitor from using "OneBeacon" name and lighthouse logo in Rhode Island was only practical remedy that could meaningfully protect Rhode Island insurance

company's mark, "The Beacon," and related marks, despite competitor's request that it be allowed to cure actionable confusion via disclaimers and directed advertising campaign, given doubtful efficacy of disclaimers and absence of evidence suggesting that disclaimer would be effective. Lanham Trade-Mark Act, § 34, 15 U.S.C.A. § 1116.

**[27] Trade Regulation** 🔑 **641**
382k641 Most Cited Cases
Injunction is the standard remedy in unfair competition cases.

**[28] Trademarks** 🔑 **1717(8)**
382Tk1717(8) Most Cited Cases
Although, in trademark infringement context, court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct, injunctive relief should be limited to the senior user's geographic market.

**Trademarks** 🔑 **1800**
382Tk1800 Most Cited Cases
Beacon Insurance.

**Trademarks** 🔑 **1800**
382Tk1800 Most Cited Cases
The Beacon.

**Trademarks** 🔑 **1800**
382Tk1800 Most Cited Cases
The Beacon Mutual Insurance Company.
 Michael A. Gamboli, Robert K. Taylor, Steven E. Snow, Partridge Snow & Hahn LLP, Providence, RI, for Plaintiff.

 Brian J. Lamoureux, William M. Dolan, III, Brown Rudnick Berlack Israels LLP, Providence, RI, Dalila Argaez Wendlandt, Martha J. Collins, Steven A. Kaufman, Ropes & Gray, Boston, MA, for Defendant.

## *DECISION AND ORDER*

WILLIAM E. SMITH, United States District Judge.

### I. *Introduction*

 **\*1** The Beacon Mutual Insurance Company ("Plaintiff" or "Beacon") is the largest writer of workers' compensation insurance in the state of Rhode Island. It has used the name "The Beacon Mutual Insurance Company" (along with a lighthouse logo) since 1992. Meanwhile, OneBeacon Insurance

Group ("Defendant" or "OneBeacon"), formerly known as CGU Insurance, adopted its current name, and began using a lighthouse logo as well, in June 2001. Following this name change, Beacon brought this lawsuit claiming that Defendant's adoption of the name "OneBeacon" and a lighthouse logo violated federal and state unfair competition law. Beacon also asserted claims for service mark infringement and trademark dilution under state law.

 OneBeacon responded to Beacon's suit with a Motion for Summary Judgment, which this Court granted. *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 290 F.Supp.2d 241 (D.R.I.2003) ("*Beacon I* "), *rev'd* 376 F.3d 8 (1st Cir.2004). In granting summary judgment, this Court relied primarily on the First Circuit's opinion in *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201 (1st Cir.1983), which held that in order to find a likelihood of confusion between parties' marks sufficient to support a claim of unfair competition, that confusion "*must* be based on the confusion of some relevant person; i.e., a customer or purchaser," *id.* at 1206 (emphasis added). Because "Plaintiff ha[d] not established that the [allegedly confused] entities and persons ... are [ ] consumers of the product," *Beacon I,* 290 F.Supp.2d at 246, this Court concluded that Plaintiff failed "to demonstrate that the confusion it identifies is connected in any way to its commercial interests," *id.* at 252, as required to maintain an unfair competition claim.

 On appeal, the First Circuit reversed. *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 376 F.3d 8 (1st Cir.2004)("*Beacon II* "). Without addressing its earlier holding in *Astra* that the relevant confusion *must* be shown to exist in customers or purchasers, the First Circuit implicitly abdicated the *Astra* standard by concluding that evidence of actionable commercial injury in a case such as this was "not restricted to the loss of sales to actual and prospective buyers of the product in question." *Id.* at 10. Instead, the First Circuit enunciated a new standard for what constitutes actionable confusion: "Confusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision *or* persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner." *Id.* (emphasis added). Further, "relevant commercial injury includes not only loss of sales but also harm to the trademark holder's goodwill and reputation." *Id.*

 As a result of the First Circuit's decision, the case returned to this Court and a bench trial was held from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1655201                                                                                              Page 5
--- F.Supp.2d ---
**(Cite as: 2005 WL 1655201 (D.R.I.))**

February 28, 2005, to March 4, 2005, with final arguments on March 9, 2005. What follows are the Court's findings of fact and conclusions of law.

II. *Findings of Fact and Conclusions of Law*

**\*2** The marks that Plaintiff seeks to protect are not registered. "Therefore the present claim is based upon § 43(a) of the Lanham Act which covers unregistered trademarks." *Boston Beer Co. v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 180 (1st Cir.1993). Section 43(a) of the Lanham Act forbids persons from using,

> in connection with any goods or services ... any word, term, name, symbol, or device, or any combination thereof ... which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).

[1] To make out a claim under § 43(a), the owner of an unregistered mark must establish that its mark is (1) either inherently distinctive or has acquired secondary meaning, and (2) is likely to be confused with the defendant's mark. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769- 70, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

A. *The Spectrum of Distinctiveness*

[2][3][4][5] In analyzing whether a mark is distinctive, marks are divided into four categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). Suggestive, arbitrary and fanciful marks are considered inherently distinctive, while descriptive marks are deemed distinctive only upon a showing that they have acquired secondary meaning. *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 39 (1st Cir.1998). Generic marks are generally not protected. *Id.* Whether a mark is inherently distinctive is a question of fact. *Boston Beer,* 9 F.3d at 180.

[6][7][8][9] To be classified as "fanciful," terms will usually have to have been "invented solely for their use as trademarks." *Abercrombie,* 537 F.2d at 11 n. 12. Arbitrary marks are "common word[s] ... applied in an unfamiliar way." *Id.* Suggestive marks "require imagination, thought and perception to reach a conclusion as to the nature of goods." 537 F.2d at 11

(quoting *Stix Prods., Inc. v. United Merch. & Mfrs., Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968)). Finally, "[a] term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* (quoting *Stix Prods., Inc.,* 295 F.Supp. at 488).

[10] Beacon's mark is most appropriately deemed descriptive. The word "beacon" in the mark is meant to suggest that Beacon will serve as a good guide to consumers. *See* Miriam-Webster's Collegiate Dictionary 98 (10th ed.2002) (defining "beacon" as a "signal for guidance" and "a source of light or inspiration"); *see also Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 728 (7th Cir.1998) ("In this instance, 'platinum' describes the quality of plaintiff's mortgage services and suggests that it provides a superior service...."); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 11 (5th Cir.1974) (upholding a district court's conclusion "that the word 'heritage' is generic or descriptive of life insurance"); *Hiram Walker & Sons, Inc. v. Penn-Maryland Corp.,* 79 F.2d 836, 838 (2d Cir.1935) (holding that "imperial" was descriptive of quality of whiskey). The descriptive nature of the mark is confirmed by the widespread use of the term "beacon" with a lighthouse logo by many other companies around the country. [FN1] *See American Heritage Life Ins.,* 494 F.2d at 11 ("The industry itself evidently recognizes the truth of the district court's finding because the word 'heritage' is used in the corporate names of insurance companies all over the country."). Finally, Beacon itself has capitalized upon the descriptive significance of its mark by putting out a newsletter in the past entitled "Guiding Light." (Tr. of 2/28/05 at 85 (testimony of Michael Lynch, Vice President of Legal Services at Beacon).)

B. *Proving Secondary Meaning*

**\*3** [11][12][13][14] Because Beacon's mark is descriptive, and therefore not inherently distinctive, Beacon must show secondary meaning to avail itself of the protection of the Lanham Act. A mark that is not inherently distinctive is protected under the Lanham Act only upon a showing by the mark owner, by a fair preponderance of the evidence, that the mark has acquired secondary meaning. *See* 2 J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition § 15:33 (4th ed.2005) (hereinafter, "McCarthy"). A mark has acquired secondary meaning only if its primary significance in the minds of the public is to identify the source of the product or service. *See I.P. Lund,* 163 F.3d at 41.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1655201                                                                    Page 6
--- F.Supp.2d ---
(Cite as: 2005 WL 1655201 (D.R.I.))

