IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF MASSACHUSETTS

DIAMOND STAFFING SOLUTIONS INC )
                              )

      Plaintiff             )

                              )

v.                             )      CIVIL ACTION NO:05-40046-FDS

                              )

DIAMOND STAFFING, INC          )

                              )

      Defendant            )

**DEFENDANT'S SURREPLY BRIEF IN SUPPORT OF ITS OPPOSITION TO THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Now comes the Defendant, Diamond Staffing, Inc. ("Diamond" or "the Defendant") and provides the following sur-reply.

The Defendant questions whether the Reply Brief is truly an attempt to bring to the attention of this Court the appearance of new and relevant case law or the appearance of misstatements of fact. Rather, the Plaintiff's Reply Brief appears drafted to confuse this Court as to the relevant issues of the Defendant's Opposition, which are as follows:

1.     This is not a conflict between two companies using unregistered marks, as the Plaintiff continually suggest. This is a case in which the Plaintiff, which was apparently negligent in protecting its claimed common law usage of a mark, is attempting to deprive the Defendant of its state and federal trademark rights established by lawful registration in the usual course of business.

1

2.  All of the evidence on the record confirms that the Plaintiff failed to use the "Diamond Staffing" mark in Massachusetts during the relevant common law period, developing, instead, DeVries as its recognizable mark.

3.  All of the evidence on the record confirms that the Plaintiff failed to establish any secondary meaning of its mark, even if it has any trademark rights subject to infringement.

4.  Notwithstanding a history of repetitive[1] name-calling by this Plaintiff, there is absolutely no evidence on the record that the Defendant acted in bad faith in adopting its mark. Indeed, all of the evidence on the record demonstrates that the Defendant acted within the ordinary course of business and within the law in adopting and registering an unused mark;

5.  There is actual evidence of bad faith conduct by the Plaintiff in its conduct since 2003 toward the Defendant.

6.  There is absolutely no evidence of actual confusion in this case; the Plaintiff continues to insist that initial confusion, or confusion by non-relevant persons, rise to the level of actual confusion, even in the absence of any factual nexus between the alleged confusion and any harm.

The Plaintiff's "Reply Brief" does not address these factual deficiencies, any or all of which render the Plaintiff without a remedy. In addition any "new" case law simply supports the reality that the Plaintiff's suit is legally deficient as well. The Defendant states as follows:

---

[1] and unprofessional

THE BEACON MUTUAL CASE SUPPORTS THE DEFENDANT'S POSITION
IN THIS CASE THAT THE PLAINTIFF CANNOT MEET THE STANDARD
OF ACTUAL USE, SECONDARY MEANING, ACTUAL CONFUSION OR
COMMON CHANNEL NECESSARY FOR THE REMEDY SOUGHT BY THE
PLAINTIFF

The Beacon Mutual Insurance Co. v. OneBeacon Insurance Corp. case attached to the

Plaintiff's Reply Brief (from July, 15, 2005) is fully supportive of the Defendant's position in

this case. Notwithstanding the Plaintiff's insistence that this new case overrules Astra Pharm.

Prods., Inc. v. Beckman Instruments, Inc. 718 F.2d 1201 (1st Cir. 1983), it does nothing of the

sort. Rather, Beacon Mutual clarified the definition of "relevant person" for the concept of actual

confusion raised in Astra Pharm, requiring that actual confusion exists "when it exists in the

minds of persons in a position to influence the purchasing decision or persons whose confusion

presents a significant risk to the sales, goodwill or reputation of the trademark owner." Clearly,

Beacon Mutual has not done away with the Astra requirement that there must be a nexus

between the "confused" person and the risk of harm.

The Plaintiff has been unable to identify a single relevant person who has been

"confused" even if the Beacon Mutual case broadened the class of individuals whose confusion

would be relevant.  By all admissions, the Plaintiff is in the business of dealing with the crème de

la crème of the jewelry business. There is no evidence before this Court that any "confused"

person identified by the Plaintiff would have any impact on the Plaintiff's customers, nor is there

any credible affidavit from any customer indicating that the Plaintiff's reputation (if any) would

be harmed by the incidents alleged.

More importantly, the Beacon Mutual case highlights that the legal standard for

infringement continues to require an exact synergy in the business channel, with both companies

not only existing in the same broad industry but also competing *for the same customers*. In

3

Beacon Mutual, it is absolutely key that both companies were engaged in the sale of workers'
compensation insurance.  As the Beacon Mutual Court noted, "While OneBeacon sells other
insurance products besides workers' compensation, and workers' compensation makes up only a
part of its business, the workers' compensation insurance coverage offered by OneBeacon in
Rhode Island is the same as that offered by Beacon."  As has been noted in the case at bar,
Diamond Staffing and Diamond Staffing Solutions do not sell the same product to the same
customer. This has been confirmed by the Plaintiff's repeated assertions that it engaged is
business in the jewelry industry, and that  the customer lists do not overlap in industry or work-
type. This case would be entirely different if both parties were competing in the jewelry staffing
business.

