## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**DIAMOND STAFFING SOLUTIONS, INC.,** )
)
**Plaintiff,** )
)     **05-40046-FDS**
**v.** )
)
**DIAMOND STAFFING, INC.,** )
)
**Defendant.** )
_____)

## MEMORANDUM AND ORDER ON
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**SAYLOR, J.**

This is a trademark action involving the use of the words "Diamond Staffing" to describe

two personnel-placement businesses. Plaintiff Diamond Staffing Solutions, Inc. ("DSS")

commenced this action against defendant Diamond Staffing, Inc. ("DSI"), asserting claims of

trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a), and unfair and deceptive

acts and practices in violation of Mass. Gen Laws ch. 93A. Currently pending before the Court

is a motion by DSS for preliminary injunction to prevent DSI from, among other things, using

the "Diamond Staffing" mark. For the reasons set forth below, the motion is denied.

**I.**     **Background**[1]

    **A.**     **Diamond Staffing Solutions, Inc.**

In May 2002, Suzanne DeVries founded DSS, a Delaware corporation located in Derry,

New Hampshire. DSS is a small, home-based business that provides permanent staffing services

---

[1] This brief factual background is based on the verified complaint and affidavits and exhibits submitted by
the parties. More detailed descriptions of certain factual matters appear below in the portions of the legal analysis to
which they pertain.

to the jewelry industry.  DeVries has more than 30 years of experience and numerous contacts in the jewelry industry.

DSS focuses on staffing high-end establishments that are particularly image-conscious. DSS's client base includes regional and national jewelry retailers and wholesalers.  Its first two clients, for which it began servicing in 2002, were Helzberg Diamonds (a jewelry retailer with approximately 260 stores nationwide) and Whitehall Jewelers (a jewelry retailer with approximately 386 stores in 38 states).  Today, DSS has approximately 60 clients.  In addition to Helzberg Diamonds, DSS provides staffing services to Sterling Jewelers (a retailer with more than 1,000 stores nationwide), Borsheim's Jewelers, Tiny Jewelbox, London Jewelers, and Swarovski AG.

Generally speaking, DSS's advertising efforts have involved print advertisements in jewelry trade publications.  DSS has advertised in such nationally-disseminated publications as *Jewelers Circular Keystone*, *National Jewelers*, *Modern Jeweler*, *Instore Magazine*, *Professional Jeweler*, *Luxury*, and *Couture,* beginning in approximately August 2003.  DSS has also capitalized on the reputation of its founder, DeVries, in building its business.  DeVries writes periodic columns on personnel-related issues in publications such as those listed above. And DeVries has attended jewelry trade shows on behalf of DSS, distributing business cards and brochures and meeting with retail and wholesale jewelry executives.

### B.    Diamond Staffing, Inc.

On September 16, 2003, Francis Vaccaro incorporated a staffing company under the name Diamond Staffing, Inc.  The business was formerly known as Ultimate Personnel, Ltd.  As compared to DSS, the business of DSI is self-admittedly mundane.  DSI is a general-service

staffing company, providing mainly temporary employees as administrative assistants, customer-service specialists, executive assistants, legal secretaries, and light-industrial staff, as well as in the fields of data entry, engineering, finance and accounting, information technology, sales, and telemarketing.  DSI advertises mainly in newspapers, including the *Boston Globe*, *Boston Herald*, *Worcester Telegram & Gazette*, and *Lowell Sun* in Massachusetts.  DSI has a weekly payroll of approximately 1,400-1,600 people and annual sales of between $21,000,000 and $40,000,000.  At present, DSI operates ten offices, seven in Massachusetts and three in New Jersey.

DSI was aware of DSS and the operation of its business under the name Diamond Staffing Solutions, Inc. when it chose the name Diamond Staffing, Inc.  DSI chose the "Diamond Staffing" mark, it claims, because "it liked the name, it was available for use according to the Secretary of the Commonwealth, the 'Diamond Staffing' mark was not subject to any state or federal trademark protection and there was no evidence whatsoever that anyone else was using the mark in the Commonwealth in the same line of business."  DSI based that conclusion in part on the fact that, prior to selecting the Diamond Staffing name in the summer of 2003, DSI ran an Internet search and came across DSS and a brief description of its business as involving the jewelry industry but did not find a link to the DSS website or a telephone number.

C.    **Confusion in the Marketplace**

The paths of DSS and DSI cross most prominently in cyberspace.  The businesses maintain websites with nearly-identical domain names—DSS at www.diamondstaffing.com and DSI at www.diamondstaffinginc.com.  Both businesses use their websites for e-mail traffic and as a place for potential candidates to fill out online applications.  In addition, both DSI and DSS

3

use www.monster.com ("Monster"), a service that permits job seekers to search job postings, to recruit potential candidates—although DSI apparently only uses Monster to place candidates in its professional-placement division, rather than recruitment for blue-collar positions.