Market surveys have "become a well-recognized means of establishing secondary meaning." _Boston Beer Co., 9 F.3d at 182._ Other factors a court may look to "in determining whether a term has acquired secondary meaning are: (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection ... between the name ... and a particular product...." _Id._ (citation omitted).

Beacon retained the services of Dr. Jacob Jacoby as an expert witness on secondary meaning. Dr. Jacoby produced a written report which concludes that the phrase "The Beacon," has acquired a substantial degree of secondary meaning among individuals in Rhode Island responsible for selecting their company's workers' compensation insurance and/or commercial or industrial insurance. (Pl.'s Ex. 406.) This conclusion is based upon the results of three surveys conducted in Rhode Island in the Fall of 2001. In these surveys, a total of 237 targeted respondents (persons who choose, or help to choose, the provider of workers' compensation or commercial/industrial insurance for their company) were asked what they thought of when they heard or saw the term "The Beacon." According to Jacoby, 69% of the respondents who heard and 79% of the respondents who saw the term "The Beacon" said that it signified a workers' compensation insurance company.

Dr. Jacob Jacoby's survey supports the conclusion that Beacon's marks have acquired secondary meaning. [FN2] Dr. Jacoby's survey demonstrates that individuals in Rhode Island responsible for, or influential in, selecting their company's workers' compensation insurance and/or commercial or industrial insurance are familiar with Beacon's name and lighthouse logo, and that they associate it with a particular source of workers' compensation insurance.

OneBeacon argues that since Beacon has surveyed a narrower population of persons for purposes of establishing secondary meaning (those individuals likely to influence purchasing decisions) than that in which it is looking to establish a likelihood of confusion (the general public), Beacon should be precluded from relying on its survey evidence or, in the alternative, the evidence of confusion among the general population should be accorded less probative value. In support of this contention, counsel for Defendant, in his closing argument, stated that a highly respected commentator, J. Thomas McCarthy, has written that the respective universes "must"

match. (Tr. of 3/9/05 at 89.) However, a reading of the cited source discloses no such assertion. Rather, McCarthy merely recognizes that there is "interdependence between buyer confusion and secondary meaning." 2 McCarthy § 15:11. Thus, the "basic principle is that if there is no secondary meaning, there is no mark to protect and confusion is not possible." _Id._ This has been understood to mean that "proof of secondary meaning is a condition precedent to any discussion of likely confusion." _Universal Frozen Foods, Co. v. Lamb-Weston, Inc., 697 F.Supp. 389, 394 (D.Or.1987)._ This is a far cry from requiring that the respective populations for establishing secondary meaning and likelihood of confusion must be identical.

*4 OneBeacon acknowledges that it knows of no case that expressly endorses its position on this point. OneBeacon does, however, cite to one case that seemingly advances the proposition. In _Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373 (2d Cir.1997),_ the Second Circuit recognized that "[t]he likelihood of confusion test concerns not only potential purchasers but also the general public," _id. at 382._ The court went on to note, however, that "such third parties are only relevant if their views are somehow related to the goodwill of the aggrieved manufacturer." _Id. at 382-83._ The court concluded that "where there is no showing that the general public is aware of Landscape's 'dress,' the district court erred in giving this factor great weight." _Id._ This language could possibly be read to imply that secondary meaning must be demonstrated as to the particular population in which likelihood of confusion is to be shown.

[15][16] Nonetheless, the most generally accepted law is that: (1) secondary meaning is determined on the basis of _purchaser_ perception, see _Am. Assoc. for the Advancement of Science v. Hearst Corp., 498 F.Supp. 244, 257 (D.D.C.1980)_ ("The question is not whether the general public, but the _relevant buyer class_ associates a name with a product or its source.") (citing 1 McCarthy § 15:11) (emphasis in original), and (2) non-purchasers are relevant for purposes of finding an actionable likelihood of confusion, see _Beacon II, 376 F.3d at 10_ (including anyone "whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner"). Thus, Plaintiff may establish secondary meaning via a survey of those individuals "likely to influence purchasing decisions," while establishing likelihood of confusion among a broader population. _See Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125, 128 (4th Cir.1990)_ (recognizing that likelihood of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

confusion may be demonstrated via a group made up of "the public, but not typical purchasers," while describing secondary meaning as based upon "the *consuming* public's understanding") (emphasis added). This Court has found nothing to suggest that the 1962 amendment of the Lanham Act, which broadened actionable confusion beyond that of purchasers was intended to change the standards for proving validity of a descriptive mark (i.e., establishing secondary meaning in the consuming public). *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.,* 998 F.2d 985, 989 (Fed.Cir.1993) ("Section 32 of the Lanham Act was amended in 1962 to include confusion of nonpurchasers as well as direct purchasers by striking out language limiting its scope to confusion of 'purchasers as to the source of origin of such goods or services.' ").

Even if this Court did not find secondary meaning by virtue of the Jacoby market survey evidence, Beacon would be able to establish secondary meaning on the basis of its promotion efforts and market share. *See Boston Beer Co.,* 9 F.3d at 182 ("Among the factors this court generally looks to in determining whether a term has acquired secondary meaning are: (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."). Here, the Beacon name and lighthouse logo have been used by the company for over a decade as the primary designator of its workers' compensation product. Beacon was formed in 1990 as the State Compensation Insurance Fund to write workers' compensation insurance for Rhode Island employers. To better compete, Beacon adopted its current name and lighthouse logo in June 1992. Since then, Beacon has been using "The Beacon Mutual Insurance Company," "Beacon Insurance," "The Beacon" and a lighthouse logo as its marks. Beacon has extensively promoted its name and logo, and has acquired substantial market share in Rhode Island. (*See generally* Tr. of 2/28/05 at 60- 108 (testimony of Michael Lynch, setting forth various promotional efforts).) Beacon immediately began to promote its new name and logo through advertising, sponsorships and civic participation throughout Rhode Island. Beacon increased its advertising and promotional expenditures between 1992 and 2001 from $4,600 to over $1 million per year, spending nearly $5 million during that period overall. (*Id.* at 101-04.) In 2001, Beacon's share of the Rhode Island market for workers' compensation insurance was approximately 66%, having peaked at 84.47%. (*Id.* at 105.) Beacon's

drop in market share reflects the success of the company in that it brought competition back into the market for workers' compensation insurance. As a result of this long term use, extensive and broad-based promotional efforts, and large market share, it is reasonable to infer that a significant percentage of Rhode Islanders are familiar with the Beacon name and logo and associate it with a specific source for workers' compensation insurance. *See President and Trs. of Colby Coll. v. Colby Coll.-New Hampshire,* 508 F.2d 804, 808 (1st Cir.1975) ("[W]hile secondary meaning is shown by the success rather than by the mere fact of an enterprise's promotional efforts, the normal consequence of substantial publicity may be inferred."). Thus, based on Dr. Jacoby's survey evidence and the circumstantial evidence regarding length of use, promotion, and market share, the Court concludes that Beacon's marks have acquired secondary meaning.

*C. Likelihood of Confusion*

**\*5** [17][18][19] Likelihood of confusion is "an essential element of a claim of trademark infringement." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 486-87 (1st Cir.1981). A plaintiff must prove that there exists "a substantial likelihood that the public will be confused as to the source" of the relevant goods or services. *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193, 194 (1st Cir.1980). The First Circuit has enumerated eight factors to be used as guides in assessing likelihood of confusion as to source or affiliation: "(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of plaintiff's mark." *Astra Pharm. Prods.,* 718 F.2d at 1205. "No one factor is necessarily determinative, but each must be considered." *Id.* In this case, application of the eight factor test favors finding a substantial likelihood of confusion.