       This is consistent with all trademark infringement law previously cited. Beacon Mutual is
consistent with Boustany, relied upon by the Defendant for the proposition that a party will not
be afforded the equitable relief of an injunction unless there is such overlap of customers that
harm is clearly a risk.

       The Beacon Mutual case is a common sense interpretation of the law. It supports the
positions taken by the Defendant in this case, such that the Motion for Injunctive Relief must be
DENIED.


**NOTWITHSTANDING REPEATED STATEMENTS BY THE PLAINTIFF THAT THE
DEFENDANT ACTED NEGLIGENTLY OR IN BAD FAITH, THERE IS NO
EVIDENCE BEFORE THIS COURT OF BAD FAITH BY THE DEFENDANT,
ALTHOUGH SUBSTANTIAL EVIDENCE OF PLAINTIFF'S BAD FAITH HAS BEEN
PROVIDED TO THIS COURT, SUCH THAT THE MOTION FOR INJUNCTIVE
RELIEF, AN EQUITABLE REMEDY, MUST BE DENIED**

       Throughout this case, Plaintiff has accused Defendant of bad faith despite the fact that
there is no evidence of any intent on Defendant's part to benefit from Plaintiff's claimed use of a

mark or to cause harm to the Plaintiff. Indeed, all evidence demonstrates that the Defendant acted within the law, and that it is the Plaintiff who has failed to act in a manner proscribed by federal statute for protecting one's rights.

Case law clearly states that in determining bad faith "...the ultimate focus is whether the second user had the intent to benefit from the reputation or goodwill of the first user." (GTE Corp. v. Williams, 904 F2d 536, 14 USPQ 2d 1971 (10th Circ. 1990) cert. Denied, 111 S. Ct. 557 (1990). It goes without saying that this law only applies when there has been bad faith toward a "first user," and the record is devoid of any demonstrated first use of the Diamond Staffing, Inc. mark by the Plaintiff.

The record confirms that the Plaintiff failed to take any steps that would have put a subsequent user on notice of the claim to the mark, and which may have forestalled subsequent use. Sales records and customer lists produced through discovery do not show that the Defendant has benefited from any goodwill that the Plaintiff may have had, or that Defendant profited from Plaintiff's reputation, nor has the Plaintiff lost business as a result of Defendant's activities.

Plaintiff repeatedly states that Defendant's counsel saw and ignored the Plaintiff's web link, when, in fact Plaintiff's own e-mails confirm that no such web site link was available when doing an internet search for Diamond Staffing Solutions, Inc. in October of 2003, and that this, somehow, creates actionable bad faith. Instead, Plaintiff claims that Defendant's discovery of an obscure Internet reference to Plaintiff's service of the jewelry industry, containing no web-site link, no telephone number, and no other way of further investigating the Plaintiff, warranted further and expansive investigation. This suggestion, that a party would be required to dig for

information of use, is directly contradictory to the legal premise that evidence of use must be public and obvious in order for it to be subject to protection.

Similarly, the Plaintiff insists that failure to perform a Thompson search rises to the level of bad faith.[2] However, the Plaintiff admits that the information generally found on a Thompson search did not even exist. For example, the Plaintiff does not contest that she failed to file for trademark registration with the PTO, or to take other *basic* steps such has having a business telephone listing under the name Diamond Staffing Solutions. The Plaintiff even failed to register to conduct business in her home state of New Hampshire. The law puts the burden *on the Plaintiff* to establish common law usage, not on the defendant to find a concealed company. As a matter of law and common sense, if the public cannot find the user, than there is no user.

The Plaintiff also suggests that merely using the name "Diamond Staffing" is a bad faith act, when it is clear that other staffing companies using the Diamond name and logo existed at the time the Plaintiff commenced business. For example, Diamond Personnel/DP Staffing, located in New York provides "... the best temporary and permanent personnel placement service..." Diamond Personnel/DP Staffing started using the mark as early as 2000 and had a website as far back as 2001. Diamond Personnel/DP Staffing also uses a diamond as part of its mark, and the phrase, "A cut above the rest." (See, attached Exhibit A, the current web page, and the 2001 version), the same language that so enraged the Plaintiff in 2003.