DSS cites numerous mix-ups that have occurred since DSI began using the Diamond Staffing mark in the fall of 2003. A number of e-mails intended for DSI have been misdirected to DSS, and a few DSI candidates have mistakenly submitted feedback forms to DSS through the DSS website. In addition, on at least two instances, prospective clients of DSS have been at least temporarily diverted to DSI, once to DSI's website and once by telephone to a DSI employee, before being redirected to DSS. DSS has also been erroneously implicated in transactions with the Massachusetts Commission Against Discrimination, the Massachusetts Department of Transitional Assistance, and the Premier Insurance Company (apparently DSI's carrier) that actually involved DSI. These last three events have been particularly troubling to DSS because of the image consciousness of the clients DSS services.

### D. <u>Prior Proceedings</u>

DSI filed an application for trademark protection with the United States Patent and Trademark Office on November 12, 2003, and registered the mark in Massachusetts on December 10, 2003. On December 5, 2003, DSS informed DSI that its use of the "Diamond Staffing" mark was infringement and demanded that DSI cease and desist using the mark in connection with staffing services. In November 2004, DSS filed an opposition to DSI's application for federal registration. DSS did not file the present complaint in this Court until March 2005.

4

## II.    <u>Legal Analysis</u>

To be entitled to a preliminary injunction, DSS must show that (1) there is a substantial likelihood of its success on the merits; (2) without the injunction there is a significant risk of irreparable harm; (3) the balance of hardships tilts in its favor; and (4) the granting of the injunction will not negatively affect the public interest. *Bay State Sav. Bank v. Baystate Fin. Services, LLC*, 338 F. Supp. 2d 181, 186 (D. Mass. 2004) (citing *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544 (1st Cir.1996)). "In cases involving trademark infringement, however, 'the key issue is the likelihood of success on the merits because the other decisions will flow from that ruling.'" *Boustany v. Boston Dental Group, Inc.*, 42 F. Supp. 2d 100, 104 (D. Mass. 1999) (quoting *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989)). For purposes of this motion, the Court will focus, as do the parties, on whether DSS is likely to succeed on its claim of trademark infringement under federal law.

"Trademark law seeks to prevent one seller from using a 'mark' identical or similar to that used by another seller in a way that confuses the public about the actual source of the goods or services in question. Such confusion may prevent the buyer from obtaining the goods [or services] he seeks or may endanger the reputation of the first user of the mark by association with the subsequent user." *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 121 (D. Mass. 1999). The mark DSS seeks to protect is not registered; "[t]herefore, the present claim is based upon § 43(a) of the Lanham Act which covers unregistered trademarks." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 2005 WL 1655201, *2 (D.R.I. 2005) (quoting *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir. 1993)).

To succeed on the merits of a claim under § 43(a), DSS must show (1) that its mark is

entitled to trademark protection and (2) that DSI's allegedly infringing mark is likely to cause confusion. *Boston Beer Co.*, 9 F.3d at 180.  Based on the evidentiary record as currently constituted, DSS is not likely to succeed on the first prong of its claim.

### A. <u>Distinctiveness</u>

"A court's inquiry into whether a term merits trademark protection starts with the classification of the term along the spectrum of 'distinctiveness.'" *Id.*  The law recognizes five categories of marks, classified by the degree to which they are distinctive:  (1) generic; (2) descriptive; (3) suggestive, (4) arbitrary; and (5) fanciful. *Boustany*, 42 F. Supp. 2d at 105. Categories three through five are inherently distinctive and thus entitled to protection. *Id.* Descriptive marks, however, are protected only if they have acquired secondary meaning. *Id.* The classification of a term according to its distinctiveness involves a question of fact. *Boston Beer Co.*, 9 F.3d at 180.

It is important to note at the outset what this lawsuit is, and is not, about.  The dispute centers on the use of the words "Diamond Staffing," not on the overall appearance of the two parties' marks.  Furthermore, the parties are disputing only DSS's claim of protection for the "Diamond Staffing" mark, and the fact that DSS uses the longer form "Diamond Staffing Solutions" is essentially immaterial to the resolution of the issues in this case.  Accordingly, and because "Diamond Staffing" is the more dominant portion of both parties' marks, the Court will analyze the claim based solely on the words "Diamond Staffing."

The parties in this case dispute whether Diamond Staffing, as used in connection with the business of DSS, is descriptive or suggestive.  There is no bright line separating marks that are suggestive from those that are descriptive.   "A term is suggestive if it requires imagination,

thought and perception to reach a conclusion as to the nature of goods.  A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 545 (1st Cir. 1995).  As another court has described it, "A 'descriptive' mark is one which portrays a characteristic of the article or service to which it refers. . . .  'Suggestive' marks, on the other hand, connote rather than describe a particular product or service and require the consumer's imagination to reach a conclusion as to the nature of the product or service."  *Calamari Fisheries, Inc. v. Daily Catch, Inc.*, 698 F. Supp. 994, 1006-07 (D. Mass. 1988) (citations omitted).