*1. Similarity of Marks*

The fonts Beacon and OneBeacon use in their marks are not identical. [FN3] (*See* Pl.'s Ex. 411, 412 (setting forth OneBeacon's and Beacon's marks).) Beacon uses a standard typeface font in a stylized orientation with the text placed to the right of the illustration. OneBeacon uses a modern-looking, rounded font, with the text centered below its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1655201                                                                                      Page 8
--- F.Supp.2d ---
**(Cite as: 2005 WL 1655201 (D.R.I.))**

illustration. Beacon uses a realistic depiction of a traditional lighthouse on land. OneBeacon's illustration is a suggestion of a lighthouse illuminating the sky, drawn in negative space and contained in an oval centered above the text. In Beacon's designation, the lighthouse appears in black and white and the text in blue lettering. In OneBeacon's designation, the lighthouse image appears in yellow and the text in blue. In Beacon's mark, the most prominent word is "beacon" and the word "the" is oriented perpendicularly to "beacon." In OneBeacon's mark, the words "one" and "beacon" are equally prominent, and there is no space between them.

In spite of their differences, Beacon's and OneBeacon's marks are fundamentally similar. The marks have two identical elements: use of the word "Beacon," and incorporation of the visual reference to a lighthouse. These marks are displayed without other names, logos, or source-identifying designations that would help to differentiate them. *See Beacon II, 376 F.3d at 18* ("The first factor, similarity of marks, weighs in Beacon Mutual's favor. This factor is evaluated based on the [ ] designation's total effect. Here, the marks use different fonts and colors, but a factfinder could reasonably find the total effect to be similar.") (internal quotation marks and citation omitted).

### 2. Similarity of Goods

Beacon sells only workers' compensation insurance to employers within the state. Beacon presently insures approximately 14,500 employers. (Tr. of 2/28/05 at 120 (testimony of Michael Lynch).) OneBeacon, on the other hand, offers property, casualty and other forms of commercial insurance (including workers' compensation insurance) in New York, New Jersey, and the six New England states. In 2004, OneBeacon had twenty-four workers' compensation policies in all of Rhode Island. (Tr. of 3/3/05 at 102 (testimony of Roger Pare, OneBeacon Branch Manager).) While OneBeacon sells other insurance products besides workers' compensation, and workers' compensation makes up only a small part of its business, the workers' compensation insurance coverage that is offered by OneBeacon in Rhode Island is the same as that offered by Beacon. (Tr. of 2/28/05 at 123 (testimony of Michael Lynch, citing R.I. Gen. Laws § 28-36- 5).) Thus, the Court concludes this factor weighs in favor of Beacon. Both Beacon and OneBeacon deal in insurance, and both parties specifically offer workers' compensation insurance. *See Beacon II, 376 F.3d at 18* ("The

second factor, similarity of goods and services, also favors Beacon Mutual. OneBeacon conceded this point in its summary judgment papers before the district court and thus has abandoned any argument to the contrary.").

### 3. Channels of Trade, Advertising, and Classes of Prospective Purchasers

**\*6** Employers with at least one employee in Rhode Island must purchase workers' compensation insurance. R.I. Gen. Laws § 28-29-6. The majority of Rhode Island employers who purchase workers' compensation insurance are small businesses who employ less than five people. (Tr. of 2/28/05 at 139 (testimony of Michael Lynch).)

[20] Every insurance broker licensed by the State of Rhode Island is an agent of Beacon. (Tr. of 2/28/05 at 132.) All insurance offered by OneBeacon, in contrast, is sold exclusively through the company's independent insurance agents. (*Id.* at 133.) Each of these agents in Rhode Island is also an agent for Beacon. (*Id.*) Beacon offers its workers' compensation insurance through agents, as well as through direct sales. (*Id.* at 132.) OneBeacon restricts workers' compensation offerings to those who purchase other types of coverage. (Tr. of 3/3/05 at 109.) The rates OneBeacon charges for workers' compensation coverage are generally the same as Beacon's rates. [FN4] (Tr. of 2/28/05 at 124.)

The parties' channels of trade, advertising, and classes of prospective purchasers weigh against Beacon. Workers' compensation insurance is a costly product generally purchased in consultation with licensed insurance agents. Those agents know the difference between OneBeacon and Beacon. Meanwhile, OneBeacon does not advertise its workers' compensation insurance in Rhode Island. Finally, the overlapping customers are business owners or individuals charged with purchasing workers' compensation insurance on behalf of their employers. Thus, the relevant class of consumers is sophisticated and has a professional incentive to make informed judgments.

### 4. Actual Confusion

Shortly after OneBeacon's name change, Beacon became aware of numerous instances of apparent confusion. (*See generally* Tr. of 2/28/05 at 149-217; Tr. of 3/1/05 at 16-85 (testimony of Michael Lynch, setting forth various instances of confusion).) Rhode Island employers, employees, vendors, doctors, court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

personnel and others have all demonstrated confusion over the relationship between the two companies.

Beacon has received checks from Rhode Island employers for premiums on OneBeacon policies, letters from employers meant for OneBeacon, and telephone and email inquiries indicating confusion about the distinction between the two companies. Beacon has also received medical records, physician letters, health insurance claim forms, and statements from health care providers intended for OneBeacon. In addition, Beacon has received correspondence intended for OneBeacon from third party insurance companies, as well as from attorneys and workers' compensation court personnel. The reverse is also true: OneBeacon has received documents intended for Beacon. Beacon has summarized much of this evidence in a "confusion matrix," which is further discussed below.

[21][22][23][24] OneBeacon has challenged the admissibility of much, if not all, of Beacon's evidence of actual confusion (*see* Def.'s Mot. in Limine to Exclude Evidence of Confusion), and some discussion of the legal framework which guided this Court's rulings during trial is in order. Where Beacon sought to introduce evidence of actual confusion on the part of a member of the public (as manifested by behavior, rather than a statement such as "I'm confused") via the live testimony of an employee (for example, a receptionist testifying to someone calling Beacon looking for car insurance, which OneBeacon sells but Beacon does not), the testimony was ruled admissible as non-hearsay since it was not being offered for the truth of the matter asserted. [FN5] Where Beacon sought to introduce evidence of actual confusion on the part of a member of the public (as manifested by a statement equivalent to: "I'm confused") via the live testimony of an employee, the testimony was admissible under the then-existing state of mind exception to the hearsay rule. [FN6] However, Beacon's attempt to admit its "confusion matrix," either directly or via the testimony of a corporate officer, could not survive OneBeacon's objection. The matrix is hearsay (i.e., the document states that someone said, in effect, "I received a letter that indicated confusion on the part of the author"). The business record exception is not available because the matrix was prepared by Beacon in anticipation of litigation. *See Source Servs. Corp. v. Source Telecomputing Corp.,* 635 F.Supp. 600, 612 n. 9 (N.D.Ill.1986). Nor can Beacon overcome OneBeacon's objection by arguing the matrix constitutes a recorded present sense impression of another's then-existing mental state. *See Ocean Bio-*

*Chem, Inc. v. Turner Network Television, Inc.,* 741 F.Supp. 1546, 1559 (S.D.Fla.1990). Finally, the Court declined to admit the matrix as a recorded present sense impression of non-hearsay behavior indicating confusion because the matrix does not disclose the time between forming the impression and recording the information. *See United States v. Ferber,* 966 F.Supp. 90, 99 (D.Mass.1997) ("A present sense impression, in contrast, is admissible so long as it explains an event immediately after it happens.").