In effect, the Plaintiff's claim that the Defendant's conduct constitutes bad faith is weakened by the obvious reality that the Plaintiff engaged in the same activity in May 2002

---

[2] The suggestion that a Thompson search is required or necessary is an outdated concept. With the growth of the Internet, a paralegal in an office with web access can do the same search as Thompson personnel for a fraction of the cost. A Thompson search is also futile if a company such as the Plaintiff's fails to register in records due to failure to do such things as having its phone number in its name. Indeed, the Plaintiff, itself, did not perform anything but a web search when it started its business, and it also found other users of the Diamond mark, yet proceeded with its own use of the Diamond Staffing name.

without any concern that its conduct constituted an infringement as to the rights of Diamond Personnel/DP Staffing.

While there is no evidence of bad acts by the Defendant, there is substantial evidence that Plaintiff itself is guilty of bad faith. Not only did Plaintiff adopt a mark similar to an existing mark, but since the time that the Defendant entered the market and applied for trademark registration, Plaintiff,

1. fully aware of Defendant's existence, and with full knowledge that Defendant had obtained Massachusetts trademark registration for same and filed for federal registration of its mark, appropriated Defendant's mark and filed Defendant's mark (as well as her own) with the PTO *after* the Defendant's registration;

2. has tailored and manipulated its mark so as to cause and heighten confusion, deceive potential customers into believing that her Company is "Diamond Staffing, Inc.," and thereby solicit and accumulate a body of evidence to be used in this case against the Defendant to indicate confusion;

3. deceptively noted on her web-site in 2004 that "Diamond Staffing, Inc. and Diamond Staffing Solutions, Inc. are registered marks." (See, attached, Exhibit B), when they are absolutely not registered marks;

4. further used the Defendant's registered mark to file as a business in New Hampshire after becoming aware of the Defendant's use of the mark, creating a company which has never been in good standing;

5. understood that by using both marks, "Diamond Staffing Solutions, Inc." and "Diamond Staffing, Inc." as its own, Plaintiff would virtually assure that initial

7

confusion in the mind of the general public would not only continue, but increase

dramatically, and refused to take steps that would stop or diminish the confusion;

6.  After the initial misdirected emails, Defendant took steps to avoid future instances

of confusion and suggested very simple steps that Plaintiff could take to eliminate

its receipt of misdirected emails, while Plaintiff elected to continue objectionable

conduct that created the impression of confusion.

The Plaintiff commenced business using DeVries or Diamond Staffing Solutions as a

mark in 2002 and never used Diamond Staffing, Inc. as a mark during the common law period.

The Plaintiff started using the Diamond Staffing Solutions, Inc. mark predominantly after 2003

and has slowly and subtly attempted to morph into "Diamond Staffing" through wrongful

appropriation of Defendant's mark, alternately referring to itself as "Diamond Staffing" even in

legal documents, rather than Diamond Staffing Solutions, Inc. Plaintiff, in effect, has tried to turn

this case from a dispute between "Diamond Staffing Solutions, Inc. v. Diamond Staffing, Inc. "

into a dispute between " Diamond Staffing v. Diamond Staffing."

While the law does not recognize the Defendant's conduct as anything other than lawful

business conduct, the law clearly recognizes the Plaintiff's predatory conduct as bad faith. Since

it is the Plaintiff who is seeking equitable relief in this matter, the Court should consider the

Plaintiff's unclean hands, and the Motion for Injunctive Relief must be DENIED.

## THE PLAINTIFF HAS CONTINUALLY FAILED TO IDENTIFY ANY INSTANCES OF ACTUAL CONFUSION, SUCH THAT THE MOTION FOR INJUNCTIVE RELIEF MUST BE DENIED

The confusion that the Plaintiff insists is "actual confusion" is nothing more than  "initial

confusion," a doctrine fully recognized by the Court in this circuit as not constituting actual

confusion. These instances cited by the Plaintiff consisted of misdirected emails mostly

occurring at the beginning of Defendant's entry into the market.  These were quickly curtailed by

Defendant's timely efforts, as the Plaintiff's own records demonstrate that the misdirected e-

mails abruptly ceased. Yet even under these circumstances, the confusion that resulted has

always been *initial* confusion that was quickly and easily recognized and corrected and that

never reached a point even remotely close to causing any loss of business or harm to the

goodwill or reputation of the Plaintiff.[3] The record indicates that the Plaintiff is as much to blame

for creating the confusion by appropriating the Diamond Staffing mark (which it did not adopt

through usage), and which it has apparently encouraged.