The two components of the mark "Diamond Staffing" are the words "diamond" and "staffing."  The word "staffing" is easily defined:  it is derived from the verb "staff," which means "to supply with a staff or with workers."  *Merriam-Webster's Collegiate Dictionary* 1213 (11th ed. 2003).  As DSS argues, however, the word "diamond" in the abstract is susceptible of a variety of meanings.  As relevant here, "diamond" can mean either a highly precious stone or "something that resembles a diamond (as in brilliance, value, or fine quality)."  *Id.* at 345.

Under trademark law, however, the Court is not to analyze the word "diamond" as if in a vacuum; rather, the Court's determination must be made "with reference to the specific goods, services, or business with which the designation is used."  *Restatement (Third) of Unfair Competition* § 14 cmt. a (1995) ("The term TRIM may be descriptive when used in connection with hedge clippers, clothing, or hair styling services but arbitrary when used as a trademark for toothpaste, cement or brokerage services."); *see also Calamari Fisheries*, 698 F. Supp. at 1007-08 (analyzing the distinctiveness of the word "catch" in connection with seafood-restaurant businesses).  Here, DSS is in the business of providing staffing services to the jewelry industry.

7

Accordingly, the word "diamond" has a primary meaning that, in combination with the word "staffing," literally imparts information about the services that DSS provides. As such, the mark is descriptive.[2]

DSS maintains, however, that its business transcends the diamond retailing and wholesaling industry to comprise two additional industries: the retailing and wholesaling of both non-diamond jewelry and giftware. As to the former, DSS clearly does provide staffing services to the jewelry industry generally, including that portion that does not involve the purchase and sale of diamonds.[3] DSS contends that the words "Diamond Staffing" thus literally describe only a portion of the services it provides—not the services in their entirety—and accordingly must be viewed as suggestive. That argument fails, however, because "the fact that a service mark describes less than all the activities of its proprietor does not prevent it from being descriptive." 3 Louis Altman, *Callman on Unfair Competition, Trademarks and Monopolies* § 18:6 (4th ed.). It is clear from the record that staffing individuals in positions related to the buying and selling of diamonds is a significant feature of DSS's services. Of the first 24 candidates DSS placed, 16 of them were to Helzberg Diamonds. The affidavit of John Joseph indicates that he contacted DSS to search for a diamond buyer. The records from Monster reveal searches for gemologists

---

[2] Even if the Court were to consider the alternative meaning of the word "diamond"—namely, resembling a diamond as in brilliance, value, or fine quality—DSS is unlikely to succeed in proving that, as a self-laudatory designation, "Diamond Staffing" is other than descriptive. *See Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998) ("platinum" descriptive of plaintiff's superior mortgage services); *France Milling Co. v. Washburn-Crosby Co.*, 7 F.2d 304, 306 (2d Cir. 1925) ("gold medal" as applied to flour not inherently distinctive); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:17 (4th ed.). *But see* 3 Louis Altman, *Callman on Unfair Competition, Trademarks and Monopolies* § 18:10 (4th ed.) (arguing that self-laudatory words should be viewed as suggestive).

[3] The Court assumes, for present purposes, that the customers of DSS consist principally of jewelry retailers and wholesalers, who sell both diamond jewelry and other forms of jewelry; that the sale of diamond jewelry (such as engagement rings) comprises a substantial, but by no means exclusive, portion of their business; and that such establishments also trade in individual diamonds, not set in jewelry.

and "diamond super sellers."  It is undisputed that diamonds represent a significant portion of the merchandise carried by the high-end jewelers that are DSS's actual or target clients. Accordingly, staffing for diamond sellers is at least a very substantial feature of DSS's services, which is a sufficient basis to conclude that the mark is merely descriptive.  *See In re Steelbuilding.com*, 415 F.3d 1293, 1299-1300 (Fed. Cir. 2005).[4]

As to the contention that DSS also services the giftware industry, the evidence is thin at best.  The record evidence demonstrates that DSS's business is focused—if not exclusively then nearly so—on the jewelry industry.  In her deposition, DeVries stated that DSS has made no placement in the giftware industry to date, although it has conducted searches for Swarovski AG. Furthermore, the record is replete with examples of promotional materials and testimonials that emphasize DSS's exclusive focus on the jewelry industry.  Indeed, that message is a major feature of DSS's promotional effort.  Even if the staffing searches conducted for Swarovski AG could be taken to represent some foray or expansion into giftware, as opposed to jewelry—a distinction that is not entirely clear—such an effort is plainly *de minimis* in context.