**\*7** Defendant argues that the probative weight accorded the admitted evidence should be de minimus. [FN7] (*See* Def.'s Mot. in Limine to Exclude Inadmissible Hearsay.) The cases Defendant provides set out a number of reasons why Plaintiff's actual confusion evidence may be of limited probative worth. For instance, courts have refused to give much credence to actual confusion evidence similar to the misdirected communications here where: (1) the total number of misdirected communications represents a small portion of the total number of communications received, *see Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 632 (6th Cir.2002); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 299 (3d Cir.2001); (2) there is no evidence that the misdirected communications were the result of anything other than clerical error, [FN8] *see Therma-Scan,* 295 F.3d at 636; *Checkpoint,* 269 F.3d at 298; (3) the total amount of misdirected communications was small in relation to the total time the senior and junior user had been using the marks at issue, *see Therma-Scan,* 295 F.3d at 636; *Checkpoint,* 269 F.3d at 298-99; and (4) the testimony regarding the misdirected communications came from employees of the plaintiff, *see Checkpoint,* 269 F.3d at 298. All these reasons for giving limited weight to actual confusion evidence are present here, and the Court accordingly limits the probative weight accorded to evidence of actual confusion fitting into one or more of the preceding categories.

Plaintiff, however, points out that at least some of the misdirected communications not only were sent to the wrong address, but included the wrong name as well--thus indicating more than mere clerical error. Also, the relatively small number of incidents cannot be held against Plaintiff without accounting for the fact that Defendant has an admittedly small Rhode Island presence and Plaintiff has not had similar confusion problems with other insurers. Finally, Plaintiff points out that because "[a]ctual confusion is often taken to be the most persuasive possible

evidence that there is a likelihood of confusion ... [e]ven a minimal demonstration of actual confusion may be significant." *Three Blind Mice Designs Co., Inc. v. Cyrk, Inc.,* 892 F.Supp. 303, 312 (D.Mass.1995).

Furthermore, even if Plaintiff's actual confusion evidence is found to be de minimus, Plaintiff points out that it can prove likelihood of confusion independently. *See Nautilus Group, Inc. v. Icon Health and Fitness, Inc.,* 372 F.3d 1330, 1339 (Fed.Cir.2004) (concluding that "it was improper for the district court to consider [ ] scant and ambiguous evidence of actual confusion in Nautilus's favor for purposes of granting a preliminary injunction," but nonetheless upholding determination that there was a likelihood of confusion as to registered mark on the basis of plaintiff's strength of mark and similarity between the marks and products); *Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1340 (11th Cir.1999) (stating that actual confusion evidence "is not a prerequisite" and finding a likelihood of confusion as to registered mark on the basis of plaintiff's strength of mark, similarity of the marks, and defendant's intent to copy).

**\*8** In light of all the above, the Court concludes that the evidence of actual confusion presented by Beacon, while clearly not overwhelming, is sufficient to tip the scale in its favor as to this factor.

### 5. Defendant's Intent

OneBeacon (then known as "CGU Insurance") was sold to White Mountains Insurance Group, Ltd. ("White Mountains") in 2001 and OneBeacon adopted its current name and lighthouse logo in connection with that sale. (Tr. of 3/3/05 at 58-59.) The choice of name and logo resulted from a year-long process that culminated with a naming contest in which employees and agents submitted their proposals. (*Id.* at 67-71.) The name "One Beacon" was one of 2000 submissions. (*Id.* at 69.) It was chosen by senior management from among twelve finalists. (*Id.* at 70, 83.) The choice of the name was influenced by several factors, including the fact that (a) One Beacon Street in Boston was the longstanding address of the Company's corporate headquarters, which its employees and agents had come to refer to as "One Beacon," and (b) it connected the Company to its base in Boston and, more broadly, New England. (*Id.* at 71, 84.) Management of the company's new owner, White Mountains, endorsed the choice. (*Id.* at 84.) Throughout the naming process, the Company was

aware of the existence of Beacon (*id.* at 92-93), which it did not view as an impediment to the adoption of "OneBeacon" because it did not view the companies as being in direct competition (*id.* at 83) and the name had been cleared for use by outside counsel (*id.* at 81-82). Around the time that "OneBeacon" was emerging as the consensus choice for the new name, the Company's in-house design staff and an advertising consultant developed over fifty potential logos. (*Id.* at 84.) The chosen logo is a combination of a lighthouse and obelisk designed by the outside consultant. (*Id.* at 85-86.)

The seventh factor in the likelihood of confusion inquiry--the defendant's intent in adopting its mark--falls in OneBeacon's favor. In this case, the record is clear that OneBeacon adopted its name and logo in good faith, without intending to copy Beacon's marks or deceive relevant purchasers. However, as the Circuit Court pointed out, "[u]nder this circuit's precedents ... this factor usually matters only where an alleged infringer copied a mark in bad faith; a converse finding of good faith carries 'little weight.' " *Beacon II,* 376 F.3d at 19.

### 6. Strength of Mark

OneBeacon offered the following evidence at trial: A search of yellowpages.com showed fourteen companies using "beacon" in their names in Rhode Island. (Tr. of 3/3/05 at 117.) One of those companies was in the insurance/financial industry and also used a lighthouse logo. (*Id.*) In Massachusetts, 289 companies listed in yellowpages.com used "beacon" in their name. (*Id.* at 119.) Ten of those were in the insurance/financial industry, and five of those used a lighthouse logo. (*Id.*) In New York, there were 233 listings, including one company in the insurance/financial industry. (*Id.* at 120.) In Connecticut, there were 101 such listings, including three in the insurance/financial industry, one of which used a lighthouse logo. (*Id.*) A search of the world wide web showed, nationwide, an additional thirty-four companies in the insurance/financial industry using "beacon" in their names, twenty-nine of which also employed a lighthouse logo. (*Id.* at 125.)

**\*9** Beacon raised many legitimate challenges to the accuracy of this evidence. Nonetheless, after reviewing all the evidence and objections thereto, the Court finds that: (1) the word "beacon" has been used by companies nationwide; (2) many of the companies using the word "beacon" in their mark are in the financial services/insurance industries; and (3) it is

not uncommon for these marks to include a lighthouse logo.

However, even given this finding, the Court concludes that Beacon's marks are strong marks. As the Court of Appeals stated in *Beacon II*:

> OneBeacon argues that the mark is weak because a yellow pages search shows that the term 'beacon' is used by other financial services companies in the Northeast. But none of the Rhode Island companies listed appear to be insurance companies and there is no evidence that any of the other companies do business in Rhode Island.

*376 F.3d at 19 n. 5.* And so the evidence remained after trial. Beacon has used its marks since 1992, has promoted them actively, and has gained renown in the field, as evidenced by Dr. Jacoby's consumer survey and Beacon's substantial market share. Thus, the strength of the marks weighs in Beacon's favor.

[25] Having reviewed the eight factors, the Court concludes Beacon has carried its burden of proving a likelihood of confusion. Defendant argues Plaintiff must directly prove harm to its goodwill or reputation. But this is not correct. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 640 (1st Cir.1992)* (Selya, J.) ("[T]he district court erred in suggesting that proof of actual harm to Nestle's goodwill was a prerequisite to finding a Lanham Trade-Mark Act violation. The Lanham Act contains no such proof-of-injury requirement. By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement as a matter of law."). Plaintiff put on evidence of, *inter alia,* mistaken cancellations of coverage for failure to pay premiums, improper disclosure of confidential medical records, and delayed reimbursement of health care providers. (*See* Tr. of 2/28/05 at 90.) This evidence, which this Court accepts, provides independent support for concluding that Beacon's goodwill and reputation have been damaged. The next issue is remedy.