### THE PLAINTIFF HAS FAILED TO DEMONSTRATE THAT ITS MARK IS ANYTHING OTHER THAN DESCRIPTIVE, SUCH THAT, IN THE ABSENCE OF SECONDARY MEANING, IS NOT SUBJECT TO PROTECTION,THUS WARRANTING DENIAL OF PLAINTIFF'S MOTION

Diamond Staffing Solutions, as used with the services provided by the Plaintiff, is clearly

and absolutely a descriptive mark.  The preponderance of case law agrees that "[a] term is

*descriptive if it forthrightly conveys an immediate idea of the ingredients, qualities or*

*characteristics of the goods.* " (emphasis added)  (Stix Products Inc. v. United Merchants &

Manufacturers, Inc. 295 F Supp 179 488 (SDNY 1968)., see, also,  Chisum and Jacobs,

Understanding Intellectual Property Law, Matthew Bender & Co., Inc., 1992 § 5C[3][a][ii] ("A

term may be descriptive because of its relation to (1) the product or service's nature or quality,

(2) the nature or quality of its ingredients or properties, or (3) the use to which the product or

service is put." (citations omitted)).  The Plaintiff maintains that because the "mental leap is not

---

[3] With the exception of one affidavit from an industry colleague and associate of the Plaintiff, all the affidavits submitted to support confusion have not been from actual or alleged confused parties, but from the Plaintiff's own employees. The affidavits from the colleagues demonstrate the problem of initial confusion and misdirected e-mail, not a problem of confounded potential customers.

almost instantaneous, and competitors are left with a variety of terms to describe their competing services," the Plaintiff's mark should be considered suggestive. This is not the prevalent legal consensus on the matter. In Forum Corp. of North America v. Forum, Ltd. 903 F2d 434, 444, 14 USPPQ2d 1950, 1958 (7th Circ. 1990) the Court stated "…it is not necessary that a descriptive term depict the service itself, but only that the term refer to a characteristic of the service." In Thompson Medical Co. v. Pfizer, 753 F2nd 208 217, 225 USPQ 124, 131 2d Circ. 1985, the Court declares, "[t]his assertion misapprehends the relevant concern. The trademark law should not grant, in effect, a monopoly to the first mark that effectively and concisely describes a product's use or function."

The Lanham Act affords trademark protection to strong marks that are at minimum suggestive, preferably distinctive or arbitrary. As Understanding Intellectual Property Law § 5C[3][a]) correctly maintains, "Policy reasons support conditionally excluding descriptive terms from trademark protection: every competitor should be entitled to use appropriate language to describe his or her goods or services. It does not necessarily matter that there are alternative words to describe the product's characteristics or use."

Plaintiff's use of the trademark "360°" by Reebok as an example of a mark that is suggestive rather than descriptive is completely irrelevant to this case. That mark may be suggestive when used with sneakers, but the Plaintiff's reliance is completely misplaced in a case in which a company, exclusively doing personnel work in the high-end jewelry industry uses the mark "Diamond Staffing Solutions."

The Diamond Staffing Solutions mark clearly is descriptive of the ingredients, qualities or characteristics of the services provided by the Plaintiff; it is a weak mark and does not lend itself to trademark protection.

As noted above, there has been no showing that the Plaintiff has developed any secondary meaning during its very short and very covert existence between May of 2002 and October of 2003. Secondary meaning, especially in the case of a descriptive mark, is not easily established. It must be shown that the mark is associated in the minds and hearts of the consuming public as the single source for the goods or services provided, and that the company has penetrated the market, showing substantial sales and promotional presence. The Beacon Mutual case also addressed the concept of secondary meaning. The Court noted that Beacon Mutual had been using its mark for *more than ten years*, and that it had done so actively and publicly, noting that after adopting its mark "Beacon immediately began to promote its new name and logo through advertising and promotional activity and civic participation throughout Rhode Island....As a result of long-term use...it is reasonable to infer that a significant percentage of Rhode Islanders are familiar with the Beacon name and logo and associate it with a specific source for workers' compensation insurance."

Plaintiff has not submitted any evidence other than having made a number of cold calls to recruit clients and customers and placed a smattering of minimum size ads in a few jewelry magazines starting three months before Defendant entered the market that she had done anything that would lead to or rise to the level of establishing secondary meaning. Plaintiff further failed to take basic steps that contribute toward and are typically precursors to the establishment of secondary meaning. She cannot contest the fact that she did not register the business in her home state. She cannot contest the fact that she did not apply for either state or federal trademark protection. She cannot contest the fact that she did not list her telephone number under the business name. She does not even submit any evidence of advertising until August 2003, a full 15 months after she started her business. In the period between August 2003 and the end of