DSS relies on the decision of the First Circuit in *Equine Technologies* and of the District

---

[4] *See also Interpayment Servs. Ltd. v. Docters & Thiede*, 66 U.S.P.Q.2d 1463, 1466 (T.T.A.B. 2003) (euro symbol descriptive of computer software for use in online financial transactions; computer hardware and software that disperses and creates digital cash, credit, and debit cards; magazines in the field of finance; and online financial-transaction services, namely electronic cash transactions, electronic credit-card transactions, and electronic debit transactions); *In re Busch Entm't*, 60 U.S.P.Q.2d 1130, 1130, 1132 (T.T.A.B. 2001) ("EGYPT" descriptive of an area within an amusement park with Egyptian-themed elements but also elements that relate to the North African/Middle Eastern area generally, a roller coaster, American-style fast food, and music from American movies); *In re Taylor & Francis Inc.*, 55 U.S.P.Q.2d 1213, 1214 & n.4 (T.T.A.B. 2000) ("PSYCHOLOGY PRESS" descriptive of nonfiction books in the field of psychology and additional topics not subsumed within the general subject of psychology); *In re Eden Foods*, 24 U.S.P.Q.2d 1757, 1760 (T.T.A.B. 1992) ("DOUBLE CERTIFIED ORGANIC" descriptive of pasta because it conveyed information about a characteristic and quality of the product); *In re Aid Labs.*, 223 U.S.P.Q. 357, 358-59 (T.T.A.B. 1984) ("BUG MIST" descriptive of insecticide because "mist" described a significant attribute of the product); *In re The Computer Store, Inc.*, 211 U.S.P.Q. 72, 74 (T.T.A.B. 1981) ("THE COMPUTER STORE" descriptive of a store that sells computers and also offers a blue print library, copying services, and a technical staff); *In re MBAssociates*, 180 U.S.P.Q. 338, 338-39 (T.T.A.B. 1973) ("STUN-GUN" descriptive of a weapon with multiple purposes, including to stun a person senseless).

Court in *Public Service Co. of New Mexico v. Nexus Energy Software, Inc.*, 36 F. Supp. 2d 436 (D. Mass. 1999), both of which are readily distinguishable.  In the former case, the First Circuit held that the mark "Equine Technologies" was suggestive, not descriptive, of plaintiff's product, which was hoof pads for horses.  68 F.3d at 544.  The court reasoned that although the word "equine" is descriptive of horses and "the term 'Equine Technologies' might reasonably be thought to suggest that the product to which it applies has to do with horses," the mark in its entirety did not convey information about plaintiff's specific product, hoof pads.  *Id.* at 545. Rather, it would require "imagination to connect the term 'Equine Technologies' to hoof care products, in general, and to the plaintiff's product in particular."  *Id.*

Similarly, in *Nexus Energy,* the court held that the mark "Energy Place" was suggestive, not descriptive, of a "consumer service relating to energy information, products, and services." 36 F. Supp. 2d at 438-39.  Although the term "Energy Place" suggested that it is "a place related to energy," it did not "convey an immediate idea of the ingredients, qualities, or characteristics of" the broad range of energy-related services that the plaintiff offered.  *Id.*

The inclusion of the descriptive term "staffing" (as opposed to generic terms such as "technologies" and "place") is sufficient to distinguish the present case.  The phrase "Diamond Staffing" does not suggest merely that the services DSS provides have to do with diamonds, *Equine Techs.*, 68 F.3d at 544, or are related to diamonds, *Nexus Energy*, 68 F.3d at 544. Instead, the inclusion of the term "staffing" makes clear, without the use of imagination, the connection between diamonds generally and the specific services DSS provides.

Finally, DSS argues that the mark "Diamond Staffing" is properly viewed as suggestive because its competitors are left with alternative names to describe their services, such as

10

"Jewelry Staffing," "Gem Staffing," or "Jewelry Employment Services." It is true that courts have considered competitors' need to use a mark as one test for determining whether a mark is descriptive or suggestive, because "[t]he more imagination that is required to associate a mark with the product, the less likely the words used will be needed by competitors to describe their products." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:68 (4th ed.) (internal quotation omitted); *see also Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F. Supp. 49 (D. Mass. 1990) (finding that the mark "360°" was only suggestive, not descriptive, of sneakers notable for their pivotability). In this case, however, the availability of alternative names that competitors could use to describe their services, while helpful to plaintiff, does not prevent DSS's mark from being descriptive. Certainly "the suggestion made by the mark [is not] so remote and subtle" that the mere availability of other names will carry the day. *See* McCarthy, *supra*.