### III. *Remedy*

[26][27][28] The Lanham Act affords the Court the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." *15 U.S.C. § 1116.* Indeed, "an injunction is the standard remedy in unfair competition cases." *5 McCarthy § 30:2.* While the

Court has a "wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," *Soltex Polymer Corp. v. Fortex Indus., Inc., 832 F.2d 1325, 1329 (2d Cir.1987)* (quoting *Spring Mills, Inc. v. Ultra-cashmere House, Ltd., 724 F.2d 352, 355 (2d Cir.1983)*), injunctive relief should be limited to the senior user's geographic market, *Citizens Fin. Group,* 383 F.3d at 132 ("[T]he senior user of a common law mark may not be able to obtain relief against the junior user in an area where it has no established trade, and hence no reputation and goodwill.").

***10** OneBeacon has argued that it should not be enjoined from using its mark in Rhode Island, but rather should be allowed to cure the actionable confusion via disclaimers and, perhaps, a directed advertising campaign. The Court, however, is not convinced such a solution would be effective. First of all, the efficacy of disclaimers generally is in doubt. *See Home Box Office, Inc. v. Showtime/The Movie Channel, Inc., 832 F.2d 1311, 1315-16 (2d Cir.1987)* (recognizing "body of academic literature that questions the effectiveness of disclaimers in preventing consumer confusion as to the source of a product"); *see also* Jacob Jacoby & George J. Szybillo, *Why Disclaimers Fail,* 84 Trademark Rep. 224, 224 (1994) ("most disclaimers do not in fact eliminate the potential for confusion"). Second, OneBeacon has put on no evidence to suggest a disclaimer would be effective in this case. *See* Vincent N. Palladino, *Disclaimers Before and After HBO v. Showtime,* 82 Trademark Rep. 203, 218 (1992) (summarizing cases following *HBO* as standing for the proposition that a disclaimer "should not be ordered where plaintiff establishes a substantial likelihood of confusion, unless defendant shoulders the heavy burden of proving a disclaimer will effectively alleviate that substantial likelihood"). Finally, because Beacon is the one doing the vast majority of advertising in Rhode Island, the burden to correct confusion via disclaimer would arguably fall to them. [FN9] Given that Beacon is not the creator of the actionable confusion in this case, it would be manifestly unfair to impose the burden of clearing up that confusion on it. In light of these concerns, the Court concludes that the only practical remedy that can meaningfully protect Beacon's mark is an injunction prohibiting OneBeacon from using the OneBeacon name and lighthouse logo in Rhode Island.

### IV. *Rhode Island Law Claims*

Beacon also seeks injunctive relief under its state

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1655201                                                              Page 12
--- F.Supp.2d ---
**(Cite as: 2005 WL 1655201 (D.R.I.))**

law claims. Because this Court has already concluded that Beacon is entitled to the relief it seeks pursuant to resolution of its Lanham Act claims, there is no need to further address Beacon's state law claims.

*V. Conclusion*

For the foregoing reasons, the Court hereby ENJOINS Defendant OneBeacon Insurance Group from using the OneBeacon name and lighthouse logo in Rhode Island.

IT IS SO ORDERED.

> FN1. For example, Sara Soubosky, a paralegal for the Defendant's law firm, Ropes & Gray, LLP, testified at trial that a search of the internet revealed 289 businesses in Massachusetts used the name Beacon, with ten of those businesses being in the financial/insurance industry, and five of those employing a lighthouse logo as well. (Tr. of 3/3/05 at 119.)

> FN2. OneBeacon challenges Dr. Jacoby's methodology in conducting the survey on a number of grounds. However, after an extensive *Daubert* hearing on this matter, this Court concluded Dr. Jacoby's survey evidence constitutes admissible expert testimony. *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 253 F.Supp.2d 221 (D.R.I.2003). OneBeacon also challenges Dr. Jacoby's survey on the ground that it only tested the term "The Beacon," while Plaintiff here is claiming infringement of "The Beacon," "Beacon Insurance," and "The Beacon Mutual Insurance Company." (*See* Def.'s Mot. to Exclude Evidence Relating to Marks other than "The Beacon.") The Court concludes Dr. Jacoby's explanation for constructing the surveys as he did makes sense and denies Defendant's motion. (*See* Pl.'s Ex. 406 at 6 ("Because the entire name, The Beacon Mutual Insurance Company, actually tells the respondent that it refers (1) to a company, and (2) that that company is an insurance company, no effort was made to test whether the full name effectively communicates that it is the name of an insurance company.").)

> FN3. OneBeacon argues that the names "Beacon Mutual Insurance Company" and "OneBeacon Insurance Group" should be compared here. However, this Court will follow the First Circuit's lead and focus on the similarity of the visual marks. *See Beacon II,* 376 F.3d at 18.

> FN4. OneBeacon retained the services of Jessica Pollner, Ph.D., to determine whether there was a likelihood of confusion between OneBeacon and Beacon among OneBeacon agents in Rhode Island who produce commercial insurance policies. OneBeacon seeks to have the testimony of Dr. Pollner admitted as expert testimony to the effect that the results of the survey she conducted demonstrate a lack of likelihood of confusion among OneBeacon agents in Rhode Island. Beacon filed a motion to exclude this testimony and the Court conducted a *Daubert* hearing in the course of the trial, reserving ruling until the issuance of this opinion. This Court grants Beacon's motion for the following reasons: First, the Court does not need an expert to testify to the non-startling conclusion that OneBeacon agents in Rhode Island are not confused between OneBeacon and Beacon. *Cf. United States v. Sebaggala,* 256 F.3d 59, 65 (1st Cir.2001). Second, Dr. Pollner's methodology raises a number of questions as to the reliability of her conclusions. As just one example, after receiving responses from only forty-eight of the 140 agents from whom she sought responses (for a response rate of 34%), Dr. Pollner's primary effort to verify the representativeness of the sample was to ask OneBeacon itself whether the forty-eight agents were representative of the larger group. This Court concludes that such methodology is not sufficiently rigorous to meet the requirements of Rule 702 of the Federal Rules of Evidence. (*Cf.* Pl.'s Mem. for Exclusion at 14 (pointing out that the Guidelines for Statistical Surveys issued by the former U.S. Office of Statistical Standards provide that, in the case of probability samples, "[p]otential bias should receive greater scrutiny when response rate drops below 75%" and "[i]f the response rate drops below 50%, the survey should be regarded with significant caution").)

> FN5. *See Boston Athletic Assoc. v. Sullivan,* 867 F.2d 22, 31 (1st Cir.1989) ("Mickey Lawrence, president of Image Impact, reported in her affidavit that she had

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1655201
--- F.Supp.2d ---
(Cite as: 2005 WL 1655201 (D.R.I.))

encountered a shopper at the Filene's department store who expressed surprise when Lawrence told her that defendants' shirt, which the shopper was wearing, was not an 'official' Boston Marathon shirt. The district court refused to consider this account, holding that it was inadmissible hearsay. We think that the account was not hearsay, however, because it was not 'offered in evidence to prove the truth of the matter asserted.' Fed.R.Evid. 801(c). The statement was made not to prove that the defendants' shirts were in fact officially authorized, but rather to show that the declarant, a member of the public, *believed* that they were officially authorized.") (emphasis in original); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City,* 383 F.3d 110, 133 (3d Cir.2004) ("In this case, the tellers described what they saw and the action they took with respect to customers who appeared to be confused with respect to CFG and CNBEC. This is not hearsay.").

FN6. *See Citizens,* 383 F.3d at 133 ("Fed.R.Evid.803(3) allows statements, otherwise excluded as hearsay, to be received to show the declarant's then-existing state of mind. To the extent that any of the customers' statements may be deemed hearsay, we believe Rule 803(3) would apply."); *Programmed Tax Sys., Inc. v. Raytheon Co.,* 439 F.Supp. 1128, 1131 n. 1 (S.D.N.Y.1977) ("[A]n exception [to the hearsay rule] is available for the statements of those 'declarants' who were describing to Kanofsky their 'then existing state of mind,' i.e., their confusion.").