October, 2003, at which time the Defendant entered the market, Plaintiff placed a total of 10 small ads (2" x3") in the back of specialty jewelry retailer magazines. It is also interesting to note that Plaintiff's alleged first and biggest client, Helzberg Diamonds, continues to place rather prominent ads to recruit directly rather than utilizing Plaintiff for their staffing needs. During the period during which Plaintiff supposedly established secondary meaning for her mark, she cannot show anything but a de minimus level of sales scattered over a number of different states. It is preposterous that the Plaintiff can claim that secondary meaning was achieved prior to Defendant's entry over a three month period with a total of ten minimum size ads in specialty jewelry magazines, each with a national circulation that does not exceed 25,000 at best, versus the nearly 2 million readership that Defendant has reached through its use of the Boston Globe in Massachusetts and the New England area alone.  As in re Soccer Sport Supply Co. 507 F2d 1400, 184 USPQ 345 (CEPA 1975), the advertising evidence failed to establish "association of the applicant's design with a single source by other than a small number of purchasers."

Plaintiff's brief and other legal filings continuously refers to Plaintiff's careful and continual development of goodwill and market penetration through authoring of magazine articles, press releases, testimonials and "sponsorship" of trade shows.  Yet, Plaintiff has not been able to put into evidence any support for any activity of this type prior to 2004.  Moreover, even the evidence submitted for the period after 2004 consists or just 3 undated, unsigned testimonials, a handful of press releases printed on Plaintiff's stationery with no evidence whatsoever that these press releases were ever carried by any media whatsoever, and only 3 magazine articles in which Ms. DeVries is mentioned more prominently than her company.  In fact, all claims and exhibits in support of the notion that Plaintiff developed any secondary

12

meaning, market penetration or goodwill in the professional staffing industry is either inaccurate, misleading, or insufficient.

During the common law period between May 2002 and early November 2003, the Plaintiff was not known in the general staffing industry. In fact, there is no reason to believe the Plaintiff's mark was even very well known in the jewelry market niche. Any familiarity or notoriety achieved by Plaintiff was mostly due to Suzanne DeVries' personal contacts in the jewelry market, culled from her prior employment, and not to any secondary meaning developed by the mark, Diamond Staffing Solutions, Inc.

## THE PLAINTIFF PERSISTENTLY MISTATES THE SIMILARITY OF THE TWO MARKS, WHICH ARE SUBSTANTIVELY DIFFERENT ENOUGH TO WARRANT DENIAL OF PLAINTIFF'S MOTION

It has been shown that there exist many marks in the placement industry that predate the Plaintiff which make use of the word Diamond plus either Personnel or Staffing. These generally also that include the graphic of a diamond and some phrase similar to "a cut above" or "cutting edge." Even having adopted a mark whose registrability was questionable at best, Plaintiff did nothing to develop, maintain or protect its mark against other existing users of similar marks or future potential users. It only decided to cloak itself as an injured senior user when the Defendant decided to protect its mark by filing for trademark protection. It was only then that Plaintiff commenced on a campaign to blur the distinction between the two marks by appropriating the Defendant's mark as its own. Since then it has tried to convince the Court that the mark "Diamond Staffing, Inc." was always its own and it has tried to make itself more like the Defendant. Plaintiff claims that in QDivision Records, LLC v. Q Records, the two marks were found to be sufficiently different because the word DIVISION separated the two marks and

13

the graphic elements and fonts were different. This is exactly the present case. The word

SOLUTIONS separates Plaintiff's mark from Defendant's and the font and graphical

representation of the two marks is markedly different (See, attached Exhibit C). The Q Division

Records v. Q Records case also contained misdirected emails, and similar to the present case,

each company dealt in a different and discrete segment of the same industry, yet the Court found

this to be insufficient evidence to prove confusion or infringement.


### THERE IS SUCH A DISTINCT DISSIMILARITY OF SERVICES THAT THE PLAINTIFF'S MOTION MUST BE DENIED

Since its inception, the Plaintiff has promoted itself as serving the jewelry industry

exclusively. Even today, the message on its website and the Mission Statement contained therein

(Exhibit D) maintains that it is committed to servicing the crème de la crème of the jewelry

industry exclusively. This is the message it presents to its jewelry clients, who constitute her

whole market. For purposes of this lawsuit, however, it is attempting to present a different

image to the Court. It would have the Court believe that its services go beyond the jewelry

segment, and would like the Court to see it as servicing a wide range of industries that overlap

the Defendant's market area, and whose candidates share the same characteristics as the

Defendant's. It claims to have recently placed one software candidate, again in an attempt to

appear to be what it is not. In fact, the Plaintiff showed bad faith when it applied to the PTO for

registration by listing as the description of goods the much broader area of professional

placement services, despite the fact that it only provides services to the jewelry industry, and

despite the fact that the PTO requires the description of goods and services to be limited to those

that are actually covered by the mark.