**B.    Secondary Meaning**

Because DSS's "Diamond Staffing" mark is descriptive and therefore not inherently distinctive, DSS must show secondary meaning in the mark to be protected by the Lanham Act. *Beacon Mut.*, 2005 WL 1656201, at *3. The fact that DSS will likely be able to prove that it is the senior user of the mark is not enough.[5] As McCarthy explains:

_____

[5] DSI contends that DSS cannot prove even that it is the senior user of the Diamond Staffing mark, because DSS did not use the mark sufficiently during the relevant period to establish ownership. *See, e.g., CCBN.com, Inc. v. c-call.com, Inc.*, 73 F. Supp. 2d 106, 109-10 (D. Mass. 1999) ("[T]he right to a particular mark grows out of its use, not its mere adoption."). Although the issue is a close one, the Court concludes that DSS's use of the Diamond Staffing mark on transactional documents related to its May 2002 Whitehall Jewelers placement and subsequent use of the mark in print advertisements beginning in August 2003 constitutes "evidence showing, first, adoption, and second, use in a way sufficiently public to identify or distinguish the marked goods [or services] in an appropriate segment of the public mind as those of the adopter of the mark," which is "competent to establish ownership." *New Eng. Duplicating Co. v. Mendes*, 190 F.2d 415, 418 (1st Cir. 1951) (concluding that plaintiff's adoption of a mark for his product, prompt use of the mark in publicizing the product in a leading trade periodical, and sale of two machines with the mark affixed was "clearly enough to establish the plaintiff's ownership of the mark"); *see also*

> In a dispute over priority of use for a mark requiring secondary meaning, mere priority of use (as for technical trademarks) is insufficient. It is the party who first achieved trademark significance in the mark through secondary meaning who is the senior user of such mark.

McCarthy § 16:34. DSS must prove the existence of secondary meaning in its mark "at the time and place that [DSI] first began use of that mark." *Id.*; *accord Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000); *Tone Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192, 1201 (Fed. Cir. 1994); *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1525 (11th Cir. 1991); *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125-26 (4th Cir. 1990); *Papercutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir. 1990).

Although there is evidence to suggest an earlier date, DSS takes the position that DSI began to use the "Diamond Staffing" mark on November 8, 2003, the date set forth in DSI's federal trademark application. For purposes of this motion, therefore, the Court will accept November 8, 2003, as DSI's first-use date, and DSS must establish that its "Diamond Staffing" mark had acquired secondary meaning before then. If secondary meaning cannot be established, DSS will not be entitled to protection for "Diamond Staffing," and the Court will conclude its analysis without having to address the likelihood of confusion. *See Boston Beer Co.*, 9 F.3d at 183.

Whether words have acquired secondary meaning is an issue of fact, and DSS bears the burden of proving that secondary meaning attached within the relevant class of consumers. *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 19 (1st Cir. 2004) (citing *Boston Beer Co.*, 9 F.3d at 181).

---

*Allard Enters. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 359 (6th Cir. 1998) (holding that defendants' use of the mark on at least one fax, at least one resume, and in numerous other solicitations, as well as evidence that several large companies identified the mark with defendants' services was sufficient for defendants to establish "bona fide use in commerce"); *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975) ("[E]ven a single use in trade may sustain trademark rights if followed by continuous commercial utilization.").

A term has secondary meaning only if the term in the minds of the relevant public no longer "refers[s] to particular individual items that exhibit the characteristics that the word or phrase connotes," but rather "denotes a product . . . that comes from a particular source." *Boston Beer Co.*, 9 F.3d at 181. Here, the relevant public consists of individuals in the jewelry industry who make or influence personnel decisions. To establish secondary meaning in the mark "Diamond Staffing," DSS must prove that, when read or heard by those consumers, "Diamond Staffing" (1) no longer refers generally to staffing services provided to diamond retailers, but (2) identifies DSS as the source of the services. *See Boston Beer Co.*, 9 F.3d at 181-82.

The First Circuit has repeatedly stated that "[p]roof of secondary meaning entails vigorous evidentiary requirements." *E.g., Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 43 (1st Cir. 2001); *Boston Beer Co.*, 9 F.3d at 181. An individual seeking protection for a mark can meet this evidentiary burden through either direct or circumstantial evidence. *Flynn*, 377 F.3d at 20. "The only direct evidence probative of secondary meaning is consumers surveys and testimony by individual consumers." *Yankee Candle*, 259 F.3d at 43. Evidence that middlemen such as distributors believe the mark has acquired secondary meaning is not probative. *See id.* n.14.

### 1. <u>Direct Evidence of Secondary Meaning</u>

DSS has provided no direct evidence that the "Diamond Staffing" mark had acquired secondary meaning by November 2003. DSS has not submitted a consumer survey, which, although not required, is a "well-recognized means of establishing secondary meaning." *Boston Beer Co.*, 9 F.3d at 182. DSS has submitted affidavits from Amy Wenslow and Mitchell Horowitz, but their statements are not probative of secondary meaning. Wenslow, Director of

West Coast Operations for the Manufacturing Jewelers and Suppliers of America ("MJSA")

avers, "I first met Suzanne DeVries on June 3, 2003. . . .  At that time, [DSS] already had a

significant presence in jewelry industry staffing."  She goes on, "In my opinion, [DSS]

commanded a strong presence in the jewelry industry at the time I met Ms. DeVries in June,

2003 and that presence continues to the present."  Horowitz, currently Director of Advertising of

*JCK Magazine*, states, "I believe that [DSS] is one of the fastest—if not the fastest—growing

companies in jewelry industry staffing, and is one of a handful of significant companies in this

area on a national level," and that "[DSS] has a strong, favorable reputation throughout the

jewelry industry as one of the industry's leading, most well-respected staffing services."