FN7. Defendant also argues the evidence should be deemed irrelevant. However, the cases Defendant cites for this proposition are not particularly compelling. For example, in *Lang v. Ret. Living Publ'g Co., Inc.,* 949 F.2d 576 (2d Cir.1991), the Second Circuit held that evidence of 400 misdirected phone calls was not relevant because it only showed (at best) that "consumers erroneously believed that the *senior user* (Lang) was the source of the *junior user's* (Retirement Living) magazine," *id.* at 583 (emphasis in original). This was not sufficient because, according to the Second Circuit, in order to be relevant the evidence

needed to show that "purchasers or prospective purchasers of Lang's products" believed the products "were produced by or affiliated with Retirement Living's magazine." *Id.* This Court, however, is not bound by such a limitation. *See Beacon II,* 376 F.3d at 10 (noting that the evidence of misdirected communications in this case could support the inference that Beacon's goodwill and reputation had been damaged). The Sixth Circuit, in *Therma-Scan,* also found evidence of actual confusion to be irrelevant where the communications that had been misdirected to plaintiff made no mention of defendant's product, 295 F.3d at 635. Since at least some of the inquiries to Plaintiff here did mention products sold only by Defendant, this rationale for finding irrelevance is also not applicable.

FN8. In addition to the parties having similar names, they share similar addresses. Beacon is located at One Beacon Centre in Warwick, Rhode Island, while OneBeacon's headquarters is at One Beacon Street in Boston, Massachusetts.

FN9. This fact may be the source of OneBeacon's suggestion that it be permitted to avoid an injunction by implementing a directed advertising campaign. This Court, however, foresees needlessly difficult logistical issues involving the form, quantity, and duration of such proposed advertising. Moreover, such a campaign might actually make the problem worse. *See Jacobs v. Beecham,* 221 U.S. 263, 272, 31 S.Ct. 555, 55 L.Ed. 729 (1911) (Holmes, J.) ("To call pills Beecham's pills is to call them the plaintiff's pills. The statement that the defendant makes them does not save the fraud. That is not what the public would notice or is intended to notice, and, if it did, its natural interpretation would be that the defendant had bought the original business out and was carrying it on."); *see also* Jacob Jacoby, Margaret C. Nelson, & Wayne D. Hoyer, *Corrective Advertising and Affirmative Disclosure Statements: Their Potential for Confusing and Misleading the Consumer,* 46 J. Marketing 61 (1982) ("Studies on corrective advertising suggest that remedial messages may also fail to be correctly comprehended. Mazis and Adkinson (1976, p. 182) noted that 39% of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1655201                                          Page 14
--- F.Supp.2d ---
**(Cite as: 2005 WL 1655201 (D.R.I.))**

their subjects misunderstood the corrective message they used, while Russo et al. (1981) obtained a median miscomprehension rate of 61% for corrective ads for 10 different products. In other words, remedial statements may be at least as confusing and misleading as the advertising they are designed to counteract."). Thus, the Court does not view directed advertising as an effective solution to the problem of confusion as to source in this case.

2005 WL 1655201 (D.R.I.)

**Motions, Pleadings and Filings (Back to top)**

•            1:01CV00354            (Docket)
(Jul. 27, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d
2000 WL 294875 (D.Mass.)
(Cite as: 2000 WL 294875 (D.Mass.))

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.
Q DIVISION RECORDS, LLC Plaintiff
v.
Q RECORDS AND QVC, INC. Defendants
No. Civ.A. 99-10828-GAO.

Feb. 11, 2000.

*MEMORANDUM AND ORDER*

OTOOLE, J.

**\*1** The plaintiff in this case, Q Division Records, LLC ("Q Division"), filed suit against Q Records and QVC, Inc., alleging that the defendants have infringed and diluted its registered and unregistered trademarks in violation of federal and state trademark law. Pending are the plaintiff's motion for preliminary injunction and the defendants' motion to dismiss the plaintiff's state law dilution claim. As explained below, both motions are denied.

I. Background

Q Division is a recording studio founded in Boston in 1985; a variety of rock music artists from the Boston area as well as from around the world have recorded there. In 1995, the studio's founders created a record label [FN1] named Q Division Records and began to use "Q DIVISION RECORDS" and "QDIVISION" as trademarks to promote its recordings and services. Q Division registered QDIVISION with the Patent and Trademark Office ("PTO"), but not Q DIVISION RECORDS. Q Division has established several promotional web sites [FN2] and recently cut a licensing agreement with Sony Records.

FN1. "Recording company," "record label," and "label" are used more or less interchangeably. The terms are somewhat amorphous, and generally refer to entities that produce, promote, and distribute musical recordings.

FN2. "qdivision.com," "qdivisionrecords.com," and "qrecords.com

." The latter domain name was registered in March, 1999, at least three months after Q Division was aware of Q Records' existence.

The Q DIVISION RECORDS mark serves as both a phrase and a logo. The phrase appears on the jackets and discs of many of Q Division's recordings and on Q Division's website. The logo, composed of an illustration and words, also appears on almost all of Q Division's products. The illustration features an obliquely set ellipse with a line through the middle, an abstraction simultaneously evocative of both the letter "Q" and an old-fashioned vinyl record slightly tilted and halfway down the spindle. Underneath the illustration, the word "QDIVISION" appears in relatively large block letters. In the logo, the letters "Q" and "DIVISION" are not separated by a space. That is not an accident but instead a deliberate choice of the logo designer. (Dep. of Michael Denneen, July 14, 1999, at 52-53 .) "RECORDS" appears in much smaller font beneath "QDIVISION."

In 1997, Q Division registered "QDIVISION" for marketing musical sound recordings. [FN3] The mark QDIVISION is used on most, if not all, of Q Division's recordings. In particular, the mark is prominently featured on the spine of Q Division's compact discs, next to the title and the artist.

FN3. Registered on February 25, 1997, No. 2,040,527, to market musical sound recordings. The registration indicates a date of first use of July, 1995.

The defendant QVC, Inc., a large electronic retailer in business since 1986, sells a wide variety of commercial goods through its cable television channel and through the Internet. In 1997, QVC decided to launch a record label called "Q Records." [FN4] In September 1998, an intent-to-use application for the mark "Q RECORDS" [FN5] was filed. Q Records released its first recording in November 1998: *Live at Gilley's Volumes 1-4,* featuring Willie Nelson, Loretta Lynn, and Ernest Tubb. It has since released a recording of the Broadway version of *Footloose* and additional live recordings from Gilley's nightclub. Q Records plans to release more Broadway musicals, a live performance by Luciano Pavarotti, and a jazz compilation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 294875 (D.Mass.)
(Cite as: 2000 WL 294875 (D.Mass.))

Page 2

FN4. Q Records is owned and operated by Q The Music, Inc., a wholly owned subsidiary of QVC.

FN5. Application for federal trademark registration, filed September 3, 1998, Serial No. 75-547,477, for use in marketing musical sound recordings. The exclusive right to use "RECORDS" apart from the mark is expressly disclaimed.

*2 The Q RECORDS mark features a stylized letter "Q" above the word "RECORDS." Essentially the same rendition of "Q" appears in another of defendants' music-related marks, "ON Q MUSIC." [FN6] The "Q" as found in the Q RECORDS mark is elliptical, though the ellipse is squatter than the one found in Q Division's logo. Also, the "Q" in Q RECORDS has a somewhat traditional tail instead of a thin vertical "spindle" running through the ellipse.

FN6. Federally registered for use in marketing musical sound recordings, No. 2,155,261, first used in January, 1996.

Shortly after becoming aware of the defendants' use of Q RECORDS, and after an unsuccessful attempt to persuade the defendants to adopt a different mark, Q Division filed this suit. The motions for an injunction and for dismissal of certain counts followed in due course.