14

As much as Plaintiff tries to blur the differences in services and markets served, and attempts to convince the Court of an overlap, both the services and the markets are, in fact different. The two companies have never come across each other in the marketplace. They have never found themselves competing for the same clients or customers. In fact, except for misdirected emails the two companies would probably have never have crossed paths at all and would have continued to grow and develop, each in its respective market. The Defendant has never placed a candidate in the jewelry industry, and has stated it has no intention of doing so. Despite Plaintiff's claims, Defendant denies having ever solicited business away from the Plaintiff. The one time that a potential customer of the Plaintiff emailed the Defendant by mistake, Defendant's employee was courteous enough to advise the customer that he had the wrong party and redirected the lead to Ms. DeVries. The same cannot be said of the Plaintiff.

## DEVELOPING INTERNET LAW FAVORS THE DEFENANT, SUCH THAT THE PLAINTIFF'S MOTION MUST BE DENIED

The internet permits that any individual, without having to make almost any investment at all, and without being easily held accountable to local, state or federal laws, can set up a "virtual" business and claim having a "national" presence simply by creating a web site. There is no law that states that the existence of a web site is to be equated with having national presence for the purposes of trademark law. If having a web site was enough to establish secondary meaning or common law rights in a mark, then many concepts of trademark law would be turned on their heads and traditional brick and mortar businesses with sizeable investments would be afforded little protection.

The standard requirements of the law are still valid and important; the statutory mechanism of registration remains in full force and effect. No case law has stated that the

Polaroid factors have been consigned to the dust heap based upon the evolution of web technology. The Court must still look to the traditional indices of establishing trademark rights: actual sales in those geographic locations to which users lay claim; investment in a business location that is more than just an office in the bedroom or den, and yes, following the mechanisms provided by the statutes, i.e., registering the business in the area in which it is operated, registering the mark with state and federal agencies, showing conclusive evidence that the majority of consumers in the market claimed actually do recognize the mark as the single source for the product of service provided. If the Internet is allowed to play an exaggerated role, the result will be the dilution of trademark laws and standards. The Court should note that the Plaintiff has been unable to identify a single case that stands for the proposition that having one's name listed on a web page, without more, creates sufficient knowledge of a use of a mark to establish trademark rights.

## THE PLAINTIFF HAS MISINTERPRETED THE DOCTRINE OF LACHES, A DOCTRINE WHICH MUST BAR THE PLAINTIFF FROM SECURING A REMEDY DELAYED BY THE PLAINTIFF'S OWN DILATORY RESPONSE TO THE PERCEIVED THREAT

Despite Plaintiff's attempt to eliminate the question of laches, it is an important issue in this case. Plaintiff has known since December of 2003 that the Defendant did not agree with its claim to infringement of the mark. Defendant was clear that it would work with the Plaintiff to arrive at an acceptable arrangement whereby the two marks could co-exist, but it would not change its name because it did not believe that it was infringing on the Plaintiff.

Complaining about misdirected emails and filing an opposition to trademark registration is not sufficient to overcome Defendant's claim of laches because neither action was a substitute for filing an action for infringement. If the Plaintiff wanted to stop the Defendant from using the

16

mark, it was incumbent upon it to proceed to file suit well before the passage of 17 months. Filing an opposition with the PTO simply implied that it was willing to allow the PTO to make a determination on the matter. If it felt that it was urgent to obtain a preliminary injunction, it should have filed shortly after learning of Defendant. The Court should note that the Plaintiff has been unable to identify any case law supporting its position on this issue. The Defendant relied upon the Plaintiff's failure to file suit to build a multi-million dollar business. This justifiable reliance, in the face of continuing failure of the Plaintiff to take steps to protect its claim, simply bars a remedy at this late date.

The Defendant has not acted in bad faith, it has not profited from the Plaintiff's goodwill or reputation, it has not diverted any sales from the Plaintiff, it has not entered the Plaintiff's market segment or marketed to its clients or customers. In sum it has done nothing to infringe on the Plaintiff's use of its mark. Through hard work, making traditional, old-fashioned brick and mortar type of investments, and following state and federal guidelines regarding trademark protection, it has quickly grown its business exponentially without any negative impact on the Plaintiff's business.