The statements by Horowitz are too vague as to time frame to establish secondary

meaning prior to November 2003.  More importantly, evidence that a magazine executive and a

trade-organization staffer within the jewelry industry viewed the Diamond Staffing mark as

distinctive is not probative, because those individuals are not DSS's relevant consuming public.

*See Yankee Candle*, 259 F.3d at 43 n.14 ("The opinions of retailers and distributors active in the

scented candle field and extremely familiar with Yankee products is hardly evidence of whether

the 'consuming public' forms the same association."); McCarthy, § 15:39.  Their opinions do not

demonstrate that individuals within the jewelry industry who make or influence personnel

decisions have associated the words "Diamond Staffing" with a particular source of services.

The testimonials submitted by DSS—although indicative of the high quality of the

services DSS apparently provides—are either undated or were written months after November

2003; they are therefore irrelevant.  The affidavit of John Joseph, Vice President of Josephs

Jewelers, is likewise irrelevant.  Joseph attests that, when he began searching for a new diamond

14

buyer in October 2004, he spoke with many people in the jewelry industry, and "[a]ll of them recommended Ms. DeVries and/or [DSS] highly." Joseph's statements relate to circumstances as they existed nearly a year after DSI entered the market and therefore say nothing about the secondary meaning of the mark "Diamond Staffing" in November 2003.

### 2.    Circumstantial Evidence of Secondary Meaning

DSS can also prove secondary meaning in the "Diamond Staffing" mark through circumstantial evidence. Such evidence may include "'(1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark, and (3) efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture.'" *Flynn*, 377 F.3d at 20 (quoting *Boston Beer Co.*, 9 F.3d at 182). Media coverage and attempts to copy the mark are also relevant, *id.*, as are instances of actual confusion among the relevant class of consumers, *Beacon Mut.*, 2005 WL 1655201, at *4.

DSS has not carried its heavy evidentiary burden with respect to secondary meaning. By far the bulk of the materials submitted to the Court either relate to events that transpired after November 2003 or are phrased so generally as to obscure the date when they occurred. The limited relevant evidence that is contained in the record establishes the following.

DSS began using the Diamond Staffing mark in May 2002, only 17 months before DSI began using the mark. "There is no fixed rule as to the length of time a [mark] must be in use before it can achieve secondary meaning." McCarthy, § 15:54. A longer period of use, however, is normally required before an inference of secondary meaning will be drawn. *Compare Beacon Mut.*, 2005 WL 1655201, at *4 (more than a decade), *Boustany*, 42 F. Supp. 2d at 107 (nearly 16 years), *and Calamari Fisheries*, 698 F. Supp. at 1008 (15 years), *with Boston*

15

*Beer Co.*, 9 F.3d at 176, 183 (no secondary meaning after eight years), *and Labrador Software, Inc. v. Lycos, Inc.*, 32 F. Supp. 2d 31, 34 (D. Mass. 1999) (only a few months of use not enough).

The manner of DSS's use of the "Diamond Staffing" mark similarly does not give rise to an inference of secondary meaning. During the relevant period, DSS used the mark on transactional documents, as evidenced by an invoice issued to Whitehall Jewelers in connection with its very first placement in May 2002. That placement, however, resulted from a lead given by a contact at Whitehall Jewelers that DeVries had developed during her former employment, not from any association between the words "Diamond Staffing" and DSS's services on the part of Whitehall Jewelers.

Over the next 17 months, DSS placed candidates with reputable national retailers such as Whitehall Jewelers, Helzberg Diamonds, and Landstrom's. During this period, DSS used the designation "Diamond Staffing" in its domain name and as its e-mail address.[6] DSS's searches included solicitation telephone calls and postings on Monster. In 2002, DSS placed a total of nine candidates to three different customers, receiving a total of $29,550 in fees, and, during the relevant part of 2003, DSS placed fifteen candidates to five customers, charging a total of $58,200 in fees.[7] These sales and numbers of customers in the abstract appear to be relatively meager, and, as DSS has provided no information about its market share in 2002 and 2003, the Court is unable to infer the existence of secondary meaning based on that level of commercial

---

[6] Between May 2002 and early October 2003, DSS used the e-mail addresses diamondsuz26@hotmail.com and diamondsolutions@hotmail.com to solicit resumes and to communicate with businesses about advertising and issues concerning the DSS website. It appears, in fact, that DSS may not have used the designation "Diamond Staffing" exclusively for e-mail traffic until October 9, 2003, when DeVries sent a memo instructing individuals to use the suzanne@diamondstaffing.com address.