II. Preliminary Injunction

A. The Standard for Awarding a Preliminary Injunction.

Q Division's motion for a preliminary injunction is based primarily on its federal trademark infringement claims under 15 U.S.C. § § 1114(1) and 1125(a). [FN7] Q Division also argues that its state law trademark dilution claims warrant a preliminary injunction.

FN7. Technically, the claim under § 1125(a) is for unfair competition, not trademark infringement. Functionally, in cases such as this, the difference is vanishingly small. See *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Veryfine Prods. v. Colon Bros.,* 799 F.Supp. 240, 256 (D.P.R.1992); *Gucci America, Inc. v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1063 (S.D.N.Y.1991).

A preliminary injunction, though often sought in trademark cases, is still extraordinary relief. It constitutes the exercise of a far-reaching power which ought not be indulged in lightly. See *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1181 (7th Cir.1989).

Four conditions must be met before a preliminary injunction may issue. First, the plaintiff must show that it is likely to succeed on the merits. Second, the injunction must be necessary to prevent an injury to the plaintiff which would not adequately be repaired by later relief. Third, that injury must outweigh any harm which would be inflicted upon the defendant by the grant of the injunction. Finally, an injunction should not issue if a consequence would be an adverse effect upon the public interest. See *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 220 (1st Cir.1989).

B. Likelihood of Success--Trademark Infringement Claims.

Q Division has sued on a registered mark (QDIVISION) and an unregistered mark (Q DIVISION RECORDS), both of which it owns and has used in interstate commerce prior to the first use of Q RECORDS. To succeed, the plaintiff must further show that one or both of its marks are distinctive and likely to be confused with Q RECORDS. [FN8] See 15 U.S.C. § 1114(1) (registered marks); *Calamari Fisheries v. The Village Catch,* 698 F.Supp. 994, 1006 (D.Mass.1988) (unregistered marks).

FN8. Consumer confusion is the touchstone of trademark law, as such confusion makes it difficult for consumers searching for either the defendants' or the plaintiff's wares to get what they want. *Cf.* Neil Young, "Hey Hey, My My," on *Rust Never Sleeps* (Warner 1979) ("They give you this, but you pay for that."). Clarity and distinction among trademarks serves the further purpose of making it easy for consumers to find the brands they want without inefficiently expending extra effort to search for them. *See* William M. Landes & Richard A. Posner, *Trademark Law: An Economic Perspective,* 30 J.L. & Econ. 265, 270 (1987) (trademarks have value primarily as indicia of consistent quality upon which a buyer can rely, thereby avoiding search costs).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 294875 (D.Mass.)
(Cite as: 2000 WL 294875 (D.Mass.))

Page 3

## 1. Distinctiveness

QDIVISION, the registered mark, carries a presumption of distinctiveness. *See Equine Techs., Inc. v. Equitechnology, Inc.,* 68 F.3d 542, 544 (1st Cir.1995). Q Division contends that its unregistered mark, Q DIVISION RECORDS, in no way describes the "ingredients, qualities, or characteristics" of the records sold under that label. Because it does not do so, the plaintiff says, Q DIVISION RECORDS is "arbitrary" and therefore distinctive. *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976); *see also I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 39 (1st Cir.1998)(discussing the applicability of *Abercrombie* to word-based trademarks). The defendants have not attempted to rebut the presumption of validity attributable to QDIVISION, nor have they substantially challenged Q Division's characterization of Q DIVISION RECORDS as arbitrary, and thus distinctive. Applying the *Abercrombie* factors, the Court concludes that the plaintiff is likely to succeed in showing that QDIVISION and Q DIVISION RECORDS are distinctive marks.

## 2. Likelihood of Confusion

**\*3** This Circuit applies a test for likelihood of confusion that resembles, though it does not precisely mirror, the famous set of factors developed by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.1961). Here, in assessing likelihood of confusion, "courts have commonly looked to the following factors: the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting its mark; and the strength of the plaintiff's mark." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981). "No one factor is necessarily determinative, but each must be considered." *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 29 (1st Cir.1989) (citing *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 817 (1st Cir.1987)).

*Similarity of the marks.* When deciding whether two marks are similar, the court does not rest its conclusion on the individual features but instead upon the "total effect" of the respective marks. *See Lund,* 163 F.3d at 43. Thus, while it is often useful to compare relevant similarities and differences between the marks, no single difference or similarity necessarily carries the day.

Graphically, the fat, elliptical "Q" of Q RECORDS has no counterpart in the QDIVISION mark. The presentation of QDIVISION on a single horizontal axis also differs from Q RECORDS, where the Q is placed atop the word RECORDS. As a matter of phrasing, the two marks are also quite distinct, with the only point of similarity between them being the common emphasis on the letter Q. But while the emphasis on Q may help render a mark arbitrary in the recorded music context, it is hardly so unique as to render any other mark emphasizing it similar *per se.* Indeed, taking judicial notice of federally registered trademarks, [FN9] the Court notes that several record labels prominently feature the letter Q. [FN10] It is readily apparent that QDIVISION and Q RECORDS are quite dissimilar in total effect.

FN9. *See* Fed.R.Evid. 201(b)(2); *Metro Pub., Ltd. v. San Jose Mercury News,* 987 F.2d 637, 641 n. 3 (9th Cir.1993).

FN10. *See, e.g.,* QWEST, Trademark Reg. No. 2,197,797; Q QWEST, Trademark Reg. No. 2,189,326; ON Q MUSIC, Trademark Reg. No. 2,155,261; Q-ZAR, Trademark Reg. No. 1,894,488.

The comparison of Q DIVISION RECORDS to Q RECORDS presents a closer question. While there are differences between the logos, particularly the absence of the spindle from the Q RECORDS logo, the elliptical design of the "Q" is a rather striking feature and is shared by both logos. Both graphically and as a matter of phrasing, the two marks run quite close together, with one significant exception: in both the logo and the phrase, the word "DIVISION" separates Q Division's mark from Q Records' mark.

How much significance should be given to the presence (or absence) of the word "DIVISION"? Q Division argues that the presence of the word actually draws the marks closer to each other, since "Division" is a word commonly used to indicate a subsidiary or branch of a company. Hence, the argument goes, Q RECORDS usurps Q DIVISION RECORDS by making the latter look like a subsidiary of the former. But that is not the effect of "Division" as it is located in the phrase Q DIVISION RECORDS. A cursory review of the 230 trademarks currently registered or under consideration by the PTO which contain the word "Division" illustrates the point. While the vast majority of those marks do

Not Reported in F.Supp.2d
2000 WL 294875 (D.Mass.)
(Cite as: 2000 WL 294875 (D.Mass.))

use "Division" to indicate a subsidiary or branch of a larger company, the way in which this is done follows two fairly uniform paradigms. The most common pattern is to begin the mark with the name of the division, followed by the name of the parent entity. [FN11] The other common pattern is to name the parent entity first, followed by a descriptive term or phrase that identifies the division by its line of business. [FN12] Q DIVISION RECORDS simply does not follow either paradigm. "Division" is used in an entirely arbitrary fashion here, not in the descriptive manner described above. Its presence is sufficient to render the marks dissimilar.

> FN11. *See, e.g.,* CRYO MOTORSPORTS A DIVISION OF 300 BELOW, INC., Trademark Reg. No. 2,280,877; MULTISTATE TRANSMISSIONS DIVISION OF TRANSMISSION UNITED STATES, Trademark Reg. No. 2,258,714.

> FN12. *See, e.g.,* DOWNTOWN AIRPARK CORPORATE JET DIVISION, Trademark Reg. No. 2,203,738; MALT-O-MEAL FOODSERVICE DIVISION, Trademark Reg. No. 2,201,527.