The Defendant's payroll on a weekly basis is not just the "47 full time staff", as Plaintiff erroneously claims. Defendant provides weekly paychecks to approximately 1,500 temporary employees. These temporary employees recognize Diamond Staffing Inc. as their employer, not the companies for which they provide temporary labor. A forced name change would have a devastating effect on them. In the less than two years in operation, Defendant has processed W2s for in excess of *10,000* different employees, contracted with for over 400 client companies, and is averaging yearly sales of between 35 and 45 million dollars. To ask a business of this size and scope to change its name, with all the disruption and financial losses associated with it, is

17

unjust and uncalled for, especially in light of the fact that the Plaintiff brought this situation upon itself because it did not follow the simple and basic steps of trademark registration and protection.

## CONCLUSION

Notwithstanding an 18 page reply, the Plaintiff has failed to identify a single case in the First Circuit that questions the law identified by the Defendant in its original brief. Notwithstanding repetitive and unprofessional name-calling, the Plaintiff identifies no facts to support its contentions of use or secondary meaning, and allegations of bad faith by the Defendant do not suffice in the absence of any evidence of bad faith.

This is a case in which the Plaintiff has failed to engage in the basic protections afforded a business attempting to protect a mark. The failure belongs to the Plaintiff and the Plaintiff alone. The evidence in this case confirms that the Defendant has acted properly and appropriately, such that the Motion to Dismiss must be ALLOWED, and the Motion for Preliminary Injunction, DENIED.

Respectfully Submitted,
**Diamond Staffing, Inc.**
By its attorneys,

Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Mary C. Casey, BBO #636250
Harbor Law Group
48 Maple Avenue
Shrewsbury, MA 01545
Phone: (508) 842-9244

Dated: August 5, 2005

18

CERTIFICATE OF SERVICE

     I, Robert N. Meltzer, do hereby certify that on this day I served a copy of the foregoing by hand, on:

Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
Attn: Nicholas G. Papastavros, Esq.

                                     Robert N. Meltzer

August 5, 2005

# EXHIBIT A

## PLEASE SELECT AN OPTION



24hr/7 Days a Week
temporary and
permanent
staffing solutions

Legal
Word Processing
Secretarial
Desktop Publishing
Admin./ Assist
Accounting
Reception
Clerical
Data Entry
Mailroom/ Messengers
Bank Tellers

- DP Staffing/ Diamond Personnel -
providing clear solutions
for staffing & employment needs,
with a rock-solid reputation that you can rely on.
Whether you're looking for a full-time position, temporary
assignment, or have one to fill, D P Staffing/ Diamond Personnel
has the solution.





EQUAL OPPORTUNITY EMPLOYER
copyright 2000 by Diamond Personnel LLC
432 Park Ave South Suite 810 New York NY 10016
Tel: 212 679 8335 Fax: 212 679 0145

Welcome to Diamond Personnel- a leader in New York City Temporary Employment!





Mission
Service Profile
Screening
Resources
Job Listings
Submit Resumé
Diamond Elite
Contact Us

Welcome to Diamond Personnel- a leader in New York City Temporary Employment!

Case 4:05-cv-40046-FDS    Document 72    Filed 08/08/2005    Page 23 of 32

Page 1 of 6



Mission
Service Profile
Screening
Resources
Job Listings
Submit Resumé
Diamond Elite
Contact Us

**Service Profile**
Diamond Personnel is commited to providing the best temporary and permanent personnel placement service to our customers.

We've outlined various aspects of our commitment to excellence, and invite you to review why Diamond Personnel should be your choice for an Employment agency.

**Temporary Personnel Enrollment and Retention**
**Temp to Perm Conversions**
**Twenty-Four Hour Service**
**The DP Advantage**
**Testing and Reference Investigations**
**The DP Staffing Approach**
**Equal Opportunity Policy**
**Confidentiality**
**Recruiting Power**
**Employee Evaluations**
**The Bottom Line**

**Temporary Personnel Enrollment and Retention**
A constant supply of highly-qualified placement candidates is maintained by DP Staffing to affect expeditious fulfillment of client's staffing needs.

http://www.diamondmedicalstaffing.com/



Employment Opportunities    Client Service    About Us    Employee Log In

## Welcome To Diamond Medical Staffing, Inc.



Diamond Medical Staffing, Inc. specializes in matching the highest caliber nurses and ancillary support with Acute and Long-term HealthCare Facilities in need of supplemental staff.

We rest our reputation on the quality of staff we hire and the "attention to detail" each of our Client Service Representatives and Staffing Coordinators demonstrate in their dealings with our nurses and clients.

This commitment to excellence and quality service is what makes Diamond Medical Staffing, Inc. your solution to exceptional medical staffing.