[7] For some reason, the figures given for 2003 are through September 28 only. It does not appear from the record, however, that DSS made any other placements between that date and November 8, 2003.

activity.  McCarthy, § 15:49 ("Sales may be so minimal that it was not possible to achieve any secondary meaning in a descriptive designation.").

Starting in 2003, DSS began to make greater efforts to promote a conscious connection between the "Diamond Staffing" mark and the services of DSS.  For example, in May 2003, DeVries attended, "on behalf of [DSS]," the prominent JCK Las Vegas jewelry trade show.  There, she "disseminated a number of business cards and brochures, and had meetings with a number of retail and wholesale jewelry executives, in an attempt to further enhance the reputation of the company."  According to DeVries, DSS "experienced considerable growth in its business and reputation in the months following this trade show."

In June 2003, DSS became a member of MJSA and subsequently registered its services in MJSA's Buyers' Guide Referral System, which lists products and services of MJSA members and is searchable on the organization's website at www.mjsainc.com.

DSS also began using the "Diamond Staffing" mark in print advertisements during the summer of 2003.  The record shows that DSS placed small advertisements bearing the Diamond Staffing mark into the classified pages of jewelry trade magazines.  The first such advertisements appeared in August 2003, approximately three months before DSI entered the market, and they also ran from September through November 2003.  There is no information in the record concerning the number of advertisements run during this time period.  There is also no evidence of DSS's total advertising and promotional expenditures from May 2002 through November 8, 2003.[8]

---

[8] Reports generated by Monster and submitted by DSS show that DSS placed 15 postings in 2002 and 16 postings in 2003 through November 8.  DSS has submitted the actual text of only one of the Monster postings from the relevant period.  The words "Diamond Staffing" appear in the text of that posting only as the e-mail address for DeVries.  None of the other Monster records of the relevant period contain the designation Diamond Staffing.  In

Finally, the fourth affidavit submitted by DeVries describes other efforts made by DSS in the direction of promoting a conscious connection, in the public's mind, between "Diamond Staffing" and its staffing services.  Thus, DSS has hired a graphic-design firm to develop a design and logo for the company; created branded business cards, stationery, and envelopes; worked with a communications firm to put together a comprehensive press and marketing kit that includes a background sheet, a personal biography (presumably for DeVries), testimonial profiles, and press releases; and become involved with organizations such as MJSA, the Women's Jewelry Association, the Continental Buying Group, and the American Gem Society. Apart from its membership in the MJSA, described previously, there is no evidence as to when DSS undertook these activities.

DSS's advertising and promotional activities are insufficient to give rise to an inference of secondary meaning.  As noted, the record does not contain evidence of the total amount DSS spent in promoting and advertising the "Diamond Staffing" mark.  Such evidence is vital in a case such as this, because evidence that a large sum of money has spent in advertising a mark is circumstantial evidence that buyers will associate the mark with a particular seller of services, the essence of secondary meaning.  McCarthy, § 15:51; *see also President & Trustees of Colby Coll. v. Colby Coll.-N.H.*, 508 F.2d 804, 808 (1st Cir. 1975) ("[W]hile secondary meaning is shown by the success rather than by the mere fact of an enterprise's promotional efforts, the normal consequence of substantial publicity may be inferred.").  Although DSS did undertake

_____

addition, in September 2003, DSS held a job fair of sorts for placements at Day's Jewelers in New Hampshire.  In connection with the job fair, DSS placed two print announcements seeking candidates and bearing the "Diamond Staffing" mark.  In cases involving personnel agencies, however, courts have not considered "advertisements" of the help-wanted variety to be client solicitation or promotion of services.  *See Accu Personnel, Inc. v. Accustaff, Inc.*, 846 F. Supp. 1191, 1207-08 (D. Del. 1994); *Architemps, Inc. v. Architemps, Ltd.*, 704 F. Supp. 39, 40 (S.D.N.Y. 1988).

some legitimate promotional activities during the relevant period—including DeVries's attendance at the trade show, DSS's membership in MJSA, and a handful of advertisements in nationally disseminated trade magazines—such efforts are not substantial enough for the Court to conclude that the relevant consuming public had come to associate the "Diamond Staffing" mark with DSS's services.

There is no evidence of any media coverage of DSS during the relevant period, solicited or unsolicited. The articles DSS has submitted—which were either written by or feature DeVries—all are either undated or ran after November 2003. The press releases submitted by DSS are self-serving and were created after November 2003; there is also no evidence that any of them were picked up by any media outlet. The photograph of DeVries that apparently ran in *Fashion Mannuscript* [*sic*] magazine was published in April 2005, long after DSI entered the market.