**\*4** This factor weighs in favor of the defendants.

*Similarity of the Goods.* Both Q Division and the defendants sell musical recordings. But that is not the end of the matter, since "this type of classification is so broad as to be meaningless...." *Mejia and Assocs. v. IBM Corp.,* 920 F.Supp. 540, 548 (S.D.N.Y.1996). Within the broad outlines of a product class, the differences between the particular products in question is often sufficient to render them dissimilar for the purposes of trademark analysis. *See Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 582 (2d Cir.1991) (magazine catering to older adults and magazine concerning enhancing one's charisma were not similar products despite the fact that both were magazines); *Pignons,* 657 F.2d at 487-88 (low-priced instant camera and more expensive traditional camera were not similar products for purposes of trademark analysis). Indeed, musical recordings are as idiosyncratic and distinct as the artists who create them, and are not fungible goods whose distinctions are oft overriden by their similarities. For that reason, it is appropriate to look at the particular sorts of recordings that are sold under the various marks.

Q Division's stable of artists appear to specialize in so-called "alternative rock," an appellation used to denote several strands of hard-to-categorize pop music subgenres. Perhaps the best description that may be offered is that Q Division's artists create challenging works which are not intentionally geared for mass-market success. Recordings marketed under the Q RECORDS imprint, on the other hand, apparently will cut a broader arc across various musical genres, ranging from opera to honkey-tonk to Broadway show tunes. Though quite a few of the artists featured in these recordings have achieved considerable degrees of critical success, the tune that seems to have caught QVC's corporate ear is the melodious ring of the mass-market cash register.

An eclectic audiophile might have both Pavarotti and Poundcake in her collection. And it is certainly possible that an artist championed by Q Division might someday achieve sales at the levels that Q Records aims for. But it seems plain that while the broad category of goods-musical recordings-sold under the different marks is the same, the goods themselves are dissimilar.

This factor also weighs in favor of the defendants.

*Channels of Trade, Advertising, and the Classes of Prospective Purchasers.* These three factors are traditionally analyzed together, due to their interrelated nature. *See Equine Techs.,* 68 F.3d at 546 n. 5. The mere fact that products may be sold or advertised in similar environments to similar customers does not lead forthwith to a conclusion redounding in the plaintiff's favor. *See Pignons,* 657 F.2d at 488-89 (different channels of trade and advertising for two cameras despite fact that both were advertised in photographic magazines and sold in camera stores). A further examination is required of the sophistication of the customers and the manner in which trade is conducted. *See International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 204 (1st Cir.1996) ("[A] court called upon to assay likelihood of confusion must ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark.")

**\*5** There are essentially three types of "prospective purchasers" that a record label regularly deals with. The first type consists of those who seek to purchase production and promotion services from the label. These include the artists and their agents who want to "get signed" as well as other labels looking to barter production and promotion capacity for a cut of the resulting sales revenues. The second group are distributors and retailers that seek to market the recordings generated by the labels. These two types

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 6
2000 WL 294875 (D.Mass.)
**(Cite as: 2000 WL 294875 (D.Mass.))**

commercially strong marks in the field of musical recordings. On the latter point, all that the plaintiff has adduced is that it has spent considerable sums promoting its mark, which does not by itself show that the mark has achieved commercial renown. *See Keds Corp.,* 888 F.2d at 222.

Admittedly, weak marks may nonetheless merit protection, and a defendant's *bona fides* in choosing its mark has little bearing on the ultimate question of probable consumer confusion. *See Lund,* 163 F.3d at 44; *Calamari,* 698 F.Supp. at 1013. But, as discussed above, the information available does not give this Court much reason to conclude that confusion is likely. Hence, Q Division simply has not made the necessary showing of a substantial likelihood of success.

C. Likelihood of Success--State Trademark Dilution Claim.

Q Division also asserts that the alleged violation of Massachusetts' antidilution statute, Mass. Gen. Laws ch. 110B, § 12, separately warrants the entry of a preliminary injunction. Q Division's argument on this issue is perfunctory and relies primarily on the alleged similarity of the marks. (Pl.'s Br. at 18-19.) That point is adequately addressed above, and the Court concludes that the plaintiff also has not established a likelihood of success on its state law dilution claim and thus declines to preliminarily enjoin the defendants' use of Q RECORDS.

Having failed to meet the first of the four parts of the test with respect to its infringement or dilution claims, Q Division has not presented sufficient justification to support the issuance of a preliminary injunction. This does not foreclose Q Division's chances of eventual success on the merits, as the denial of a preliminary injunction does not, in any way, constitute a final adjudication of the underlying controversy. *See Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir.1985).

III. Motion to Dismiss

The defendants have also moved under Rule 12(b)(6) to dismiss the counts in the plaintiff's complaint alleging state law claims of trademark dilution.

Granting a motion to dismiss is appropriate when the allegations in the pleadings make it certain that a bar to relief exists. *See LaChapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 509 (1st Cir.1998) (dismissal

warranted where pleadings left "no doubt" that statute of limitations barred recovery). All well-pled facts are taken as true and all reasonable inferences are drawn therefrom in the light most favorable to the plaintiff. *See Washington Legal Found. v. Massachusetts Bar Found.,* 993 F.2d 962, 971 (1st Cir.1993).

**\*7** The defendants argue that Q Division's state law dilution claims are preempted because the remedies available under § 43(a) of the Lanham Act displace any state law remedies similarly designed to prohibit the marketing of products "resulting in a likelihood of confusion between similar, directly competitive goods." *Three Blind Mice Designs Co. v. Cyrk, Inc.,* 892 F.Supp. 303, 309 (D.Mass.1995). Q Division has pled that "the intended use for which registration [of defendants' mark] was requested is identical to Q Division's use of its trademarks." Q Division has also represented that its musical recordings are similar and directly competitive with those of Q Records, that it intends to prove this in support of its trademark infringement claims, and that it has pled the state law dilution claims as a fallback position in case it is unsuccessful on this point. (Pl.'s Opp'n to Defs.' Mot. to Dismiss, Docket No. 30, at 5-6.) This is an acceptable example of pleading alternative and potentially inconsistent theories of recovery. The proof of the case may pan out in a direction that would support these claims. At this early stage of the litigation it would not be prudent to void them. *See* Fed.R.Civ.P. 8(e)(2); *Gens v. Resolution Trust Corp.,* 112 F.3d 569, 573 & n. 4 (1st Cir.1997).

The defendants also argue that their purchase of a moribund video retailer's federally registered mark ("Q RECORDS & VIDEO") and its associated goodwill preempts plaintiff's state law claims. *See* 15 U.S.C. § 1125(c)(3). The Court need not examine this argument in detail. Q Division has not directed its state law dilution claims against the use of Q RECORDS & VIDEO. Indeed, no one appears to be using that mark at all. Q Division's complaint concerns defendants' use of Q RECORDS, a different mark in a different class of goods. That the defendants felt it desirable to purchase Q RECORDS & VIDEO to assure themselves of a better chance of obtaining registration for Q RECORDS does not necessarily mean that the Q RECORDS mark may be afforded whatever statutory protections attach to Q RECORDS & VIDEO. [FN15]

> FN15. Indeed, if the benefits of Q RECORDS & VIDEO simply redounded to Q RECORDS, there would seem to be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 294875 (D.Mass.)
**(Cite as: 2000 WL 294875 (D.Mass.))**

precious little reason to continue the prosecution of Q RECORDS once the title and goodwill to Q RECORDS & VIDEO had been obtained. Yet the defendants apparently have opted to continue the effort to register Q RECORDS. In this matter, the Court is more persuaded by the defendants' walk than by their talk.

The defendants' motion is denied.

IV. Conclusion

The plaintiff's motion for a preliminary injunction and the defendants' motion to dismiss certain counts of the complaint are both DENIED.

So ordered.

2000 WL 294875 (D.Mass.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.