Diamond Medical Staffing provides staffing to many areas of medicine including O.R., Medical/Surgical Unit, Trauma, I.C.U., Physical Therapy, Occupational Therapy, and various other services. Whether you are a nurse

# EXHIBIT B



Copyright 2004 © Diamond Staffing Solutions, Inc.[SM]

Designed by: Idea Outfitters

Diamond Staffing Inc.[SM] & Diamond Staffing Solutions Inc.[SM] are registered Trademarks

# EXHIBIT C



Copyright 2004 © Diamond Staffing Solutions, Inc.[SM]

Designed by: Idea Outfitters

Diamond Staffing Inc.[SM] & Diamond Staffing Solutions Inc.[SM] are registered Trademarks

# Diamond Staffing, Inc.

*...A Cut Above the Rest!*



Our Mission          Job Search          Opportunities          Locations

Are you in search of an agency that is a cut above the rest?

If your answer is yes!!!, then talk to us at Diamond Staffing. Our team approach and creative strategies can be implemented into your company needs and help assure that you exceed your recruitment goals, whatever those may be.

If you want the ultimate in Health Care staffing, visit our health care division at Horizons Healthcare.

**Diamond Staffing, Inc.**
146 West Boylston Drive Worcester, MA
508-459-5005
508-459-5014 (fax)
*resume@diamondstaffinginc.com*

# EXHIBIT D



# ABOUT DIAMOND STAFFING℠

**ABOUT US**

NEWS

**SERVICES**

**JOB OPPORTUNITIES**

**OUR MARKET**

**LOSS PREVENTION**

**CONTACT US**

**HOME**

Call Today 603-437-2629
Toll free 877-396-6377
email: suzanne@diamondstaffing.com

**Diamond Staffing Solutions℠** is a national placement service that focuses exclusively on the jewelry industry and is dedicated to bringing you the best talent in the industry. We strive to develop long term relationships based on integrity, honesty, and chemistry.

Suzanne DeVries, President of Diamond Staffing Solutions, has over 30 years in the retail and wholesale jewelry field. Her business has been built on working with only the crème de la crème - both clients and candidates. Her knowledge, experience and personalized service appeal to the market's most prestigious leaders.

## Our Mission Statement

To continue as the leading national placement service that focuses exclusively on the jewelry industry.

To stay on the cutting edge of the industry's trends.

To use our personalized service to confidently place candidates in positions which maximize their talents and to give employers an immediate asset to their business.

To establish long-term relationships based on integrity, honesty, and chemistry.

To ensure the highest quality of service for our clients by understanding personalities and company cultures through site visits, background checks, and personality profiles.



"Suzanne has taken a great deal of time to learn about the culture of our organization and understands the skill set that a candidate needs to be successful here. Suzanne represents our company very professionally. She thoroughly pre-screens all candidates before presenting them, and as a result consistently provides quality candidates. Suzanne's response time and work ethic has been unmatched by other firms that we have worked with. It is a pleasure to work with Suzanne and I would recommend the services of Diamond Staffing Solutions for your recruiting needs."

- Large Retail Jeweler

Sign In

Help | Customer Service: 866-438-1485

**careerbuilder.com**



INTRODUCING THE E·TRADE

FEATURING OUR NEW DIGITAL SECURITY ID.

| Home | Find Jobs | Post Resumes | Job Alerts | My CareerBuilder | Advice & Resources | Career Fairs | Employer? |

| Advanced | By Company | Saved Searches |

**Location:** Company Search : Diamond Staffing Solutions Inc.

## Diamond Staffing Solutions Inc.



Company Website

See Job Opportunities

| About Us | Products | News | Contact |

**Diamond Staffing Solutions**<sup>SM</sup> is a national placement service that focuses exclusively on the jewelry industry and is dedicated to bringing you the best talent in the industry. We strive to develop long term relationships based on integrity, honesty, and chemistry.

Suzanne DeVries, President of **Diamond Staffing Solutions**<sup>SM</sup>, has over 30 years in the retail and wholesale jewelry field. Her business has been built on working with only the crème de la crème - both clients and candidates. Her knowledge, experience and personalized service appeal to the market's most prestigious leaders.

See Job Opportunities >>

Quic

**Testimonials**
has taken a g
time to learn
culture of our
organization
understands
that a candid
to be success
Suzanne rep
company ver
professionally
Retail Jewele

CareerBuilder.com Customer Service: **866-438-1485**   |   Help   |   New Users   |   Feedback

✉ Email this page to a friend

About Us | Affiliate Program | Advertising Info | Privacy | Terms

Partner Sites: Contract & Freelance Jobs | College Scholarships | Candidate Screening | Shopping | Apartments | Cars | Re

Local Newspaper Sites by City: A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W
Show all