Despite DSS's protestations to the contrary, there is no evidence in the current record that DSI intentionally copied DSS's "Diamond Staffing" mark. The facts of this case stand in stark contrast to those of the case relied upon by DSS to prove DSI's bad faith, *Yankee Spirits, Inc. v. Gasbarro*, No. Civ. 96-10967PBS, 1998 WL 428092 (D. Mass. May 26, 1998). There, the court found "extraordinary evidence of intentional copying," including defendant's "absurd" and "unconvincing" reasons given for selecting the name; the fact that defendant chose the name of a business he opposed in proceedings before the Alcohol and Beverage Control Commission for more than a year; and defendant's knowing use made possible only by the lapse of plaintiff's formal trademark protection. *Yankee Spirits*, 1998 WL 428092, at *7. Here, the record evidence shows that the name Diamond Staffing was on a list of names proposed by Vaccaro to his

attorney *before* Vaccaro learned about DSS.  Following the attorney's trademark search, DSI

indeed became aware of DSS's existence, but believed that it was a New Hampshire company

exclusively involved in the jewelry industry, based on a small blurb the attorney uncovered in

the course of her search.  Believing that the two businesses could co-exist, DSI adopted the

name.  No improper purpose analogous to the situation in *Yankee Spirits* can be inferred solely

from these facts.

### 3.     Evidence of Actual Confusion

Finally, a brief word about actual confusion.  DSS has spent much time emphasizing

instances where individuals have been confused by the similarity of the names Diamond Staffing

Solutions, Inc. and Diamond Staffing, Inc.  For the most part, these have been e-mails and

feedback forms from candidates misdirected from DSI to DSS—confusion unquestionably

arising from the fact that DSS and DSI use very similar domain names and e-mail addresses.

There have been other incidents, however, that have been more concerning to DSS.  Two

involved then-potential customers of DSS.  First, in October 2004, a potential customer ran an

Internet search to obtain contact information for DSS.  He erroneously followed a link to DSI's

website and spent approximately three to five minutes on the website before realizing that he had

the wrong company; he then successfully located DSS's website.  Second, on February 11, 2005,

a potential customer who was seeking DSS on the recommendation of someone in the jewelry

industry mistakenly sent an email to DSI.

Three other incidents involved entities mistaking DSS for DSI.  In September 2004, DSS

was inaccurately named as a defendant in an employment-discrimination action filed with the

Massachusetts Commission Against Discrimination by an employee placed by DSI.  On June 22,

2005, a woman from the Massachusetts Department of Transitional Assistance called DSS to complain about an employee of DSI; she asked if the two companies were affiliated.  And, twice in July 2005, DSS has received telephone calls from the Premier Insurance Company regarding claims issues that were apparently intended for DSI.  DSS is especially concerned about these last three events because, DSS claims, they affect DSS's ability to control its reputation.

Instances of actual confusion are probative of secondary meaning, but only if they involve relevant consumers.  "[I]f buyers are confused, then this also means that they must have recognized plaintiff's word as a trademark and associated it only with plaintiff.  If this is not so, how could there be any confusion?"  McCarthy, § 15:11.  The fact that instances of confusion must involve customers to be probative of *secondary meaning* is different from, but consistent with, the rule announced by the First Circuit in *Beacon Mutual Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 10 (1st Cir. 2004); there, the court held that, with respect to *likelihood of confusion*, "[c]onfusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner."  Indeed, the district court recognized this distinction on remand in *Beacon Mutual*, writing that a "[p]laintiff may establish secondary meaning [by proving confusion on the part of] individuals 'likely to influence purchasing decisions,' while establishing likelihood of confusion among a broader population."  *Beacon Mut.*, 2005 WL 1655201, *4 (citing *Perini Corp.*, 915 F.2d at 125, 128).  This distinction makes sense, because it is those who are likely to influence purchasing decisions who constitute a business's relevant consuming public for purposes of secondary meaning.  There are others, however, whose confusion nonetheless could cause actionable commercial injury to the owner of

21

a protected mark.

Here, the only two examples "confusion" involving customers occurred in October 2004 and February 2005, long after DSI entered the market. They are therefore not probative of whether the "Diamond Staffing" mark had previously acquired secondary meaning.

Based on the foregoing, the Court concludes that DSS is unlikely to succeed in proving that its descriptive mark Diamond Staffing has acquired secondary meaning. Accordingly, the Court will not address the merits of the likelihood-of-confusion analysis or the remaining preliminary-injunction factors. Plaintiff cannot establish likelihood of success on the merits, and therefore cannot establish that it is entitled to a preliminary injunction.

**III.    Conclusion**

For the reasons set forth above, plaintiff's motion for a preliminary injunction is hereby DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: September 16, 2005